UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE #11-80416-CIV-RYSKAMP

CORDELL CONSULTANT, INC. MONEY
PURCHASE PLAN AND TRUST, a
Virginia corporation,

        Plaintiff,

vs.

ELIOT C. ABBOTT, an individual; DALE
S. BERGMAN, an individual; ABBEY L.
KAPLAN, an individual; STEVEN I.
SILVERMAN, an individual; and
KLUGER, PERETZ, KAPLAN & BERLIN,
P.L., a Florida Professional Limited
Liability Company

        Defendants.

_____/

## SECOND AMENDED COMPLAINT

The plaintiff, Cordell Consultant, Inc. Money Purchase Plan and Trust ("Cordell"),

through its undersigned counsel, hereby sue Defendants, Eliot C. Abbott ("Abbott") an

individual, Dale S. Bergman ("Bergman") an individual, Abbey L. Kaplan ("Kaplan") an

individual, Steven I. Silverman ("Silverman") an individual and Kluger, Peretz, Kaplan &

Berlin, P.L. ("Kluger" or "Kluger law firm") a Florida Professional Limited Liability

Company, (collectively, "Defendants"), and states as follows:

### Parties, Jurisdiction, and Venue

1.     This is an action for damages exceeding $75,000.00, exclusive of interest,

costs, and attorneys' fees.

2.      Plaintiff ('Cordell") is a registered corporation in the Commonwealth of Virginia, and Cordell engaged in a lending transaction with Edward Okun, a person who resided in the State of Florida at times material to the claims asserted in this action.

3.      Defendant Abbott is an individual who resides in the geographical boundaries of the United States District Court in and for the Southern District of Florida. During the relevant times material hereto, Defendant Abbott was a partner at the Kluger law firm and had management and supervisory responsibilities for the work performed by employees of the law firm which is the subject of this lawsuit.

4.      Defendant Bergman is an individual who resides in Florida.  During the relevant times material hereto, Defendant was a partner at the Kluger law firm and had management and supervisory responsibilities for the work performed by employees of the law firm which is the subject of this lawsuit.

5.      Defendant Kaplan is an individual who resides in Florida.  During the relevant times material hereto, Defendant Kaplan was a partner at the Kluger law firm and had management and supervisory responsibilities for the work performed by employees of the law firm which is the subject of this lawsuit.

6.      Defendant Silverman is an individual who resides in Florida.  During the relevant times material hereto, Defendant Silverman was a partner at the Kluger law firm and had management and supervisory responsibilities for the work performed by employees of the law firm which is the subject of this lawsuit.

7.      The Kluger law firm is a Florida Professional Limited Liability Company with its principal place of business in the geographical boundaries of the United States District Court in and for the Southern District of Florida.

2

8.     This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1332 and § 48.193, Fla. Stat., because, without limitation: (a) Defendants have engaged in substantial and not isolated activities in the State of Florida; (b) Defendants committed tortious acts in the State of Florida; (c) the facts and circumstances giving rise to the causes of action set forth herein occurred in the State of Florida; (d) the amount in controversy exceeds $75,000; and (e) there is complete diversity of citizenship between Plaintiff, a Virginia resident, and Defendants who are all residents of Florida.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) in that, without limitation, all of the Defendants reside in the State of Florida with at least one of those defendants residing within the geographical boundaries of the United States District Court in and for the Southern District of Florida.  The causes of action set forth herein accrued in the geographical boundaries of the Southern District of Florida.

<u>**General Allegations**</u>

**A.     Edward Okun and the Ponzi Scheme**

10.     The underlying circumstances that gave rise to these actions relate to the fraud and "Ponzi scheme" perpetrated by Edward Hugh Okun ("Okun"), the owner of The 1031 Tax Group, LLC., with the direct and active participation with the defendant lawyers named herein.  As explained below, the continuation and expansion of Okun's fraud was not possible without the direct and material assistance of the defendant lawyers.

11.     Under Section 1031 of the Internal Revenue Code, capital gains tax otherwise due from the sale of commercial property may be avoided if the taxpayer arranges a "like kind exchange", i.e. buys similar replacement property within a certain time.  This is accomplished by having a qualified intermediary company ("QI") take title

to the property, conduct the sale of the property and then retain the proceeds of sale until the "like/kind" exchange can be completed.  The QI acts as the purchaser of the like/kind property utilizing the funds entrusted to it.  The new property is then transferred to the taxpayer.  In the parlance of the 1031 exchange industry, the taxpayer is referred to as the "exchanger".

12.     Unlike other QI companies, 1031 Tax Group, LLC was formed for the purpose of acquiring control of the large cache of cash being held for exchangers.  Okun admits this.  After acquiring a QI company, Okun removed the cash being held for exchangers and used the cash to acquire real property through other corporations, including Investment Properties of America ("IPofA") which was solely owned by Okun.  These facts are admitted by Okun as well.

13.     Once stripped of the funds entrusted by exchangers, the QI companies lacked the funds to close the "like/kind" purchase for those exchangers.  Instead, the Okun QI companies used newly entrusted funds by new exchangers to fund the like/kind purchase by old exchangers.  Okun flatly admits this as well.  This arrangement bears all of the hallmarks of a classic "Ponzi" scheme.

14.     Okun systematically acquired QI companies in various states:

Atlantic Exchange Company, Inc. in Boston, Mass. in 2005;

Security 1031 Services, LLC in Trumball, Connecticut in 2005;

 Real Estate Exchange Services, Inc. in Safety Harbor, Florida in June, 2006;

National Exchange Services QI, Ltd. in San Antonio, Texas in June of 2006;

Investment Exchange Group, LLC in Denver, Colorado in August of 2006;

1031 Advance, Inc. in San Jose, California on December 18, 2006.

15.     The core components of the fraudulent scheme included: (i) defrauding exchangers by entering into written agreements which falsely represented that exchanger funds would be safe guarded and preserved until needed by the exchanger; (ii) withdrawing the entrusted funds from the QI leaving the QI illiquid; (iii) purportedly "borrow" the funds from a QI but fail to document the purported loan; (iv) use the funds removed from the QI to support a lavish lifestyle which included private jets and yachts and lavish trips[1].

16.     However, a critical component of Okun's ongoing fraud included (i) defrauding lenders with knowingly false and misleading financial statements to obtain loans to fund the purchase of additional QI companies to continue and expand the fraudulent scheme; (ii) acquiring funds to cover shortfalls in capital caused by leaving QI's with insufficient funds to close the like/kind purchases by exchangers; and (iii) acquiring funds to conceal the criminal enterprise and avoid detection.  Each of these components of the fraudulent scheme could only be accomplished with the assistance of lawyers.

17.     On March 17, 2008 Okun was indicted by a Grand Jury sitting in Richmond, Virginia and charged with mail fraud, bulk cash smuggling and other charges.

18.     Okun stole as much as $150,000,000.00 from these QIs with the help of others.  Okun has been convicted and imprisoned for his crimes.

---

[1] According to the Indictment against Okun, on at least one occasion Okun arrange for an employee to remove $15,000.00 in cash from the funds held as a QI and Fedex the cash to Okun's yacht then docked in the Bahamas.

