UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  11-CV-80416-RYSKAMP

CORDELL CONSULTANTS, INC.,
MONEY PURCHASE PLAN AND
TRUST, a Virginia corporation,
Plaintiff,

v.

ELIOT C. ABBOTT, DALE S. BERGMAN,
ABBEY L. KAPLAN, STEVEN I.
SILVERMAN, and KLUGER, PERETZ,
KAPLAN & BERLIN, P.L.,
Defendants.
_____/

## DECLARATION OF ROBIN RODRIGUEZ

Robin Rodriguez, being duly sworn, deposes and says under penalties of perjury:

1. I am a Trustee of the Plaintiff and make this affidavit upon personal knowledge. This Declaration is filed in support of Plaintiff's Motion for Summary Judgment.

### Loans to Edward H. Okun and Related Entities

2. Plaintiff made multiple loans to Edward H. Okun ("Okun") in May and December, 2006 and April, 2007. The last loan was made on April 20, 2007 in the amount of $7,000,000.00.[1]

3. The loan made by Plaintiff in May, 2006 refinanced real property owned by Okun through an entity called Investment Properties of America or "IPofA". [2]  This loan was a

---

[1] A different lender, Cordell Funding, LLLP, made an asset based loan of $13,416,000.00 to Okun's "IPofA Shreveport Industrial Park, LLC" to refinance the property in February, 2007. Okun was represented by Kluger Peretz Kaplan and Berlin ("KPKB") in that transaction. Okun was current in the payment of that loan through April 1, 2007. Through arrangements with the Plaintiff, a late payment was made by Okun on April 20, 2007 to bring the loan current. The loan was highly collateralized by real estate.

1

somewhat typical 'asset based' loan where the value of the collateral for the loan substantially exceeded the loan amount. However, Plaintiff required a Personal Financial Statement from Okun for this and every other loan. Okun's statement revealed a $300,000,000.00 net worth. In our due diligence process, we reviewed the real estate assets claimed by Okun and had confidence in those asset values.

4.     In December, 2006, Plaintiff loaned $3,000,000.00 to IPofA based upon the pledge of certain real estate as collateral and Okun's Personal Financial Statement. Also in December, 2006, Plaintiff loaned $2,500,000.00 to Okun and his wife Simone based upon the pledge of real estate as collateral and based upon Okun's Personal Financial Statement. The December, 2006 Okun Financial Statement was prepared by a Certified Public Accountant.[3] A copy of that Okun financial statement is attached as Exhibit 3. In both loans, the value of the collateral pledged substantially exceeded the amount of the loan made. KPKB closed both of these loans for the borrower. Okun was current in the repayment of both loans as of April 20, 2007.

5.     In April of 2007, through an intermediary, Okun described short term cash flow problems and sought a further personal loan. Okun needed funds to close a real estate transaction for a customer of one of his IRS Section 1031 Qualified Intermediary ("QI") companies. He needed to close this loan by April 20, 2007 at noon so he could meet the obligation to his customer. Okun also desired a supplemental loan to meet his interest

---

[2] The May, 2007 loan refinanced a property owned by IPofA known as "Columbus Works". This loan preceded Okun employing Kluger Peretz Kaplan and Berlin. Okun was current on his payment of this loan of $26.5 Million through April 1, 2007. Through an arrangement with the Plaintiff, a late payment was received on April 20, 2007 which brought the loan current.
[3] According to a series of e-mail exchanges between David Field and the defendant lawyers on December 1, 2006, a draft Okun Personal Financial Statement was reviewed and finalized. The final Okun Financial Statement was used secure the loans from Plaintiff. See Exhibit 2.

obligations on two prior loans. Okun was arranging to liquidate or refinance real estate holdings and needed time to complete the transactions. He did not want to make a less favorable disposition of the real property at that moment and preferred a short term loan.

6. Much of the loan business of Plaintiff involves real estate investors and developers. These businesses usually lack 'cash flow'. The value of the business is in the real estate and repayment of loans is typically based upon completing and selling projects, or simply 'flipping' the property. It is typical to make supplemental loans to these borrowers so that they can remain current with loan interest until the underlying assets can be sold. The value of Okun's real estate holdings through IPofA substantially exceeded his indebtedness by hundreds of millions of dollars.

