UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CV-80416-RYSKAMP

CORDELL CONSULTANTS, INC.,
MONEY PURCHASE PLAN,
a Virginia corporation,

        Plaintiff,

v.

ELIOT C. ABBOTT, et al.

        Defendants.
_____/

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT CULVER SMITH [D.E. 597]**

    Plaintiff ("Cordell") responds to Defendants Abbey Kaplan ("Kaplan") and Steven Silverman's ("Silverman") (collectively "Defendants") motion to exclude the testimony of legal ethics expert D. Culver Smith ("Smith") [D.E. 597]. Defendants make a number of attacks against which are mostly inaccurate and all insufficient to disqualify Smith from testifying as a witness under Fed. R. Evid. 702 and Fed. R. Civ. P. 26.

**Standard for the Admissibility of Expert Testimony**

    1.    In reviewing an admissibility challenge to expert testimony under Federal Rule of Evidence 702, courts must consider the following:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

    2.    For the purposes of assessing expert testimony reliability, the Supreme Court has delineated several factors, including whether an expert's theory has been tested, whether it has

been subject to publication and peer review, the error rate of the technique, and whether the expert's approach is generally accepted in the scientific community. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 593-94 (1993). As the test is a flexible one, not every factor will be implicated each and every time. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The pertinent reliability, for example, of certain types of testimony may come from the expert's "personal knowledge or experience." *Id*. at 151. Nevertheless, in exercising their gatekeeping functions, courts have "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999).

3. Rule 702 requires that expert testimony be helpful to the trier of fact. "Expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person," *Frazier*, 387 F.3d at 1262, or if it presents information "beyond the understanding and experience of the average citizen." *United States. v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Further, in order to be deemed useful, there "must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). The legal duties and obligations of lawyers imposed by the Rules Regulating the Florida ("the Rules") fit this criteria.

4. Lastly, courts have "broad latitude" in ruling on the admissibility of expert testimony. *Kumho*, 526 U.S. at 142. Nevertheless, courts must be cautious as to not "supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596).

## Compliance with Rule 702

5. Defendants contend that it was Smith's obligation in his deposition testimony to specifically identify facts that demonstrate that Kaplan and Silverman aided and abetted and conspired to commit fraud. Defendants intentionally misconstrue the purpose of Smith's testimony, which is to opine that the defendants breached their legal duties as established by the Rules Regulating the Florida Bar ("Rules"). A copy of the transcript of the October 27, 2014, Smith deposition is attached hereto as Exhibit A; Exhibit A at 5:5-8; D.E. 421-2 at p. 2. Florida

lawyers may not assist clients in the commission of a fraud or crime. Rule 4-1.2(d). A lawyer that does so is not proceeding in the ordinary course of representation and is not merely a scrivener. A lawyer that is aware his client is about to commit a crime is required to reveal it in order to prevent the crime. Rule 4-1.6(b)(1). This an affirmative duty intended to protect the public—not the lawyer's client. A lawyer must terminate representation where the lawyer otherwise is assisting a fraud or crime unless the client <u>stops, discloses,</u> and rectifies the fraud or crime. Rule 4-1.16(a)(4)(5).

6. Smith is not offered to testify that one or more of the acts or omissions of the defendants constitute aiding or abetting a fraud. That would not be a proper form of expert testimony. The Court will instruct the jury on the issue of aiding and abetting, as well as fraud. The jury will weigh the evidence.

7. Defendants fault Smith for not testifying about what acts satisfy the elements of the torts sued upon. Defendants, however, are placing an onus on Smith that goes beyond what is required by Fed. R. Evid. 702. Indeed, Rule 702 only requires that expert testimony be useful for the trier of fact for the purposes of understanding the evidence or determining a disputed fact. Fed. R. Evid. 702(1); *see R.K. v. Kanaskie*, No. 02-61534, 2007 U.S. Dist. LEXIS 49224, at *27 (S.D. Fla. Jul. 9, 2007) (testimony admissible where expert's "synthesis and subsequent analysis of numerous documents" was helpful to jury due to complexity of relevant information). In other words, the testimony need not be case dispositive. Moreover, it is for trier of fact to determine based upon the totality of evidence whether defendants are culpable under the ***legal standard*** of liability for aiding and abetting and conspiracy to defraud.