## THE PERKINS MEMORANDA

19.     Eric C. Perkins was the chief legal officer for the respective Okun companies.  On November 7, 2006 and November 21, 2006 Perkins issued written memoranda to Okun and his management team.[2]  In particular, in-house counsel Perkins reveals that: (a) "Few, if any, of the transactions [loans] were documented when consummated and some transactions remain undocumented." (b)"There is currently no established reserve or source of immediately available funds with which to repay these funds." (c) the removal of funds from the QI companies "(i) violates existing Exchange Agreements with QI Entity customers; (ii) violates any fiduciary or prudent investor standard that might apply under applicable law; (iii) could potentially subject one or more involved parties to criminal prosecution in multiple states and/or at the federal level (under theories ranging from theft, embezzlement, and or conversion to racketeering and [money] laundering statutes and (v) these Loans could render outstanding financial statements provided to lenders of IPofA or Ed Okun materially inaccurate.

20.     On November 21, 2006, in-house counsel Perkins reports that recently engaged outside counsel Maguire Woods confirmed the accuracy of Perkin's analysis. Most significantly, Perkins then states:

> Under the Virginia Rules of Professional Conduct, I am obligated to advise the company that continuing this course of conduct will likely result in both civil and criminal liability (in multiple jurisdictions) to the entities and individuals involved with such conduct.  This course of conduct should cease and desist immediately and all outstanding funds owed to QI entities should be repaid immediately.

---

[2] Copies of the Perkins memoranda are annexed hereto as Exhibits 1 and 2 respectively.

Under the Virginia Rules of Professional Conduct, I am also obligated to inform the company that I must promptly reveal the company's criminal intention to continue this improper course of conduct unless such course of conduct is abandoned.

21.     According to Perkins, he was advised by McGuire Woods to resign immediately as in-house counsel and Maguire Woods thereafter declined to undertake the representation of the respective Okun companies.  According to Okun, Perkins submitted a notice triggering a 90 day separation under his employment agreement, but Perkins was promptly dismissed from the company.

### THE KUTAK ROCK, LLP MEMORANDUM

22.     Okun's companies engaged the law firm of Kutak Rock, LLP ("Kutak") to review Okun's practice of removing funds from QI companies.  Kutak provided a written memorandum advising, among other things, that QI companies were obligated to comply with standards of care for "prudent investors" because they are entrusted with exchanger's money.  Kutak further opined that QI companies were escrow agents.

23.     Given these opinions, Okun's practices were indefensible.  The QI's practice of "lending" funds to Okun personally without documentation or collateral, would never comport with the prudent investor standards of any State.  Moreover, given the nature of the QI's obligation to fund like/kind exchanges on demand, a critical requirement was to maintain liquidity.  None of Okun's QI's maintained adequate liquidity and Okun's investment of the "borrowed" funds did not allow for liquidity at all.  Overall, an escrow agent's duty is to safeguard entrusted property.  A breach of these duties by Okun constituted to larceny.

### KAPLAN, SILVERMAN, ABBOTT, BERGMAN AND THE KLUGER LAW FIRM

**JOIN THE FRAUDULENT SCHEME**

24.     Okun engaged the Kluger law firm to represent his respective companies. According to Okun, he met with Kaplan, Silverman, Abbott and Bergman and described the background of his companies, how he conducted business and his need to continue acquiring QI companies.

25.     According to Okun, he disclosed to these lawyers that he was seeking a $2,500,000.00 loan to purchase another QI company.  Okun required the assistance of the defendant lawyers to close the loan and close on the purchase of the QI company known as 1031 Advance, Inc.  The defendant lawyers agreed to undertake the representations and close the transactions.

26.     In advance of the $2,500,000.00 loan and in advance of the purchase of 1031 Advance, Inc., Okun[3] met with Defendants Abbott, Kaplan, Silverman and Bergman of the Kluger law firm and fully disclosed: (i) his withdrawal of funds from the respective QI companies he controlled; (ii) his use of the funds to invest in other companies owned by him for the purpose of purchasing real estate, including residential and commercial properties as well as aircraft and boats; (iii) the need for additional capital so that he could make additional investments, meet cash needs associated with the real estate and other holdings he had acquired and meet the cash demands of the QI companies he had already acquired.[4]

---

[3] Descriptions of Okun's meetings with and disclosures to the defendants in this paragraph of the Complaint and elsewhere are based upon statements made by Okun.

[4] The "cash needs" specifically included funding closings of like/kind exchanges.  The QI's were short of cash because Okun had removed the funds for his use.

27.     Prior to December, 2006 and in advance of the $2,500,000.00 loan and in advance of the purchase of 1031 Advance, Inc., Okun met with Defendants Abbott, Kaplan, Silverman and Bergman of the Kluger law firm and fully disclosed: (i) written memoranda dated November 7, 2006 and November 21, 2006 by Eric C. Perkins, an in-house attorney employed by Okun's companies[5] who reported that Okun's activities vies a vie the QI companies constituted criminal acts; (ii) statements from McGuire Woods, outside counsel engaged by Okun, that Okun's actions constituted criminal acts; (iii) a written memorandum from Kutak Rock, LLP that Okun's removal of funds from the QI companies violated fiduciary duties owed to exchangers, violated the prudent investor standards imposed by statutes in several states, as well as money transmitting statutes of several states.

28.     In advance of the $2,500,000.00 loan and in advance of the purchase of 1031 Advance, Inc., Okun met with Defendants Abbott, Kaplan, Silverman and Bergman of the Kluger law firm and fully disclosed his intention to induce a lender to extend a loan to Okun based upon a written financial statement and based upon a pledge of assets that were acquired with funds previously removed from the QI companies controlled by Okun.

29.     The written financial statements signed by Okun and expressly made for the purpose of obtaining the loan and were subject to Fla. Stat. 817.03 ["Making false statement to obtain property or credit is a first degree misdemeanor].  The financial statements were materially false with respect to the statement of assets because: (i)

---

[5] Copies of the Perkins memoranda are annexed hereto as Exhibits 1 and 2 respectively.

Okun did not own the assets which had been purchased with the funds removed from the respective QI companies; and (ii) Okun's liabilities were vastly understated for the same reason.  The financial statements falsely represented that Okun had "borrowed" the funds when in fact: (i) the purported loans were not documented by signed notes; (ii) the funds were stolen, not borrowed.  Finally, the financial statements materially understated Okun's liabilities as he had "borrowed" significantly greater sums from the QI companies than he disclosed.

30.     In advance of the $2,500,000.00 loan and in advance of the purchase of 1031 Advance, Inc., Okun met with Defendants Abbott, Kaplan, Silverman and Bergman of the Kluger law firm and fully disclosed those facts pertaining to the origin of his assets and liabilities so that those defendants had actual knowledge that the written financial statements were false for the reasons stated above.  In addition, defendants had possession of the Perkins Memoranda, the Kutak Rock, LLP Memorandum and knew of the analysis performed by McGuire Woods…all before the closing on the $2,500,000.00 loan.

31.     The Perkins memos alone were sufficient to demonstrate that Okun had engaged in criminal fraud and had no right to remove the funds from the QI companies.  Moreover, Perkins reveals the true extent of the "borrowing" which greatly exceeded the liabilities actually owed by Okun as disclosed in the written financial statement.