7. Given Okun's extraordinary net worth of more than $300,000,000.00, Plaintiff made a loan of $7 Million Dollars on April 20, 2007 based upon Okun's credit worthiness and based upon the fact that (i) he was represented by counsel [KPKB]; (ii) KPKB delivered an Okun Personal Financial Statement, which had been prepared by a CPA; (iii) KPKB represented to me that there had been no material change in Okun's financial condition since that financial statement had been prepared; (iv) KPKB prepared and delivered a signed Affidavit from Okun that contained material representations; and (v) KPKB delivered an "Opinion Letter" that contained an assurance that the KPKB law firm knew of no reason why any of Okun's representations were untrue.

8. I understand that Okun intended this to be a very short term "bridge" loan of "two to three weeks".[4] Okun did provide collateral in the form of a third mortgage on his residence on Hibiscus Island in Miami. While I anticipated that this residence had a value that exceeded the

---

[4] I know this from the deposition testimony of KPKB Attorney Jon Chassen and his handwritten notes of his conversation with Edward Okun.

first two mortgages, this was not an asset based loan. In the event of a default by Okun, the property would be disposed of by foreclosure sale and it was not likely to be capable of satisfying the third mortgage. In addition, Okun pledged his membership interests in IPofA Salina Mall, LLC which owned the Central Regional Mall in Salina, Kansas. However, there were other senior liens on that real property. In the event of a default on those mortgages, the LLC would lose its ownership of the mall and the membership interests in the LLC would likely be rendered worthless. I was also mindful that real property values fluctuate due to a variety of economic conditions.

9. Initially, an additional term of the April 20, 2007 loan involved a 'put and call' provision which would have required Okun to transfer an interest in one of his LLC's to Plaintiff and then be required to repurchase it for a fixed price. However, this was never completed and the parties abandoned it.

### **PLAINTIFF'S KNOWLEDGE OF OKUN'S ACTIVITIES**

10. After being introduced to Okun, I learned that he had several businesses. Principally, he was a real estate investor/developer through IPofA. He had acquired a portfolio of commercial real property. Okun also owned a 'logistics' business as well as a group of IRS Section 1031 Qualified Intermediary companies or "QIs". Apparently, the QIs were held by an umbrella company called 1031 Tax Group, LLC ("1031TG").

11. I was unfamiliar with the QI business. I obtained a general understanding from Okun that a QI made it possible for a taxpayer to avoid paying capital gains tax on the sale of property by having the QI handle the transaction so long as the taxpayer found and closed on an 'exchange' property within a certain time frame. The QI charged fees for the service and invested the funds they received from the sale of property in order to make additional income.

4

12. I was not given copies of the written contracts called "Exchanger Agreement" between the QI companies and the customers. I had no information that any representations were made by the QI to its customers that their funds would be held in escrow accounts. I was unaware of any law or regulations that might pertain to the operation of a QI. I am not an attorney.

13. In this litigation, we have obtained evidence that the defendant attorneys had actual and detailed knowledge of all of these facts. For example, at the outset of being hired to represent Okun and his companies, the defendants obtained copies of certain documents that warned the defendant lawyers that it was unlawful (i.e. criminal) for Okun to remove funds from the QI escrow accounts. See November 7 and 21 Perkins Memoranda at Exhibit 4. See Tim Heaphy (former U.S. Attorney for the Western District of Virginia) e-mail at Exhibit 5. See Berman Legal Memo at Exhibit 6.

14. The defendants plainly understood that Okun was operating a "Ponzi" scheme. See e-mail from Kaplan to Alan Kluger at Exhibit 7.

15. I had no information of any kind to indicate that Okun was engaging in mail fraud or wire fraud or money laundering or any other crimes. I simply had no reason to believe that Okun's conduct was illegal or prohibited in any way. In his financial statements Okun seemed to readily disclose that he had *borrowed* $134 Million from 1031TG. His overall net worth was so much greater than this liability, it was not material to credit decisions. However, no loans would have been made if Plaintiff knew or even suspected that Okun was operating a Ponzi scheme or was otherwise engaged in a criminal enterprise. I had no knowledge of any of the facts set forth in paragraph 8 of the Motion for Summary Judgment on April 20, 2007.

16. Plaintiff was unaware that its actions in loaning money to Okun or his companies was wrongful or improper. Plaintiff did not know and could not know that lending money to Okun would or could lead to the concealment of the Ponzi scheme or its continuation. Plaintiff had no idea Okun was involved in a Ponzi scheme.