8. Contrary to Defendants' contentions, Smith is also under no obligation to determine or comment upon the liability of each of the individual defendants. Smith is testifying as to the factors that give rise to prohibitions under the Rules in the instant case. The evidence in the case will determine whether the facts result in such a prohibition with respect to each of the defendants. Smith will testify as to the conduct required by the Rules when an attorney knows or should know that his client is engaging in (i) a fraud, (ii) a crime, or (iii) an ongoing crime. While Smith can testify as to what facts would constitute notice to these lawyers that Okun was engaged in a fraud or crime, it is up to the jury to determine whether the evidence shows that

they knew or were charged with knowledge of Okun's fraud or crime, and thus whether they must have acted in accordance with the Rules.

## Fit and Helpfulness

9.      Defendants next complain that Smith is applying the wrong standard for adjudicating aiding and abetting fraud, asserting that Smith is suggesting that the legal standard is ordinary negligence. Plaintiff has sued under theories of aiding and abetting fraud and conspiracy—two intentional wrongs. Smith is neither testifying as to the standards for fraud nor is he advancing a negligence standard; rather, he testifying as to the professional obligations of lawyers generally.[1] Therefore, the Eleventh Circuit's recitation of the standards for aiding and abetting and conspiracy in *Cordell Consultant Inc. v. Abbott*, Case No. 13-10143 (11th Cir. 2014) has no bearing on Smith's testimony. Indeed, the gravamen of Smith's testimony is that if certain facts are present, then lawyers are prohibited from engaging in the representation of

---

[1] At Smith's deposition, Defendants inquired as to the standard of knowledge implicated by Rule Regulating the Florida Bar 4-1.16:

> **Counsel for Defendants**: What is the standard of knowledge that the lawyer has to have before he or she is required to withdraw?
> **Smith**: Well, Rule 4-1.2(d) uses the standard: Know or reasonably should know.
> **Counsel for Defendants**: Okay.
> **Smith**: So actual or constructive knowledge. 1.16(a)(1) simply -- if I have the number of the subparts right - simply says the conduct –'The representation will result in violation of the Rules of Professional Conduct or law.' It doesn't really state the standard of knowledge.
> **Counsel for Defendants**: But for the lawyer to know if he or she has to withdraw, they have to have some level of knowledge, correct?
> **Smith**: Right.
> **Counsel for Defendants**: Okay.
> **Smith**: And the handful of ethics opinions from around the country, you know, basically use a constructive -- some of them use a constructive knowledge standard.
> **Counsel for Defendants**: That standard goes to whether the lawyer knows or reasonably should know the client's conduct is criminal or fraudulent. But the lawyer is permitted to believe a client's statements in most circumstances, correct?
> **Smith**: If it's a reasonable belief.

Exhibit A at 31:22-25 and 32:1-23.

Okun, are required to withdraw, or are affirmatively charged with the duty to disclose his crimes to prevent further crime.[2]

10. Smith has repeatedly stated that he will *only* testify as to the professional duties of lawyers. In relevant part, Smith's Rule 26 disclosure [D.E. 421-2] plainly provided:

> Skip Smith will opine on the obligation that Defendants Kluger, Peretz, Kaplan & Berlin, P.L., Abbey Kaplan, Esq., Elliot Abbot[t], Esq., and Steve Silverman, Esq., had to withdraw as counsel for and discontinue and [cease] their representation of Edward Okun and his affiliated entities including their representation in the underlying loan transactions with the Plaintiff. Specifically, he will opine that Defendants should have refused to continue representing Ed Okun or any of his entities (Collectively "Okun") [when] they knew or should have known that their representation would assist Okun in conduct that was criminal or fraudulent or would result in or facilitate criminal or fraudulent conduct.