32.     In advance of the $2,500,000.00 loan and in advance of the purchase of 1031 Advance, Inc., Okun met with Defendants Abbott, Kaplan, Silverman and Bergman of the Kluger law firm and fully disclosed that he intended to remove funds

from 1031 Advance, Inc. in the same fashion as he had with the other QI companies he controlled.

33.     In advance of the $2,500,000.00 loan and in advance of the purchase of 1031 Advance, Inc., Okun met with Defendants Abbott, Kaplan, Silverman and Bergman of the Kluger law firm asked those defendants to review his actions and advise him if his practices were in fact criminal.

34.     Defendants Kaplan and Silverman undertook to perform this review and directed an associate named Jeffrey Berman to conduct research and prepare a written memorandum.

35.     On December 17, 2006, Berman completed and delivered his written memorandum to defendants Abby Kaplan, Eliot Abbott and Steve Silverman.  Among other things, the memorandum observes at page 16 that Okun's QI companies lacked an established reserve or source of immediately available funds with which to repay the funds removed by Okun.  "if true, a Ponzi scheme could be and possibly already has been triggered.  [case citation omitted].  While it is unlikely that, absent a loss of taxpayers' funds, criminal charges would be brought against the Company, an ambitious criminal prosecutor could make a case against the Company under a Ponzi scheme theory."   A copy of the Berman Memo is annexed as Exhibit 3.

36.     On December 17, 2006, each of the defendants had actual knowledge that Okun's QI companies lacked liquidity, had no reserves sufficient to meet the demands of exchangers, had no immediate means of obtaining the cash necessary to meet obligations to exchangers and was on the cusp of defaulting in those obligations. In sum, defendants Abbott, Bergman, Silverman and Kaplan knew on December 17,

2006 that Okun was operating an ongoing criminal fraud, that he intended to continue

his enterprise and expand it, that he needed to borrow funds from lenders in order to

maintain and conceal the ongoing criminal fraud and that the written financial

statements Okun would use to obtain such loans were materially false and misleading.

37.     Notwithstanding the foregoing, the defendants assisted Okun in the

preparation of the loan documents for the $2,500,000.00 loan, including the aforesaid

written financial statement.  At the closing of the $2,500,000.00 loan, defendants Abbott

and Bergman secured Okun's signature on the financial statement and delivered the

document to the lender so the loan could close. Abbott and Bergman delivered a written

opinion letter, which was a material condition precedent to the loan.

38.     Kaplan and Silverman directed Abbott and Bergman to conduct the

closing and were aware of the intentions of Okun, Abbott and Bergman to deliver the

written financial statement described above to the lender at the closing.

39.     Kaplan, Silver, Abbott and Bergman knew that the $2,500,000.00 loan

would be used to continue, expand and conceal Okun's ongoing fraudulent scheme.

40.     Notwithstanding the foregoing, the defendants Abbott and Bergman

represented Okun in the purchase of 1031 Advance, Inc.

41.     Defendants Silverman and Kaplan were responsible for maintaining the

Kluger law firm's relationship with Okun and Okun's companies.  In this capacity,

Silverman and Kaplan oversaw the work of other lawyers from the Kluger law firm,

including defendants Abbott and Bergman.

42.     Soon after Okun acquired 1031 Advance, Inc. he raided the cash held by

the QI to expand and support his personal real estate interests, maintain his lavish

lifestyle and to provide funds to close like/kind exchanges so that the criminal scheme would not be discovered.  He also used the funds obtained from 1031 Advance, Inc. to pay for the services of the Kluger law firm.

43.     Each of the Defendants had actual knowledge that the respective QI companies lacked sufficient capital to meet obligations to exchangers.  This information was supplied to defendants Abbott, Bergman, Kaplan and Silverman in a meeting with Okun when Okun explained that he removed a substantial portion of the funds held by QI companies he controlled and then used newly entrusted funds to fund like/kind purchases by prior existing exchangers.  Defendant Abbott later confirmed this fact in an e-mail to defendant Abbey L. Kaplan on November 30, 2006: "The issue we discussed this morning[sic] 160mm of customer obligations 30-80mm of cash".  The e-mail string includes an e-mail from Todd Pajonas, an employee of one of Okun's companies which included the statement: "You also better hurry with advising me of your plan to resolve this cash crisis.  Time is running out. Tick tock tick tock".  A copy of the e-mail string is annexed as Exhibit 4.

44.     But for the legal services rendered by the respective defendant lawyers, Okun's ongoing fraudulent scheme would have come to a crashing halt in December of 2006.  It was not possible for Okun to borrow funds or acquire 1031 Advance, Inc. without the material assistance of defendants Silverman, Kaplan, Abbott and Bergman and the Kluger law firm.

45.     Although defendants Kaplan, Silverman, Kaplan, Abbott and Bergman knew that Okun was operating an ongoing fraudulent scheme against exchangers and lenders, each of them and the Kluger law firm continued to actively represent and assist

Okun and his companies.  According to Okun, invoices rendered by the Kluger law firm exceeded one million dollars.

46.     According to Okun, defendants Kaplan, Silverman, Abbott and Bergman met with him and provided advice designed to facilitate and insulate Okun's schemes. For example, at a meeting with defendants, Okun was advised to revise the contracts used by Okun's QI companies to delete references to escrow accounts and interest bearing accounts and insert vague language about how the QI's would invest the funds entrusted by exchangers.

47.     As of January 1, 2007 Okun had "borrowed" approximately $100,000,000.00 from the respective QI companies, had encumbered his real estate holdings with mortgages, and owed substantial sums in connection with yachts and jet aircraft he had purchased.[6]

48.     According to Okun, in March of 2007, defendants Silverman and Kaplan advised Okun to secure refinancing of all of his assets so as to obtain the necessary funds to meet all exchanger obligations, close all the existing exchange transactions and close all of the QI companies.  The effect would be to conceal Okun's unlawful use of the exchanger funds.

49.     Defendants Silverman and Kaplan introduced Okun to a private equity firm and began the process of qualifying Okun for the refinancing.

---

[6] According to an email from Janet Dachiell, operations manager of all six Okun QI companies, by April of 2007, more than $172,000,000.00 in exchanger funds had been removed by Okun.  This e-mail was forwarded to defendant Kaplan in April of 2007.  The e-mail preceded the loan of $7,000,000.00 by plaintiff which is the subject of this lawsuit.

50.     However, before financing could be secured, Okun's Ponzi scheme began to collapse.  Okun had been depending on new exchangers to entrust funds to Okun's QI companies so that Okun could close the transactions of older exchangers.  In April of 2006, the continued inflow of new exchange money slowed and Okun's QI companies could not meet the demands to close like/kind exchanges.  Excuses were made to exchangers in order to delay closings.  According to Okun, at least one exchanger was threatening to "go to the authorities" if his closing did not occur within days.

51.     According to Okun, he was advised by Kaplan and Silverman to obtain a stop gap loan so exchanges could be closed until global refinancing could be arranged.  Upon information and belief, Kaplan and Silverman hoped to avoid detection of the Ponzi scheme which would undoubtedly occur if an exchanger contacted the FBI.