17. As a result of this litigation, I have learned that in December of 2006, the defendant lawyers had actual knowledge that Okun had taken at least $151,000,000.00 from the QI companies, far more than $134,000,000.00.[5] I was never informed by any source that Okun was in default with respect to his "loan notes" to the 1031 Tax Group. Okun's default in the payment of millions of dollars in notes owed to 1031TG would have been material information and should have been disclosed on Okun's Personal Financial Statement. At least one of the defendants admits this. See attached as Exhibit 9. Having reviewed Okun's personal financial statement on December 1, 2006 (Exhibit 2) and Kaplan's e-mail reporting far greater

---

[5] On December 19, 2006, Abbey L. Kaplan sent an email containing the following to Steven I. Silverman and Elliot Abbott:

> So here is my quick arithmetic. Between THE last quarter '05 and this month IPofA borrowed a total of $151,618,686 ... $55,403,489 from Atlantic Exchange; $50,275,088 from Security 1031; and $45,940,059 From Investment Excnage [sic]. This is based on my review of the promissory notes and a set of "Consents" (without notes). All the loans are for 180 days with interest ranging in the high 8% to mid 9% range. **Most of the obligations had due dates that have passed.** There are no guaranties nor secured loans although the "Consents" do require and expect a guaranty from Ed and/or a pledge of stock/membership interest in IF of A. I have no idea if any of the loans were made to repay others nor if any of the loans have been repaid with or without interest. Rachel is preparing a schedule of all the obligations in chronological order but the paper will be maintained in chrono/lender order.

A copy of the December 19, 2006, Abbey Kaplan email is attached hereto as Exhibit 8.

6

indebtedness (Exhibit 8), the defendants knew that Okun's Personal Financial Statement was materially false and misleading.

18.     We have also learned in this litigation that in March of 2007 the defendants learned that Okun was continuing to raid QI deposits and was using the money to pay the expenses of his other companies. In fact now we know that the defendants knew in March, 2007 that the QI liability to customers was $175 Million and that more than $172 Million was missing. See March 30, 2007 e-mail string started by Janet Dashiell, President of 1031TG at Exhibit 10.

### April 20, 2007, Loan

19.     Plaintiff was represented in the April 20, 2007 loan to Okun by Rudin McClosky and by the Zobrist Law Group. I attended a partial closing of the April 20, 2007 loan at the offices of KPKB in Miami. Okun was present along with two of the KPKB lawyers who I believe to be Eliot Abbot and Dale Bergman. At the closing, Okun executed a Borrower's Affidavit and the Promissory Note. Okun's lawyer passed an Opinion Letter signed by the KPKB law firm, the closing documents and the Okun Personal Financial Statement across the table to Plaintiff and stated that "there has been no material change in Okun's financial condition since the statement was prepared. Plaintiff would not have made the April 20, 2007 loan if: (i) KPKB did not supply a written opinion letter acceptable in form to me; (ii) KPKB did not draft and deliver a signed borrower's affidavit in the form actually supplied on April 20, 2007; (iii) neither KPKB nor Okun supplied an Okun personal financial statement; (iv) neither KPKB nor Okun represented that there had been no material change in Okun's financial condition since the Okun financial statement had been prepared.

20.     Plaintiff would not have made the April 20, 2007 loan if Okun was not represented by Florida legal counsel. Without Florida legal counsel, there could be no opinion

letter from Florida counsel. If no lawyer would represent Okun in a loan, that would be a further reason not to lend him money.

21.     Plaintiff would not have made the April 20, 2007 loan if it was disclosed that Okun was engaged in an unlawful scheme.

22.     Plaintiff would not have made the April 20, 2007 loan if it knew Okun could not repay it.

23.     Plaintiff was not a "willing participant" in Okun's business schemes inasmuch as Plaintiff merely made loans to Okun, it did not invest or participate in Okun's schemes. Moreover, Plaintiff lacked knowledge as to the operative aspects of Okun's "scheme" so it could not be a "willing" participant.

24.     Okun's use of 1031 Tax Group funds for investments in real property would periodically require the liquidation of assets to meet obligations. For this reason, I was not alarmed by Okun's need for a bridge loan. However, if it was revealed that Okun had unlawfully used QI funds to acquire the real property held by IPofA…or even if there was a risk that the IPofA assets were acquired with QI funds, Okun's actual net worth could be zero.

25.     During the closing of the April 20, 2007, loan, I was given an Okun financial statement by lawyers from Defendant KPKB, which indicated that Okun had a net worth in excess of $300 million. This financial statement turned out to be materially false and misleading. It misrepresented the nature of Okun's liability to the QI companies---he did not borrow $134 Million, he illegally defalcated the money he took---and it was $172 Million not $134 Million.