D.E. 421-2 at p. 2. At his October 27, 2014, deposition, Skip again reiterated, "I have been asked to opine on whether the Kluger Peretz firm had an obligation to discontinue representation of Edward Okun or his affiliated entities in a certain loan transaction." Exhibit A at 5:5-8. Truly, there is simply no potential for juror confusion if the straight forward purpose of Smith's testimony is spelled out as clearly and unambiguously as it is.

11. Defendants also contend that Smith's testimony is unhelpful because he failed to distinguish the actions of the individual defendants with respect to the Rules cited by him. Defendants, however, fail to understand that Smith is merely providing the trier of fact with a foundation from which to assess the mandates of the Rules of Professional Conduct, i.e. the duty owed by all Florida attorneys, including the respective defendants, to third parties like Cordell.

12. The Rules define the duties owed by lawyers. Although the majority of these rules define a lawyer's duties to his client, certain rules, such as Rules 4-1.2 and 4-1.16, define a

---

[2] For clarity, the duties imposed by these Rules do not create a new or independent cause of action. Instead, the Rules have two affects: (i) the Rules define the lawyers duties that are owed in order to determine if the lawyer breached those duties to the Plaintiff; and (2) demonstrate that the continued representation of Okun in violation of the Rules elevates this 'representation' from the ordinary attorney/client relationship and involves the attorney in the clients activities.

5

lawyer's duty to the public. *See Elkind v. Bennett*, 958 So.2d 1088, 1091 (Fla. 4th D.C.A. 2007). Rule 4-1.2(d), for example, prohibits a lawyer from either (a) counseling a client to engage in or (b) assisting a client in conduct that the lawyer knows or reasonably should know is criminal or fraudulent. The Comments to this rule provides: "There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud be committed with impunity." Likewise, pursuant to Rule 4-1.16(a), a lawyer is required to terminate the representation of a client when the representation will result in (1) a violation of the Rules of Professional Conduct or law; (2) when the client persists in a course of conduct involving the lawyer's services that the lawyer reasonably believes is criminal and fraudulent; or (3) when the client has used the lawyer's services to perpetuate a crime or fraud. Further, under Rule 4-1.6(b)(1), lawyers are required to reveal otherwise confidential information to the extent it is reasonably necessary to prevent a client from committing a crime.

13.     Given their actual knowledge of Okun's Ponzi scheme, Defendants engaged in a crime when they handed Cordell a materially false financial statement mischaracterizing Okun's theft of QI funds as "Notes & Accounts Payable" and listing as assets property subject to equitable liens and constructive trusts by QI customers. Under Section 817.03, Fla. Stat., it a crime to furnish false statements in writing to obtain loans. *See also* State v. Beasley, 580 So.2d 139, 142 (Fla. 1991) ("publication in the Laws of Florida or the Florida Statutes gives all citizens constructive notice of the consequences of their actions"). Truly, without "creatively" couching Okun's theft in the benign language of "loans," Cordell would not have been induced to make the $7 million loan.

14.     As the Rule prohibits a lawyer from assisting a client in conduct that the lawyer ***knows or reasonably should know*** is criminal or fraudulent, under Rule 4-1.2(d), Defendants owed a duty to the public to refrain from using Okun's materially false financial statement to obtain loans. Moreover, Defendants violated Rule 4-1.16(a) because they failed to withdraw despite the fact they knew continuing to represent Okun meant efforts on their part to induce loans using false financial statement in violation of Section 817.03, Fla. Stat. Lastly, under Rule 4-1.6(b)(1), Defendants were required to disclose the true nature of Okun's "loans" to Cordell to the extent that it was reasonably necessary to prevent Okun from defrauding Cordell.