52.     Prior to April 20, 2007, the manager of Investment Exchange Group, LLC located in Colorado, discharged the company's employees and closed its doors.  She also withheld funds obtained from new exchangers from the parent company, 1031 Exchange Group.  Within the same time frame, the manager of 1031 Advance, Inc. likewise withheld funds from 1031 Exchange Group.  Neither manager would return calls from Okun or his team.  This information was reported to Abbott, Kaplan and Silverman.

53.     Exchangers who entrusted funds through those two QI's were calling the parent company, 1031 Exchange Group in Virginia and reporting that calls to the QI's were not being returned.  Okun dispatched his in-house counsel to Colorado to investigate and he reported back that the offices were empty and that the computer

servers, which serviced all six QI companies, were gone.  This information was likewise reported to Abbott, Kaplan and Silverman.

54.     The Okun Ponzi scheme which had continued and expanded with the direct assistance of Kaplan, Silverman, Abbott and Bergman was collapsing around them…and they knew it.  Only another loan could delay the collapse.

### THE SEVEN MILLION DOLLAR LOAN FROM PLAINTIFF

55.     Okun approached plaintiff Cordell through intermediaries and proposed a short term loan.  Okun explained, through intermediaries, that he had a short term cash crunch.  He was in the process of refinancing his extensive real estate holdings, but simply lacked sufficient cash in the short term to meet obligations to exchangers.

56.     Cordell understood that Okun did not want to liquidate real estate holdings in an unfavorable market.  Cordell offered to lend $7,000,000.00 to Okun personally conditioned upon receipt of: (i) a written financial statement signed by Okun that would demonstrate an ability to repay the loan; (ii) a borrower's affidavit which made certain representations and warranties; (iii) an opinion letter from the Kluger law firm in mutually agreeable form that Cordell would rely upon in making the loan; (iv) a secured interest in real estate collateral; and (v) the execution of suitable loan documents.

57.     Defendants Abbott and Bergman prepared the borrower's affidavit[7] and secured Okun's attestation to it; prepared the written opinion letter and signed the Kluger law firm's name to it with the approval of and under the supervision of Silverman

---

[7] A copy of the Borrower's Affidavit is annexed as Exhibit 8.

and Kaplan;[8] assisted Okun in preparing the written financial statement, secured Okun's signature on the financial statement and delivered it to Cordell at the closing.[9]

58.     On April 20, 2007, the defendants delivered the foregoing together with the other loan documents executed by Okun, and Cordell delivered the net loan proceeds.  A copy of the promissory note is annexed as Exhibit 5.

59.     Unbeknownst to Cordell, but expressly known by Okun and the defendants, the financial statement, the borrower's affidavit and the opinion letter were materially false.  The financial affidavit listed over $140 million dollars in real estate holdings that had actually been acquired with the funds unlawfully removed from the QI companies.  These were not actually Okun's assets.  The liabilities listed by Okun were vastly understated.  Even if one was to accept the canard that Okun "borrowed" the money from the QI's, his indebtedness was materially greater than what he disclosed.  Okun had actually stolen approximately $150,000,000.00 from the QI's in an ongoing criminal scheme and had no ability to repay the $7,000,000.00 note to Cordell.

60.     Although artfully drafted, the Opinion Letter (Exhibit 6) was materially false.  In part, on page one of the letter, Abbott and Bergman state that they have conducted no "independent inquiry" when in fact an exhaustive inquiry was made and memorialized by Jeffrey Berman (Exhibit 3).  Abbott and Bergman knew that the representations and warranties were inaccurate, based in part on the information supplied in the Perkins Memoranda (Exhibits 1 and 2) in their possession.  More significant is the completely false statement "…we have no reason to believe them to be

---

[8] A copy of the Opinion Letter is annexed as Exhibit 6.

[9] A copy of the Financial Statement is annexed as Exhibit 7.

untrue".[10]  Abbott and Bergman actually knew, based upon the Perkins Memoranda, the Berman Memorandum, the Kutak Rock, LLP Memorandum and the comments by the McGuire Woods law firm that Okun had operated a criminal scheme, did not actually own the assets he claimed and had no ability to repay the loan.

61.     Yet, at page 4, paragraph "1", the Opinion Letter recites:

"The execution and delivery by Borrower of the Mortgage and the performance by Borrower of its obligations under the Mortgage are within Borrower's powers."

Based upon their discussions with Okun, their knowledge of the events in Colorado and California, their review of the respective memoranda listed above, Abbott and Bergman knew that it was impossible for the Borrower, Okun, to perform his obligations.

62.     The Borrower's Affidavit is likewise materially false. Among other things, the affidavit recites at paragraph 2 that Borrower [Okun] is the owner in fee simple of the Land [i.e. the land being pledged] and that "no other person or party who is in possession or has a right to or any claim to possession".  In fact, the Land was acquired with funds stolen from the QI companies…the funds were held in escrow for exchangers…the exchangers owned the Land, not Okun.

63.     At closing, Abbott and Bergman delivered a "Collateral Assignment of Membership Interest" which purported to assign Investment Properties of America, LLC's interest in "IPofA" Salina Central Mall Member, LLC as collateral for the $7,000,000.00 loan.  However, Okun, Abbott and Bergman knew that the assets of the LLC had been acquired with the funds stolen from the QI companies.  Since the asset

---

[10] This statement qualifies the prior statements that no independent investigation was conducted and that the plaintiff agreed to rely only upon the loan documents.

was subject to a superior claim by the victims of the Ponzi scheme, the Collateral Assignment was misleading and illusory.

64.     Okun, Bergman, Abbott, Silverman and Kaplan intended that plaintiff rely upon the Opinion Letter, the Buyer's Affidavit, the written financial statement and the other documents prepared by Bergman and Abbott in extending the $7,000,000.00 loan to Okun.  Moreover, Okun, Kaplan, Silverman, Bergman and Abbott knew that Plaintiff would not close the loan without the representations in writing.

65.     Whatever the artful nature of the drafting of the Opinion Letter, the closing would not have occurred without it.

66.     Plaintiff reasonably relied upon the respective representations and the loan documents including the Opinion Letter, the written financial statement and the borrower's affidavit.  Plaintiff reasonably relied upon the particular representation by the Kluger law firm that it, collectively, had no reason to believe any representation was untrue.

67.     At the times relevant hereto, Plaintiff was aware that that: (i) it was impermissible for an attorney to continue representing a client if the attorney knew that the client was engaged in an ongoing criminal enterprise; (ii) it was a crime for a person to make or cause to be made any false statement in writing relating to his or her financial condition, assets or liabilities or the financial condition, assets or liabilities of a corporation in which the person has a financial interest;[11] (iii) it was impermissible for an attorney to knowingly assist a client in the performance of a criminal act; (iv) it was in itself a criminal act to be an accessory to the performance of a criminal act.

---

[11] See Fla. Stat. § 817.03.

68.     Plaintiff reasonably relied upon the express inference created when Okun was represented by the Kluger law firm, including Kaplan, Silverman, Bergman and Abbott in the respective transactions…that there was no criminal enterprise, that no false financial statements were being made and that loans taken by Okun from the respective QI companies were lawful.

69.     The defendant lawyers are members of the Florida Bar.  The acts complained of occurred in Florida.  Rule 4-1.2(d) of the Rules regulating the Florida Bar states:  "Criminal or Fraudulent Conduct.  A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows or reasonably should know is criminal or fraudulent.