26.     Plaintiff would not have made the April 20, 2007 loan if it was disclosed that the personal financial statement was materially false and misleading.

### Okun Bankruptcy and Settlement with Bankruptcy Trustee

27.     1031TG and IPofA and its related entities entered Chapter 11 bankruptcy shortly after the April 20, 2007, loan.  Okun remained a "Debtor in Possession" until October, 2007 when Gerard McHale was appointed as Chapter 11 Trustee.

28.     Defendants infer that I failed to make a reasonable effort to collect the sums due on the April 20, 2007 from Okun.  That is incorrect and baseless.

29.     While Okun was the Debtor in Possession I attempted to assist Okun with a restructuring loan in the Bankruptcy Court.  KPKB lawyer Howard Berlin represented Okun in the bankruptcy cases and participated in the negotiations.  If we had been successful, Okun would have paid his debts.

30.     Ultimately no lender would participate in this proposed DIP loan.  The specter of Okun's criminal Ponzi scheme created unmeasurable risks to the ownership of the real estate assets.  The Bankruptcy estate's interest in the real property could give way to the claims of the QI customers who were some of the victims of the fraud.  A class action lawsuit was already underway, Hunter, et al v. Citibank, et al, in the Northern District of California.  In addition, there simply was not enough equity or net value in the IPofA

31.     Okun agreed to assign his remaining interest in certain real estate to the Trustee.  I could not prevent that, however, it merely placed the Trustee in Okun's shoes.  The real problem was that Plaintiff was a junior creditor.  The Hibiscus residence was foreclosed by Wachovia Bank who held the first ($3 Million) and second ($1.8 Million) mortgages which totaled $4.8 Million.  The House sold in foreclosure for $3.4 Million---less than the total of the first two mortgages.  The Trustee recovered nothing, nor did Plaintiff.

32. IPofA likewise defaulted on mortgage payments owed for the Salina Mall in Salina, Kansas. Following foreclosure, the property sold for $20 Million, far less than the senior mortgages which had priority over both Plaintiff and the Bankruptcy Trustee. Neither the Trustee nor Plaintiff recovered anything. Since the only asset of IPofA Salina Mall, LLC was the real property that was lost, the membership interests in the LLC, which were pledged as collateral were rendered worthless.

33. Okun was eventually indicted by the Department of Justice ("DOJ").

34. Plaintiff suggest that I made a deal with the Trustee in order to avoid having to disclose damaging information. This is totally groundless. In fact, I was interviewed at length by the DOJ and was deposed at length by the attorneys for the Bankruptcy Trustee and by the attorneys in the class action lawsuit, Hunter, et al v. Citibank, et al.

35. During the bankruptcy cases, I expended more than $1,000,000.00 litigating with the Trustee and other creditors in an effort to collect the sums owed by Okun. The expense of that litigation and doubts about the title to and value of the Okun/IPofA assets suggested that further efforts would be futile and wasteful. With respect to collateral provided by the April 20, 2007, loan—the third mortgage on Okun's Hibiscus house and membership interest in IPofA Salina, LLC—pursuant to the Settlement, the Trustee had the right to pursue claims against third parties with superior interests. In the event the Trustee gained a position superior to Plaintiff and the senior creditors (an "Impairment"), and this caused Plaintiff not to recover money from the sale of the collateral, Plaintiff would recover 50% of the value that Plaintiff would have received from that sale had the Trustee not gained an ownership interest.

## **The Instant Lawsuit**

36.     Plaintiff filed the instant lawsuit as soon as I had substantially completed the bankruptcy litigation and the class action lawsuit and as soon thereafter as my attorneys and I gathered enough evidence to justify commencing the instant lawsuit.  Before suing, Plaintiff asked Glen Stankee, the Ruden McClosky lawyer who represented us in the April 20, 2007, loan for the closing file.  Stankee indicated that the firm would look for the file.

37.     Plaintiff was unaware that Ruden McClosky would destroy any documents.

38.     Plaintiff also sought to obtain the same documents from the Zobrist Law Group who also represented Plaintiff in the April 20, 2007 loan.

39.     Recently, all of the loan documents for the April 20, 2007, loan were produced by the Zobrist Law Firm ("Zobrist").  Zobrist served as Plaintiff's Virginia counsel in the April 20, 2007, loan.

Under penalties of perjury, I declare that I have read the foregoing declaration and that the facts stated in it are true.


Dated: July 17, 2015

              ___/s/ Robin Rodriguez____
                Robin Rodriguez