15.     It is only after assessing the evidence presented that the trier of fact will determine which defendants acted in a manner specified by Smith, were subject to the duty described by Smith, and whether the particular defendant breached those duties.  If the jury should agree that the defendants each conspired to accomplish the acts complained, i.e. knowingly aid and assist Okun in concealing his Ponzi scheme, quiet whistle blowers, quantify the sum to be returned to the QI companies, create the illusion of actual loans by documenting the transfers and even applying interest payments, all while advising Okun as to how to "repay" the money he took, it does not matter which attorney performed a particular act.

### Compliance with Rule 26

16.     Defendants contend that Plaintiff violated Fed. R. Civ. Pro. 26 by assisting its expert in the preparation of his disclosure.[3]  However, nowhere in Rule 26 is it stated that counsel is prohibited from memorializing the opinions of its experts in a disclosure.  Moreover, Defendants had ample opportunity to scrutinize Smith's disclosure when they deposed him on October 27, 2014.

17.     Defendants also assert a violation of Rule 26 because Smith did not sign his original disclosure [D.E. 228].  At best, such an error is harmless, as demonstrated by the fact that Defendants went on to depose Smith without any cognizable delay or difficulty.  In addition, on October 27, 2014—a mere day after Smith's deposition—Plaintiff filed an amended expert disclosure bearing Smith's signature [D.E. 248].

18.     Defendants further contend that Smith relied on facts not disclosed in his report and that he otherwise made assumptions not stated in his disclosure.  In particular, Defendants point to the following:

> I have been told or I read that the lender was misinformed of the purpose of the loans and that the lender was provided with financial statements that were or may have been materially inaccurate. Exhibit 2 [of D.E. 597] at 23-24.

> He assumed that the $7 million loan was obtained to establish liquidity in anticipation of demands. *Id.* at 17.

---

[3] With respect to his disclosure, Smith testified that he and Plaintiff's counsel jointly determined what would be included in his disclosure.  Exhibit A at 9:18-22.

> He assumed that Cordell was not advised of the purpose of the loan, *Id.* at 23, and was misinformed about its purpose. *Id.* at 26-27.

D.E. 597 at p. 11.  It is clear, however, that these facts were taken or easily deduced from either the Second Amended Complaint [D.E. 97] or one of the various exhibits annexed to the Second Amended Complaint—all of which Smith stated that he reviewed in his initial disclosure.  D.E. 228 at p. 3; Exhibit A at 9:4-15.  Additionally, given the complexity of the instant case and the number of moving parts involved, Smith can hardly be criticized for not instantaneously recalling the precise source of his knowledge.  Recognizing this complexity, counsel for Defendants even commented as follows:

> **Counsel for Defendants**: Did you read the Second Amended Complaint in this case?
>
> **Smith**: I did.
>
> **Counsel for Defendants**: That must have taken you at least ten hours.

Exhibit A at 7:18-20.

19.     Citing specific lines in Smith's deposition transcript, Defendants also argue that Smith's opinions were not fully formed.  D.E. 597 at p. 11.  Defendants' argument is unavailing because the transcript lines cited by them concern inquiries made to Smith regarding issues that were <u>beyond</u> the scope of his expert disclosure [D.E. 421-2].  Defendants, for example, cite to pages 24 and 25 of Smith's deposition as evidence that his opinions were not fully formed.  In relevant part, these pages provided:

> **Counsel for Defendants**: If the lender was informed that the purpose of the April loan was to cover an exchange for which Mr. Okun and his companies did not have available cash, would you still believe that the lender was misinformed of the purpose of that loan?
>
> **Smith**: Well, based on that very narrow statement, I mean, if there are no other circumstances that are relevant, my opinion might be different.
>
> **Counsel for Defendants**: And how?
>
> **Smith**: Well, I would need to, I think, to understand a bit more about