70.     The Notes to Rule 4-1.2(d) observe that there is a "critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity."  The Notes also state "The lawyer is required to avoid assisting the client for example, by drafting or delivering documents that the lawyer knows are fraudulent or by concealing how the wrongdoing might be concealed."  "The lawyer must withdraw, therefore, withdraw from the representation of the client in the matter."  Finally, the Notes state that "Subdivision (d) applies whether or not the defrauded party is a party to the transaction.

71.     Rule 4-1.2(d) is a regulation promulgated by the Florida Supreme Court, the branch of government charged under the Florida Constitution with regulating lawyers.  Plaintiff is expressly within the class of persons intended to be protected by this regulation.

72.     Rule 4-1.2(d) imposed an unambiguous and unavoidable duty upon the defendant lawyers not to represent Okun in the taking of loans used to perpetuate and expand the fraudulent Ponzi scheme.

73.     In fact, the defendant lawyers continued to represent Okun and his respective companies when they were duty bound to withdraw from the representation, duty bound not to assist Okun in the preparation and delivery of the aforesaid financial statement, the loan documents or otherwise assist Okun in the continuation of his scheme.

## COUNT I

## AIDING AND ABETTING FRAUD

74.     Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "73" above as though fully set forth herein.

The Underlying Fraud

75.     Okun and his companies, including 1031 Tax Group, Inc. and its wholly owned QI companies, were engaged in a criminal and fraudulent scheme to defalcate funds held in escrow as fiduciaries and use those funds to enrich Okun, support a lavish lifestyle and opportune the investment in commercial real estate which would be owned and controlled solely by Okun.

76.     The QI companies made representations to exchangers that the proceeds of sale of exchangers' commercial property would be held in escrow.  Okun and the QI companies were strictly limited with respect to the handling of the exchangers funds and were obligated to comply with prudent investor standards.

77.     The exchangers entrusted their property and funds to the QI companies and reasonable relied upon the representations, expressed in the exchange contracts or otherwise imposed by law.

78.     The representations by Okun and the QI companies were knowingly false when made and made with the intention that the exchangers rely thereon.  Okun always intended to remove the funds from the respective QI companies...and did so leaving the companies illiquid and unable to meet obligations to exchangers.

79.     Okun's QI companies were escrow agents, owed a fiduciary duty to exchangers and were bound by standards of prudent investors.  Okun breached each of these duties.

80.     As a matter of law, the foregoing scheme was fraudulent and criminal in nature.  Okun was indicted and convicted and thereafter sentenced to 100 years in prison.

81.     Part of Okun's fraud scheme included the taking of loans based upon false and misleading financial statements and by concealing material information regarding his theft of exchanger money which would have resulted in lenders refusing to make loans to Okun.

82.     Defendants Kaplan, Silverman, Bergman and Abbott joined the fraudulent scheme by providing material assistance to Okun in acquiring funds to purchase 1031 Advance, Inc. so that Okun could remove the funds entrusted to it by exchangers.  The acquisition of 1031 Advance, Inc. permitted Okun to expand his fraudulent scheme by converting the exchanger funds entrusted to that QI.  The additional funds acquired by Okun were also used to fund payments to

83.     On March 29, 2007, in an e-mail to in-house attorney Richard Simring, Janet Dashiell, the operations manager of Investment Exchange Group and the five other Okun QI companies, cited the extremely low liquidity of 1031 Tax Group as a whole (1.3% of cash obligations) and inferred that the FBI would be notified of Okun's activity.  Among other things, Dashiell's e-mail reveals $175,000,000.00 in total client liabilities and only $2.3 million in "flexible" cash.  In turn, Simring forwarded the email to defendant Abbey Kaplan on March 30, 2007 stating "we need to forcefully make Ed [Okun] stop spending and start refinancing or we won't have a client.

84.     Simring and Kaplan agreed that the next step was to "refinance", meaning borrow money to keep the scheme afloat and avoid detection.

Defendants' Knowledge of the Underlying Fraud

85.     Defendants Kaplan, Silverman, Abbott and Bergman met with Okun and Okun disclosed all the material facts sufficient to demonstrate that he was engaged in an ongoing fraudulent scheme that was also criminal in nature.

86.     Defendants Kaplan, Silverman, Abbott and Bergman received and reviewed the aforesaid Perkins memos, the Kutak Rock, LLP memo, and communications from McGuire Woods at the outset of their engagement by Okun. These documents contain specific information sufficient to constitute notice to each of the defendants that Okun was engaged in an ongoing criminal fraud.

87.     Kaplan and Silverman were asked by Okun to conduct their own legal analysis of his business arrangements.  They directed Jeffrey Berman, an associate of the firm to perform that analysis.  His written conclusions confirm that Okun and the QI

companies engaged in fraudulent and criminal acts which were of an ongoing nature.

88.     Defendants the Kluger law firm, Kaplan, Silverman, Bergman and Abbott made a conscious decision to participate in the criminal fraud scheme and benefitted substantially by seeking and obtaining substantial and generous compensation from Okun and his companies.

89.     Defendant Kluger's attorneys' fee invoices, show review of these critical memoranda by one or more of Defendants, including Defendant Abbott.  They also reveal that Defendants knew about Okun's Ponzi scheme in November and December 2006.  In addition, according to Abbot's deposition testimony in another case, Kaplan and/or Silverman were billing partners. As billing partners, Kaplan and Silverman reviewed the bills and would obtain actual knowledge of the criminal nature of Okun's schemes.  The following examples from the invoices further evidence such knowledge:

> 12/01/2006
>
> Performed research to find cases where a fiduciary who held monies on account and used one person's money to pay another was held to have violated a deceptive business practices act;
>
> Legal research re: liability for fiduciaries using one beneficiary's funds for the benefit of another beneficiary
>
> 12/04/2006
>
> Performed research to determine whether the process of using a later taxpayers' funds to pay an earlier taxpayer can be considered a Ponzi scheme, and whether adequate liquidity is a complete defense to a Ponzi scheme.
>
> 12/06/2006
>
> Performed research to determine (a) the causes of action, either civil or criminal, that have been or could be brought

against a qualified intermediary, (2) the reasons for a qualified intermediary liability;

12/13/2006

research re: ponzi scheme-definition, triggering event, test, point of no return in Texas, Connecticut, New York

Conference with Steve Silverman and Leslie Press regarding research to determine whether a qualified intermediary could be liability under a Ponzi scheme theory, whether a qualified intermediary is a fiduciary with added fiduciary duties, and whether any current or pending legislation governs the rights and liabilities of qualified intermediaries; Performed research regarding same;

Researched Taxes Statutes and Case Law re: 1) definition of "Ponzi Scheme"; and 2) triggering event of "Ponzi Scheme"

12/14/2006

research re: Ponzi schemes in Connecticut and New York, research re: triggering event for ponzi scheme, pyramid scheme v. ponzi scheme, test for ponzi schemes, remedies for ponzi scheme

Conference with Leslie Sharpe and Jeff Berman re: 1031 Accomidator (sic) Business Operation (0.5); Researched Texas statutes and case law re: "Ponzi Schemes" and "Pyramid Schemes" (4.2)

12/15/2006

draft memo re: ponzi schemes in New York & Connecticut, general ponzi scheme law and triggering event

12/15/2006

Researched 1) Mass. Case Law and Statutes re: "Ponzi Schemes" and "Pyramid Schemes"; 2) researched all cases involving 1031 qualified Intermediaries (3.3); Drafted memo re: trigger for Qualified Intermediary operation to become "Ponzi Scheme" (0.7).