>   the circumstances of the transaction before I could really come to a firm conclusion on that, in response to your question.
>
>   **Counsel for Defendants**: What else would you need to know about the circumstances of the transaction?
>
>   **Smith**: Well, your question has asked me to assume that Cordell Funding was told that the purpose of this loan was to cover obligations that other QI companies had?
>
>   **Counsel for Defendants**: Yes.
>
>   **Smith**: Well, I would -- I would wonder why, I guess, that the loan was being taken out by Mr. Okun, personally, as opposed to a QI company that has the obligation.
>
>   **Counsel for Defendants**: Would that change your opinion as to whether it was a fraudulent loan?
>
>   **Smith**: I'm not sure.
>
>   **Counsel for Defendants**: Okay. What would you need to know to become sure?
>
>   **Smith**: I would need to, I suppose -- if they exist -- see counsel opinion letters. I believe there is an exhibit to the Second Amended Complaint, now that I think about it, that is a counsel exhibit letter, but I don't recall its content. Excuse me. I mean a counsel opinion letter. I don't recall its content at the moment. And perhaps see various correspondence, the loan applications, those sorts of things.
>
>   **Counsel for Defendants**: You would expect that there would be a loan application with regard to a 7-million-dollar loan?
>
>   **Smith**: Well, I don't know. I'm not a transactional lawyer. But it strikes me that there might be, and if there is, perhaps it would be relevant to this inquiry.

Exhibit A at 24:5-25 and 25:1-23. It is clear from the discussion above that Smith was being questioned on the particulars of the April 20, 2007, loan. However, Smith's disclosure [D.E. 248 and 421-2] never reached these events, as Smith concluded:

>   **It is apparent from the foregoing exhibits that Defendants were aware or should have been aware of Okun's ongoing criminal Ponzi scheme at least by November 30, 2006, when Eliot**

> **Abbott responded to Abbey Kaplan's question "What cash problems" by stating 'The issue we discussed this morning [sic] 160mm of customer obligations 30-80mm of cash."** See Exhibit 4 [DE 97-4]. Mr. Kaplan's question appears to have been prompted by his review of the following email exchange between Todd Pajonas, one of Okun's company officers, and Okun:
>
>> Ed —
>> If you want me to move the funds from the State Bank of LI to the Citibank client escrow account please fax a formal letter to the office at 877/767-3295 directing me to do so. You own the company so if you direct me to move the money so that we can pay exchangers I will do so.
>>
>> You also better hurry with advising me of your plan to resolve this cash crisis. Time is running out. Tick tock tick tock.
>
> See Exhibit 4 [DE 97-4]. This email got the immediate attention of Abby Kaplan who responded an hour later asking Eliot Abbot about the 'cash problems" to which Eliot Abbot responded 5 minutes later stating "l60mm of customer obligations 30-80mm of cash." It is apparent from these emails that Defendants Eliot Abbott and Abby Kaplan knew about Okun's cash problems and the fact that Okun did not have enough exchangers' cash to fund closings when they were due to be closed. As Todd Pajonas implied in his email, this was a time bomb ready to explode -"tick tock tick tock."

D.E 421-2 at pp. 3-4.  As Smith concluded that defendants knew or should have known that Okun was operating a Ponzi scheme literally from the onset of their representation of him, Smith had little reason to analyze events further down the road.  Indeed, Smith possessed all the facts he needed to draw his conclusions regarding the defendants' duties under the Rules simply by reviewing the emails and memoranda from November and December of 2006.[4]  D.E 421-2 at pp. 3-4.[5]

---

[4] Defendants' objections to Smith's answers on pages 42, 43, and 71 of his October 27, 2014, deposition transcript also fail for this reason.