90.     Thus, by Defendants' own analysis, they understood that Okun was engaged in a Ponzi scheme before Cordell funded the $7 Million Loan.  Yet, despite concluding that Okun was involved in a Ponzi scheme, Defendants conspired with Okun and his affiliates to perpetuate the Ponzi scheme, including assisting Okun to obtain a loan by fraud from Cordell to fund Okun's business operations, which eventually and proximately damaged Cordell.

Defendants Provided Substantial Assistance To Advance the Commission of the Fraud

91.     On April 26, 2007, Simring sent an e-mail to defendant Bergman advising that $10,000,000.00 had been located in a segregated account at Countrywide.  The problem was that the sole signatory on that account was Janet Dashiell who now refused to release any further funds into the fraud.  In order to gain control of the $10,000,000.00, Simring needed Bergman to prepare corporate resolutions showing Simring to be an authorized signatory for 1031 Advance, Inc.  Bergman prepared the corporate resolutions and other documents in order to assist Simring and Okun to strip away the $10,000,000.00.

92.     On April 26, 2007 Bergman e-mailed Simring assuring him that he was preparing the documents and would deliver same to Countrywide "within the half hour".

93.     Kaplan, Silverman, Abbott and Bergman continued to represent Okun and his companies despite actual knowledge of the criminal fraud continuing to be perpetrated.  For example, at the direction of Kaplan and Silverman, Abbott and Bergman prepared loan documents related to the proposed $7,000,000.00 loan from Plaintiff Cordell, assisted Okun in the preparation of false written financial statements

26

which would be produced as a condition precedent to the loan and prepared affidavits to

be executed by Okun and delivered same to the plaintiff to induce plaintiff to loan

money to Okun.

94.    One of those documents defendants prepared was an April 20, 2007[12]

opinion letter, **Exhibit 6**, which stated:

> "As to all matters of fact (including factual conclusions and
> characterizations and descriptions of purpose, intention or other state of
> mind) we have relied, with your permission, entirely upon the
> representations and warranties of Borrower set forth in the Loan
> Documents as hereinafter defined and have assumed, without
> independent inquiry, the accuracy of those representations, warranties
> and certificates **(although we have no reason to believe them to be
> untrue)**."

[bold added for emphasis]

95.    The April 20, 2007 opinion letter stated at page 4, paragraph #2 that:

> The execution and delivery by Borrower of the Mortgage and compliance
> by Borrower with the provisions thereof (i) will not, to the best of our
> knowledge, conflict with or result in a breach or default (or give rise to any
> right of termination, cancellation or acceleration) under any material
> agreement binding upon Borrower of which we are aware (ii) any law
> statute, rule or regulation or to the best of our knowledge, any judgment,
> order, writ, injunction or decree of any court or other tribunal located in
> Florida of which we are aware applicable to Borrower or any of his assets
> and (iii) to the best of our knowledge, will not result in the creation or
> imposition of lien…on any asset of Borrower.

At page 4, paragraph #4C, the defendants' opinion letter stated:

> C.  The opinions expressed herein concern only the effect of the law as
> currently in effect **and the state of facts as they currently are known to
> us**.  The undersigned undertakes no obligation to supplement or update
> this opinion after the date hereof.

---

[12] The closing of the loan occurred on April 27, 2007.

96.     The opinion letter and closing documents were produced to Cordell at the closing on April 27, 2007 and were produced by the defendants in order to induce Cordell to make a Seven Million Dollar ($7,000,000.00) loan to Okun.  Without the opinion letter, Cordell would not have made the loan.

97.     In order to induce Cordell to make the loan, Okun represented that he was solvent.  Defendants had actual knowledge that Okun was not solvent and could not repay the loan.  Defendants assisted Okun in making these false representations.  At closing of the loan, defendants stood silent and failed to disclose Okun's misrepresentations and omissions.    In fact, each of the defendants were under a legal duty that prevented them from attending the closing, producing the closing documents including the Opinion Letter or assisting Okun in any fashion.

98.     Defendants were duty bound to not give their opinion letter and withdraw from their representation of Okun prior to the closing, because they knew that Okun was engaged in ongoing criminal conduct that included defrauding Cordell and the exchangers.

99.     The statements quoted above from the April 20, 2007 opinion letter were false and were known by the defendants to be false when made.  The defendants had actual knowledge that (i) Okun had stolen some $150,000,000.00 or more dollars from the QIs[13];  (ii) Okun had no ability or means to repay the loan[14]; (iii) Okun had no

---

[13] Among other things, defendants had the e-mail from Janet Dashiell which indicated $172,000,000.00 was missing from the QI accounts and the Perkins Memoranda which indicated the range of unauthorized undocumented "loans" taken by Okun from the QI companies.

[14] The $172,000,000.00 taken by Okun together with the mortgage encumbrances on the real property investments actually exceeded the value of all of Okun's holdings.

intention to repay the loan;  (iv) Okun had used stolen funds to acquire the collateral for the loan; (v) that the collateral for the loan was subject to claims by victims of Okun's fraud and by the United States Government by way of forfeiture; (vi) Okun made materially false statements in documents he executed, including but not limited to the "Borrower's Affidavit," **Exhibit 8**, a document prepared by defendants, [at page 1, paragraph #2 "Borrower is the owner in fee simple of the Land; the Land is in sole possession of Borrower and there is no other person or party who is in possession or who has a right or any claim to possession"]; the Collateral Assignment of Membership Interest, **Exhibit 9**, [at page 2, paragraph #6 "Assignor hereby agrees, represents and warrants that the Assigned Interests are free from all liens, encumbrances and claims of any person or entities whatsoever, other than the assignment to Boulder Capital LLC, that Assignor has good right and lawful authority to assign and grant a security interest in the Assigned Interests…"], and the Promissory Note, **Exhibit 5**, which contains Okun's false representation that he will perform his obligations under the Note.

100.    According to allegations made in criminal and civil proceedings against Okun and others, when there were no funds immediately available from any of Okun's QIs to fund the impending closing of escrows, Okun then sought to take money from various entities, lenders, and banks, and used the loan proceeds, amongst other things, to fund the escrow closings as well as his lavish lifestyle.  This information was unknown to Cordell at the times it made loans to Okun and was concealed from Cordell by Okun and the defendants.

101.    Since Cordell insisted upon and relied upon an Opinion Letter from Borrower's counsel as a condition of making the loan, the loan by Cordell in the amount

of $7,000,000.00 could never have occurred without the active participation of a law firm complicit in Okun's scheme and willing to materially assist Okun in that fraudulent scheme.  In this case it was the defendants who elected to create and deliver the Opinion Letter to plaintiff for the purpose of closing the loan.

102.    Defendants were duty bound to withdraw from the representation of Okun based upon their actual knowledge of Okun's continuing criminal acts.  Had defendants withdrawn from the representation of Okun, the loan would not have closed.