[5] Smith's disclosure [D.E. 421-2] clearly stated that he relied in particular on the following exhibits:

20. Defendants also cite to page 36 of Smith's deposition transcript as proof that his opinions were not fully formed. D.E. 597 at 11. In pertinent part, this page provided:

> **Smith**: Well, first of all, I said a lawyer can undertake the representation of that client for that purpose, to make it right. **And then you asked me about, is the lawyer entitled to believe the client, and then we got into a discussion about circumstances would permit the lawyer to believe or require the lawyer to - -**
>
> **Counsel for Defendants**: **Not believe**.
>
> **Smith**: **-- disbelieve he client. So… And then that gets into a whole possibility - - a whole wide spectrum of possible facts, which I'm not fully prepared to discuss today.**
>
> **Counsel for Defendants**: Okay. Because you haven't had the opportunity to look at any of the other facts in this case, correct?
>
> **Smith**: I mean, I don't even know - - Of course, you have asked me to assume that is what the client said. I don't know that happened here, and under what circumstances, and whether - - you know, the whole tenor of it, and what other factual circumstances might exist to weigh on the lawyer's believing or disbelieving the client.

---

a. **Exhibit 1 [DE 97-1]** - Memorandum dated November 7, 2006, from Eric C. Perkins to Edward H. Okun, Lara D. Coleman, R. David Fields, and Jeffry S. Zacarias

b. **Exhibit 2 [DE 97-2]** - Memorandum dated November 21, 2006, from Eric C. Perkins to Edward H. Okun, Lara D. Coleman, R. David Fields, and Jeffry S. Zacarias

c. **Exhibit 3 [DE 97-3]** - Memorandum dated December 17, 2006, from Jeffrey Berman to Abbey Kaplan, Eliot Abbott and Steve Silverman

d. **Exhibit 4 [DE 97-4]** -Email dated November 30, 2006, from Eliot C. Abbott to Abbey L. Kaplan and the other emails contained in that emai[l]

e. **Exhibit 11 [DE 97-11]** - Memorandum dated February 26, 2007, from Jeffrey Berman to Abbey Kaplan, Eliot Abbott and Steve Silverman

D.E. 421-2 at 3.

Exhibit A at 35:25 and 36:1-22. Defendants here are again exceeding the scope of Smith's engagement and disclosure of opinions. In short, Smith was asked to assume facts that he was not willing to assume without evidence. This is not a grounds to disqualify Plaintiff's expert; rather, it is a means to cross-examine and undermine/contradict Smith at trial. *See Allison*, 184 F.3d at 1311 (courts must be cautious as to not "supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence'").

21. Notwithstanding the above, although Smith stated that he needed more information on a very select number of mostly unrelated matters, his need for further information was not characteristic of his deposition as a whole. In fact, Smith provided clear opinions and explanations for the vast majority of matters about which Defendants inquired, as exemplified by the following:

> **Counsel for Defendants**: [Is] your opinion that if the lender was provided with false financials, then the loan was fraudulent, depend upon financials having been provided to the lender in connection with this specific loan?
>
> **Smith**: I believe so.
>
> **Counsel for Defendants**: And if the lender was not provided with a false financial statement in connection with this specific loan, would your opinion change?
>
> **Smith**: Not necessarily.
>
> **Counsel for Defendants**: Why not?
>
> **Smith**: Well, a financial statement would be one part of the whole transaction.
>
> Exhibit A at 27:4-16.

> **Counsel for Defendants**: Why do you believe that the law firm was not permitted to represent Mr. Okun as counsel after the Perkins memo?

**Smith**: Well, it seems to me that the Perkins memo, and then the memo -- the memorandum of their own associate lawyer, Mr. Berman, made it clear or should have made it clear that Mr. Okun had been involved, had been engaged in this fraudulent course of conduct, and that going forward with the representation would assist him in that course of conduct, and that – or would result in a furtherance of that course of conduct.

Exhibit A at 29:14-25.

---

**Counsel for Defendants**: Q. And if there was no reason to believe that the conduct described in the Perkins memo had continued through, let's say, February 26th, 2007, would it still be your opinion that the law firm could not represent Mr. Okun and his businesses in lending transactions, assuming it is not a loan in the QIs -- a loan to the QIs, shall we say, or from them?

**Smith**: Well, based on what I understand now, yes, that would still be my opinion.
**Counsel for Defendants**: That they could not?