103.    The defendants provided substantial assistance to advance the commission of the fraud by Okun: (i) by means of helping Okun acquire at least one QI company to raid (1031 Advance, Inc.);  (ii) close loans to purchase at least one QI company (a $2.5 million dollar loan to purchase1031 Advance, Inc.); (iii) actively assisted Okun in cracking a bank account at Countrywide Bank containing $10,000,000.00 in a specially segregated exchanger funds account, so that Okun could strip those funds, and (iv) by assisting Okun in the fraudulent scheme to borrow $7,000,000.00 from the plaintiff in order to continue and conceal the fraud scheme.

104.    The defendants and Okun intended that Cordell rely upon the delivery of the written financial statement, the Opinion Letter and the other respective loan documents and thereby extend the $7 million loan.

105.    The assistance of the defendants was material because without it, there could be no $7 million loan.

106.    At the time Okun took the loan, Okun knew that he could not repay the $7,000,000.00 loan to plaintiff except through the successful commission of a further fraud.  Defendants had actual knowledge of that fact as well.  However, at the time of

the April 27, 2007 closing, Okun's scheme was collapsing, the FBI was investigating, managers like Dashiell were fleeing the Company and Okun and defendants knew there was no chance to continue the scheme.

107.    Unaware that the financial statement, the opinion letter, the Borrower's Affidavit, the Promissory Note and the other loan documents contained materially false statements, unaware that the defendant lawyers had elected to continue the representation of Okun despite actual knowledge of Okun's ongoing criminal scheme, and unaware that Okun had stolen more than $150,000,000.00, Plaintiff Cordell reasonably relied upon the affirmative representations of Okun of his credit worthiness, willingness and intent to repay the loan and reasonably relied upon the acts of the defendant lawyers and made the $7 million loan to Okun.

108.    As a consequence of the foregoing, plaintiff was induced to make a $7,000,000.00 loan to Edward Okun upon which Okun promptly defaulted.  Plaintiff has been damaged thereby.

WHEREFORE, plaintiff seeks judgment against the defendants, jointly and severally for such damages as may be proven together an award of costs, prejudgment and post judgment interest and such further relief as the Court deems just and proper.

## COUNT II

## CIVIL CONSPIRACY

109.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "73" above as though fully set forth herein.

110.    Defendants Kaplan, Silverman, Bergman, Abbott and the Kluger law firm

entered in an agreement with Okun and Okun's companies whereby defendants would aide and assist Okun in continuing and expanding a criminal Ponzi scheme and fraud.

111.    Among other things, despite full and complete knowledge that Okun was engaging in fraud and other criminal acts, in December of 2006, defendants undertook to assist Okun in borrowing $2.5 million so that Okun could purchase 1031 Advance, Inc., a new QI company.

112.    Defendants assisted Okun in the preparation of a false and misleading written financial statement in order to create the illusion that Okun was credit worthy and could repay the loan.  The written financial statement falsely portrayed Okun's financial condition and that of the corporations in which he had a financial interest.  Both Okun and the defendants actually knew that the written financial statement was false.

113.    Both Okun and the defendant lawyers possessed a fraudulent intent to obtain credit by such false statements.

114.    Okun made the aforesaid false statements in violation of Fla. Stat. § 817.03, a crime.

115.    Defendants produced an opinion letter and delivered it to the plaintiff in order to satisfy a condition precedent to obtaining the $2.5 million loan.

116.    Defendants conspired with Okun to obtain the $2.5 million loan so that Okun could acquire 1031 Advance, Inc., a QI company that had been entrusted with substantial sums of money by exchangers.  The specific purpose of the acquisition was for Okun to raid the funds entrusted to that company.

117.    Defendants engaged in these acts so that Okun could continue and expand his criminal scheme to defraud the clients that entrusted funds to the Company.

118.    Defendants engaged in these acts for the further reason that Okun would pay substantial and generous sums of money to the defendants.  Of the fees paid by Okun, Abbott and Kaplan each got 40% of the partnership credit for the Okun client work and Silverman and Bergman got 10% of the partnership credit.

119.    Each of the defendants further conspired with Okun to conceal the criminal fraud scheme.  One of the ways in which defendants agreed with Okun to conceal the scheme was to arrange further loans for Okun so that he could cover cash shortfalls caused because Okun had removed the exchanger's funds from the QI companies and there was insufficient capital to close exchanger purchases of like/kind exchange property.

120.    An additional method of concealing and/or insulating Okun's criminal acts was to have Okun revise the exchange contracts used by the respective QI companies to avoid a requirement of maintaining separate escrow accounts for each exchanger.  According to Okun, he met with Kaplan, Silverman, Bergman and Abbott and they advised him to make those revisions to the exchange contracts.

121.    However, the proposed changes would not and could not render Okun's actions lawful.  Instead, the defendants' advice was intended to make it harder to detect that funds had been stolen or for that matter, just whose funds had been stolen.

122.    If exchanger transactions could not be closed, Okun's theft of the exchanger money would be revealed and Okun's Ponzi scheme would collapse.  In those circumstances, defendants' role in the Ponzi scheme would also be exposed and defendants would likewise be liable.  Of course, if the Ponzi scheme collapsed, Okun could no longer pay substantial and generous fees to the defendants.

123.    On March 29, 2007, in an e-mail to in-house attorney Richard Simring, Janet Dashiell, the operations manager of Investment Exchange Group and the five other Okun QI companies, cited the extremely low liquidity of 1031 Tax Group as a whole (1.3% of cash obligations) and inferred that the FBI would be notified of Okun's activity.  Among other things, Dashiell's e-mail reveals $175,000,000.00 in total client liabilities and only $2.3 million in "flexible" cash.  In turn, Simring forwarded the email to defendant Abbey Kaplan on March 30, 2007 stating "we need to forcefully make Ed [Okun] stop spending and start refinancing or we won't have a client.

124.    Simring and Kaplan agreed that the next step was to "refinance", meaning borrow money to keep the scheme afloat and avoid detection.

125.    The defendants Silverman and Kaplan actually advised Okun to borrow funds from Cordell so that Okun could continue his Ponzi scheme and avoid detection of his activities by police agencies.

126.    In furtherance of the conspiracy, the defendant lawyers committed overt acts, including preparing various loan documents which they actually knew contained materially false and misleading statements.  In February of 2007, in connection with an earlier loan made to Okun, under the direction of Kaplan and Silverman, defendants Abbott and Bergman again delivered materially false written personal financial statement signed by Okun.  That statement represented that Okun had borrowed a certain amount of money from the QIs.  In fact, Okun had stolen the money and the defendants knew it.  This was a further criminal act in violation of Fla. Stat. 817.03.

127.    On April 27, 2007 the defendants knew that Cordell would rely upon the existing financial statement unless Okun experienced a material change in financial

34

condition.  Neither Okun nor the defendants disclosed that Okun had removed $150 Million Dollars or more from the QIs (without regard to whether the money was "borrowed" or stolen).  Defendants knew and intended that Cordell would rely upon the February 2007 financial statement in closing the April 27, 2007 loan.

128.    Defendants Bergman and Abbott prepared an opinion letter because Cordell would not close the loan without it.  As previously described above, the Opinion Letter contained material misrepresentations.

129.    The defendants intended that Cordell rely upon (i) the affirmative false representations made; (ii) the omissions of material facts by Okun; and (iii) the inference drawn from defendants' continued representation of Okun.