**Smith**: Could not.

**Counsel for Defendants**: Why?

**Smith**: Because, as I understand it, the two loans in question were part of the ongoing Ponzi scheme, even if they are trying to create liquidity.

Exhibit A at 41:6-21.

22. Lastly, Defendants assert that Plaintiff had the obligation to correct the "deficiencies" in its disclosure. Notwithstanding Defendants' critiques, nothing was problematic about Smith's initial disclosure. As evidenced above, Defendants merely inflate harmless errors with respect to Smith's disclosure and testimony.

23. Rule 37(c) provides the consequences for failing to comply with the Requirements of Rule 26. In pertinent part, Rule 37 states:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a

> hearing, or at a trial, ***unless the failure was substantially justified or is harmless***.

Fed. R. Civ. P. 37(c)(1) (emphasis supplied); *Nance v. Ricoh Elecs., Inc.*, 381 Fed.Appx. 919, 922 (11th Cir. 2010).

24. "Substantial justification is 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'" *Hewitt v. Liberty Mut. Group, Inc.*, 268 F.R.D. 681, 682. (M.D. Fla. 2010). A failure to properly disclose under Rule 26 is deemed harmless "when there is no prejudice to the party entitled to receive the disclosure." *Id*. at 682-83. The onus is on the party failing to comply with Rule 26 to demonstrate that its failure was either substantially justified or harmless. *Id*. at 683.

25. Although courts have broad discretion to determine whether a nondisclosure is substantially justified or harmless under Rule 37(c)(1), the court should nevertheless be guided by the following factors:

> a. the surprise to the party against whom the evidence would be offered;
> b. the ability of that party to cure the surprise;
> c. the extent to which allowing the evidence would disrupt the trial;
> d. the importance of the evidence; and
> e. the nondisclosing party's explanation for its failure to disclose the evidence

*Two Men and a Truck Int'l, Inc. v. Residential & Commercial Transp. Co., LLC*, 2008 WL 5235115, *2 (N.D. Fla.2008) (quoting *Southern States Rack and Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)).

26. With respect to evidentiary sanctions under Rule 37, the Middle District of Florida noted:

> The evidentiary exclusion sanction is not necessarily 'automatic,' even in the absence of substantial justification and harmlessness, because Rule 37(c)(1) provides that a court may impose other

appropriate sanctions '[i]n addition to *or instead of* this sanction.' Fed.R.Civ.P. 37(c)(1) (emphasis added); *see also Design Strategy, Inc. v. Davis,* 469 F.3d 284, 298 (2d Cir.2006); *Roberts,* 325 F.3d at 784. Eleventh Circuit caselaw is in accord with this interpretation of Rule 37(c)(1). *See Prieto v. Malgor,* 361 F.3d 1313, 1318 (11th Cir.2004) ('The district court may impose other appropriate sanctions in addition to *or in lieu of* the [Rule 37(c)(1)] evidentiary sanction.') (emphasis added).

*Collins v. U.S.*, Case No. 3:08–cv–923–J–32JRK, 2010 WL 4643279, at *5 n. 7 (M.D.Fla. Nov. 9, 2010).

## CONCLUSION

Mr. Smith's testimony at deposition conformed to his expert disclosures and provided clear and instructive analysis to support the opinions he expressed. He was not engaged to testify that the defendants aided or abetted fraud. His focus was on the question whether lawyers who obtain knowledge that their client is currently involved in a fraudulent Ponzi scheme can take on or continue the representation of that client.