130.    The defendants did not withdraw from representing Okun which induced the plaintiff to believe that there was no ongoing criminal enterprise.

131.    The defendants had exclusive and superior knowledge of Okun's fraudulent activities and fraud associated with securing a loan from Cordell.  Cordell could not discover the respective fraudulent acts through ordinary means or diligence.

132.    Plaintiff reasonably relied upon the foregoing false representations, omissions of material facts and inferences and made a Seven Million Dollar loan to Okun.  Plaintiff has been damaged as a results of the acts done under the aforesaid conspiracy.

133.    Had any of these defendant lawyers directed the firm to cease its representation of Okun upon learning that the firm was going to be used to further Okun's crimes, Cordell would not have made the loan and would have avoided damage.

134.    Each of these lawyers was duty bound by Florida Bar Rule 4.1-16(a)(4)&(5) and Rule 4-1.2(d) to withdraw from the representation because they knew that Okun was engaged in an ongoing criminal scheme which he refused to disclose or to cease.  Thus, each of these lawyers was responsible for allowing the criminal scheme to continue with the firm's participation.

135.    Unbeknownst to Cordell, prior to the time Cordell funded the $7 Million Loan, each of the Defendants, had known about Okun's recent and ongoing fraudulent and Ponzi scheme activities which led to the need for the funds to repay the pending 1031 exchanges. Defendants actively concealed this information and conspired with Okun to obtain new loans to conceal acts of theft and embezzlement by Okun.

136.    In fact, when Defendant Kaplan asked Defendant Abbott on November 30, 2006, **Exhibit 4**, "What cash problems" relating to Okun, Defendant Abbott responded on the same day with: "The issue we discussed this morning (sic) 160mm of customer obligations 30-80mm of cash."  The defendants knew that Okun was insolvent, that the QIs were insolvent and that the Ponzi scheme was on the edge of collapse before April 20, 2007, and thus that the loan could not be repaid.

137.    Elliott Abbott had a meeting with Abby Kaplan and Steve Silverman and other attorneys and Ed Okun to discuss the first Berman Memorandum within days of receiving it.  Thereafter, they asked Jeff Berman to work with an outside lawyer specializing in criminal law to verify the conclusions in the memorandum.  Jeff Berman thereafter prepared an almost identical memorandum, **Exhibit 11**, on February 26, 2007, which Defendants reviewed in or about February 2007.  Thus, as of the end of February 2007, Defendants knew that Okun did not have adequate funds to repay

outstanding loans to the Subject QIs or funds to close the escrow closings, that he was engaged in an ongoing criminal scheme and could not maintain the "house of cards" he had created without a loan from plaintiff.

138.    Defendants knew that Cordell would not have made the $7 Million Loan without Defendants' involvement including issuance of the opinion letter.  Cordell, on the other hand, reasonably relied on Defendants' participation in the process leading up to the $7 Million Loan, without knowledge of Okun's Ponzi scheme activities.

139.    Since the loan proceeds from plaintiff were destined to be consumed in the criminal scheme, Defendants knew that Okun was insolvent, the loan collateral was completely compromised and Okun would never be able to repay the loan and had no intention to do so.

140.    As a consequence of the foregoing, plaintiff Cordell was damaged as a direct result of the acts performed by Defendants in furtherance of the conspiracy.

141.    Plaintiff is entitled to recover damages from Defendants in an amount in excess of $75,000.000.

WHEREFORE, Plaintiff prays for a judgment against Defendants for damages, prejudgment interest, post-judgment interest, costs, and all such other and further relief to which Plaintiff is shown to be entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for each of the claims and issues raised herein.

Dated:  August 11, 2011                  /s/Irwin R. Gilbert_____
                                         Irwin R. Gilbert, Esq.
                                         Fla. Bar No. 099473
                                         igilbert@bizlit.net
                                         Bryan J. Yarnell, Esq.
                                         Fla. Bar No. 088900
                                         byarnell@bizlit.net
                                         GILBERT │YARNELL
                                         11000 Prosperity Farms Road, Suite 205
                                         Palm Beach Gardens, Florida 33410
                                         Tel. (561) 622.1252 Fax (561) 799.1904

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on Friday, August 10, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically transmitted notices of electronic filings.

                        GILBERT |YARNELL
                        11000 Prosperity Farms Road, Suite 205
                        Palm Beach Gardens, FL 33410
                        (561) 622-1252 - Telephone
                        (561) 799-1904 – Facsimile
                        byarnell@bizlit.net-e-mail


                   By:    /s/Irwin R. Gilbert
                        BRYAN J. YARNELL, ESQ.
                        Florida Bar No.  088900
                        IRWIN R. GILBERT, ESQ.
                        Florida Bar No.:  099473

## Service List

| | |
|---|---|
| Steven C. Marks, Esq.<br>Fla. Bar No.: 516414<br>smarks@podhurst.com<br>Alexander Rundlet, Esq.<br>Fla. Bar No.: 069201<br>arundlet@podhurst.com<br>**Podhurst Orseck, PA.**<br>City National Bank Building, 8th Floor<br>25 West Flagler Street<br>Miami, FL 33130<br>Telephone: (305) 358-2800<br>Facsimile: (305) 358-2382<br>***Counsel for Defendant Eliott C. Abbot*** | Deborah S. Corbishley, Esq.<br>Fla. Bar No.: 588229<br>dcorbishley@kennynachwalter.com<br>Richard H. Critchlow, Esq.<br>Fla. Bar No.: 155227<br>rcritchlow@kennynachwalter.com<br>**Kenny Nachwalter, P.A**.<br>201 South Biscayne Boulevard<br>Suite 1100<br>Miami, FL 33131<br>Telephone: (305) 373-1000<br>Facsimile: (305) 372-1861<br>***Counsel for Defendants Abbey L. Kaplan***<br>***and Steve I. Silverman*** |
| Howard D. DuBosar, Esq.<br>Fla. Bar No.: 729108<br>dubosarh@dubolaw.com<br>**The DuBosar Law Group, P.A.**<br>Attorneys for Kluger Peretz Kaplan & Berlin, P.L.<br>1800 N. Military Trail, Suite 470<br>Boca Raton, FL 33431<br>Telephone: (561) 544-8980<br>Facsimile: (561) 544-8988<br>***Counsel for Defendant, Kluger, Peretz,***<br>***Kaplan & Berlin, P.L.*** | Casey H. Cusick, Esq.<br>Fla. Bar No. 755931<br>ccusick@klugerkaplan.com<br>**Kluger, Kaplan, Silverman,**<br>**Katzen & Levine, P.L.**<br>201 S. Biscayne Blvd., 17th Floor<br>Miami, Florida 33131<br>Phone: (305) 379-9000<br>Facsimile: (305) 379-3428<br>***Counsel for Defendants, Abbey L.***<br>***Kaplan and Steve I. Silverman*** |
| Jason S. Weiss, Esq.<br>Fla. Bar No.: 356890<br>**Jason.weiss@smithverbit.com**<br>**Smith & Verbit**<br>9900 Stirling Road, Suite 303<br>Hollywood, FL 33024<br>Telephone: 954) 965-8350<br>Facsimile: (954) 241-6947<br>***Counsel for Defendant Dale S. Berman*** | |