He opined that KPKB as a law firm (which notably would include all the defendants) could not represent Okun given their possession of:

> **Exhibit 1 [DE 97-1]** - Memorandum dated November 7, 2006, from Eric C. Perkins to Edward H. Okun, Lara D. Coleman, R. David Fields, and Jeffry S. Zacarias;
> **Exhibit 2 [DE 97-2]** - Memorandum dated November 21, 2006, from Eric C. Perkins to Edward H. Okun, Lara D. Coleman, R. David Fields, and Jeffry S. Zacarias
> **Exhibit 3 [DE 97-3]** - Memorandum dated December 17, 2006, from Jeffrey Berman to Abbey Kaplan, Eliot Abbott and Steve Silverman;
> **Exhibit 4 [DE 97-4]** -Email dated November 30, 2006, from Eliot C. Abbott to Abbey L. Kaplan and the other emails contained in that emai[l];
> **Exhibit 11 [DE 97-11]** - Memorandum dated February 26, 2007, from Jeffrey Berman to Abbey Kaplan, Eliot Abbott and Steve Silverman.

The evidence shows that Kaplan, Abbott and Silverman were in possession and had reviewed each of these exhibits.

**WHEREFORE**, Plaintiff requests that the Court deny the Defendants' motion.

15

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 15, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically transmitted notices of electronic filings.

                                                  KELLY KRONENBERG, P.A.
                                                  Counsel for Plaintiff
                                                  1475 Centrepark Boulevard Suite 275
                                                  West Palm Beach, Florida 33401
                                                  (561) 684-5956 - Telephone
                                                  (561) 684-5753 – Facsimile
                                                  igilbert@kelleykronenberg.com

                                     By: */s/ Irwin Gilbert*
                                          IRWIN R. GILBERT, ESQ.
                                          Florida Bar No.: 099473
                                          SAYED M. ZONAID, ESQ.
                                          Florida Bar No.: 113442

**Service List**

| | |
|---|---|
| Ramon Rasco, Esq.<br>Fla. Bar No.: 0617334<br>rrasco@podhurst.com<br>**Podhurst Orseck, PA.**<br>City National Bank Building, 8th Floor<br>25 West Flagler Street<br>Miami, FL 33130<br>Telephone: (305) 358-2800<br>Facsimile: (305) 358-2382<br>*Counsel for Defendant Eliott C. Abbot*<br><br>Howard D. DuBosar, Esq.<br>Fla. Bar No.: 729108<br>dubosarh@dubolaw.com<br>**The DuBosar Law Group, P.A.**<br>Attorneys for Kluger Peretz Kaplan & Berlin, P.L.<br>1800 N. Military Trail, Suite 470<br>Boca Raton, FL 33431<br>Telephone: (561) 544-8980<br>Facsimile: (561) 544-8988<br>*Counsel for Defendant, Kluger, Peretz, Kaplan & Berlin, P.L.*<br><br>Edward R. Shohat, Esq.<br>JONES WALKER<br>201 South Biscayne Blvd., Suite 2600<br>Miami, Florida 33131<br>Telephone 305.679.5700<br>Facsimile 305.679.5710<br>eshohat@joneswalker.com<br>*Co-counsel for Defendant Steven I. Abbey Kaplan* | Deborah S. Corbishley, Esq.<br>Fla. Bar No.: 588229<br>dcorbishley@kennynachwalter.com<br>Richard H. Critchlow, Esq.<br>Fla. Bar No.: 155227<br>rcritchlow@kennynachwalter.com<br>**Kenny Nachwalter, P.A**.<br>201 South Biscayne Boulevard<br>Suite 1100<br>Miami, FL 33131<br>Telephone: (305) 373-1000<br>Facsimile: (305) 372-1861<br>*Counsel for Defendants Abbey L. Kaplan and Steve I. Silverman*<br><br><br>Marilyn G. Kohn, Esq.<br>Fla. Bar No.: 168009<br>mkohn@klugerkaplan.com<br>**Kluger, Kaplan, Silverman,**<br>**Katzen & Levine, P.L.**<br>201 S. Biscayne Blvd., 17th Floor<br>Miami, Florida 33131<br>Phone: (305) 379-9000<br>Facsimile: (305) 379-3428<br>*Counsel for Defendants, Abbey L. Kaplan and Steve I. Silverman* |