Page 1

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2
              CASE NO.  11-CV-80416-KLR
3
4

CORDELL CONSULTANT, INC.,
5    MONEY PURCHASE PLAN AND TRUST,
     a Virginia corporation,
6
              Plaintiff,
7
     vs.
8
     ELIOT C. ABBOTT, et al.,
9
              Defendants.
10   _____/
11
12                    Suite 850
             1400 Centrepark Boulevard
13            West Palm Beach, Florida
          Monday, 10:05 a.m. to 1:27 p.m.
14               October 27, 2014
15
16      DEPOSITION OF D. CULVER SMITH, III, ESQUIRE
17
18
19
20        Taken on behalf of the Defendants, Steve I.
21   Silverman and Abbey L. Kaplan, before Nancy Gilbert,
22   FPR, RMR, RDR, CRR, Notary Public in and for the
23   State of Florida at Large, pursuant to Defendants
24   Steve I. Silverman's and Abbey L. Kaplan's Notice of
25   Taking Deposition in the above cause.

EXHIBIT A

Page 2

1 APPEARANCES:
2
   ATTORNEYS FOR PLAINTIFF
3
4   GILBERT YARNELL LAW OFFICES
      Suite 205
5   11000 Prosperity Farms Road
      Palm Beach Gardens, Florida 33410
6
      BY: IRWIN R. GILBERT, ESQUIRE
7        igilbert@gilbertyarnell.com
8
9 NO APPEARANCE ON BEHALF OF ELIOT C. ABBOTT
10
11 ATTORNEYS FOR DEFENDANTS
      Abbey L. Kaplan and Steve I. Silverman
12
13   KENNY NACHWALTER
      Suite 1100 - Miami Center
14   201 South Biscayne Boulevard
      Miami, Florida 33131
15
      BY: DEBORAH S. CORBISHLEY, ESQUIRE
16        dcorbishley@knpa.com
17
18 ATTORNEYS FOR DEFENDANT
      Kluger, Peretz, Kaplan & Berlin, P.L.
19
20   THE DUBOSAR LAW GROUP, P.A.
      Suite 470
21   1800 North Military Trail
      Boca Raton, Florida 33436
22
      BY: ROBERT CORY SHERES, ESQUIRE
23        rsheres@dubosarnavon.com
24
25 ALSO PRESENT: STEVE I. SILVERMAN, ESQUIRE

Page 3

1              INDEX
2
   WITNESS                      PAGE
3
4 D. CULVER SMITH, III, ESQUIRE
5   Direct Examination by Ms. Corbishley ...........4
6   Cross-Examination by Mr. Sheres  ..............83
7   Cross-Examination by Mr. Gilbert  ............111
8   Further Cross-Examination by Mr. Sheres  .....124
9   Witness Signature Page ......................126
10   Errata Sheet .................................127
11   Certificate of Oath of Witness ...............128
12   Letter to Witness Re: Reading ................130
13
14
15
16          DEPOSITION EXHIBITS
17
   NUMBER          DESCRIPTION          PAGE
18
19 Exhibit 1    Plaintiff's Amended Notice of ......8
                Compliance Disclosing
20              Plaintiff's Expert Witness and
                His Opinion
21
22 Exhibit 2    February 26, 2007 Memorandum to ...39
                A. Kaplan, E. Abbott and S.
23              Silverman from Jeffrey Berman
24
25

Page 4

1 Thereupon,
2          D. CULVER SMITH, III, ESQUIRE
3 was called as a witness and, having been first duly
4 sworn and responding, "I do," was examined and
5 testified as follows:
6              DIRECT EXAMINATION
7 BY MS. CORBISHLEY:
8    Q.   Will you do us the favor of giving your
9 full name to the court reporter, please.
10    A.   D. Culver Smith, III.
11    Q.   Thank you.
12        Mr. Smith, I'm Debbie Corbishley, and I
13 represent Mr. Silverman, who is sitting next to me,
14 and Abbey Kaplan, who is also a man. Sometimes people
15 get confused.
16        Also with us is Rob Sheres, who represents
17 the former Kluger, Peretz, Kaplan & Berlin law firm.
18    A.   Okay.
19    Q.   And we're here on the case of Cordell
20 versus Abbott.
21    A.   Yes.
22    Q.   Mr. Smith, I understand that you were
23 retained as an expert witness for Cordell; is that
24 correct?
25    A.   That's correct.

Page 5

1    Q.   When were you retained?
2    A.   October 15th of this year.
3    Q.   And what was the scope of your
4 employment -- of your duty, as you understood it?
5    A.   I have been asked to opine on whether the
6 Kluger Peretz firm had an obligation to discontinue
7 representation of Edward Okun or his affiliated
8 entities in a certain loan transaction.
9    Q.   Was the loan transaction, itself, specified
10 to you?
11    A.   Well, I was told of two loan transactions,
12 one for 2-and-a-half million -- I don't know that I
13 know the date when that closed -- and then a second
14 loan transaction for 7 million dollars that closed, I
15 believe, in April 2007.
16    Q.   Are your opinions limited to the obligation
17 for the law firm to withdraw from their representation
18 of Mr. Okun and his related companies?
19    A.   Well, they bear on that issue, yes.
20    Q.   Are there any other issues as to which you
21 expect to give an opinion in this case?
22    A.   Not yet.
23    Q.   Is there any implication or understanding
24 that you may be called on to give other opinions?
25    A.   No.

                              2 (Pages 2 - 5)

Page 6

1    Q.   We received an "Amended Notice of
2 Compliance Disclosing Plaintiff's Expert Witness and
3 His Opinion" on October 17th.
4         Was that the point at which you gave
5 opinions for use in this case?
6    A.   I had given an opinion by then, yes.
7    Q.   Have you given any other opinions in
8 writing to plaintiff's counsel?
9    A.   No.
10    Q.   Were there any opinions that you were asked
11 to give that you are not giving?
12    A.   No.
13    Q.   Between the time that you were retained on
14 October 15th, and the time that your opinion was
15 disclosed to defendants on October 17th, can you tell
16 us how much time you spent preparing to give and then
17 giving those opinions?
18    A.   No, not with any precision.  A few hours.
19    Q.   Can you tell us whether it was more than
20 ten hours or fewer than ten hours?
21    A.   I'm not positive, but I believe it was
22 fewer.  But it would have been close to ten hours, one
23 way or the other, in my estimation.
24    Q.   And, of course, you kept records?
25    A.   I did.

Page 7

1    Q.   Did you meet with anyone concerning this
2 retention?
3    A.   No.  I had a telephone conversation with
4 Mr. Gilbert on October 15th, and I've had a telephone
5 conversation with Bryan Yarnell on, I believe, the --
6 I'm trying to remember the days of the week -- the
7 16th and 17th -- the 16th or 17th.
8    Q.   I believe the 16th was the Thursday of that
9 week.
10    A.   Yes.  I believe I spoke to Mr. Yarnell on
11 the 16th.  It may have been the 17th.
12    Q.   All right.  Did you send either Mr. Yarnell
13 or Mr. Gilbert a written draft of your opinions?
14    A.   No.
15    Q.   Did you send them the final version of your
16 opinions in writing?
17    A.   No.
18    Q.   Did you read the Second Amended Complaint
19 in this case?
20    A.   I did.
21    Q.   That must have taken you at least ten
22 hours.
23         Did you read the Answer?
24    A.   No.
25    Q.   Any party's Answer?

Page 8

1    A.   No.
2         MS. CORBISHLEY:  Okay.  Rather than make
3 you guess, let me give you a copy of what has
4 been disclosed as your opinion.
5         MR. GILBERT:  I have got one right here.
6         MS. CORBISHLEY:  Okay.
7         MR. GILBERT:  Do you want to have it
8 marked?
9         MS. CORBISHLEY:  I do.  Thank you.
10         So that will be Exhibit 1.  And we are
11 just going to number every exhibit.
12         MR. GILBERT:  Do you have enough to go
13 around?
14         MS. CORBISHLEY:  I do.
15         MR. GILBERT:  So we don't need to use
16 this one?
17         MS. CORBISHLEY:  No.  Thank you.
18         THE WITNESS:  You can use this one.
19         MS. CORBISHLEY:  We have to let
20 Ms. Gilbert mark it.
21         MR. SHERES:  You can have this one back.
22         (Thereupon, the document/item referred
23 to was marked for identification as Deposition
24 Exhibit 1.)
25

Page 9

1 BY MS. CORBISHLEY:
2    Q.   Mr. Smith, if you will turn to page three
3 of what has been marked as Exhibit 1.
4         At paragraph one on that page, it lists
5 documents that you have read and relied on, which is
6 at numbered paragraph 3.
7         Are those all of the documents that you
8 have been furnished in connection with this case?
9    A.   No.
10    Q.   What else were you furnished with?
11    A.   The Second Amended Complaint, with exhibits
12 attached; the 2014 opinion of the Eleventh Circuit
13 Court of Appeals reversing the dismissal of the Second
14 Amended Complaint.
15         I believe that's all.
16    Q.   Okay.  Now, you selected five of the
17 exhibits -- I'm sorry.  Let me rephrase that.
18         Only five of the exhibits to the Second
19 Amended Complaint are listed as documents on which you
20 have relied.  Did you make that selection, or did
21 someone else make that selection?
22    A.   Well, I would say it was jointly done.
23    Q.   Did you ask for anything else?
24    A.   No.
25    Q.   Were you offered any depositions to read?

3 (Pages 6 - 9)

1    A.    No.
2    Q.    We've been advised that you are being paid
3 at $500 per hour.  Is that correct?
4    A.    That is correct.
5    Q.    Is that your ordinary hourly rate?
6    A.    For this type of assignment, yes.
7    Q.    Do you make a difference in your rate
8 depending on whether you're testifying, or preparing,
9 or traveling?
10    A.    No.
11    Q.    Okay.  We've received some information
12 about your background, and I don't want to spend the
13 day going into all of the background.  But can you
14 tell me what area of law is your general practice
15 area?
16    A.    The law of lawyering, as it's usually
17 called.  Lawyer ethics, lawyer professional
18 responsibility.
19    Q.    Does that constitute the majority of your
20 practice these days?
21    A.    It does.
22    Q.    And for how long has that been the majority
23 of your practice?
24    A.    I would say for -- Let's see.  It has been
25 the majority of my practice for the last twelve years,

1 maybe -- maybe longer.  It has been an evolving
2 process.
3    Q.    During your career, in what other areas of
4 the law have you had a substantial practice?
5    A.    In commercial litigation.
6    Q.    Do you have any experience in white collar
7 criminal work?
8    A.    No.
9    Q.    Do you have any experience in secured
10 transactions?
11    A.    Well, litigation over secured transactions,
12 but not in transactional work, as that term is usually
13 used.
14    Q.    Okay.  That actually makes it an easier way
15 to talk about this.
16          Other than litigating transactions, in the
17 course of your career, have you had experience as a
18 transactional lawyer?
19    A.    Well, I've had experience, but it's quite
20 limited.
21    Q.    In the last, let's say, twenty years, have
22 you practiced as a transactional lawyer?
23    A.    No, I don't claim to have ever practiced as
24 a transactional lawyer.
25    Q.    Would it be fair to say that, from time to

1 time, you had an assignment that involved a
2 transaction?
3    A.    (Nodding head.)
4          And it would be a pretty simple one.
5    Q.    Have you ever closed a commercial loan?
6    A.    Not as a -- Not as a lawyer representing a
7 client, no.
8    Q.    You closed it in your own business?
9    A.    Yes.
10    Q.    And you hired another lawyer to do that for
11 you, didn't you?
12    A.    Well, I didn't do it myself.  I don't
13 recall the circumstances now.
14    Q.    Okay.  Have you ever supervised
15 transactional lawyers?
16    A.    Not with regard to executing specific
17 transactions, no.
18    Q.    It sounds as if there are areas in which
19 you have supervised transactional lawyers that don't
20 relate to specific client work.
21          Could you describe for us your experience
22 in supervising transactional lawyers?
23    A.    Well, I have not supervised lawyers whose
24 practices are essentially transaction.  I may have
25 supervised lawyers who have had occasion to execute a

1 transaction, but that's rare.
2    Q.    And in what way did you carry out your
3 duties of supervision over transactions?
4    A.    Well, when I say "supervise," I'm talking
5 about a general law firm assignment responsibility,
6 and not responsibility for a particular transaction.
7          Does that make sense, that distinction?
8    Q.    It does.  Thank you.
9          So you would not hold yourself out as
10 someone expert at supervising transactional work; is
11 that correct?
12    A.    That is correct.
13    Q.    All right.  Would you take a look at
14 Exhibit 1, and tell us if you reviewed that document
15 before it was filed?
16    A.    I did.  Well, let me take that back.
17          I reviewed what I believe was the final
18 draft.  There may have been some insubstantial tweaks
19 that led to this, what was actually filed
20 (indicating).
21    Q.    All right.  Did you sign a copy of the
22 opinion?
23    A.    No.
24    Q.    When you say you may have made some
25 insubstantial tweaks, you made no substantive changes;

4 (Pages 10 - 13)

Page 14

1 is that fair?
2     A.   No, I didn't make the substantial [sic]
3 tweaks.
4     Q.   Okay.
5     A.   I'm just saying that the Exhibit 1 may be a
6 product of what I last reviewed, with some
7 substantial [sic] tweaks made by counsel.
8     Q.   Okay.
9     A.   I mean, insubstantial tweaks made by
10 counsel.
11     Q.   Insubstantial, okay.
12         And today you wouldn't be able to identify
13 if those were made or what they were; is that fair?
14     A.   Not without a comparison to what I have
15 here.
16     Q.   Okay.
17     A.   And I'm not saying there were any.  I'm
18 just not sure.
19     Q.   Okay.  Is it fair to say that the opinions
20 that you are giving begin at paragraph 4 on page
21 three?
22     A.   Well, no.
23     Q.   I'm sorry.  They begin at page two,
24 paragraph 1, don't they?
25     A.   Right.

Page 15

1     Q.   Okay.
2     A.   Well, paragraph --  Yes, paragraph 1 --
3 Paragraphs 1 and 2, I would say, refer to my opinions.
4     Q.   All right.  Exhibit 1 at paragraph 1 states
5 that the defendants had to withdraw as counsel for
6 Ed Okun and his affiliated entities in connection with
7 the underlying loan transaction.
8         Are you opining as to both the
9 2-and-a-half-million-dollar loan transaction and the
10 7-million-dollar loan transaction?
11     A.   Well, based on an assumption of some facts,
12 yes.
13     Q.   Can you tell me what assumptions you made
14 in arriving at the opinions?
15     A.   I am assuming that the Kluger Peretz
16 lawyers, who were involved in this representation,
17 were aware of the contents of these five exhibits
18 listed in paragraph 3 of Exhibit 1, and that as a
19 result of that, they were aware -- that they knew or
20 should have known that Mr. Okun was engaged in conduct
21 with regard to these transactions that was criminal or
22 fraudulent.
23     Q.   When you say that you have assumed that
24 they knew or should have known that Mr. Okun was
25 engaged in conduct with regard to these transactions,

Page 16

1 which transactions are you referencing?
2     A.   Well, in particular, the 7-million-dollar
3 loan transaction; and I'm a little unclear as to the
4 sequence of events regarding the
5 2-and-a-half-million-dollar loan transaction.
6     Q.   And what was the criminal or fraudulent
7 conduct that you assume Mr. Okun engaged in with
8 regard to the 7-million-dollar loan?
9     A.   The continuing course of conduct that would
10 support what was described in these -- in the two
11 Perkins memoranda and the two Berman memoranda.
12     Q.   What is the course of conduct that you
13 understand to be described in -- and let's start with
14 the Perkins memoranda?
15     A.   Well, what would normally be referred to as
16 a Ponzi scheme.
17     Q.   And what was the nature of the Ponzi
18 scheme?  How was it carried out, and who were the
19 targets?
20     A.   Well, it was carried out by transferring
21 funds from earlier purchased QI companies, to Mr. Okun
22 or his affiliated entities for his or their use,
23 rather than maintaining liquidity to pay back the -- I
24 believe they are called exchangers -- the QI company
25 clients, if "client" is the right word.  And then

Page 17

1 continuing to draw money from the newer acquired QI
2 companies to pay back the exchangers to which the
3 earlier acquired QI companies were obligated.
4     Q.   And what is the connection between this QI
5 issue and the 7-million-dollar loan, as you understand
6 it?
7     A.   As I understand it, the 7-million-dollar
8 loan was obtained for the purpose of beginning to
9 reestablish some liquidity in anticipation of demands
10 or obligations to clients of the QI companies.
11     Q.   Is it your either opinion or assumption
12 that there was a crime in connection with the
13 7-million-dollar loan itself?
14     A.   I am not necessarily assuming that there
15 was a crime.
16     Q.   Have you concluded that there was?
17     A.   No, I don't -- I have no opinion as to
18 whether that particular transaction was a criminal
19 transaction.
20     Q.   Do you have an opinion as to whether that
21 7-million-dollar transaction was a fraudulent
22 transaction?
23     A.   Well, it was my opinion that it was a
24 transaction that was part of a continuing course of
25 fraudulent activities.

5 (Pages 14 - 17)

Page 18

1    Q.   And what are the logical steps that you
2  have used to determine that the 7-million-dollar loan
3  was part of a continuing course of fraudulent
4  activities?
5        MR. GILBERT:  Objection to form.
6  BY MS. CORBISHLEY:
7    Q.   How did you arrive at that conclusion?
8    A.   Well, it is based upon what I read in these
9  documents.
10    Q.   And that would be the five exhibits?
11    A.   Yes.
12    Q.   Can you describe for me what in those
13  exhibits, dated between November of 2006 and February
14  of 2007, caused you to conclude that the April loan
15  was part of the continuing course of fraudulent
16  activities?
17    A.   Would you repeat the question, please, or
18  have it read back?
19    Q.   Can you describe for me what it was that
20  you read in the five exhibits, dated between November
21  of -- Actually, I'm sorry.  The Kutak opinion may
22  have been -- The Kutak opinion may have been late
23  October of 2006.
24        But between late 2006 and February of
25  2007 -- Let me try that again.

Page 19

1        Can you tell me what it was that you read
2  in these documents, dated between late October 2006
3  and February 2007, that caused you to conclude that
4  the April loan was part of a continuing course of
5  fraudulent activities?
6    A.   Well, what Mr. Perkins described in his two
7  memoranda, I believe, makes it pretty clear that the
8  transfer of funds out of the QI companies to Mr. Okun
9  or Investment Properties of America were for
10  fraudulent or improper purposes.  And, among other
11  things, Mr. Perkins was saying that these funds need
12  to be repaid immediately.
13        Then Mr. -- I forgot his name.
14    Q.   Mr. Berman?
15    A.   Pajonas.
16    Q.   Pajonas?  Okay.
17    A.   Then Mr. Pajonas, sounding the alarm in the
18  e-mails to Mr. Okun about the cash shortage, an e-mail
19  that was copied to or forwarded to -- and I forget
20  whether it was Mr. Kaplan or Mr. Abbott -- and then
21  Mr. Berman's memoranda basically agreeing with
22  Mr. Perkins' concerns.
23    Q.   Do you know when the Kluger, Peretz,
24  Kaplan & Berlin firm was retained by Mr. Okun?
25    A.   No.

Page 20

1    Q.   Do you know whether Mr. Okun's conduct,
2  prior to November 21, 2006, occurred during the course
3  of the Kluger, Kaplan, Peretz & Berlin retention?
4    A.   Prior to November 21, 2006?
5    Q.   Yes, mm-hmm.
6    A.   I'm under the impression that it began
7  before then, but I'm not positive.
8    Q.   That --
9    A.   The representation began.
10    Q.   The conduct?
11    A.   I'm sorry.  The conduct?
12    Q.   No.  I was trying to ask what you meant.
13  So when you say it began, what was it you were under
14  the impression that began before November 21, 2007
15  [sic]?
16    A.   That the representation began.
17        Maybe I confused the question.  Maybe we
18  should start over.
19    Q.   Let's try it again.
20        I think I asked you -- Well, let's try it
21  again.
22        Is it your impression that Kluger, Peretz,
23  Kaplan & Berlin had been retained prior to
24  November 21, 2007?
25    A.   '6.

Page 21

1    Q.   '6.  Thank you.
2    A.   That is my impression.
3    Q.   Is it your assumption that the conduct that
4  Mr. Perkins described occurred during the time that
5  Kluger, Peretz, Kaplan & Berlin was representing
6  Mr. Okun?
7    A.   No, not all of it.
8    Q.   Did any of the conduct that Mr. Perkins
9  described, in your view, in your understanding, occur
10  during the time that Kluger, Peretz, Kaplan & Berlin
11  represented Mr. Okun?
12    A.   I'm unclear about that.
13    Q.   Would it make a difference to you, in
14  reaching your opinions, whether Kluger, Peretz,
15  Kaplan & Berlin was counsel to Mr. Okun or his
16  companies prior to November 21, 2007 -- 2006?
17    A.   I apologize for asking -- for responding
18  with a question.
19    Q.   Okay.
20    A.   But can you tell me the date of -- and I'm
21  sorry I don't remember this -- the date of the
22  2-and-a-half-million-dollar loan transaction?
23    Q.   I believe it was in December 2006.
24        THE WITNESS:  Okay.  And then could we
25  have the preceding question read back?

6 (Pages 18 - 21)

Page 22

1    MS. CORBISHLEY:  Yes.  Nancy, if you
2  could.  I don't think I can do it again.
3        (Thereupon, the portion referred to was
4  read by the reporter.)
5    THE WITNESS:  No, I don't believe so.
6  BY MS. CORBISHLEY:
7    Q.   Now, Mr. Perkins' memos described past
8  conduct; is that fair to say?
9    A.   Yes.
10    Q.   Were you provided with any documents that
11  you would rely on that would establish that Mr. Okun's
12  wrongdoing continued after November 21, 2006 with
13  regard to use of QI funds?
14    A.   No, I don't believe so.
15    Q.   Would it make a difference, in reaching
16  your opinions, if Mr. Okun had not continued to
17  withdraw QI funds from QIs for the use of other
18  companies or his personal needs after November 21,
19  2006?
20    A.   It might.
21        I don't mean to be evasive.  I mean, I
22  don't think so, but there may be other additional
23  facts that I don't know yet.
24    Q.   If Mr. Okun had ceased taking QI funds for
25  purposes outside of the QI business as of

Page 23

1  November 21st, 2006, would you still reach the opinion
2  that Kluger, Peretz, Kaplan & Berlin was required to
3  withdraw prior to the December 2006 loan?
4    A.   I believe I would.
5    Q.   And would you reach the same conclusion
6  with regard to the April 2007 loan?
7    A.   Yes.
8    Q.   Okay.  And why is it that you would come to
9  the conclusion that if his wrongful conduct, as
10  described in the Perkins memo, had ceased as of
11  November 21st, 2006, Kluger Peretz could not go
12  forward with closing the December 2006 or April 2007
13  loans?
14    A.   Well, I see those loans as, based on what
15  I've been told or read, I mean, I see those loans as
16  part of a continuing course of conduct that supports
17  the Ponzi scheme, and therefore, is using the lawyers'
18  services in supporting the Ponzi scheme.
19    Q.   Other than your opinion that these loans
20  were part of the Ponzi scheme, do you have any other
21  basis on which to opine that the loans themselves were
22  fraudulent or criminal?
23    A.   Well, I have been told, or read, or both,
24  that the lender was misinformed of the purpose of the
25  loans, and that the lender was provided with financial

Page 24

1  statements that were or may have been materially
2  inaccurate.
3    Q.   If it is not true -- Let me try that
4  again.
5        If the lender was informed that the purpose
6  of the April loan was to cover an exchange for which
7  Mr. Okun and his companies did not have available
8  cash, would you still believe that the lender was
9  misinformed of the purpose of that loan?
10    A.   Well, based on that very narrow statement,
11  I mean, if there are no other circumstances that are
12  relevant, my opinion might be different.
13    Q.   And how?
14    A.   Well, I would need to, I think, to
15  understand a bit more about the circumstances of the
16  transaction before I could really come to a firm
17  conclusion on that, in response to your question.
18    Q.   What else would you need to know about the
19  circumstances of the transaction?
20    A.   Well, your question has asked me to assume
21  that Cordell Funding was told that the purpose of this
22  loan was to cover obligations that other QI companies
23  had?
24    Q.   Yes.
25    A.   Well, I would -- I would wonder why, I

Page 25

1  guess, that the loan was being taken out by Mr. Okun,
2  personally, as opposed to a QI company that has the
3  obligation.
4    Q.   Would that change your opinion as to
5  whether it was a fraudulent loan?
6    A.   I'm not sure.
7    Q.   Okay.  What would you need to know to
8  become sure?
9    A.   I would need to, I suppose -- if they
10  exist -- see counsel opinion letters.
11        I believe there is an exhibit to the Second
12  Amended Complaint, now that I think about it, that is
13  a counsel exhibit letter, but I don't recall its
14  content.  Excuse me.  I mean a counsel opinion letter.
15  I don't recall its content at the moment.
16        And perhaps see various correspondence, the
17  loan applications, those sorts of things.
18    Q.   You would expect that there would be a loan
19  application with regard to a 7-million-dollar loan?
20    A.   Well, I don't know.  I'm not a
21  transactional lawyer.  But it strikes me that there
22  might be, and if there is, perhaps it would be
23  relevant to this inquiry.
24    Q.   Is it fair to say that, today, you don't
25  have a basis for an opinion as to whether the

7 (Pages 22 - 25)

Page 26

1 7-million-dollar loan was fraudulent, for any reason
2 other than the Ponzi scheme that you believe occurred
3 with regard to the QIs?
4    A.   Well, I don't want to limit the term
5 "fraudulent," the definition of "fraudulent" to Ponzi
6 schemes.  I mean, there are other forms of fraud that
7 may be at play here.
8    Q.   Have you reached an opinion as to any other
9 form of fraud with regard to the 7-million-dollar
10 loan?
11   A.   Well, I believe --  An opinion?
12   Q.   Yes.
13   A.   Well, if the lender was misinformed about
14 the purpose of the loan or the financial condition of
15 the borrower, then I would consider that fraud, wholly
16 apart from whether it rises to the level of a part of
17 a Ponzi scheme.
18   Q.   Have you reached an opinion as to whether
19 the lender was misinformed or there were false
20 financials?
21   A.   No, I don't have any opinion about that.
22   Q.   Is your opinion based upon an assumption
23 that the lender was misinformed?
24   A.   In part.
25   Q.   And that's that the lender was misinformed

Page 27

1 as to the purpose for which the loan was being taken;
2 is that correct?
3    A.   Yes.
4    Q.   Does your opinion that if the lender was
5 provided with false financials, then the loan was
6 fraudulent, depend upon financials having been
7 provided to the lender in connection with this
8 specific loan?
9    A.   I believe so.
10   Q.   And if the lender was not provided with a
11 false financial statement in connection with this
12 specific loan, would your opinion change?
13   A.   Not necessarily.
14   Q.   Why not?
15   A.   Well, a financial statement would be one
16 part of the whole transaction.
17   Q.   Okay.  If the lender was not misinformed as
18 to the purpose for which the loan was being taken out,
19 and the lender was not provided with a false financial
20 statement in connection with this loan, do you have
21 any other assumption on which to base your view that
22 this was a fraudulent loan in April of 2007, besides
23 your view that it was part of the ongoing Ponzi
24 scheme?
25   A.   No, I don't believe so.

Page 28

1    Q.   And today, you don't believe that you have
2 adequate information to permit you to opine as to
3 whether the lender was, in fact, misinformed, correct?
4    A.   Well, that's probably correct.  I mean,
5 I've been assuming that.
6    Q.   And today, you don't believe that you have
7 adequate information to opine with regard to whether
8 false financial statements were provided to the lender
9 in connection with this loan, correct?
10   A.   Other than --  Other than having been
11 informed of that in some way, that's correct.
12   Q.   And do you know by whom or how you were
13 informed of that?
14   A.   I don't -- I don't remember.
15        I either read it in a pleading, or counsel
16 told me that, or both.
17   Q.   And as a litigator, you do know that
18 occasionally counsel are mistaken?
19        MR. GILBERT:  You are fading away to
20   nothing.  I cannot hear you.
21        MS. CORBISHLEY:  I'm sorry.
22 BY MS. CORBISHLEY:
23   Q.   And you do know that occasionally pleadings
24 are inaccurate and counsel can make mistakes?
25   A.   I do know that that occasionally happens.

Page 29

1    Q.   Okay.  And if that happened in this case,
2 with regard to the lender having been misinformed or
3 having been provided with false financials, would that
4 change your opinion?
5        MR. GILBERT:  Form.
6        THE WITNESS:  I don't know.
7 BY MS. CORBISHLEY:
8    Q.   Okay.  If Kluger, Peretz, Kaplan & Berlin
9 was not retained until after Mr. Perkins' memo, I
10 think you have told me that that would not change your
11 opinion as to their obligation to withdraw on
12 receiving Mr. Perkins' memo; is that correct?
13   A.   That's correct.
14   Q.   Why do you believe that the law firm was
15 not permitted to represent Mr. Okun as new counsel,
16 after the Perkins memo?
17   A.   Well, it seems to me that the Perkins memo,
18 and then the memo -- the memorandum of their own
19 associate lawyer, Mr. Berman, made it clear or should
20 have made it clear that Mr. Okun had been involved,
21 had been engaged in this fraudulent course of conduct,
22 and that going forward with the representation would
23 assist him in that course of conduct, and that -- or
24 would result in a furtherance of that course of
25 conduct.

8 (Pages 26 - 29)

1    Q.   When a client comes to a lawyer and says:
2  I found out that something I was doing was wrong; I've
3  stopped doing it, I'm going to put it right; how do I
4  go forward; is the lawyer permitted to represent that
5  new client in those circumstances?
6    A.   Yes.
7    Q.   What are the limitations on what the lawyer
8  can do to assist that new client, who has confessed
9  past wrongdoing and who has stated to his lawyers an
10  intention to correct it?
11    A.   The lawyer is permitted to assist the
12  client in correcting it.
13    Q.   Is the lawyer permitted to rely on the
14  client's statements that he has ceased the conduct?
15    A.   That would depend on the circumstances.
16      I mean, if it's -- If the lawyer
17  disbelieves the client, based on some other
18  information, the lawyer would not be permitted to
19  continue.  If the lawyer reasonably believes the
20  client, then I believe the lawyer would be permitted
21  to undertake the representation.
22    Q.   Is there a rule that says that the lawyer's
23  belief about the client's statements has to be
24  reasonable?
25    A.   Well, not directly.  It's more a case of

1  knowing or reasonably should know the contrary.
2    Q.   What rule is that?
3    A.   Well, that would be Rule 4-1.2.
4    Q.   1.2?  Okay, let's look at that.
5    A.   4-1.2(d).
6    Q.   Okay.
7    A.   And Rule 4-1.16.
8    Q.   1.2(d) and 1.6?
9    A.   1.16.
10    Q.   1.16?  Okay.
11      Those are the rules that you cite in your
12  report?
13    A.   Yes.
14    Q.   All right.
15    A.   So those rules are more on limitation on
16  what -- on a limitation rather than a permission.
17    Q.   And those rules, read in conjunction, I
18  suppose, provide for a mandatory withdrawal of lawyers
19  under certain circumstances, correct?
20    A.   Correct.
21    Q.   And they provide --
22      What is the standard of knowledge that the
23  lawyer has to have before he or she is required to
24  withdraw?
25    A.   Well, Rule 4-1.2(d) uses the standard:

1  Know or reasonably should know.
2    Q.   Okay.
3    A.   So actual or constructive knowledge.
4      1.16(a)(1) simply -- if I have the number
5  of the subparts right -- simply says the conduct --
6  "The representation will result in violation of the
7  Rules of Professional Conduct or law."  It doesn't
8  really state the standard of knowledge.
9    Q.   But for the lawyer to know if he or she has
10  to withdraw, they have to have some level of
11  knowledge, correct?
12    A.   Right.
13    Q.   Okay.
14    A.   And the handful of ethics opinions from
15  around the country, you know, basically use a
16  constructive -- some of them use a constructive
17  knowledge standard.
18    Q.   That standard goes to whether the lawyer
19  knows or reasonably should know the client's conduct
20  is criminal or fraudulent.  But the lawyer is
21  permitted to believe a client's statements in most
22  circumstances, correct?
23    A.   If it's a reasonable belief.
24    Q.   Where do you derive a subjective standard
25  for the client's belief in the truth of the --  I'm

1  sorry.  Let me try that again.
2      From what source do you derive that is a
3  subjective --  I need more coffee.
4      From what source do you derive the standard
5  that it must be objectively reasonable for a lawyer to
6  believe a client's factual statements?
7    A.   That the client has discontinued the prior
8  wrongful conduct --
9    Q.   Yes.
10    A.   -- is that what we're talking about?
11    Q.   Yes.
12    A.   I derive it from the converse.
13      There is not a rule that says that -- if
14  I'm not mistaken -- that gives affirmative permission
15  in the terms that your question uses.
16      There are rules that put limitations -- the
17  two rules that I cited -- on what a lawyer can do, and
18  they put limitations on that in the sense of what a
19  lawyer believes or reasonably believes about the
20  client's course of conduct.
21    Q.   The standard isn't actually what the lawyer
22  believes, it's what the lawyer knows or reasonably
23  should know is criminal or fraudulent, correct?
24    A.   Well, which one are you --  Which rule are
25  you talking about?

9 (Pages 30 - 33)

Page 34

1  Q.  4 --
2  A.  4-1.2(d)?
3  Q.  4-1.2(d).
4  A.  Yes, that's what the rule provides.
5  Q.  Okay.  In what circumstances is a lawyer
6  not permitted to believe a client who says:  I have
7  learned that what I have done in the past is not
8  right, and I won't do it again; help me put it right?
9       When does a lawyer have to disbelieve those
10 statements?
11 A.  Well, that's a difficult question to
12 answer.  When does a lawyer have to disbelieve those
13 statements?
14      Well, without using specific hypothetical
15 facts, I would say when it's objectively unreasonable
16 for a lawyer to believe those statements.
17 Q.  And under the circumstances, when the
18 client has engaged in the conduct described in
19 Mr. Perkins' memo, what would disallow the lawyer to
20 believe the client who says:  I'm stopping, help me
21 put it right?
22 A.  Well I'm not saying that the circumstances
23 described in Mr. Perkins' memoranda in and of
24 themselves require the lawyer to disbelieve a
25 subsequent statement of the nature you describe.

Page 35

1  Q.  What would they have to know, or see, or
2  hear that would make it objectively unreasonable for
3  them to believe their client when he says:  I'm
4  stopping, help me make it right?
5  A.  I think that's too --  That is such an
6  open-ended question, I can't answer that.  We would
7  have to go through, I suppose, a litany of
8  hypotheticals.
9  Q.  Is it fair to say that you don't know
10 enough about the circumstances of the case to be able
11 to discuss that today?
12 A.  It would be helpful if I knew more.
13 Q.  And today, you can't give me any guidance
14 on what facts would make a difference to your opinion?
15 A.  Well, no, I wouldn't say that.  I mean,
16 that's a very broad question.
17      But in the context of -- You're asking me,
18 first of all, in this line of questioning, to assume
19 that a client has told the lawyer:  I'm done, you
20 know, I've seen the error of my ways --
21 Q.  I'm going to make it right.
22 A.  -- I'm going to make it right.
23 Q.  And you have said the lawyer may not be
24 allowed to rely on that; is that correct?
25 A.  Well, first of all, I said a lawyer can

Page 36

1  undertake the representation of that client for that
2  purpose, to make it right.
3       And then you asked me about, is the lawyer
4  entitled to believe the client, and then we got into a
5  discussion about what circumstances would permit the
6  lawyer to believe or require the lawyer to --
7  Q.  Not believe.
8  A.  -- disbelieve the client.  So...
9       And then that gets into a whole
10 possibility -- a whole wide spectrum of possible
11 facts, which I'm not fully prepared to discuss today.
12 Q.  Okay.  Because you haven't had the
13 opportunity to look at any of the other facts in this
14 case, correct?
15 A.  I mean, I don't even know --
16      Of course, you have asked me to assume that
17 that is what the client said.  I don't know that that
18 happened here, and under what circumstances, and
19 whether -- you know, the whole tenor of it, and what
20 other factual circumstances might exist to weigh on
21 the lawyer's believing or disbelieving the client.
22 Q.  And no one has provided you with that
23 information as of today, correct?
24 A.  That is correct.
25 Q.  Okay.  Assuming that the facts, as set

Page 37

1  forth in Mr. Perkins' memos were correct, and assuming
2  that Mr. Okun said:  I understand that I'm not
3  permitted to do this.  I understand I have to put the
4  money back.  I will need to borrow to put the money
5  back.
6       Assuming that Mr. Okun is a new client, and
7  that the law firm was not involved in his prior
8  conduct, was the law firm permitted to assist Mr. Okun
9  with borrowing to put the money back?
10 A.  I don't think I'm prepared to opine on that
11 question today.
12 Q.  Okay.  Assuming that Mr. Okun was a new
13 client, and that the law firm was told by Mr. Okun
14 that:  I am going to stop borrowing from the QIs; was
15 the law firm permitted to assist Mr. Okun with regard
16 to transactions in his other businesses, not the QI
17 business?
18 A.  Assuming they are all proper transactions,
19 I believe the law firm would be permitted to assist
20 Mr. Okun in those unrelated transactions.
21 Q.  If we look at your opinions in Exhibit 1,
22 you begin about four lines down, that the law firm
23 "had to withdraw as counsel..."
24      What were the circumstances that required
25 Kluger, Peretz, Kaplan & Berlin to withdraw as

10 (Pages 34 - 37)

Page 38

1  counsel, provided that they were not retained until
2  after the Perkins memo?
3      A.   Well, I'm talking about not withdraw as
4  counsel in all matters, as your more recent question
5  made the distinction -- which your recent question
6  made the distinction.
7          I'm talking about the -- Well, it does say
8  here, the loan, "the underlying loan transactions."
9      Q.   All right. I think my question was, what
10 was the basis on which, assuming that they were first
11 retained after the Perkins memo, the law firm would be
12 required to withdraw, let's say with respect to the
13 loan transaction in April 2007?
14     A.   The circumstances were the knowledge gained
15 from the Perkins memoranda and from the Berman
16 memoranda.
17     Q.   Okay. Let's turn our attention for a
18 minute to the Berman memoranda.
19         Was the Berman memoranda, in your view,
20 describing current and ongoing behavior, or past
21 behavior? Would it help to have a copy? It is not in
22 there.
23     A.   I believe it was describing past behavior,
24 but -- or I don't recall exactly, but anticipating
25 continuing similar behavior.

Page 39

1      Q.   What is --
2      A.   I'm not sure I recall that accurately.
3      Q.   Would you like a copy? Would that make it
4  easier? I have one.
5      A.   Yes.
6      Q.   Okay. If you have a marked copy and you
7  would rather look at that, that's fine.
8      A.   No, I don't.
9      Q.   Okay.
10     A.   Well, I might. Let's see.
11         MR. GILBERT: Use her copy.
12         THE WITNESS: Okay.
13         (Thereupon, the document/item referred
14 to was marked for identification as Deposition
15 Exhibit 2.)
16 BY MS. CORBISHLEY:
17     Q.   Let me give you the February 26th dated
18 memo, if that is helpful. I believe that is
19 Exhibit 2.
20     A.   All right.
21     Q.   All right. Mr. Smith, I have given you
22 Exhibit 2, which is a copy of Mr. Berman's memo with a
23 date of February 26th, 2007.
24         I believe my question was whether
25 Mr. Berman's memo described past behavior or ongoing

Page 40

1  behavior.
2      A.   Well, I believe it was -- Well, strike
3  that.
4          Well, it seems to me the memorandum is
5  describing a type of behavior. And so it's clearly
6  describing or the type -- Excuse me.
7          It is describing a type of behavior, what
8  are the legal ramifications of a type of behavior.
9  And the type of behavior in question is drawn in part
10 from what is described in the Perkins e-mail, which is
11 past behavior, but it seems to me that it is
12 anticipating ramifications of future similar behavior
13 as well.
14     Q.   Do you know whether the law firm had reason
15 to believe, between November 26th, 2006 and
16 February 26th, 2007, that there was, indeed, ongoing
17 behavior of the type described in the Perkins memo?
18     A.   The time frame you -- It's referring to
19 ongoing behavior?
20     Q.   Between the time of the Perkins memo and
21 the retention of the law firm, which I will tell you
22 was after --
23     A.   All right.
24     Q.   -- November 21st, and the date of this
25 memo, February 26th, 2007.

Page 41

1      A.   I do not know whether the law firm had
2  reason to believe that there was additional
3  transferring of funds from QI companies to Mr. Okun or
4  his affiliates for their personal uses during that
5  period of time.
6      Q.   And if there was no reason to believe that
7  the conduct described in the Perkins memo had
8  continued through, let's say, February 26th, 2007,
9  would it still be your opinion that the law firm could
10 not represent Mr. Okun and his businesses in lending
11 transactions, assuming it is not a loan in the QIs --
12 a loan to the QIs, shall we say, or from them?
13     A.   Well, based on what I understand now, yes,
14 that would still be my opinion.
15     Q.   That they could not?
16     A.   Could not.
17     Q.   Why?
18     A.   Because, as I understand it, the two loans
19 in question were a part of the ongoing Ponzi scheme,
20 even if they are trying to create liquidity.
21     Q.   So if Mr. Okun has told the law firm, when
22 he retained them, that he will not continue to borrow
23 from the QIs, it is still your belief that borrowing,
24 in December 2006, was not a transaction that the law
25 firm could represent Mr. Okun with regard to?

11 (Pages 38 - 41)

1        MR. GILBERT:  Form.

2        THE WITNESS:  I think there is probably

3    more I need to know about that transaction.

4  BY MS. CORBISHLEY:

5    Q.   So, today, you don't have enough knowledge

6  to opine one way or another on that issue?

7    A.   Well, it would be a --

8        That's probably true, yes.

9    Q.   Would that be the same answer with regard

10  to the April loan --

11       MR. GILBERT:  Form.

12  BY MS. CORBISHLEY:

13   Q.   -- the April 2007 loan?

14       MR. GILBERT:  Form.

15       THE WITNESS:  Well, my opinion is, based

16   upon what I've read or been told, is that they

17   should not have been representing Mr. Okun in

18   that transaction.  There may be more that I need

19   to know.

20  BY MS. CORBISHLEY:

21   Q.   If the loan is to Mr. Okun personally, and

22  Mr. Okun had represented that he was not borrowing

23  funds from the QIs for personal use or for other

24  businesses, and the lawyers closing those loans had no

25  reason to know otherwise, is it your opinion that it

1  was improper for the April 2007 loan to be closed by

2  the Kluger Peretz lawyer?

3        THE WITNESS:  Could you repeat back the

4    question, please?

5        (Thereupon, the portion referred to was

6    read by the reporter.)

7        THE WITNESS:  Well, based on your

8    question as you frame it -- and it's all

9    inclusive -- I don't have an opinion on that.

10       I think I would need to know more about

11   the circumstances surrounding the loan.

12  BY MS. CORBISHLEY:

13   Q.   Okay.  Is it fair to say that you have not

14  been provided with anything, other than the complaint,

15  that would demonstrate that Mr. Okun continued to

16  borrow from the QIs for purposes unrelated to the QIs,

17  between the time that Kluger Peretz was retained in

18  November 2006 and April 2007?

19   A.   I'm hesitating because I don't recall the

20  content of the lawyer opinion letter attached to the

21  Second Amended Complaint.

22       But, otherwise, I believe that's probably

23  fair to say.

24   Q.   It would be fair to say that the lawyer

25  opinion letter probably didn't say:  Oh, by the way,

1  Mr. Okun has been taking money from the QIs for the

2  last six months, right?

3        MR. GILBERT:  Form.

4        THE WITNESS:  Yeah, I assume that.

5  BY MS. CORBISHLEY:

6    Q.   I think that's a fair assumption --

7    A.   Right.

8    Q.   -- for both of us.

9    A.   The question would be more whether the

10  opinion letter misstates the facts.

11   Q.   Okay.  And you have not been retained to

12  give an opinion on the opinion letter, correct?

13   A.   That is correct.

14   Q.   Okay.  Is it fair to say that you have not

15  been provided with anything other than the allegation

16  of the complaint, the Second Amended Complaint, that

17  would support an assumption that any lawyer at Kluger,

18  Peretz, Kaplan & Berlin knew that, between the time of

19  their retention in late November 2006 and the April

20  2007 loan, that Mr. Okun was continuing to borrow from

21  the QIs for non-QI purposes?

22       MR. GILBERT:  Form.

23       THE WITNESS:  Yes.  If you're including

24   inferences that one might draw from the exhibits

25   attached to the complaint, that's true.

1  BY MS. CORBISHLEY:

2    Q.   As I recall, the Berman memo is the only

3  memo that you -- is the only item that you rely on

4  that is later than, say, December 1, 2006, correct?

5    A.   I was thinking the initial Berman

6  memorandum was in December.

7    Q.   That is December of 2006.  But you don't --

8        If I understood you correctly, you didn't

9  think that the Berman memo described, one way or

10  another, whether it was, in fact, ongoing behavior.

11   A.   Oh, that's -- That's correct.

12   Q.   Do you know what Mr. Berman's relationship

13  was with the client?

14   A.   All I know -- Well, all I've been told is

15  Mr. Berman was an associate with the firm.  I have no

16  idea whether he had any personal contact with

17  Mr. Okun.

18   Q.   Do you know whether he had sources of

19  knowledge other than the Kutak and Perkins memoranda?

20   A.   I do not know.

21   Q.   Do you know whether he was engaged in

22  conversations about what Mr. Okun's ongoing conduct

23  was or was anticipated to be?

24   A.   I do not know.

25   Q.   Does it matter?

12 (Pages 42 - 45)

Page 46

```
1     A.   Probably not.
2     Q.   Do you know why his memorandum was
3  reprinted on February 26th of 2007?
4     A.   No.
5     Q.   Did you ask?
6     A.   No.
7     Q.   All right.  What is the basis for your
8  opinion that Kluger, Peretz, Kaplan & Berlin lawyers
9  knew or should have known that their representation,
10 with respect specifically to the April loan, would
11 assist Okun in conduct that was criminal or
12 fraudulent?
13    A.   Well, again, I mean, the basis is their
14 knowledge of the prior circumstances, as described in
15 the Perkins memoranda, their awareness of conclusions
16 drawn by Mr. Berman, and the relationship of the April
17 transaction to that prior course of conduct.
18    Q.   Have you reached an opinion that Steve
19 Silverman knew or should have known that the
20 representation in connection with the April loan was
21 assisting Okun in conduct that was criminal or
22 fraudulent?
23    A.   I have not.
24    Q.   Have you reached that conclusion with
25 respect to Abbey Kaplan?
```

Page 47

```
1     A.   I do not know which lawyers in the firm
2  read or were aware of or were made aware of the
3  contents of the Perkins memoranda or Mr. Berman's
4  memoranda, so I cannot specifically identify one or
5  more individual lawyers.
6     Q.   Does it matter whether they knew -- Let me
7  try again.
8          If Mr. Silverman had read the Berman memo,
9  but was not involved in the closing of the April loan,
10 would it be your opinion that Mr. Silverman knew or
11 should have known that the representation in
12 connection with that loan was assisting Mr. Okun in
13 conduct that was criminal or fraudulent?
14    A.   Well, knowing of the loan and its relation
15 to the prior conduct and being involved in actually
16 executing the loan transaction are two different
17 things.
18    Q.   Do you have a basis for an opinion that
19 Mr. Silverman was involved in or knew of the purpose
20 of the April 2007 loan?
21    A.   I don't have an opinion.  I don't know
22 whether he was.
23    Q.   Does it make a difference to your overall
24 opinions if Mr. Silverman was unaware of the purposes
25 for which the April 2007 loan was taken?
```

Page 48

```
1     A.   It might.  I haven't reflected on that.
2     Q.   Did you make any effort, in your opinions,
3  to distinguish between Mr. Kaplan, Mr. Abbott, and
4  Mr. Silverman?
5     A.   No.
6     Q.   Did you consider that there might be
7  different circumstances with respect to each of them,
8  in arriving at your opinion?
9     A.   I did not consider it, but I would assume
10 that they would differ in some way.
11    Q.   Did you make any inquiry into the
12 differences that there might be between and among the
13 three of them, before reaching an opinion that they
14 were obliged to withdraw and discontinue and cease
15 their representation?
16    A.   No.  I mean, my opinion was focused on the
17 firm's obligation.
18    Q.   Did you approve of the language that said
19 that you "will opine on the obligation" -- in the
20 middle of paragraph 1 -- "that Defendants Kluger,
21 Peretz, Kaplan & Berlin, Abbey Kaplan, Eliot Abbott,
22 and Steve Silverman had to withdraw"?
23    A.   Yes.
24    Q.   Did you approve of the language that,
25 "Specifically, he will opine that defendants should
```

Page 49

```
1  have refused to continue representing Ed Okun"?
2     A.   Yes.
3     Q.   Did you ask if there were any different
4  circumstances as to whether Mr. Kaplan, Mr. Abbott, or
5  Mr. Silverman knew or should have known that their
6  representation would assist Okun in conduct that was
7  criminal or fraudulent?
8     A.   No.
9     Q.   Why not?
10    A.   Well, I was assuming that one or more of
11 the defendants had this level of knowledge, and that
12 the obligation resulting from that knowledge would be
13 imputed to other members of the firm.
14    Q.   Is there a legal basis or a rule basis that
15 imputes knowledge of criminal conduct or knowledge of
16 fraudulent conduct from one member of a firm to
17 another member of the firm?
18    A.   I don't know that there is a rule that
19 expressly does that, but I'm not positive.  I would
20 have to consider that further.
21    Q.   Is the knowledge of an individual lawyer
22 imputed to his or her law firm?
23    A.   It depends on the circumstances.
24    Q.   Okay.  And you don't know whether there is
25 a basis for imputing knowledge from one lawyer in a
```

13 (Pages 46 - 49)

Page 50

1 firm to another lawyer in a firm?
2    A.   I don't know that I could tell you a
3 specific legal basis at the moment, but I am
4 comfortable that if a lawyer in a firm knows that a
5 transaction in which he or she has been asked to help
6 execute is part of a fraudulent scheme or is
7 fraudulent, it is not permissible for that lawyer to
8 put his or her head in the sand and say, "Go get my
9 partner to do it," and not tell the partner about it.
10    Q.   Is it your opinion that that happened in
11 this case?
12    A.   I don't have an opinion on that.
13    Q.   You're not giving an opinion that one of
14 the three lawyers knew that there was a fraudulent
15 transaction and distanced himself from it and asked
16 someone else to close it, are you?
17        MR. GILBERT:  Form.
18        THE WITNESS:  No, I'm not giving that
19    opinion.
20 BY MS. CORBISHLEY:
21    Q.   If we're looking strictly at, let's say,
22 Steve Silverman, and he has read the Berman memo but
23 he doesn't have any knowledge about whether Mr. Okun
24 is taking out a 7-million-dollar loan or why Mr. Okun
25 is taking out a 7-million-dollar loan, does your

Page 51

1 opinion that he had to withdraw or that he had to
2 cease representing Mr. Okun apply to him?
3    A.   Well, that question doesn't make much sense
4 to me, because it assumes he doesn't know of the
5 transaction, and then asks me whether he should
6 withdraw from representing them in the transaction.
7    Q.   Well, I'm having some trouble with your
8 opinion, because you have lumped three individuals and
9 a law firm together and say that they have an
10 obligation to do certain things.  But you are telling
11 me today that you don't know whether there is a
12 factual basis for that with regard to the individuals.
13        And I'm having some trouble trying to
14 figure out what your opinion is with respect to
15 Mr. Silverman, or Mr. Kaplan, whom I represent as
16 well.
17    A.   Okay.  Well, I have not --  And maybe this
18 is a bit broad, the way it is stated.
19        But I have not singled out --  It is not my
20 intent to single out Mr. Silverman, or Mr. Kaplan, or
21 Mr. Abbott, rather than the firm's obligation based on
22 knowledge that -- at least assuming a knowledge that
23 one or more of them had.
24        In other words, again, it's --
25        Mr. Silverman, if he --

Page 52

1        If Mr. Silverman knew -- and I'm not
2 assuming that -- if Mr. Silverman knew of all of these
3 circumstances, and said to Mr. Okun, I can't represent
4 you, I can't be a part of this, but it is okay for one
5 of my partners, who is ignorant of all of this, to
6 represent you --  You know, that's what my opinion,
7 is that you can't do that.
8    Q.   I think we would all be in agreement on
9 that.
10    A.   Okay.  Okay, good.
11    Q.   We're not completely unreasonable, no
12 matter what Mr. Yarnell says.
13        But my concern is that this is very strong
14 language of impropriety with regard to Mr. Kaplan and
15 Mr. Silverman.
16    A.   I mean, we're talking in the context here
17 of litigation -- I don't know if you would call it
18 tort litigation -- in which the principles of
19 vicarious liability perhaps pertain.
20        If we were talking about an individual bar
21 grievance against any of the three of them, the
22 inquiry might be a little different.
23    Q.   Is it your view that the principles of
24 ordinary vicarious liability would impute liability to
25 Mr. Kaplan and Mr. Silverman?

Page 53

1    A.   No.  I'm sorry.  It would impute to the
2 firm.
3    Q.   I don't represent the firm.
4    A.   I understand.
5    Q.   So I have a concern that I don't understand
6 the basis of your opinion against Kaplan and
7 Silverman.  And perhaps neither you nor I is quite
8 certain what the opinion is about each of them
9 individually.
10    A.   Well, other than the e-mail thread that's
11 an exhibit, where there is e-mail between Mr. Kaplan
12 and Mr. Abbott talking about the cash situation --
13    Q.   Mm-hmm.
14    A.   -- I don't know what knowledge either of
15 those two gentlemen or Mr. Silverman had.
16        I'm just saying the firm --  My opinion is
17 that the firm should have been out of it.
18    Q.   And if the members of the firm were told in
19 November, or let's say December of 2006, that Mr. Okun
20 would not borrow from the QIs for non-QI purposes, is
21 it still your opinion that the firm, as new counsel,
22 not involved in the prior conduct, had to withdraw and
23 could not represent Mr. Okun?
24        MR. GILBERT:  Form.
25        THE WITNESS:  Based on what information I

14 (Pages 50 - 53)

Page 54

1    have, that is my opinion.
2 BY MS. CORBISHLEY:
3    Q.   And we have talked about all the
4 information that you have --
5    A.   Yes.
6    Q.   -- all the documents that you have read,
7 everything that you have been told?
8    A.   That's correct.
9    Q.   Okay.  I know that you said that you were
10 first retained on the 15th?
11   A.   (Nodding head.)
12   Q.   Were you contacted about this case before
13 the 15th?
14   A.   No.
15   Q.   You never heard of it before then?
16   A.   That's correct.
17   Q.   Okay.
18   A.   I believe that's correct.
19   Q.   Would it be fair to say that you don't have
20 a basis today for knowing whether Mr. Silverman knew
21 or should have known that his representation would
22 assist Okun in conduct that was criminal or
23 fraudulent, Mr. Silverman as an individual?
24   A.   I believe that's fair to say.
25   Q.   Would that also be fair to say with regard

Page 55

1 to Mr. Kaplan?
2    A.   Well, I -- I have at least the
3 impression -- No.  I have at least the impression
4 that Mr. Kaplan and Mr. Abbott had some sense of what
5 was going on here, based at least on the e-mail
6 thread.
7    Q.   That there were very poor cash balances as
8 of that particular date?
9    A.   And that they had talked about that
10 problem.
11        Now, I'm, of course, assuming that --
12        I don't know who read the Perkins -- who in
13 the firm read the Perkins memoranda or the Berman
14 memoranda, or who asked Mr. Berman to even research
15 the issues in the first place.
16   Q.   Mm-hmm.
17   A.   But I'm assuming that someone did.
18   Q.   So Mr. Berman has written this memo, and as
19 of November 30th, you have been shown something that
20 gives you reason to believe that Mr. Abbott and
21 Mr. Kaplan have discussed the fact that there is -- or
22 their belief that there is 160 million of customer
23 obligations and 30 to 80 million of cash, correct?
24   A.   Correct.
25   Q.   Is that the memo that you were referring to

Page 56

1 a minute ago?
2    A.   Yes.  Yes.
3    Q.   Okay.  So on November 30th, they are aware
4 that there isn't enough cash to pay all of the
5 exchangers in cash on that date, correct?
6    A.   Correct.
7    Q.   Do you understand how the 1031 exchange
8 process works?
9    A.   Somewhat.  I'm certainly not an expert on
10 them.
11   Q.   Do you understand that in the course of a
12 1031 deferred exchange, that moneys deposited with a
13 QI will generally be left with the QI for some period
14 of time, up to 180 days?
15   A.   That's what I understand.
16   Q.   Okay.  So the fact that today there are
17 customer obligations of as much as 160 million, and
18 actual cash of 30 to 80 million, that does not mean
19 that tomorrow all 160 million has to be paid out,
20 correct?
21   A.   Understood.
22   Q.   And, in the normal course of business, one
23 does not sit with 160 million dollars worth of cash
24 that is not needed in cash tomorrow, correct?
25        MR. GILBERT:  Form.

Page 57

1        THE WITNESS:  I don't have an opinion on
2    that.
3 BY MS. CORBISHLEY:
4    Q.   So you are not in a position to opine as to
5 whether this liquidity issue that you referred to in
6 the November 30th, 2006 e-mail, which was Exhibit 4 to
7 the Second Amended Complaint, is, as a business
8 matter, acceptable or not acceptable?
9        MR. GILBERT:  Form.
10       THE WITNESS:  I do not have an opinion on
11   that.
12 BY MS. CORBISHLEY:
13   Q.   Do you have enough business background to
14 understand that if there are obligations that will
15 come due over the next six months, it is not ordinary
16 for a business to have the cash to pay those
17 obligations in full on day one of the six-month
18 period?
19       MR. GILBERT:  Form.
20       THE WITNESS:  I think your question was:
21   Do I have enough business experience?
22 BY MS. CORBISHLEY:
23   Q.   Yes.
24   A.   I am not a businessman, and I just don't
25 have an opinion on that.  I do not know.

15 (Pages 54 - 57)

Page 58

1    Q.   Do you have the ability to give an opinion
2  as to whether, at November 30th, there was, in fact, a
3  liquidity problem with the 1031 exchanges?
4    A.   Not beyond Mr. Abbott's and Mr. --
5       Well, not beyond the documents that I have
6  read.
7    Q.   Do you know when the first time was that
8  any of the 1031 exchange companies missed the ability
9  to fund a transaction?
10    A.   No.
11    Q.   Do you know what representations were made
12  to the law firm concerning the accuracy of the
13  balances of cash being reported by its people?
14    A.   No.
15       MS. CORBISHLEY:  I have had you sitting
16    here for an hour-and-a-half.  Would you like a
17    break?
18       THE WITNESS:  I would appreciate it.
19       MS. CORBISHLEY:  I should have told you
20    that before, that of course you may get up any
21    time you want to.
22       THE WITNESS:  I knew that.  I would have
23    asked.
24       MR. GILBERT:  Are we off?
25       MS. CORBISHLEY:  Yes, we're off.

Page 59

1       (A recess was taken from 11:30 a.m. to
2  11:46 a.m., after which the following proceedings
3  were had:)
4  BY MS. CORBISHLEY:
5    Q.   All right.  Let's see.
6       I think we were talking a little bit about
7  your impression from the, I guess it was two e-mails,
8  one referring to the amount of cash and the amount of
9  customer obligations, and then one from Mr. Pajonas
10  saying time is running out.
11    A.   Mm-hmm.
12    Q.   And those are both in November of 2006.
13       Do you have any information about what the
14  lawyers knew about liquidity at the 1031 companies
15  from November of 2006 through April 20th, 2007?
16    A.   No.
17    Q.   And I think you told me right before the
18  break that you were not aware of the first time the
19  lawyers learned that a scheduled exchange could not
20  close because there was not enough cash; is that
21  correct?
22    A.   That is correct.
23    Q.   Okay.  Are you aware of what actions were
24  in progress from the end of November 2006, through
25  April 2007, to rectify Mr. Okun's past conduct?

Page 60

1    A.   No.
2    Q.   Perhaps I should state that differently.
3       Do you have any information about what the
4  lawyers at Kluger, Peretz, Kaplan & Berlin believed
5  was in progress to rectify Mr. Okun's past conduct,
6  from the time that they were retained in late
7  November 2006, through this loan in April 2007?
8    A.   No.
9    Q.   Have you formed any opinion as to the
10  involvement of any of the lawyers in any financial
11  statements given to Cordell, the lender in this case?
12    A.   No.
13    Q.   Do you have any information on the
14  involvement of the lawyers in the provision of
15  financial statements to Cordell?
16    A.   Are you talking about the individual
17  lawyers?
18    Q.   Yes.
19    A.   As distinct from one another?  No, I do
20  not.
21    Q.   Do you have any information on whether any
22  of the lawyers -- even if you can't identify him --
23  had a role in giving financial statements to Cordell?
24    A.   Well, beyond representing Mr. Okun in the
25  transaction in which those documents were provided, I

Page 61

1  do not.
2    Q.   Okay.  You assume that a financial
3  statement was given to Cordell in connection with the
4  April 2007 loan?
5    A.   That's my impression.  I don't recall the
6  source of my impression.
7    Q.   Okay.  Are you assuming that there was a
8  financial statement, based upon something that you
9  have read, or seen, or based upon your knowledge of
10  loan transactions?
11    A.   I am under the -- I'm under the
12  impression --
13       I guess I'm assuming that there was a
14  financial statement provided in connection with that
15  transaction.
16    Q.   And you don't know the source?
17    A.   And I don't recall, I don't recall the
18  source of that assumption.
19    Q.   Do you know who the lawyers were who were
20  involved in the loan transaction in April of 2007?
21    A.   I don't have any firsthand knowledge of
22  that.
23    Q.   Do you have any understanding or
24  recollection?
25    A.   Not by name.

16 (Pages 58 - 61)

Page 62

1    Q.   Is there some --
2    A.   I have some sense.
3    Q.   -- kind of a description?
4    A.   I have this sense that the so-called
5  transactional lawyers -- quote, end quote -- were
6  involved.
7    Q.   Do you know if Mr. Kaplan was a
8  transactional lawyer?
9    A.   I don't know.
10   Q.   Do you know if Mr. Silverman was a
11  transactional lawyer?
12   A.   I don't know.  I suspect that that is laid
13  out in the Second Amended Complaint, but I don't
14  recall those allegations.
15   Q.   Do you have a basis for an opinion or an
16  assumption that Mr. Kaplan had actual or constructive
17  knowledge that the April loan was part of a criminal
18  or fraudulent activity?
19   A.   Mr. Kaplan personally?
20   Q.   Yes.
21   A.   No.
22   Q.   The same question with regard to
23  Mr. Silverman.
24   A.   The same answer.
25   Q.   Same question with regard to Mr. Abbott.

Page 63

1    A.   Same answer.
2        MR. GILBERT:  Form.
3        THE WITNESS:  Same answer.
4  BY MS. CORBISHLEY:
5    Q.   Are you giving an opinion as to the civil
6  liability of the law firm today?
7    A.   No.
8    Q.   Would that be true with respect to each of
9  the individual lawyers?
10   A.   Yes.
11   Q.   I don't remember if I asked you this.
12       Do you have an opinion on the duty of
13  Mr. Silverman or Mr. Kaplan to supervise the
14  transactional lawyers with regard to the April loan?
15   A.   No.
16   Q.   Okay.  And it would be fair to say that you
17  do not know who billed time on the loan, worked on the
18  loan, spoke to Cordell and its representatives, or
19  worked on the opinion letter?
20       MR. GILBERT:  Form.
21       THE WITNESS:  That would be fair to say.
22  BY MS. CORBISHLEY:
23   Q.   And it would be fair to say that you don't
24  have an opinion and don't have any knowledge on
25  whether anybody reviewed the opinion letter?

Page 64

1    A.   Well, I don't know who did, but I assume
2  some lawyer at the firm did.  Somebody authored it.
3    Q.   Okay.  Do you have any opinions on the
4  obligation of lawyers, other than the author, to
5  supervise or review an opinion letter?
6    A.   Not in general terms, no.
7    Q.   And you don't have any specific information
8  in this case?
9    A.   That's correct.
10       MR. GILBERT:  Form.
11  BY MS. CORBISHLEY:
12   Q.   Do you have any basis to believe that any
13  of the lawyers at KPKB, in the most general sense,
14  counseled Ed Okun to engage in criminal or fraudulent
15  conduct?
16   A.   Not in those terms, no.
17   Q.   Do you have an opinion as to whether any of
18  the lawyers assisted the client to engage in criminal
19  or fraudulent conduct?
20   A.   Well, it seems to me that the lawyers, by
21  participating in the two transactions, did, in fact,
22  assist the lawyer -- assist the client -- excuse me --
23  in conduct that could be characterized as fraudulent
24  or criminal.
25   Q.   And it is fair to say you don't know which

Page 65

1  of those lawyers it was, correct?
2    A.   That is correct.
3    Q.   And other than the five documents that
4  we've talked about that you relied on, you have no
5  other basis for an opinion that the clients knew --
6  that the lawyers knew or should have known that the
7  December and April loans were providing assistance to
8  ongoing criminal or fraudulent conduct?
9        MR. GILBERT:  Form.
10       THE WITNESS:  Well, I don't know that I
11   would -- could limit it to those five documents.
12       I mean, I've been told to assume certain
13   things, certain allegations that have been made,
14   assume that they are accurate.
15       And so it's not that -- it's not that
16   simple that it's just those five documents.
17  BY MS. CORBISHLEY:
18   Q.   Have you assumed that all of the
19  allegations of the Second Amended Complaint are true?
20   A.   No.  I haven't assumed anything is false,
21  but I haven't assumed that they are all true.
22   Q.   Can you tell us which allegations you have
23  assumed are true and have relied on in forming your
24  opinions?  And I can provide you with a copy, if that
25  helps.

17 (Pages 62 - 65)

Page 66

1    MR. GILBERT:  Object to the form.
2    THE WITNESS:  It is not that I have gone
3  through the Second Amended Complaint and picked
4  out certain allegations and assumed they are
5  true.
6    It has been more a question of
7  discussions with counsel and reviewing
8  documents, from which I've derived certain
9  assumptions.
10 BY MS. CORBISHLEY:
11   Q.   What are your assumptions with regard to
12 the satisfaction of the prong that the lawyers had to
13 know or have constructive knowledge of the ongoing
14 fraud or criminal conduct?
15   A.   Well, the sources are those documents,
16 and --
17   Q.   What assumptions are you relying on --
18   A.   Oh, I'm sorry.
19   Q.   -- to satisfy that prong?
20   A.   What assumptions, that they knew?
21   Q.   That they knew or were in constructive
22 knowledge that they were providing assistance to an
23 ongoing fraud.
24   A.   Well, I am assuming that they -- one or
25 more of them were aware of the contents of those five

Page 67

1  documents, and...
2    Q.   We have to make the leap between the
3  statement of past conduct to the ongoing wrongdoing,
4  so that it is wrongful to do something --
5    A.   Well, I'm making --
6    Q.   -- in April.
7    A.   I'm sorry.
8    MR. GILBERT:  Form.
9    THE WITNESS:  I'm making assumptions that
10 the loans, the two loan transactions in question
11 were related to, at least, the past conduct
12 insofar as trying to --
13   Well, I have just related it -- related
14 to the past conduct.  Let's leave it at that.
15 BY MS. CORBISHLEY:
16   Q.   And how do you satisfy --
17   What are you relying on or assuming to
18 satisfy the prong that the lawyers knew or should have
19 known that those loan transactions were part of
20 ongoing criminal or fraudulent conduct?
21   A.   Well, I don't know that it's a -- you can
22 characterize it as an assumption.  I mean, it is --
23 It is certainly related to that past conduct.
24   I don't know whether there were -- As we
25 have established, I don't know today whether there was

Page 68

1  additional improper transferring of funds during the
2  term of the representation, except to the extent that
3  maybe the 2-and-a-half-million-dollar loan was such a
4  thing.  I don't know.
5    Q.   But I was asking you, how do you establish
6  that the lawyer satisfy that prong that they knew or
7  should have known that these loan transactions were
8  part of ongoing wrongful conduct?
9    It's one thing if Mr. Okun is behaving
10 improperly and the lawyers don't know it, correct?
11   MR. GILBERT:  Form.
12   THE WITNESS:  Correct.
13 BY MS. CORBISHLEY:
14   Q.   If Mr. Okun is behaving improperly, and the
15 lawyers are not charged with actual or constructive
16 knowledge, then they have no obligation to withdraw,
17 correct?
18   MR. GILBERT:  Form.
19   THE WITNESS:  Well, I believe that's
20 correct.  That's a self-answering question.
21 BY MS. CORBISHLEY:
22   Q.   Okay.  Therefore, in order for the lawyers
23 to have an obligation to withdraw, they have to have
24 actual or constructive knowledge, correct?
25   A.   Yes.

Page 69

1    (Brief interruption.)
2  BY MS. CORBISHLEY:
3    Q.   All right.  And so my question to you is,
4  how do we get there?  How do you get there to form
5  your opinion that they were required to withdraw,
6  based on the knowledge prong of the requirement?
7    A.   Well, I'm assuming they knew, that they had
8  this information -- one or more of them -- they had
9  this information that is contained in the Perkins
10 memoranda and the Berman memo; that they knew of the
11 cash liquidity issue; they knew that someone
12 internally in the company considered it an emerging,
13 if not an existing, crisis; that they knew of the
14 nature of -- the undocumented nature of the prior
15 loans and that these loans were part of that
16 continuing scheme, whether it be to try to avoid
17 discovery or whatever.  But it was, to me, it was part
18 of the continuing process.
19   Q.   And you base that belief upon the memos and
20 e-mails in November of 2006 or earlier, and then the
21 Berman memo?
22   A.   And then the Berman memoranda.  And --
23 Something else just slipped my mind.  But that's
24 basically it, yes.
25   Q.   Okay.  Now, assuming that Mr. Okun had

18 (Pages 66 - 69)

Page 70

1 engaged in wrongful conduct before November 21, 2006,
2 and that when he retained Kluger, Peretz, Kaplan &
3 Berlin, he told them:  I will not borrow from the QIs
4 again.
5        Do you have a basis to satisfy the "knew or
6 should have known" prong of the rules that we're
7 talking about that would require Kluger, Peretz,
8 Kaplan & Berlin to withdraw, rather than engage in the
9 April 2007 loan?
10        MR. GILBERT:  Form.
11        THE WITNESS:  I, as I sit here at the
12   moment, I don't have an opinion on that.
13        You're asking me to assume that he --
14 BY MS. CORBISHLEY:
15    Q.   Yes, that he told them.
16    A.   -- announced that he would not engage in
17 any further such wrongdoing?
18    Q.   Correct.
19    A.   No, I don't have an opinion on that today.
20    Q.   Okay.  Are you aware of any facts, between
21 the end of November 2006 and April 2007, that would
22 support an opinion that the lawyers had become aware
23 that their services had been used to perpetrate a
24 crime or fraud?
25    A.   Not specifically, no.

Page 71

1    Q.   Do you have a general belief that there are
2 such facts?
3    A.   Not at the moment, no.
4    Q.   Do you expect to learn more?
5    A.   I have no way of knowing.
6    Q.   Okay.  There hasn't been --
7    A.   I would like to learn more.
8    Q.   Has there been a discussion about whether
9 you will revise your opinions?
10    A.   No.
11    Q.   Okay.  Let's see.  You made a statement
12 that -- I believe it is on page four of the document
13 that contains your opinions, up at the top.  Yes, it
14 is page four.
15        "...the fact that Okun did not have enough
16 exchangers' cash to fund closings when they were due
17 to be closed."
18        Do you have a basis for the belief that
19 Okun did not have enough cash to fund closings when
20 due to be closed?
21    A.   Not specifically, because, as I think in
22 earlier questioning and as you just pointed out, I do
23 not know when they were due to be closed, when each
24 individual transaction was due to be closed.
25        I do know that there was a cash issue that

Page 72

1 was alarming to Mr. -- Is it Projones?  I forgot his
2 name.
3        MR. GILBERT:  Pajonas.
4        THE WITNESS:  It is in the e-mail.
5 BY MS. CORBISHLEY:
6    Q.   Pajonas.
7    A.   Pajonas.
8    Q.   Pajonas.
9    A.   Pajonas.  Thank you.
10    Q.   Are you aware that Mr. Pajonas was involved
11 in a struggle with Mr. Okun to get Mr. Okun to give
12 him substantial sums of money at the time that he
13 wrote that e-mail?
14    A.   No, I'm not aware of that.
15        MR. GILBERT:  Form.
16 BY MS. CORBISHLEY:
17    Q.   Are you aware that Mr. Pajonas was
18 withholding access to bank accounts at the time that
19 he wrote that memo?
20        MR. GILBERT:  Form.
21        THE WITNESS:  No.
22 BY MS. CORBISHLEY:
23    Q.   And assuming that it appeared to the
24 lawyers at Kluger, Peretz, Kaplan & Berlin that
25 Mr. Pajonas was engaged in an effort to get more cash

Page 73

1 from Mr. Okun than he was entitled to, and was
2 withholding access to corporate records and corporate
3 money as part of that struggle, would it be reasonable
4 for the lawyers to disbelieve Mr. Pajonas?
5    A.   Well --
6        MR. GILBERT:  Form.
7        THE WITNESS:  Well, withholding access to
8   funds, I'm not sure how that would be working,
9   but the --  I don't know the --
10        To answer your question, I don't know.
11   Because, to me, the important question is
12   whether what he said, what Pajonas said in that
13   e-mail was accurate, not what he was doing
14   otherwise.
15 BY MS. CORBISHLEY:
16    Q.   If there was reason to believe that
17 Mr. Pajonas was not reporting accurately, because of
18 his personal desire to achieve something personally
19 out of the situation that he was describing, would it
20 be fair for lawyers to discount what he said?
21        MR. GILBERT:  Form.
22        THE WITNESS:  I suppose it would.
23 BY MS. CORBISHLEY:
24    Q.   And that would be usual, wouldn't it?
25    A.   Yes.

19 (Pages 70 - 73)

Page 74

1    Q.   And is it fair to say that --
2         You have a law firm in which you are a
3  named partner, correct?
4    A.   Correct.
5    Q.   Is it fair to say that today, you don't
6  have the cash on hand to meet all of your obligations
7  coming due in the next six months?
8    A.   Well, that's kind of personal.  But it's
9  not fair to say that.
10   Q.   Okay.  It's not?
11   A.   (Shaking head.)
12   Q.   Okay.  Your law firm maintains the cash to
13 meet its obligations for the next six months?
14   A.   Yes.
15   Q.   Okay.  Is it your experience --
16   A.   I'm a sole practitioner, so it is pretty
17 easy.
18   Q.   Is it your experience that in the large
19 firms that you were with, that they maintained enough
20 cash on hand to meet their expenses for six months?
21        MR. GILBERT:  Form.
22        THE WITNESS:  I was never privy to that
23   information.  I mean, I could have obtained that
24   information, but I do not know.
25

Page 75

1  BY MS. CORBISHLEY:
2    Q.   In your commercial litigation experience,
3  do you know whether businesses generally maintain
4  sufficient cash on hand to meet the debts coming due
5  in the next six months?
6         MR. GILBERT:  Form.
7         THE WITNESS:  I do not know.
8  BY MS. CORBISHLEY:
9    Q.   If an in-house lawyer says that there might
10 be a problem with financial statements, but the
11 client's CPA brings statements to you and tells you
12 that he has reviewed them and that he is comfortable
13 with them, is it fair for a lawyer to believe the CPA?
14        MR. GILBERT:  Form.
15        THE WITNESS:  Yes, absent some unusual
16   circumstance.  Yes.
17 BY MS. CORBISHLEY:
18   Q.   If an in-house lawyer says he is going to
19 report the conduct to the authorities but he doesn't
20 do so, do you believe it's fair for a lawyer to
21 discount what the in-house lawyer said about the
22 circumstances?
23        MR. GILBERT:  Form.
24        THE WITNESS:  No, I don't believe it
25   would be fair.  You mean to totally discount it,

Page 76

1  to ignore it?
2  BY MS. CORBISHLEY:
3    Q.   Not to ignore it completely, but to not
4  give it a lot -- as much credence as you would give
5  otherwise?
6         MR. GILBERT:  Form.
7         THE WITNESS:  I wouldn't say that, no.
8  BY MS. CORBISHLEY:
9    Q.   If Mr. Perkins knew that Mr. Okun was
10 engaged in criminal and fraudulent conduct, he had an
11 obligation, as Mr. Okun's in-house counsel, to end it,
12 correct?
13   A.   To try to end it.
14   Q.   Right.  And if he was not successful in
15 ending it, what was his next obligation?
16   A.   Well, without knowing any more details, I
17 would say he should have withdrawn or terminated his
18 employment.
19   Q.   If he believed that the conduct, the
20 wrongful conduct, was ongoing and was criminal or
21 fraudulent, and that his own and his department's
22 services had been used in connection with those
23 criminal and fraudulent activities, did he have an
24 obligation to report it beyond to Mr. Okun and others
25 in the business?

Page 77

1    A.   I don't have an opinion about a legal
2  obligation.
3         Whether he had an ethical obligation would
4  depend upon more circumstances than I'm -- than to
5  which I'm privy.
6         I know he's a member -- evidently, a member
7  of the Virginia bar.  I'm not sure what the Virginia
8  bar's rules are about that.  There are confidentiality
9  issues to consider.  So I'm not really prepared to
10 opine on that.
11   Q.   Didn't Mr. Perkins say that he was obliged
12 to report it to the authorities?
13   A.   He said that.
14   Q.   And if he said it and it's not true, would
15 you think that the new lawyers coming in had to lend
16 great weight to everything he said?
17        MR. GILBERT:  Form.
18        THE WITNESS:  No, no.  Great weight?  I
19   mean, we're talking degree here.  I mean, I
20   think it is a serious thing to consider what he
21   had to say.
22 BY MS. CORBISHLEY:
23   Q.   And if they considered it and concluded
24 that his statements were in excess of the actual
25 situation, would that be reasonable?

20 (Pages 74 - 77)

Page 78

1    MR. GILBERT: Form.
2    THE WITNESS: I have no way of knowing
3  whether that would have been reasonable under
4  the circumstances.
5 BY MS. CORBISHLEY:
6    Q.   It's not your opinion, however, that they
7  had to take his memos as gospel truth, correct?
8    A.   Well, in the sense that --
9    MR. GILBERT: Form.
10    THE WITNESS: In the sense that they --
11  They certainly had the option, and
12  probably it was the right thing to do, to
13  conduct their own investigation and evaluation.
14 BY MS. CORBISHLEY:
15    Q.   Were they required to?
16    A.   No, they are not required to, I wouldn't
17  say, necessarily.
18    Well, I'm not sure that I have an opinion
19  about that, because I'm not sure how this came to
20  them, other than it did come to them.
21    Q.   And do you know anything about what
22  attention they gave to Mr. Perkins' memos?
23    A.   No.
24    Q.   And I think it's fair to say -- I think you
25  have already told us this -- that you don't know what

Page 79

1 Mr. Okun, or the CPA that he hired, or the new
2 in-house lawyer that he hired, told them about the
3 circumstances?
4    MR. GILBERT: Form.
5    THE WITNESS: That's correct, I do not.
6 BY MS. CORBISHLEY:
7    Q.   Have you done any independent legal
8 research in connection with your opinions?
9    A.   Yes.
10    Q.   Okay. What legal research have you done?
11    A.   I checked -- Of course, I read the rules.
12    Q.   And you have cited those, so we know that.
13    A.   And the comments -- And the comments to
14 the rules.
15    Q.   Okay.
16    A.   I looked at the annotations to the rules
17 in, you know, Florida Statutes Annotated.
18    I reviewed some case law. There were a
19 couple Florida opinions, Florida cases that I thought
20 were, perhaps, pertinent.
21    And I looked at -- I checked whether there
22 were Florida Bar ethics opinions that might relate,
23 and there were a couple that might.
24    I subscribe to the ABA/BNA Lawyer's Manual,
25 and I checked that with regard to the discussion and

Page 80

1 citations regarding obligation to withdraw under
2 certain circumstances.
3    I believe that's all the research that I
4 have done to date.
5    Q.   Were there particular Florida cases that
6 assisted you in forming the opinions that you reached?
7    A.   Yes. There was -- There are one or two.
8    The one that I recall that sticks in my
9 mind is Florida Bar versus Brown. It is a 2001 case.
10 It involved a lawyer's assisting a client in violation
11 of the elections laws, and it discussed the "should
12 have known" standard.
13    Q.   Okay.
14    A.   But that was discussing, if I recall
15 correctly, Rule 4-1.2, you know, the bar on assisting
16 a client in a criminal or fraudulent activity, and not
17 the withdrawal rule.
18    Q.   Okay.
19    A.   But I don't recall, at the moment, what the
20 other one is. It didn't leave as much of an
21 impression on me.
22    Q.   Okay.
23    A.   There is the Florida Bar Ethics Opinion
24 90-6 that was reconsidered in 2009, that opined that a
25 criminal defense lawyer is obligated to withdraw from

Page 81

1 representation if he learns that an existing criminal
2 defense client is using an alias in the legal
3 proceedings and won't correct it.
4    And there were three or four case decisions
5 or ethics opinions from other jurisdictions that were,
6 I thought, perhaps relevant.
7    Q.   Okay. Have you given an opinion on Florida
8 Rule of Professional Conduct 4-1.2(d) in the past?
9    A.   No. You mean as an expert?
10    Q.   As an expert, yes.
11    A.   As an expert? No, I don't recall that I
12 have.
13    Q.   And have you given an opinion on mandatory
14 withdrawal in the past, as an expert?
15    A.   No.
16    Q.   I couldn't find one, so that's not a trick
17 question.
18    Is it fair to say that you are not prepared
19 to and don't plan to give any opinions on whether the
20 lender has a right to rely upon borrower's counsel to
21 disclose past wrongdoing not directly connected with
22 the loan?
23    A.   It is fair to say that I do not have such
24 an opinion on that topic.
25    Q.   Is it fair to say that you don't intend to

21 (Pages 78 - 81)

Page 82

1 give an opinion with regard to whether the lawyer for
2 the borrower is obligated to tell a lender of any
3 concern that the lawyer has regarding the current
4 business methods of the borrower?
5     MR. GILBERT: Form.
6     THE WITNESS: I'm not prepared to opine
7 on that today. I haven't been asked to.
8 BY MS. CORBISHLEY:
9   Q. Okay. When you are giving an opinion with
10 regard to violation of ethical standards, that is not
11 intended to suggest that that is the basis for a
12 liability decision, correct?
13   A. Correct.
14     MS. CORBISHLEY: Do you want to give me
15 five minutes? And we will go in the hall this
16 time.
17     THE WITNESS: Well, I can go and get a
18 bottle of water. We can step outside.
19     MS. CORBISHLEY: Oh, okay.
20     (A recess was taken from 12:21 p.m. to
21 12:30 p.m., after which the following proceedings
22 were had:)
23     MS. CORBISHLEY: Okay. Back on the
24 record.
25     I'm going to cede the questioning to

Page 83

1 Mr. Sheres.
2     CROSS-EXAMINATION
3 BY MR. SHERES:
4   Q. Okay. Good afternoon.
5     I am Robert Sheres, and I represent the
6 firm of Kluger, Peretz, Kaplan & Berlin.
7     I have just a couple of questions. And I
8 apologize if some of these are repetitious of what
9 Ms. Corbishley has gone through.
10     Just for clarification, you don't know
11 exactly what Mr. Okun told the Kluger Peretz attorneys
12 regarding how the loan proceeds were going to be used;
13 is that correct?
14   A. That is correct.
15   Q. And you never reviewed any bank statements
16 or other financial documents that actually showed how
17 the loan proceeds were actually used; is that correct?
18   A. Correct.
19   Q. Okay. And did you ever review the loan
20 documents for the 7 -- well, for either of the two
21 loan transactions?
22   A. I looked at the documents that are attached
23 to the Second Amended Complaint, which I think had to
24 do with the 7-million-dollar loan transaction. I
25 think there is a borrower's affidavit and the opinion

Page 84

1 letter, and maybe -- and maybe the note. I don't
2 recall. But I didn't study them.
3   Q. Do you recall if the loans were secured by
4 any collateral?
5   A. I believe I have been told that they were,
6 but beyond that, I don't have any knowledge.
7   Q. Okay. And if you recall from what you
8 heard, do you know whether the collateral was
9 collateral belonging to any of the entities or
10 Mr. Okun individually?
11   A. I believe that there is an issue of who had
12 legal title or constructive ownership of the
13 collateral that was used. That's what I recall being
14 told.
15   Q. Okay.
16   A. Or maybe I read that somewhere, that there
17 is an issue.
18   Q. And if I recall correctly, you mentioned
19 that you did not ask for additional documents from
20 counsel in connection with your analysis, you just
21 reviewed what was provided to you; is that correct?
22   A. That is correct.
23   Q. Okay. Did you ever ask for any additional
24 facts that may or may not be documents?
25   A. In the time period since I have been

Page 85

1 retained, I have not asked for additional documents.
2   Q. And as you sit here today, based on some of
3 the questions that you were asked, are there any
4 additional facts that you believe would be helpful to
5 provide a more full analysis of your opinion?
6   A. Well, there probably are.
7     I'm not sure that I could identify them.
8 Of course, as an expert, you are usually asked to just
9 assume things, without necessarily verifying the
10 accuracy, whether it is on examination or
11 cross-examination.
12   Q. Sure.
13   A. But, you know, due to my natural curiosity,
14 if nothing else, I would always like more.
15   Q. What facts are you curious about
16 determining at this point, that might play into your
17 opinion?
18   A. Well, I've been asked about the role of the
19 individual defendants, and there may be further
20 information that I could be provided to enable me to
21 answer those questions, rather than say "I don't
22 know." Something like that, things like that.
23   Q. And if I understood your testimony
24 correctly, the standard by which the attorneys are
25 governed in determining whether they have an

22 (Pages 82 - 85)

Page 86

1 obligation or do not have an obligation to withdraw is
2 very much dependent upon, A, what they know, and B,
3 what they reasonably believe; is that correct?
4      MR. GILBERT:  Form.
5      THE WITNESS:  In part.  But also what
6   they reasonably should have known.
7 BY MR. SHERES:
8    Q.   Okay.  And you would agree that there are
9 certainly facts that the attorneys of Kluger Peretz
10 knew regarding their client's situation that you don't
11 know?
12   A.   I assume so, yes.
13   Q.   And you would agree that based upon those
14 facts, that would affect what they reasonably believed
15 at the time?
16   A.   Well, without knowing what those facts are,
17 I don't believe that I could answer that question.
18   Q.   Are you relatively certain that there are
19 facts that the attorneys representing these clients --
20 or this client in the transaction, that there are
21 facts that they knew that you do not know?
22   A.   I'm relatively certain of that, yes.
23   Q.   And just as much as you explained you are
24 not a transactional attorney and you have not
25 practiced in the transactional forum, you know, at

Page 87

1 least not primarily, there would be facts that
2 transactional attorneys would need to know to put
3 together a transaction, that you do not know right
4 now?
5      MR. GILBERT:  Form.
6      THE WITNESS:  Probably so.
7 BY MR. SHERES:
8    Q.   Okay.  I understand you don't know what
9 facts you don't know.  But having a full understanding
10 of all of the facts in the transaction, really, in any
11 circumstance, would affect what the individual's
12 reasonable belief would be?
13      MR. GILBERT:  Form.
14      THE WITNESS:  That's a pretty broad
15   question.
16 BY MR. SHERES:
17   Q.   Okay.
18   A.   I'm not sure I could really answer that.
19   Q.   All right.  Then I will try to narrow it
20 down.
21      The "reasonable belief" standard that you
22 discussed previously, that's an objective standard,
23 correct?
24   A.   Yes.
25   Q.   And the objective standard, that would

Page 88

1 require the individuals analyzing whether it was
2 objectively reasonable to be based upon, you know, a
3 series of facts?
4    A.   No.  An objective standard is an externally
5 imposed standard.
6    Q.   Right.  But it would be the objective --
7      From an objective standpoint, you would
8 have to say:  Okay, objectively, looking at these
9 facts, you reasonably should have believed one way or
10 the other?
11   A.   That's correct.
12   Q.   Okay.  So if we don't know what all of the
13 facts are, it would be impossible to determine whether
14 it was objectively reasonable for an attorney to have
15 believed one way or the other?
16      Does that make sense?
17      MR. GILBERT:  Form.
18      THE WITNESS:  I understand the question,
19   but I disagree with you.
20 BY MR. SHERES:
21   Q.   Okay.  So you do not believe that we have
22 to know all of the facts to know whether they acted
23 reasonably?
24   A.   I do not believe we have to know all of the
25 facts.  I mean, some facts are more material than

Page 89

1 others, and some --
2    Q.   Right.  So you would agree that we would
3 have to know all of the material facts to determine
4 whether or not they acted reasonably?
5      MR. GILBERT:  Form.
6      THE WITNESS:  Yes, but we would have to
7   agree on what is material.
8 BY MR. SHERES:
9    Q.   I agree with your statement.
10   A.   Okay.
11   Q.   Assuming we agreed on what material -- on
12 what facts were material, we would have to know what
13 those facts are to determine whether the attorneys
14 acted reasonably?
15      MR. GILBERT:  Form.
16      THE WITNESS:  Well, I think, as a general
17   proposition, that is fair to say.
18 BY MR. SHERES:
19   Q.   All right.  Do you plan on asking counsel
20 for any additional facts in the event that you
21 ultimately testify at trial in this case?
22   A.   I expect to have further conversation with
23 counsel about whether that would be appropriate.
24   Q.   Okay.
25   A.   Or needed.

23 (Pages 86 - 89)

Page 90

```
 1      Q.   And if, as a result of your further
 2  conversations, you obtained material facts, what you
 3  believe to be material to your opinion, is it likely
 4  that your opinion could change?
 5          MR. GILBERT:  Form.
 6          THE WITNESS:  I wouldn't -- I couldn't
 7    say whether it's likely.  It might.
 8  BY MR. SHERES:
 9      Q.   Okay.  Do you plan on preparing any more
10  comprehensive report of your opinion?
11      A.   No.
12      Q.   If you are asked to, will you, by counsel?
13          MR. GILBERT:  Form.
14          THE WITNESS:  Sure.  Certainly.
15  BY MR. SHERES:
16      Q.   As an expert opining on a particular
17  subject matter, do you believe that you have an
18  obligation to request additional information if you
19  believe the information you have been provided is
20  incomplete?
21          MR. GILBERT:  Form.
22    Excuse me one second.  I'm sorry.
23      (Cellular phone interruption.)
24          MR. GILBERT:  Go ahead.
25          THE WITNESS:  Well, if I were unable to
```

Page 91

```
 1    form an opinion based upon what I had been
 2    provided, I would ask for additional
 3    information.
 4  BY MR. SHERES:
 5      Q.   Okay.  And would you be asking based
 6  upon --
 7          Well, why would you ask?
 8      A.   So I could form an opinion --
 9      Q.   Okay.
10      A.   -- on the requested subject.
11      Q.   But do you believe that you have any
12  particular duty, when you are testifying, to ask for
13  additional information?
14          MR. GILBERT:  Form.
15          THE WITNESS:  Not as a general
16    proposition.  I mean, that question is somewhat
17    out of context.  But I don't think I have a
18    duty, as an expert.
19  BY MR. SHERES:
20      Q.   Okay.  Just asking your opinion.
21          MR. GILBERT:  Just asking.
22  BY MR. SHERES:
23      Q.   Did you review Mr. Berman's deposition
24  transcript?
25      A.   No.
```

Page 92

```
 1      Q.   Okay.  If Mr. Berman had testified that his
 2  memoranda were simply -- was simply a legal analysis
 3  of the accuracy of the legal assertions in the Perkins
 4  and Kutak Rock memos, would that change your opinion
 5  in any way?
 6          MR. GILBERT:  Form.
 7          THE WITNESS:  I don't -- I don't believe
 8    so.
 9  BY MR. SHERES:
10      Q.   And you mentioned that you were not a
11  transactional attorney, you didn't practice as one,
12  correct?
13      A.   Correct.
14      Q.   Are you familiar with what information a
15  transactional attorney must know in order to abide by
16  that attorney's ethical obligations to close on a
17  commercial loan?
18          MR. GILBERT:  Form.
19          THE WITNESS:  That would depend upon the
20    transaction in question.
21  BY MR. SHERES:
22      Q.   You're not aware of any standard lists of
23  information that a particular transactional attorney
24  would need, correct?
25      A.   Correct.
```

Page 93

```
 1      Q.   Okay.  Did you review the case law in the
 2  Berman memoranda?
 3      A.   No.
 4      Q.   Do you have any opinion as to whether
 5  Mr. Berman's legal analysis was accurate?
 6      A.   No.
 7      Q.   If Mr. Berman's legal analysis was not
 8  accurate, would that have an effect on the -- on your
 9  opinion?
10      A.   It might.
11      Q.   Okay.  We talked about a lot of scenarios,
12  or more so when you were speaking with Ms. Corbishley,
13  about different circumstances and different types of
14  information that the attorneys may or may not have
15  known.
16          Would you agree that there are
17  circumstances in which the Kluger Peretz attorneys
18  would have been permitted to believe Mr. Okun, that he
19  had stopped engaging in criminal activity?
20          MR. GILBERT:  Form.
21          THE WITNESS:  I -- I believe there have
22    been, but I don't know.
23  BY MR. SHERES:
24      Q.   Okay.  In those unknown circumstances, in
25  which they --
```

24 (Pages 90 - 93)

Page 94

1    A.   Please, let me take that back.  I said in
2  my answer:  I believe that there might have been.
3        I don't know the -- I don't have a belief
4  on that.  I'm just saying that there might have been.
5    Q.   Okay.  Correct.
6    A.   Okay.
7    Q.   In this hypothetical, where information was
8  conveyed to these attorneys and they believed that he
9  engaged in -- that he has ceased engaging in improper
10  conduct -- Okay?  That's the assumption.
11        In that circumstance, would they have been
12  required to withdraw?
13    A.   I assume that you mean that they reasonably
14  believed, objectively reasonably believed that he had
15  discontinued the conduct?
16    Q.   Correct.
17    A.   It is my opinion, based upon what I know or
18  have been informed, that they had an obligation not to
19  represent Mr. Okun and/or whoever the borrower was in
20  one or both of those transactions.
21    Q.   Right.  And I'm having you disregard the
22  information that you reviewed.
23        In this hypothetical situation, where the
24  attorneys at Kluger Peretz reasonably believed, based
25  on information conveyed to them, that Mr. Okun has

Page 95

1  ceased his criminal conduct, in that scenario,
2  regardless of anything else, would they have had an
3  obligation to withdraw?
4        MR. GILBERT:  Form.
5        THE WITNESS:  I prefer to phrase it in
6    terms of representing them in the loan
7    transactions, you know, whether to go through
8    with that, as opposed to withdraw, which sounds
9    much broader.  But it is my opinion, based upon
10    what I have been provided, that they had an
11    obligation not to represent Mr. Okun in those
12    transactions.
13  BY MR. SHERES:
14    Q.   Right.  And, again, that wasn't --
15        The question was, in this hypothetical --
16        You indicated that there could be
17  circumstances in which they reasonably believed he had
18  stopped?
19    A.   No, I --
20    Q.   Well --
21    A.   Well, okay.  You're asking me to assume,
22  then, that the loan transactions themselves had no
23  part of the criminal -- had no relation to the
24  criminal -- to the prior criminal conduct?
25    Q.   I'm asking you to assume that the attorneys

Page 96

1  did not know, had no reason to believe.  Regardless of
2  whether it did, we're talking about the knowledge of
3  the attorneys.
4        So assuming that they did not know and they
5  had no reason to believe that it was related to or in
6  furtherance of criminal activity, would they have had
7  an obligation to withdraw?
8        MR. GILBERT:  Form.
9        THE WITNESS:  Well, I think, as you have
10    phrased it, I'm not prepared to say that they
11    would have an obligation.  I would have to think
12    about that further.
13  BY MR. SHERES:
14    Q.   Okay.
15    A.   I don't have an opinion on that at the
16  moment.
17    Q.   Okay.  If I remember correctly, when you
18  were asked about 1031 exchanges, you're somewhat
19  familiar with them but not as an expert; is that what
20  you testified to?
21    A.   Yes.
22    Q.   You're familiar with the fact that the
23  clients, let's say, will have money deposited with a
24  qualified intermediary, correct?
25    A.   Correct.

Page 97

1    Q.   And that that money will be held for a
2  certain amount of time?
3    A.   (Nodding head.)
4    Q.   Okay.  Up to 180 days?
5    A.   That's my understanding.
6    Q.   Are you aware of whether the qualified
7  intermediaries are required to hold the money in an
8  account versus whether they are able to invest that
9  money during the holding period?
10        MR. GILBERT:  Form.
11        THE WITNESS:  Well, except to the extent
12    that that's governed by contract, I am --
13        I do not know what the obligation is.
14        I remember reading in Mr. Berman's
15    memoranda that there may be some issue as to who
16    actually owns those funds and, you know, and
17    what can be done with them.
18  BY MR. SHERES:
19    Q.   Do you recall any memos, any discussions
20  about the prudent investor standard?
21    A.   I recall that that was discussed, yes.
22    Q.   Now, assuming that the money deposited with
23  a qualified intermediary, under law, under statute,
24  for whatever purpose, was entitled to be invested and
25  did not have to just sit in an account.

25 (Pages 94 - 97)

Page 98

1    A.   Okay.
2    Q.   So, with that understanding, do you have
3  any opinion as to or understanding as to what would
4  occur if the money was lost in a bad investment?
5        MR. GILBERT:  Form.
6        THE WITNESS:  You mean what liabilities
7  would arise?
8  BY MR. SHERES:
9    Q.   Yes.
10   A.   Well, if, if --  There are some "ifs" here
11 prefacing what opinion I may have on that subject.
12       If those funds are subject to the prudent
13 investor rule, and if it were determined that the
14 funds were lost because of an imprudent investment, I
15 would think that the QI would be liable to the
16 exchanger or client for the loss.
17   Q.   Okay.
18   A.   But that's my opinion.
19   Q.   I wouldn't ask for anything besides your
20 opinion.
21   A.   But I would not be surprised if my opinion
22 is wrong.
23   Q.   Okay.  Assuming that your opinion is
24 correct and that the QI was responsible --
25       I know that you said that you practiced in

Page 99

1  commercial litigation, so you probably dealt with
2  circumstances where someone made a bad investment and
3  was liable to their client as a result; is that
4  correct?
5    A.   Yes.
6    Q.   In that instance, the QI would likely be
7  required to repay that client for the funds that they
8  imprudently lost, correct?
9        MR. GILBERT:  Form.
10       THE WITNESS:  I assume that.
11 BY MR. SHERES:
12   Q.   Okay.  And assuming that is true, and the
13 QI did not have the money on hand to repay that
14 investor, do you believe that it would be unethical
15 for an attorney to represent that QI in borrowing the
16 money, with full disclosure, to repay that investment
17 that was lost?
18       MR. GILBERT:  Form.
19       THE WITNESS:  As a general principle, I
20 believe the lawyer would be able to do that.
21 But that's assuming the exclusion, I think, of
22 some facts.
23       I mean, you're asking me --  You're
24 describing to me, I believe, a violation of the
25 prudent investor rule, a circumstance under

Page 100

1  which the investment was lost, the funds were
2  lost because of a violation of the prudent
3  investor rule.
4  BY MR. SHERES:
5    Q.   Correct.
6    A.   I think it would be appropriate for a
7  lawyer to represent the QI in that circumstance in
8  defending whatever litigation results, for example.
9    Q.   And not even that.  I wasn't even talking
10 about litigation.
11       This is simply that the attorney reasonably
12 believes or knows that the loan transaction in which
13 he is representing the borrower, that the borrower
14 intends to use that money to repay a debt that that
15 borrower owes.
16       There is no ethical obligation or no
17 ethical hurdle for the attorney to represent that
18 borrower, correct?
19       MR. GILBERT:  Form.
20       THE WITNESS:  If we're talking about a
21 bad investment, a violation of the prudent
22 investor rule, and in circumstances in which the
23 QI contractually or legally is authorized to
24 make investments pursuant to the prudent
25 investor rule, I would agree there would be no

Page 101

1  ethical bar to the lawyer representing the QI in
2  borrowing money to pay that obligation.
3  BY MR. SHERES:
4    Q.   And during your experience as a commercial
5  litigator, or any experience, really, have you come
6  across any circumstances where your client may have
7  been found liable for fraud?
8    A.   Let's see.  I don't recall any, but I have
9  been at this a long time.  It may have happened.
10   Q.   All right.  And I'm including, so, for
11 instance, a judgment against them for fraudulent
12 inducement, something along those lines.
13   A.   All right.  So your question is:  Do I
14 recall any such?
15   Q.   I just want to --  I want to give context,
16 so we're on the same page.  I want to make sure it is
17 clear.
18       If you had a client who had a judgment
19 against him for fraudulent inducement, and they
20 borrowed money to pay that judgment, does an attorney
21 have an ethical obligation to withdraw because the
22 proceeds from the loan are used to repay an obligation
23 that was found to have been the result of fraud?
24       MR. GILBERT:  Form.
25       THE WITNESS:  No, I'm not prepared to go

26 (Pages 98 - 101)

Page 102

1  that far.
2  BY MR. SHERES:
3     Q.   Okay.  A lot of your opinion seems to be
4  based upon the assumption that Mr. Okun was involved
5  in a Ponzi scheme; is that correct?
6     A.   Fraudulent conduct, at least.
7     Q.   Okay.  Have you litigated any cases with a
8  similar circumstance, on any side?
9     A.   I believe I have, but I can't recall the
10  specifics.
11     Q.   Okay.  Have you ever provided any expert
12  opinions on fraudulent schemes?
13     A.   Not as a testifying expert, no.  At least
14  not that I recall.
15     Q.   Okay.  Have you written any scholarly
16  articles on fraudulent schemes?
17     A.   I wouldn't call them an article.
18        I have written a chapter in a Florida Bar
19  treatise on causes of action under my -- underlying
20  lawyer liability, and it included some discussion
21  about fraud, or misrepresentation, or negligent
22  misrepresentation, that sort of thing.  Not A
23  standalone article.
24     Q.   Do you know approximately when you prepared
25  that?

Page 103

1     A.   Well, there have been several editions of
2  that book.  I think the last one is the fourth
3  edition, and that's probably getting to be ten years
4  ago now.
5        Is it in the -- Well, I don't know whether
6  it was listed in the disclosure with a date.  But it
7  has been a while.
8     Q.   Was that pre Madoff?
9     A.   Pardon?
10     Q.   Pre Madoff?
11     A.   It was pre Madoff, yes.
12     Q.   Do you think --
13        And pre Rothstein?
14     A.   (Nodding head.)
15     Q.   Do you think all of the revelations
16  regarding these types of schemes from, you know, the
17  Madoff and Rothstein cases, would have changed your
18  analysis or given you --
19     A.   No, because my discussion in that treatise
20  talked about lawyer liability for the lawyer's own
21  acts.
22     Q.   Okay.
23     A.   Plus Ponzi schemes, by name, have been
24  around since the 1920s.
25     Q.   Sure.  Since Ponzi.

Page 104

1        Now, you seem to recall that there was an
2  opinion letter in this case; is that correct?
3     A.   That's what I recall, yes.
4     Q.   Right.  You weren't sure exactly?
5     A.   Right.
6     Q.   You didn't recall the contents of it; is
7  that correct?
8     A.   That's correct.
9     Q.   Okay.  Given, you know, your opinion, do
10  you believe that anything in the opinion letter would
11  have any effect on your opinion?
12        MR. GILBERT:  Form.
13        THE WITNESS:  Yes, it might.  But it's
14  difficult for me to say, without --
15  BY MR. SHERES:
16     Q.   What, generally speaking, what type of
17  information in the opinion letter could have an effect
18  on your opinion, given its narrow scope?
19     A.   Well, any statement about the nature of the
20  transaction or the purposes of the transaction.
21     Q.   And --
22     A.   Or what the lender could rely on.
23     Q.   So if there were broad disclaimers in the
24  opinion letter, that could have an effect on the
25  opinion --

Page 105

1     A.   It could.
2     Q.   -- on your opinion?
3     A.   It could.
4     Q.   It could.  Okay.
5        I'm just going to go really quickly through
6  the different cases which you identified here on
7  your -- as far as testifying experience.
8     A.   Oh, okay.  All right.
9     Q.   I don't know if you have a copy of this in
10  front of you.
11     A.   I do.
12     Q.   Okay.  I think the first one says,
13  "Reasonable attorney's fee."  I'm guessing --  Am I
14  correct in assuming that you just testified that a
15  particular attorney's fees were reasonable?
16     A.   Yes.
17     Q.   Okay.
18     A.   And that was just a declaration.
19     Q.   Do you recall what law firm retained you in
20  that case?
21     A.   Yes.  That was Holland & Knight.
22     Q.   And the next case is ParkerVision versus
23  Qualcomm.  You indicate that the subject of your
24  testimony was "Counsel's conflict of interest."
25        What exactly was the nature of the conflict

27 (Pages 102 - 105)

Page 106

1 of interest involved in that case?
2    A.   It involved counsel who represented
3 Qualcomm, patent counsel that represented Qualcomm,
4 undertaking to represent ParkerVision, a competitor,
5 on, at least, a closely related patent application.
6    Q.   Okay.
7    A.   If I recall correctly.
8    Q.   And you represented, it says here, the
9 defendant in that case?
10   A.   Qualcomm.  I was hired by Qualcomm's
11 counsel.
12   Q.   Okay.  What was the substance of your
13 testimony at that point?
14   A.   That a conflict of interest existed.
15   Q.   In that case, did you opine that counsel
16 should have withdrawn?
17   A.   I believe my opinion was that counsel
18 should not have undertaken the Qualcomm
19 representation.
20   Q.   Do you recall what the result of that was?
21   A.   Excuse me.  I misspoke.
22   Q.   Sorry.
23   A.   That counsel should not have undertaken the
24 ParkerVision representation.
25   Q.   Right.  Okay.

Page 107

1        And do you recall what the result of that
2 case was?  I mean, did they -- Did the judge
3 ultimately accept your opinion and adopt it?
4    A.   Well, my opinion was expressed in a
5 declaration, a written declaration.  I didn't testify
6 at deposition.
7        I don't know the extent or recall the
8 extent to which it was used, that that declaration was
9 used.
10       I believe the lawsuit was ParkerVision was
11 suing Qualcomm claiming patent infringement, and
12 Qualcomm counterclaimed, but also filed a third party
13 claim against the lawyers involved.
14       I believe the declaration was designed to
15 be used in connection with that third party claim.
16 And I understand that that third party claim was
17 eventually dismissed by the court.  I do not know the
18 reason.
19   Q.   Okay.  In the Blake versus Ellis case, the
20 subject of your testimony was "Breach of fiduciary
21 duty by lawyer for joint venture."
22       Oh, and before I ask about that --
23       In the ParkerVision case, which counsel
24 represented you -- or, I mean, retained you?
25   A.   The Bedell Dittmar firm from Jacksonville.

Page 108

1    Q.   And in the next case, the Blake/Ellis case,
2 the breach of fiduciary duty, what was the nature of
3 the alleged breach of fiduciary duty?
4    A.   It was also a conflict of interest, duty of
5 loyalty.
6    Q.   Okay.  What was the substance of your
7 testimony there?
8    A.   That the counsel in question had breached
9 the fiduciary duty of loyalty, that there was a
10 conflict of interest.
11   Q.   Okay.  It says that it was at a jury trial.
12       Do you recall what the verdict was in that
13 case?
14   A.   It was a verdict for the plaintiffs.
15   Q.   Okay.  So, did the court accept --
16       Do you know whether the court accepted your
17 opinion?
18   A.   The jury did.
19   Q.   Well, the jury did, yes.  Okay.
20   A.   I assume.
21   Q.   And, again, who was the attorney that
22 retained you?
23   A.   Oh, boy.  It is a well-known Miami firm,
24 and I'm -- It escapes me.  I'm sorry.
25   Q.   It wasn't Gilbert Yarnell, though?

Page 109

1    A.   Pardon me?
2    Q.   It wasn't Gilbert Yarnell?
3    A.   Oh, no.  No.
4    Q.   Okay.
5        MS. CORBISHLEY:  That's a well-known Palm
6    Beach firm.
7        MR. SHERES:  Yes.
8        MR. GILBERT:  I thought we were a stealth
9    Palm Beach firm.
10 BY MR. SHERES:
11   Q.   And the second one, I see that is just a
12 deposition in the same case?
13   A.   That's the same case.
14   Q.   Next, Florida Bar versus Johnson,
15 "Suitability of respondent's law practice for
16 monitoring"?
17   A.   Yeah.  It was an unusual circumstance.
18       It was a Florida Bar disciplinary
19 proceeding against a lawyer, Mr. Johnson, who was
20 accused of misusing trust funds in connection with
21 ancillary debt relief businesses.
22       And his lawyer hired me to opine on a
23 hearing to remove a temporary emergency suspension,
24 that he should be allowed to practice, and that the
25 practice could be monitored by an ethics lawyer.  That

28 (Pages 106 - 109)

Page 110

1  was where my role came in.
2     Q.   Do you recall whether they prevailed on
3  that motion?
4     A.   They did prevail on that motion.  The
5  referee recommended removing the emergency suspension.
6     Q.   Okay.  And do you know whether that was
7  adopted by the court following the recommendation?
8     A.   I doubt, frankly, that my opinion had much
9  to do with that decision.  It was -- The testimony
10  was about 15 minutes, and it is my belief...
11        I read the referee's report, and I don't
12  recall that the monitoring issue had much to do with
13  his decision.
14     Q.   Okay.  And, again, I guess the next two are
15  Smith versus Effective Teleservices?
16     A.   Yes.  That is a reasonable attorney's fees
17  case, talking about allocating fees among the various
18  claims.
19        MR. SHERES:  Okay.  I think I'm pretty
20  close to being done here.
21        Now, you did mention that you are going
22  to have some discussions, you know, with counsel
23  afterwards, and you may or may not request
24  additional information.
25        So, based upon that, you know, we're done

Page 111

1  questioning now, but certainly if the opinion
2  changes or if there is a new report out, you
3  know, I know that we would want to reserve our
4  right to --
5        MR. GILBERT:  We would stipulate to --
6        MR. SHERES:  -- continue the deposition
7  at a later time.
8        MR. GILBERT:  -- that, counsel.
9        MR. SHERES:  Okay.
10        MR. GILBERT:  I don't expect it, but we
11  would stipulate to that, absolutely.
12        MR. SHERES:  Okay.  Then I think I'm
13  done.
14        MR. GILBERT:  All right.  Well, then, I
15  just have a few questions.
16        THE WITNESS:  As long as the questions
17  haven't been given to you by a family member,
18  it's okay.
19        MS. CORBISHLEY:  Is there a rule about
20  that?
21        CROSS-EXAMINATION
22  BY MR. GILBERT:
23     Q.   All right.  Well, let's see.  All right.
24        So, I think both lawyers have asked you
25  whether or not you were just assuming whether or not

Page 112

1  there was a Ponzi scheme or whether or not there was a
2  fraudulent scheme.
3        Would it be fair to say that you were asked
4  to assume there was a criminal fraudulent scheme, for
5  the purpose of forming your opinion?
6     A.   Yes.
7     Q.   And if Mr. Okun was convicted of such a
8  scheme, would that be a further basis for your
9  opinion?
10        MS. CORBISHLEY:  Object to the form.
11        MR. GILBERT:  Excuse me.  What is the
12  nature of your objection?
13        MS. CORBISHLEY:  He was not convicted of
14  a Ponzi scheme, because there is no statute on
15  that.  That was not the charge.
16        MR. GILBERT:  All right.  I didn't use
17  the phrase "Ponzi scheme."
18        I said, convicted of a criminal fraud.
19        Do you want to hear it again?  Do you
20  want me to ask the question again?
21        MS. CORBISHLEY:  Yes.  But let me give
22  you the other one, just so you know. --
23        MR. GILBERT:  Okay.  Sure.
24        MS. CORBISHLEY:  But I don't think that
25  you can fix it.

Page 113

1        I don't think that his conviction is
2  admissible.
3        MR. GILBERT:  Okay.
4        MS. CORBISHLEY:  Okay?
5        MR. GILBERT:  You don't think his
6  conviction is admissible to establish that there
7  was a criminal scheme?
8        MS. CORBISHLEY:  Correct.
9        MR. GILBERT:  Okay.
10  BY MR. GILBERT:
11     Q.   Notwithstanding counsel's belief, if in
12  fact Mr. Okun was convicted of a criminal scheme, a
13  criminal fraud scheme, would that be a factor that you
14  consider in determining whether or not it was
15  reasonable for you to assume that there was an
16  underlying criminal scheme?
17     A.   Yes.  It certainly gives me some comfort.
18     Q.   Okay.  Now, if Mr. Okun's conviction was,
19  in fact, for engaging in a criminal fraudulent scheme
20  through the time period August 2005 through
21  May 2007 -- May 2007 being after the 7-million-dollar
22  loan -- do you recall that?
23     A.   I don't recall that, but --
24     Q.   Okay.  No, no.  I mean -- Let me rephrase.
25        That the 7-million-dollar loan was prior to

29 (Pages 110 - 113)

Page 114

1 May of 2007.
2     A.   Yes, I recall that.  Yes.
3     Q.   All right.  So Mr. Okun was convicted of
4 this criminal scheme, and his conviction included the
5 time period of August 2005 through May 2007.  Would
6 that indicate to you that this criminal scheme was
7 ongoing during the period of time that the defendants
8 were representing Mr. Okun?
9         MS. CORBISHLEY:  Same objection to form.
10        THE WITNESS:  Yes.
11 BY MR. GILBERT:
12    Q.   Okay.  Now, you were asked about what the
13 factual basis might be for what Mr. Silverman would
14 know of the ongoing nature of the criminal scheme
15 after the date of the Perkins memo.
16        Do you recall that?
17    A.   I do recall that.
18    Q.   Okay.  So if Mr. Silverman sent an e-mail
19 to various lawyers, including the other defendants in
20 this case, in February of 2007, and the substance of
21 the e-mail is an acknowledgment that the moneys that
22 Mr. Okun took from the respective qualified
23 intermediary companies were not documented with any
24 notes or other kinds of evidence that it was a loan,
25 and that there was a process taking place in February

Page 115

1 of 2007 of attempting to document the loans, would
2 that indicate to you that Mr. Silverman was, in fact,
3 aware of what Mr. Okun had been doing with respect to
4 the moneys in the QIs?
5         MS. CORBISHLEY:  Object to the form.
6 BY MR. GILBERT:
7     Q.   You can answer.
8     A.   At least to some extent, yes.
9     Q.   Okay.  One of the things you relied on to
10 form your opinion is the complaint; is that correct?
11    A.   Yes.
12    Q.   All right.  And if the Second Amended
13 Complaint, on page 23 at paragraph 83, contained the
14 following allegation:
15        On March 29, 2007, in an e-mail to an
16    in-house attorney, Richard Simring, Janet
17    Dashiell, the operations manager of Investment
18    Exchange Group and the five other Okun QI
19    companies, cited the extremely low liquidity of
20    1031 Tax Group as a whole (1.3 percent of cash
21    obligations) and inferred that the FBI would be
22    notified of Okun's activity.  Among other
23    things, Dashiell's e-mail reveals $175 million
24    in total client liabilities and only
25    2.3 million in "flexible" cash.

Page 116

1         In turn, Simring forwarded the e-mail to
2 defendant, Abbey Kaplan, on March 30, 2007,
3 stating, "We need to forcefully make Ed (Okun)
4 stop spending and start refinancing, or we
5 won't have a client."
6         What would that indicate to you regarding
7 the knowledge of the lawyers at the Kluger Peretz law
8 firm regarding the ongoing nature of Okun's activity?
9         MS. CORBISHLEY:  Object to the form.
10        MR. SHERES:  Object to the form.
11        THE WITNESS:  That was a memorandum --
12        May I see that?
13 BY MR. GILBERT:
14    Q.   Yes.  That is part of the Second Amended
15 Complaint.  It is paragraph 83.
16    A.   Well, I don't -- Oh.
17        Well, that would indicate to me that at
18 least Mr. Kaplan knew there was a major problem.
19    Q.   Well, to be more particular, with respect
20 to a "major problem," was the nature of the major
21 problem that you're referring to that there was an
22 ongoing criminal fraudulent scheme even as of the date
23 of that e-mail, March 30th, 2007?
24    A.   Yes, if this allegation is true, that would
25 so indicate.

Page 117

1     Q.   Okay.  Now, you were asked whether or not
2 it would be, quote, ethical, unquote, for a lawyer to
3 represent a client who was seeking advice as to how to
4 correct prior bad acts.  Do you recall that?
5     A.   Yes.
6         MS. CORBISHLEY:  Object to form.
7 BY MR. GILBERT:
8     Q.   Now, I have paraphrased.  But do you
9 remember generally those questions?
10    A.   Yes.
11    Q.   Okay.  Now, can a lawyer act consistent
12 with 4-1.2 and 4-1.6 [sic] if he is assisting a client
13 in concealing the crime?
14        MS. CORBISHLEY:  Object to the form.
15        MR. GILBERT:  Hold on.  What is the
16    nature of the objection?
17        MS. CORBISHLEY:  You misstated the rule.
18    You said 4-1.6.  You mean 1.16.  And --
19        MR. GILBERT:  I said 4-1.2 and 4-1.6.
20        THE WITNESS:  1.16.
21        MR. GILBERT:  1.16?  Oh, I'm sorry.  Let
22    me just ask the question again.
23        THE WITNESS:  Okay.
24        MS. CORBISHLEY:  But I wasn't done.
25        MR. GILBERT:  Oh, okay.  Go ahead.

30 (Pages 114 - 117)

Page 118

1    MS. CORBISHLEY:  Also with regard to
2  concealing the nature of the crime.
3    MR. GILBERT:  What is the nature of your
4  objection?
5    MS. CORBISHLEY:  The form.
6    MR. GILBERT:  All right.  I'm asking you
7  what the nature of your form objection is, and
8  you have just told me words that are in my
9  question.  You need to tell me what's wrong with
10  those words.
11    MS. CORBISHLEY:  Prejudicial, lacking in
12  foundation.  You are lacking elements of the
13  rules with regard to knowledge, constructive
14  knowledge, et cetera, et cetera.
15    MR. GILBERT:  Okay.  With all of that in
16  mind, let me repeat the question, correcting the
17  rule.
18  BY MR. GILBERT:
19    Q.  Can a lawyer act consistently with his
20  obligations under Rules Regulating the Florida Bar
21  4-1.2 and 4-1.16, if the assistance that the client is
22  asking him to provide is to conceal a crime?
23    A.  I don't think so.
24    Q.  Okay.  Would a lawyer be required to
25  decline the representation if a client asked the

Page 119

1  lawyer to assist the client in concealing the crime?
2    A.  I'm sorry.  Would you repeat the first
3  part?  I forgot how it was framed.
4    MR. GILBERT:  Would you repeat it,
5  please.
6    (Thereupon, the portion referred to was
7  read by the reporter.)
8    THE WITNESS:  I believe so.
9  BY MR. GILBERT:
10    Q.  Okay.  And so, if a crime had in fact
11  occurred, consistent with Mr. Okun's indictment and
12  subsequent conviction for removing funds from these
13  respective qualified intermediary companies, and
14  Mr. Okun sought a loan in order to meet obligations so
15  that the FBI was not notified that the funds had been
16  removed from the qualified intermediary companies,
17  would these lawyers be permitted, consistent with Rule
18  4-1.2 and Rule 4-1.16, to assist Mr. Okun in borrowing
19  the funds for that purpose?
20    MS. CORBISHLEY:  Objection to the form.
21  The initial clause was not well-founded.
22    MR. GILBERT:  Okay.
23    THE WITNESS:  I believe they would not be
24  permitted to do so.
25

Page 120

1  BY MR. GILBERT:
2    Q.  Okay.  Now, you were asked a question -- at
3  least I think I heard this correctly -- about whether
4  or not the Kluger Peretz law firm and its lawyers
5  could represent Mr. Okun in other transactions, other
6  than those transactions that might otherwise be
7  assisting him in a continuing crime.
8    Do you recall those?
9    A.  Yes.
10    Q.  Okay.  If Mr. Okun was taking money from
11  the qualified intermediary companies himself, and then
12  using that money to acquire real property, either in
13  the name of a company he formed, he personally formed,
14  or in his own name, or acquired jet aircraft, or large
15  boats, fancy cars -- and I'm sorry can't be more
16  particular, because I don't remember what the make of
17  the cars were -- would that have an impact on your
18  opinion as to whether or not the underlying
19  transactions that involved acquiring QI companies or
20  taking the money that Mr. Okun removed from those
21  companies to acquire real property, planes, and boats,
22  whether or not any lawyer could actually, consistent
23  with Rule 4-1.2 and 4-1.16, represent Mr. Okun even in
24  those transactions?
25    MS. CORBISHLEY:  Object to the form.  I'm

Page 121

1  not sure what "those transactions" are.
2    THE WITNESS:  The acquisition of the
3  property?
4  BY MR. GILBERT:
5    Q.  The acquisition of property.
6    MS. CORBISHLEY:  Objection to form.  Lack
7  of foundation.
8    THE WITNESS:  I think it would just
9  depend on the circumstances, the degree of
10  knowledge involved.
11  BY MR. GILBERT:
12    Q.  All right.  So, in particular, if lawyers
13  who had enough information to request an associate to
14  draft a memo such as the one that Mr. Berman
15  drafted --
16    Do you recall Mr. Berman's memo?
17    A.  Yes.
18    Q.  -- if they were also representing
19  Mr. Okun's other company, Investment Properties of
20  America during the period of time where they
21  understand that is, according to Mr. Berman,
22  improper and unlawful to take these moneys out of the
23  QI companies, and represent him or one of his
24  companies in the acquisition of yet another company
25  using those funds, could these lawyers from the Kluger

31 (Pages 118 - 121)

1 Peretz law firm do that and be in accord with Rule
2 4-1.2 or 4-1.16?
3          MS. CORBISHLEY:  Objection to form.
4 Foundation.  Compound.
5          THE WITNESS:  I'm not sure about Rule
6 4-1.2.  I don't -- I don't think you have asked
7 me this before.
8          I don't have an opinion on that at the
9 moment.
10 BY MR. GILBERT:
11     Q.    Okay.
12     A.    I think it would be a problem under Rule
13 4-1.16, possibly.
14     Q.    Okay.  Now, if Mr. Kaplan or Mr. Silverman
15 are not actually conducting the closing of a loan or a
16 closing of an acquisition of property, but they know
17 that the firm is representing Mr. Okun, they know that
18 the firm is representing Mr. Okun in those very
19 transactions, and they have knowledge that Mr. Okun is
20 involved in an ongoing criminal fraud, do they have a
21 different duty under Rule 4-1.16 than the lawyers who
22 were handling the actual mechanics of the closings?
23          MS. CORBISHLEY:  Object to the form.
24          THE WITNESS:  They might.  You know, the
25 overriding scenario here, to me, is that any of

1     the lawyers with this kind of knowledge that you
2     are asking me to assume, should make darn sure
3     the firm distances itself -- I'm assuming that
4     they are all shareholders or partners in the
5     firm -- distances itself from those
6     transactions.
7 BY MR. GILBERT:
8     Q.    Well --
9     A.    But the Florida Bar Rules, you know, they
10 are not rules of tort liability or vicarious
11 liability.  They are directed to conduct of separate
12 individual lawyers, although the Florida Bar likes to
13 spread it a little more sometimes, but...
14          So there may be a technical ethical
15 distinction as you apply the rules in a potential
16 disciplinary context.  That's all that I'm saying.
17          It just seems like, though, if the three of
18 them, if they had knowledge of this that you have
19 asked me -- the knowledge that you have asked me to
20 assume, they should have ethically ensured that the
21 firm had no involvement in those transactions.
22     Q.    Okay.  Are lawyers charged, in your
23 opinion, with knowledge of what conduct constitutes
24 criminal conduct?
25          MS. CORBISHLEY:  Object to the form.

1          THE WITNESS:  Yes, I suppose we're all,
2 we're all charged with knowledge of the law.
3          MR. GILBERT:  Okay.
4          THE WITNESS:  Even prior to someone
5 determining how it applies.
6          MR. GILBERT:  Okay.  I don't have
7 anything further for you today.
8          Thank you.
9          FURTHER CROSS-EXAMINATION
10 BY MR. SHERES:
11     Q.    I have one follow-up, just on that last
12 point.
13          The last statement you made in response to
14 that question was:  If the lawyers had the knowledge
15 that you're being asked to assume, they should
16 ethically ensure that the firm has no involvement in
17 the transactions.
18          Do you recall saying that a few moments
19 ago?
20     A.    Yes.
21     Q.    You would agree that that statement of what
22 the lawyers should ethically do is different than
23 their legal obligation under the specific rules of the
24 Rules of Professional Conduct; is that correct?
25     A.    No, it's not correct.  I'm talking about

1 the ethical obligation under the rules.
2     Q.    Okay.  So if they have the knowledge that
3 you're being asked to assume?
4     A.    (Nodding head.)
5          MR. SHERES:  Okay.  All right.  That
6 clarifies it.
7          THE WITNESS:  Okay.
8          MR. GILBERT:  Did you have any
9 follow-ups?
10          MS. CORBISHLEY:  I didn't.  Thank you.
11          MR. GILBERT:  We will read, I suppose.
12          THE WITNESS:  Please.
13          (Discussion off the record)
14          MR. SHERES:  I don't need a copy at this
15 time.  I will let you know if I decide to order
16 a copy later.
17          (Thereupon, the taking of the deposition
18 was concluded at 1:27 p.m.  Signature and
19 formalities were not waived.)
20
21
22
23
24
25

32 (Pages 122 - 125)

**Page 126**

1  RE   : Cordell vs. Abbott, et al.
   DEPO OF: D. CULVER SMITH, III, ESQUIRE
2  TAKEN  : October 27, 2014
3
4         EXCEPT FOR ANY CORRECTIONS
          MADE ON THE ERRATA SHEET BY
5         ME, I CERTIFY THIS IS A TRUE
          AND ACCURATE TRANSCRIPT.
6         FURTHER DEPONENT SAYETH NOT.
7         _____
          D. CULVER SMITH, III, ESQUIRE
8
9
10 STATE OF FLORIDA   )
              ) SS:
11 COUNTY OF        )
12
13      Sworn and subscribed to before me this
14 ____ day of _____, 2014.
15 PERSONALLY KNOWN _____ OR I.D._____
16
17
18      _____
          Notary Public in and for
19        the State of Florida at
          Large.
20
21
22 My commission expires:
23
24
25

**Page 127**

1         ERRATA SHEET
2  RE : Cordell vs. Abbott, et al.
   DEPO OF: D. CULVER SMITH, III, ESQUIRE
3  TAKEN : October 27, 2014
4  DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
5  Page #| Line # | Change    | Reason
6  _____|_____|_____|_____
7  _____|_____|_____|_____
8  _____|_____|_____|_____
9  _____|_____|_____|_____
10 _____|_____|_____|_____
11 _____|_____|_____|_____
12 _____|_____|_____|_____
13 _____|_____|_____|_____
14 _____|_____|_____|_____
15 _____|_____|_____|_____
16 _____|_____|_____|_____
17 _____|_____|_____|_____
18 _____|_____|_____|_____
19 _____|_____|_____|_____
20 _____|_____|_____|_____
21 State of Florida)
   County of Palm Beach)
22
   Under penalties of perjury, I declare that I have
23 read by deposition transcript, and it is true and
   correct subject to any changes in form or
24 substance entered here.
   _____   _____
25 Date        D. CULVER SMITH, III, ESQUIRE

**Page 128**

1
         CERTIFICATE OF OATH OF WITNESS
2
3  STATE OF FLORIDA    )
              ) SS:
4  COUNTY OF PALM BEACH)
5
6
7      I, NANCY GILBERT, Registered Merit Reporter,
8  Registered Diplomate Reporter, Certified Realtime
9  Reporter, Florida Professional Reporter, Notary
10 Public in and for the State of Florida at Large,
11 certify that the witness, D. CULVER SMITH, III,
12 ESQUIRE, personally appeared before me on October
13 27, 2014 and was duly sworn by me.
14     WITNESS my hand and official seal this 28th
15 day of October, 2014.
16
17
18      _____
          NANCY GILBERT, FPR, RMR, RDR, CRR
19        Notary Public, State of Florida
          at Large
20
21 Notary #EE 055376
22 My commission expires: 2/4/2015
23
24
25

**Page 129**

1     REPORTER'S DEPOSITION CERTIFICATE
2
3      I, NANCY GILBERT, Registered Merit Reporter,
4  Registered Diplomate Reporter, Certified Realtime
5  Reporter, Florida Professional Reporter, certify
6  that I was authorized to and did stenographically
7  report the deposition of D. CULVER SMITH, III,
8  ESQUIRE, the witness herein on October 27, 2014;
9  that a review of the transcript was requested; that
10 the foregoing pages numbered from 1 to 131 inclusive
11 is a true and complete record of my stenographic
12 notes of the deposition by said witness; and that
13 this computer-assisted transcript was prepared under
14 my supervision.
15     I further certify that I am not a relative,
16 employee, attorney or counsel of any of the parties,
17 nor am I a relative or employee of any of the
18 parties' attorney or counsel connected with the
19 action.
20     DATED this 28th day of October, 2014.
21
22      _____
          NANCY GILBERT
23        Florida Professional Reporter
          Registered Merit Reporter
24        Registered Diplomate Reporter
          Certified Realtime Reporter
25        Certified LiveNote Reporter

33 (Pages 126 - 129)

```
                                                        Page 130
 1         VERITEXT LEGAL SOLUTIONS
             One Biscayne Tower, Suite 2250
 2          Two South Biscayne Boulevard
               Miami, Florida  33131
 3              (305) 376-8800
 4
    October 28th, 2014
 5
    D. CULVER SMITH, III, ESQUIRE
 6  c/o GILBERT|YARNELL LAW OFFICES
    11000 Prosperity Farms Road, #205
 7  Palm Beach Gardens, Florida  33410
    Attn:  IRWIN R. GILBERT, ESQUIRE
 8
    RE    : Cordell vs. Abbott, et al.
 9  DEPO OF: D. CULVER SMITH, III, ESQUIRE
    TAKEN  : October 27, 2014
10  READ & SIGN BY:  November 28, 2014
    Attn:  D. CULVER SMITH, III, ESQUIRE:
11
    This letter is to advise you that the transcript
12  of the deposition listed above is completed and
    is available for reading and signing.
13
    PLEASE CALL THE ABOVE NUMBER TO MAKE AN APPOINTMENT
14  to come to the Veritext office closest to you to read
    and sign the transcript.  Our office hours are from
15  8:30 a.m. to 4:30 p.m., Monday through Friday.
16  IN THE EVENT OTHER ARRANGEMENTS ARE MADE, please send
    us a list of any and all corrections, signed and
17  notarized, noting page and line numbers and the
    reason for such changes, so we can furnish all
18  counsel with a copy of same.  If the reading and
    signing has not been completed prior to the
19  referenced date, we shall conclude that you have
    waived the reading and signing of the deposition
20  transcript.  Your prompt attention to this matter is
    appreciated.
21
    Sincerely,
22
23  NANCY GILBERT, RMR, RDR, CRR
24  cc: All Counsel on Appearance page
25
```

```
                                                        Page 131
 1         VERITEXT LEGAL SOLUTIONS
             One Biscayne Tower, Suite 2250
 2          Two South Biscayne Boulevard
               Miami, Florida  33131
 3              (305) 376-8800
 4
 5  October 28th, 2014
 6
    KENNY NACHWALTER
 7  Suite 1100 - Miami Center
    201 South Biscayne Boulevard
 8  Miami, Florida  33131
    Attn:  Deborah S. Corbishley, Esquire
 9
    RE    : Cordell vs. Abbott, et al.
10  DEPO OF: D. CULVER SMITH, III, ESQUIRE
    TAKEN  : October 27, 2014
11  READ & SIGN BY:  November 28, 2014
12
    Dear Counsel:
13
14  The original transcript of the deposition listed
    above is enclosed for your file.  The witness
15  did not waive reading and signing and has been
    sent a letter notifying them to come in and read
16  and sign their deposition transcript.
17  The witness will be provided a copy of their
    deposition transcript for reading in our office
18  should they come in to review the transcript, and
    we will forward to you any corrections made by
19  the witness at that time, along with an original
    signature page which should be attached to the
20  original transcript which is in your possession.
21
22  Sincerely,
23
24  NANCY GILBERT, FPR, RMR, RDR, CRR, CLR
25
```

34 (Pages 130 - 131)

[& - accepted]

| & |
|---|
| **&** 2:18 4:17 19:24 20:3,23 21:5,10,15 23:2 29:8 37:25 44:18 46:8 48:21 60:4 70:2,8 72:24 83:6 105:21 130:10 131:11 |

| 0 |
|---|
| **055376** 128:21 |

| 1 |
|---|
| **1** 3:19 8:10,24 9:3 13:14 14:5,24 15:2,3 15:4,4,18 32:4 37:21 45:4 48:20 129:10 |
| **1.16** 31:10 32:4 117:21 |
| **1.16.** 31:9 117:18,20 |
| **1.2** 31:4,8 |
| **1.3** 115:20 |
| **1.6** 31:8 |
| **1031** 56:7,12 58:3,8 59:14 96:18 115:20 |
| **10:05** 1:13 |
| **11** 1:2 |
| **1100** 2:13 131:7 |
| **11000** 2:5 130:6 |
| **111** 3:7 |
| **11:30** 59:1 |
| **11:46** 59:2 |
| **124** 3:8 |
| **126** 3:9 |
| **127** 3:10 |
| **128** 3:11 |
| **12:21** 82:20 |
| **12:30** 82:21 |
| **130** 3:12 |
| **131** 129:10 |
| **1400** 1:12 |
| **15** 110:10 |
| **15th** 5:2 6:14 7:4 54:10,13 |

| 2 |
|---|
| **160** 55:22 56:17,19 56:23 |
| **16th** 7:7,7,8,11 |
| **175** 115:23 |
| **17th** 6:3,15 7:7,7,11 |
| **180** 56:14 97:4 |
| **1800** 2:21 |
| **1920s** 103:24 |
| **1:27** 1:13 125:18 |

| 2 |
|---|
| **2** 3:22 5:12 15:3,9 16:5 21:22 39:15,19 39:22 68:3 |
| **2.3** 115:25 |
| **2/4/2015** 128:22 |
| **2001** 80:9 |
| **2005** 113:20 114:5 |
| **2006** 18:13,23,24 19:2 20:2,4 21:16,23 22:12,19 23:1,3,11 23:12 40:15 41:24 43:18 44:19 45:4,7 53:19 57:6 59:12,15 59:24 60:7 69:20 70:1,21 |
| **2007** 3:22 5:15 18:14 18:25 19:3 20:14,24 21:16 23:6,12 27:22 38:13 39:23 40:16,25 41:8 42:13 43:1,18 44:20 46:3 47:20,25 59:15,25 60:7 61:4 61:20 70:9,21 113:21 113:21 114:1,5,20 115:1,15 116:2,23 |
| **2009** 80:24 |
| **201** 2:14 131:7 |
| **2014** 1:14 9:12 126:2 126:14 127:3 128:13 128:15 129:8,20 130:4,9,10 131:5,10 131:11 |
| **205** 2:4 130:6 |

| 3 |
|---|
| **20th** 59:15 |
| **21** 20:2,4,14,24 21:16 22:12,18 70:1 |
| **21st** 23:1,11 40:24 |
| **2250** 130:1 131:1 |
| **23** 115:13 |
| **26** 3:22 |
| **26th** 39:17,23 40:15 40:16,25 41:8 46:3 |
| **27** 1:14 126:2 127:3 128:13 129:8 130:9 131:10 |
| **28** 130:10 131:11 |
| **28th** 128:14 129:20 130:4 131:5 |
| **29** 115:15 |

| 3 |
|---|
| **3** 9:6 15:18 |
| **30** 55:23 56:18 116:2 |
| **305** 130:3 131:3 |
| **30th** 55:19 56:3 57:6 58:2 116:23 |
| **33131** 2:14 130:2 131:2,8 |
| **33410** 2:5 130:7 |
| **33436** 2:21 |
| **376-8800** 130:3 131:3 |
| **39** 3:22 |

| 4 |
|---|
| **4** 3:5 14:20 34:1 57:6 |
| **4-1.16** 118:21 119:18 120:23 122:2,13,21 |
| **4-1.16.** 31:7 |
| **4-1.2** 31:5,25 34:2,3 80:15 81:8 117:12,19 118:21 119:18 120:23 122:2 |
| **4-1.2.** 31:3 122:6 |
| **4-1.6** 117:12 |
| **4-1.6.** 117:18,19 |
| **470** 2:20 |
| **4:30** 130:15 |

| 5 |
|---|
| **500** 10:3 |

| 6 |
|---|
| **6** 20:25 21:1 |

| 7 |
|---|
| **7** 5:14 15:10 16:2,8 17:5,7,13,21 18:2 25:19 26:1,9 50:24 50:25 83:20,24 113:21,25 |

| 8 |
|---|
| **8** 3:19 |
| **80** 55:23 56:18 |
| **80416** 1:2 |
| **83** 3:6 115:13 116:15 |
| **850** 1:12 |
| **8:30** 130:15 |

| 9 |
|---|
| **90-6** 80:24 |

| a |
|---|
| **a.m.** 1:13 59:1,2 130:15 |
| **aba** 79:24 |
| **abbey** 1:21,24 2:11 4:14 46:25 48:21 116:2 |
| **abbott** 1:8 2:9 3:22 4:20 19:20 48:3,21 49:4 51:21 53:12 55:4,20 62:25 126:1 127:2 130:8 131:9 |
| **abbott's** 58:4 |
| **abide** 92:15 |
| **ability** 58:1,8 |
| **able** 14:12 35:10 97:8 99:20 |
| **absent** 75:15 |
| **absolutely** 111:11 |
| **accept** 107:3 108:15 |
| **acceptable** 57:8,8 |
| **accepted** 108:16 |

**access**  72:18 73:2,7
**accord**  122:1
**account**  97:8,25
**accounts**  72:18
**accuracy**  58:12 85:10 92:3
**accurate**  65:14 73:13 93:5,8 126:5
**accurately**  39:2 73:17
**accused**  109:20
**achieve**  73:18
**acknowledgment**  114:21
**acquire**  120:12,21
**acquired**  17:1,3 120:14
**acquiring**  120:19
**acquisition**  121:2,5 121:24 122:16
**act**  117:11 118:19
**acted**  88:22 89:4,14
**action**  102:19 129:19
**actions**  59:23
**activities**  17:25 18:4 18:16 19:5 76:23
**activity**  62:18 80:16 93:19 96:6 115:22 116:8
**acts**  103:21 117:4
**actual**  32:3 56:18 62:16 68:15,24 77:24 122:22
**additional**  22:22 41:2 68:1 84:19,23 85:1,4 89:20 90:18 91:2,13 110:24
**adequate**  28:2,7
**admissible**  113:2,6
**adopt**  107:3
**adopted**  110:7
**advice**  117:3
**advise**  130:11
**advised**  10:2

**affect**  86:14 87:11
**affidavit**  83:25
**affiliated**  5:7 15:6 16:22
**affiliates**  41:4
**affirmative**  33:14
**afternoon**  83:4
**ago**  56:1 103:4 124:19
**agree**  86:8,13 89:2,7 89:9 93:16 100:25 124:21
**agreed**  89:11
**agreeing**  19:21
**agreement**  52:8
**ahead**  90:24 117:25
**aircraft**  120:14
**al**  1:8 126:1 127:2 130:8 131:9
**alarm**  19:17
**alarming**  72:1
**alias**  81:2
**allegation**  44:15 115:14 116:24
**allegations**  62:14 65:13,19,22 66:4
**alleged**  108:3
**allocating**  110:17
**allowed**  35:24 109:24
**amended**  3:19 6:1 7:18 9:11,14,19 25:12 43:21 44:16 57:7 62:13 65:19 66:3 83:23 115:12 116:14
**america**  19:9 121:20
**amount**  59:8,8 97:2
**analysis**  84:20 85:5 92:2 93:5,7 103:18
**analyzing**  88:1
**ancillary**  109:21
**annotated**  79:17
**annotations**  79:16
**announced**  70:16

**answer**  7:23,25 34:12 35:6 42:9 62:24 63:1 63:3 73:10 85:21 86:17 87:18 94:2 115:7
**answering**  68:20
**anticipated**  45:23
**anticipating**  38:24 40:12
**anticipation**  17:9
**anybody**  63:25
**apart**  26:16
**apologize**  21:17 83:8
**appeals**  9:13
**appearance**  2:9 130:24
**appearances**  2:1
**appeared**  72:23 128:12
**application**  25:19 106:5
**applications**  25:17
**applies**  124:5
**apply**  51:2 123:15
**appointment**  130:13
**appreciate**  58:18
**appreciated**  130:20
**appropriate**  89:23 100:6
**approve**  48:18,24
**approximately**  102:24
**april**  5:15 18:14 19:4 23:6,12 24:6 27:22 38:13 42:10,13 43:1 43:18 44:19 46:10,16 46:20 47:9,20,25 59:15,25 60:7 61:4 61:20 62:17 63:14 65:7 67:6 70:9,21
**area**  10:14,15
**areas**  11:3 12:18
**arrangements**  130:16

**arrive**  18:7
**arriving**  15:14 48:8
**article**  102:17,23
**articles**  102:16
**asked**  5:5 6:10 20:20 24:20 36:3,16 50:5 50:15 55:14 58:23 63:11 82:7 85:1,3,8 85:18 90:12 96:18 111:24 112:3 114:12 117:1 118:25 120:2 122:6 123:19,19 124:15 125:3
**asking**  21:17 35:17 68:5 70:13 89:19 91:5,20,21 95:21,25 99:23 118:6,22 123:2
**asks**  51:5
**assertions**  92:3
**assignment**  10:6 12:1 13:5
**assist**  29:23 30:8,11 37:8,15,19 46:11 49:6 54:22 64:22,22 119:1,18
**assistance**  65:7 66:22 118:21
**assisted**  64:18 80:6 129:13
**assisting**  46:21 47:12 80:10,15 117:12 120:7
**associate**  29:19 45:15 121:13
**assume**  16:7 24:20 35:18 36:16 44:4 48:9 61:2 64:1 65:12 65:14 70:13 85:9 86:12 94:13 95:21,25 99:10 108:20 112:4 113:15 123:2,20 124:15 125:3
**assumed**  15:23 65:18 65:20,21,23 66:4

**assumes** 51:4
**assuming** 15:15
17:14 28:5 36:25
37:1,6,12,18 38:10
41:11 49:10 51:22
52:2 55:11,17 61:7
61:13 66:24 67:17
69:7,25 72:23 89:11
96:4 97:22 98:23
99:12,21 105:14
111:25 123:3
**assumption** 15:11
17:11 21:3 26:22
27:21 44:6,17 61:18
62:16 67:22 94:10
102:4
**assumptions** 15:13
66:9,11,17,20 67:9
**attached** 9:12 43:20
44:25 83:22 131:19
**attempting** 115:1
**attention** 38:17 78:22
130:20
**attn** 130:7,10 131:8
**attorney** 86:24 88:14
92:11,15,23 99:15
100:11,17 101:20
108:21 115:16
129:16,18
**attorney's** 92:16
105:13,15 110:16
**attorneys** 2:2,11,18
83:11 85:24 86:9,19
87:2 89:13 93:14,17
94:8,24 95:25 96:3
**august** 113:20 114:5
**author** 64:4
**authored** 64:2
**authorities** 75:19
77:12
**authorized** 100:23
129:6
**available** 24:7 130:12
**avoid** 69:16

**aware** 15:17,19 47:2
47:2 56:3 59:18,23
66:25 70:20,22 72:10
72:14,17 92:22 97:6
115:3
**awareness** 46:15

**b**

**b** 86:2
**back** 8:21 13:16
16:23 17:2 18:18
21:25 37:4,5,9 43:3
82:23 94:1
**background** 10:12
10:13 57:13
**bad** 98:4 99:2 100:21
117:4
**balances** 55:7 58:13
**bank** 72:18 83:15
**bar** 52:20 77:7 79:22
80:9,15,23 101:1
102:18 109:14,18
118:20 123:9,12
**bar's** 77:8
**base** 27:21 69:19
**based** 15:11 18:8
23:14 24:10 26:22
30:17 41:13 42:15
43:7 51:21 53:25
55:5 61:8,9 69:6 85:2
86:13 88:2 91:1,5
94:17,24 95:9 102:4
110:25
**basically** 19:21 32:15
69:24
**basis** 23:21 25:25
38:10 46:7,13 47:18
49:14,14,25 50:3
51:12 53:6 54:20
62:15 64:12 65:5
70:5 71:18 82:11
112:8 114:13
**beach** 1:13 2:5 109:6
109:9 127:21 128:4
130:7

**bear** 5:19
**bedell** 107:25
**began** 20:6,9,13,14
20:16
**beginning** 17:8
**behalf** 1:20 2:9
**behaving** 68:9,14
**behavior** 38:20,21,23
38:25 39:25 40:1,5,7
40:8,9,11,12,17,19
45:10
**belief** 30:23 32:23,25
41:23 55:22 69:19
71:1,18 87:12,21
94:3 110:10 113:11
**believe** 5:15 6:21 7:5
7:8,10 9:15 13:17
16:24 19:7 21:23
22:5,14 23:4 24:8
25:11 26:2,11 27:9
27:25 28:1,6 29:14
30:20 32:21 33:6
34:6,16,20 35:3 36:4
36:6,7 37:19 38:23
39:18,24 40:2,15
41:2,6 43:22 54:18
54:24 55:20 64:12
68:19 71:12 73:16
75:13,20,24 80:3
84:5,11 85:4 86:3,17
88:21,24 90:3,17,19
91:11 92:7 93:18,21
94:2 96:1,5 99:14,20
99:24 102:9 104:10
106:17 107:10,14
119:8,23
**believed** 60:4 76:19
86:14 88:9,15 94:8
94:14,14,24 95:17
**believes** 30:19 33:19
33:19,22 100:12
**believing** 36:21
**belonging** 84:9
**berlin** 2:18 4:17
19:24 20:3,23 21:5

21:10,15 23:2 29:8
37:25 44:18 46:8
48:21 60:4 70:3,8
72:24 83:6
**berman** 3:23 16:11
19:14 29:19 38:15,18
38:19 45:2,5,9,15
46:16 47:8 50:22
55:13,14,18 69:10,21
69:22 92:1 93:2
121:14,21
**berman's** 19:21
39:22,25 45:12 47:3
91:23 93:5,7 97:14
121:16
**beyond** 58:4,5 60:24
76:24 84:6
**billed** 63:17
**biscayne** 2:14 130:1
130:2 131:1,2,7
**bit** 24:15 51:18 59:6
**blake** 107:19 108:1
**bna** 79:24
**boats** 120:15,21
**boca** 2:21
**book** 103:2
**borrow** 37:4 41:22
43:16 44:20 53:20
70:3
**borrowed** 101:20
**borrower** 26:15 82:2
82:4 94:19 100:13,13
100:15,18
**borrower's** 81:20
83:25
**borrowing** 37:9,14
41:23 42:22 99:15
101:2 119:18
**bottle** 82:18
**boulevard** 1:12 2:14
130:2 131:2,7
**boy** 108:23
**breach** 107:20 108:2
108:3

**breached** 108:8
**break** 58:17 59:18
**brief** 69:1
**brings** 75:11
**broad** 35:16 51:18
  87:14 104:23
**broader** 95:9
**brown** 80:9
**bryan** 7:5
**business** 12:8 22:25
  37:17 56:22 57:7,13
  57:16,21 76:25 82:4
**businesses** 37:16
  41:10 42:24 75:3
  109:21
**businessman** 57:24

**c**

**c** 1:8 2:9 130:6
**call** 52:17 102:17
  130:13
**called** 4:3 5:24 10:17
  16:24 62:4
**career** 11:3,17
**carried** 16:18,20
**carry** 13:2
**cars** 120:15,17
**case** 1:2 4:19 5:21 6:5
  7:19 9:8 29:1 30:25
  35:10 36:14 50:11
  54:12 60:11 64:8
  79:18 80:9 81:4
  89:21 93:1 104:2
  105:20,22 106:1,9,15
  107:2,19,23 108:1,1
  108:13 109:12,13
  110:17 114:20
**cases** 79:19 80:5
  102:7 103:17 105:6
**cash** 19:18 24:8
  53:12 55:7,23 56:4,5
  56:18,23,24 57:16
  58:13 59:8,20 69:11
  71:16,19,25 72:25
  74:6,12,20 75:4

**115**:20,25
**cause** 1:25
**caused** 18:14 19:3
**causes** 102:19
**cc** 130:24
**cease** 48:14 51:2
**ceased** 22:24 23:10
  30:14 94:9 95:1
**cede** 82:25
**cellular** 90:23
**center** 2:13 131:7
**centrepark** 1:12
**certain** 5:8 31:19
  51:10 53:8 65:12,13
  66:4,8 80:2 86:18,22
  97:2
**certainly** 56:9 67:23
  78:11 86:9 90:14
  111:1 113:17
**certificate** 3:11 128:1
  129:1
**certified** 128:8 129:4
  129:24,25
**certify** 126:5 128:11
  129:5,15
**cetera** 118:14,14
**change** 25:4 27:12
  29:4,10 90:4 92:4
  127:5
**changed** 103:17
**changes** 13:25 111:2
  127:4,23 130:17
**chapter** 102:18
**characterize** 67:22
**characterized** 64:23
**charge** 112:15
**charged** 68:15
  123:22 124:2
**checked** 79:11,21,25
**circuit** 9:12
**circumstance** 75:16
  87:11 94:11 99:25
  100:7 102:8 109:17
**circumstances** 12:13
  24:11,15,19 30:5,15

**31**:19 32:22 34:5,17
  34:22 35:10 36:5,18
  36:20 37:24 38:14
  43:11 46:14 48:7
  49:4,23 52:3 75:22
  77:4 78:4 79:3 80:2
  93:13,17,24 95:17
  99:2 100:22 101:6
  121:9
**citations** 80:1
**cite** 31:11
**cited** 33:17 79:12
  115:19
**civil** 63:5
**claim** 11:23 107:13
  107:15,16
**claiming** 107:11
**claims** 110:18
**clarification** 83:10
**clarifies** 125:6
**clause** 119:21
**clear** 19:7 29:19,20
  101:17
**clearly** 40:5
**client** 12:7,20 16:25
  30:1,5,8,12,17,20
  33:7 34:6,18,20 35:3
  35:19 36:1,4,8,17,21
  37:6,13 45:13 64:18
  64:22 80:10,16 81:2
  86:20 98:16 99:3,7
  101:6,18 115:24
  116:5 117:3,12
  118:21,25 119:1
**client's** 30:14,23
  32:19,21,25 33:6,20
  75:11 86:10
**clients** 16:25 17:10
  65:5 86:19 96:23
**close** 6:22 50:16
  59:20 92:16 110:20
**closed** 5:13,14 12:5,8
  43:1 71:17,20,23,24
**closely** 106:5

**closest** 130:14
**closing** 23:12 42:24
  47:9 122:15,16
**closings** 71:16,19
  122:22
**clr** 131:24
**coffee** 33:3
**collar** 11:6
**collateral** 84:4,8,9,13
**come** 23:8 24:16
  57:15 78:20 101:5
  130:14 131:15,18
**comes** 30:1
**comfort** 113:17
**comfortable** 50:4
  75:12
**coming** 74:7 75:4
  77:15
**comments** 79:13,13
**commercial** 11:5
  12:5 75:2 92:17 99:1
  101:4
**commission** 126:22
  128:22
**companies** 5:18
  16:21 17:2,3,10 19:8
  21:16 22:18 24:7,22
  41:3 58:8 59:14
  114:23 115:19
  119:13,16 120:11,19
  120:21 121:23,24
**company** 16:24 25:2
  69:12 120:13 121:19
  121:24
**comparison** 14:14
**competitor** 106:4
**complaint** 7:18 9:11
  9:14,19 25:12 43:14
  43:21 44:16,16,25
  57:7 62:13 65:19
  66:3 83:23 115:10,13
  116:15
**complete** 129:11
**completed** 130:12,18

**completely** 52:11
  76:3
**compliance** 3:19 6:2
**compound** 122:4
**comprehensive** 90:10
**computer** 129:13
**conceal** 118:22
**concealing** 117:13
  118:2 119:1
**concern** 52:13 53:5
  82:3
**concerning** 7:1 58:12
**concerns** 19:22
**conclude** 18:14 19:3
  130:19
**concluded** 17:16
  77:23 125:18
**conclusion** 18:7 23:5
  23:9 24:17 46:24
**conclusions** 46:15
**condition** 26:14
**conduct** 15:20,25
  16:7,9,12 20:1,10,11
  21:3,8 22:8 23:9,16
  29:21,23,25 30:14
  32:5,7,19 33:8,20
  34:18 37:8 41:7
  45:22 46:11,17,21
  47:13,15 49:6,15,16
  53:22 54:22 59:25
  60:5 64:15,19,23
  65:8 66:14 67:3,11
  67:14,20,23 68:8
  70:1 75:19 76:10,19
  76:20 78:13 81:8
  94:10,15 95:1,24
  102:6 123:11,23,24
  124:24
**conducting** 122:15
**confessed** 30:8
**confidentiality** 77:8
**conflict** 105:24,25
  106:14 108:4,10
**confused** 4:15 20:17

**conjunction** 31:17
**connected** 81:21
  129:18
**connection** 9:8 15:6
  17:4,12 27:7,11,20
  28:9 46:20 47:12
  61:3,14 76:22 79:8
  84:20 107:15 109:20
**consider** 26:15 48:6
  48:9 49:20 77:9,20
  113:14
**considered** 69:12
  77:23
**consistent** 117:11
  119:11,17 120:22
**consistently** 118:19
**constitute** 10:19
**constitutes** 123:23
**constructive** 32:3,16
  32:16 62:16 66:13,21
  68:15,24 84:12
  118:13
**consultant** 1:4
**contact** 45:16
**contacted** 54:12
**contained** 69:9
  115:13
**contains** 71:13
**content** 25:14,15
  43:20
**contents** 15:17 47:3
  66:25 104:6
**context** 35:17 52:16
  91:17 101:15 123:16
**continue** 30:19 41:22
  49:1 111:6
**continued** 22:12,16
  41:8 43:15
**continuing** 16:9 17:1
  17:24 18:3,15 19:4
  23:16 38:25 44:20
  69:16,18 120:7
**contract** 97:12
**contractually** 100:23

**contrary** 31:1
**conversation** 7:3,5
  89:22
**conversations** 45:22
  90:2
**converse** 33:12
**conveyed** 94:8,25
**convicted** 112:7,13
  112:18 113:12 114:3
**conviction** 113:1,6
  113:18 114:4 119:12
**copied** 19:19
**copy** 8:3 13:21 38:21
  39:3,6,11,22 65:24
  105:9 125:14,16
  130:18 131:17
**corbishley** 2:15 3:5
  4:7,12 8:2,6,9,14,17
  8:19 9:1 18:6 22:1,6
  28:21,22 29:7 39:16
  42:4,12,20 43:12
  44:5 45:1 50:20 54:2
  57:3,12,22 58:15,19
  58:25 59:4 63:4,22
  64:11 65:17 66:10
  67:15 68:13,21 69:2
  70:14 72:5,16,22
  73:15,23 75:1,8,17
  76:2,8 77:22 78:5,14
  79:6 82:8,14,19,23
  83:9 93:12 109:5
  111:19 112:10,13,21
  112:24 113:4,8 114:9
  115:5 116:9 117:6,14
  117:17,24 118:1,5,11
  119:20 120:25 121:6
  122:3,23 123:25
  125:10 131:8
**cordell** 1:4 4:19,23
  24:21 60:11,15,23
  61:3 63:18 126:1
  127:2 130:8 131:9
**corporate** 73:2,2
**corporation** 1:5

**correct** 4:24,25 10:3
  10:4 13:11,12 27:2
  28:3,4,9,11 29:12,13
  30:10 31:19,20 32:11
  32:22 33:23 35:24
  36:14,23,24 37:1
  44:12,13 45:4,11
  54:8,16,18 55:23,24
  56:5,6,20,24 59:21
  59:22 64:9 65:1,2
  68:10,12,17,20,24
  70:18 74:3,4 76:12
  78:7 79:5 81:3 82:12
  82:13 83:13,14,17,18
  84:21,22 86:3 87:23
  88:11 92:12,13,24,25
  94:5,16 96:24,25
  98:24 99:4,8 100:5
  100:18 102:5 104:2,7
  104:8 105:14 113:8
  115:10 117:4 124:24
  124:25 127:23
**correcting** 30:12
  118:16
**corrections** 126:4
  130:16 131:18
**correctly** 45:8 80:15
  84:18 85:24 96:17
  106:7 120:3
**correspondence**
  25:16
**cory** 2:22
**counsel** 6:8 14:7,10
  15:5 21:15 25:10,13
  25:14 28:15,18,24
  29:15 37:23 38:1,4
  53:21 66:7 76:11
  81:20 84:20 89:19,23
  90:12 106:2,3,11,15
  106:17,23 107:23
  108:8 110:22 111:8
  129:16,18 130:18,24
  131:12
**counsel's** 105:24
  113:11

**counseled**  64:14
**counterclaimed**
  107:12
**country**  32:15
**county**  126:11
  127:21 128:4
**couple**  79:19,23 83:7
**course**  6:24 11:17
  16:9,12 17:24 18:3
  18:15 19:4 20:2
  23:16 29:21,23,24
  33:20 36:16 46:17
  55:11 56:11,22 58:20
  79:11 85:8
**court**  1:1 4:9 9:13
  107:17 108:15,16
  110:7
**cover**  24:6,22
**cpa**  75:11,13 79:1
**create**  41:20
**credence**  76:4
**crime**  17:12,15 70:24
  117:13 118:2,22
  119:1,10 120:7
**criminal**  11:7 15:21
  16:6 17:18 23:22
  32:20 33:23 46:11,21
  47:13 49:7,15 54:22
  62:17 64:14,18,24
  65:8 66:14 67:20
  76:10,20,23 80:16,25
  81:1 93:19 95:1,23
  95:24,24 96:6 112:4
  112:18 113:7,12,13
  113:16,19 114:4,6,14
  116:22 122:20
  123:24
**crisis**  69:13
**cross**  3:6,7,8 83:2
  85:11 111:21 124:9
**crr**  1:22 128:18
  130:23 131:24
**culver**  1:16 3:4 4:2
  4:10 126:1,7 127:2
  127:25 128:11 129:7

  130:5,9,10 131:10
**curiosity**  85:13
**curious**  85:15
**current**  38:20 82:3
**customer**  55:22
  56:17 59:9
**cv**  1:2

**d**

**d**  1:16 3:4 4:2,10
  31:5,8,25 34:2,3 81:8
  126:1,7 127:2,25
  128:11 129:7 130:5,9
  130:10 131:10
**darn**  123:2
**dashiell**  115:17
**dashiell's**  115:23
**date**  5:13 21:20,21
  39:23 40:24 55:8
  56:5 80:4 103:6
  114:15 116:22
  127:25 130:19
**dated**  18:13,20 19:2
  39:17 129:20
**day**  10:13 57:17
  126:14 128:15
  129:20
**days**  7:6 10:20 56:14
  97:4
**dcorbishley**  2:16
**dealt**  99:1
**dear**  131:12
**debbie**  4:12
**deborah**  2:15 131:8
**debt**  100:14 109:21
**debts**  75:4
**december**  21:23 23:3
  23:12 41:24 45:4,6,7
  53:19 65:7
**decide**  125:15
**decision**  82:12 110:9
  110:13
**decisions**  81:4
**declaration**  105:18
  107:5,5,8,14

**declare**  127:22
**decline**  118:25
**defendant**  2:18 106:9
  116:2
**defendants**  1:9,20,23
  2:11 6:15 15:5 48:20
  48:25 49:11 85:19
  114:7,19
**defending**  100:8
**defense**  80:25 81:2
**deferred**  56:12
**definition**  26:5
**degree**  77:19 121:9
**demands**  17:9
**demonstrate**  43:15
**department's**  76:21
**depend**  27:6 30:15
  77:4 92:19 121:9
**dependent**  86:2
**depending**  10:8
**depends**  49:23
**depo**  126:1 127:2
  130:9 131:10
**deponent**  126:6
**deposited**  56:12
  96:23 97:22
**deposition**  1:16,25
  3:16 8:23 39:14
  91:23 107:6 109:12
  111:6 125:17 127:23
  129:1,7,12 130:12,19
  131:14,16,17
**depositions**  9:25
**derive**  32:24 33:2,4
  33:12
**derived**  66:8
**describe**  12:21 18:12
  18:19 34:25
**described**  16:10,13
  19:6 21:4,9 22:7
  23:10 34:18,23 39:25
  40:10,17 41:7 45:9
  46:14
**describing**  38:20,23
  40:5,6,7 73:19 99:24

**description**  3:17 62:3
**designed**  107:14
**desire**  73:18
**details**  76:16
**determine**  18:2 88:13
  89:3,13
**determined**  98:13
**determining**  85:16
  85:25 113:14 124:5
**differ**  48:10
**difference**  10:7 21:13
  22:15 35:14 47:23
**differences**  48:12
**different**  24:12 47:16
  48:7 49:3 52:22
  93:13,13 105:6
  122:21 124:22
**differently**  60:2
**difficult**  34:11
  104:14
**diplomate**  128:8
  129:4,24
**direct**  3:5 4:6
**directed**  123:11
**directly**  30:25 81:21
**disagree**  88:19
**disallow**  34:19
**disbelieve**  34:9,12,24
  36:8 73:4
**disbelieves**  30:17
**disbelieving**  36:21
**disciplinary**  109:18
  123:16
**disclaimers**  104:23
**disclose**  81:21
**disclosed**  6:15 8:4
**disclosing**  3:19 6:2
**disclosure**  99:16
  103:6
**discontinue**  5:6
  48:14
**discontinued**  33:7
  94:15
**discount**  73:20 75:21
  75:25

**discovery** 69:17
**discuss** 35:11 36:11
**discussed** 55:21
   80:11 87:22 97:21
**discussing** 80:14
**discussion** 36:5 71:8
   79:25 102:20 103:19
   125:13
**discussions** 66:7
   97:19 110:22
**dismissal** 9:13
**dismissed** 107:17
**disregard** 94:21
**distanced** 50:15
**distances** 123:3,5
**distinct** 60:19
**distinction** 13:7 38:5
   38:6 123:15
**distinguish** 48:3
**district** 1:1,1
**dittmar** 107:25
**document** 8:22 13:14
   39:13 71:12 115:1
**documented** 114:23
**documents** 9:5,7,19
   18:9 19:2 22:10 54:6
   58:5 60:25 65:3,11
   65:16 66:8,15 67:1
   83:16,20,22 84:19,24
   85:1
**doing** 30:2,3 73:13
   115:3
**dollar** 15:9,10 16:2,5
   16:8 17:5,7,13,21
   18:2 21:22 25:19
   26:1,9 50:24,25 68:3
   83:24 113:21,25
**dollars** 5:14 56:23
**doubt** 110:8
**draft** 7:13 13:18
   121:14
**drafted** 121:15
**draw** 17:1 44:24
**drawn** 40:9 46:16

**dubosar** 2:20
**dubosarnavon.com**
   2:23
**due** 57:15 71:16,20
   71:23,24 74:7 75:4
   85:13
**duly** 4:3 128:13
**duties** 13:3
**duty** 5:4 63:12 91:12
   91:18 107:21 108:2,3
   108:4,9 122:21

**e**

**e** 3:22 19:18,18 40:10
   53:10,11 55:5 57:6
   59:7 69:20 72:4,13
   73:13 114:18,21
   115:15,23 116:1,23
**earlier** 16:21 17:3
   69:20 71:22
**easier** 11:14 39:4
**easy** 74:17
**ed** 15:6 49:1 64:14
   116:3
**edition** 103:3
**editions** 103:1
**edward** 5:7
**ee** 128:21
**effect** 93:8 104:11,17
   104:24
**effective** 110:15
**effort** 48:2 72:25
**either** 7:12 17:11
   28:15 53:14 83:20
   120:12
**elections** 80:11
**elements** 118:12
**eleventh** 9:12
**eliot** 1:8 2:9 48:21
**ellis** 107:19 108:1
**emergency** 109:23
   110:5
**emerging** 69:12
**employee** 129:16,17

**employment** 5:4
   76:18
**enable** 85:20
**enclosed** 131:14
**ended** 35:6
**engage** 64:14,18 70:8
   70:16
**engaged** 15:20,25
   16:7 29:21 34:18
   45:21 70:1 72:25
   76:10 94:9
**engaging** 93:19 94:9
   113:19
**ensure** 124:16
**ensured** 123:20
**enter** 127:4
**entered** 127:24
**entities** 5:8 15:6
   16:22 84:9
**entitled** 36:4 73:1
   97:24
**errata** 3:10 126:4
   127:1
**error** 35:20
**escapes** 108:24
**esquire** 1:16 2:6,15
   2:22,25 3:4 4:2 126:1
   126:7 127:2,25
   128:12 129:8 130:5,7
   130:9,10 131:8,10
**essentially** 12:24
**establish** 22:11 68:5
   113:6
**established** 67:25
**estimation** 6:23
**et** 1:8 118:14,14
   126:1 127:2 130:8
   131:9
**ethical** 77:3 82:10
   92:16 100:16,17
   101:1,21 117:2
   123:14 125:1
**ethically** 123:20
   124:16,22

**ethics** 10:17 32:14
   79:22 80:23 81:5
   109:25
**evaluation** 78:13
**evasive** 22:21
**event** 89:20 130:16
**events** 16:4
**eventually** 107:17
**evidence** 114:24
**evidently** 77:6
**evolving** 11:1
**exactly** 38:24 83:11
   104:4 105:25
**examination** 3:5,6,7
   3:8 4:6 83:2 85:10,11
   111:21 124:9
**examined** 4:4
**example** 100:8
**excess** 77:24
**exchange** 24:6 56:7
   56:12 58:8 59:19
   115:18
**exchanger** 98:16
**exchangers** 16:24
   17:2 56:5 71:16
**exchanges** 58:3 96:18
**exclusion** 99:21
**excuse** 25:14 40:6
   64:22 90:22 106:21
   112:11
**execute** 12:25 50:6
**executing** 12:16
   47:16
**exhibit** 3:19,22 8:10
   8:11,24 9:3 13:14
   14:5 15:4,18 25:11
   25:13 37:21 39:15,19
   39:22 53:11 57:6
**exhibits** 3:16 9:11,17
   9:18 15:17 18:10,13
   18:20 44:24
**exist** 25:10 36:20
**existed** 106:14
**existing** 69:13 81:1

**expect** 5:21 25:18
71:4 89:22 111:10
**expenses** 74:20
**experience** 11:6,9,17
11:19 12:21 57:21
74:15,18 75:2 101:4
101:5 105:7
**expert** 3:20 4:23 6:2
13:10 56:9 81:9,10
81:11,14 85:8 90:16
91:18 96:19 102:11
102:13
**expires** 126:22
128:22
**explained** 86:23
**expressed** 107:4
**expressly** 49:19
**extent** 68:2 97:11
107:7,8 115:8
**externally** 88:4
**extremely** 115:19

**f**

**fact** 28:3 45:10 55:21
56:16 58:2 64:21
71:15 96:22 113:12
113:19 115:2 119:10
**factor** 113:13
**facts** 15:11 22:23
34:15 35:14 36:11,13
36:25 44:10 70:20
71:2 84:24 85:4,15
86:9,14,16,19,21
87:1,9,10 88:3,9,13
88:22,25,25 89:3,12
89:13,20 90:2 99:22
**factual** 33:6 36:20
51:12 114:13
**fading** 28:19
**fair** 11:25 14:1,13,19
22:8 25:24 35:9
43:13,23,24 44:6,14
54:19,24,25 63:16,21
63:23 64:25 73:20
74:1,5,9 75:13,20,25

78:24 81:18,23,25
89:17 112:3
**false** 26:19 27:5,11
27:19 28:8 29:3
65:20
**familiar** 92:14 96:19
96:22
**family** 111:17
**fancy** 120:15
**far** 102:1 105:7
**farms** 2:5 130:6
**favor** 4:8
**fbi** 115:21 119:15
**february** 3:22 18:13
18:24 19:3 39:17,23
40:16,25 41:8 46:3
114:20,25
**fee** 105:13
**fees** 105:15 110:16
110:17
**fewer** 6:20,22
**fiduciary** 107:20
108:2,3,9
**figure** 51:14
**file** 131:14
**filed** 13:15,19 107:12
**final** 7:15 13:17
**financial** 23:25 26:14
27:11,15,19 28:8
60:10,15,23 61:2,8
61:14 75:10 83:16
**financials** 26:20 27:5
27:6 29:3
**find** 81:16
**fine** 39:7
**firm** 4:17 5:6,17 13:5
19:24 24:16 29:14
37:7,8,13,15,19,22
38:11 40:14,21 41:1
41:9,21,25 45:15
47:1 49:13,16,17,22
50:1,1,4 51:9 53:2,3
53:16,17,18,21 55:13
58:12 63:6 64:2 74:2
74:12 83:6 105:19

107:25 108:23 109:6
109:9 116:8 120:4
122:1,17,18 123:3,5
123:21 124:16
**firm's** 48:17 51:21
**firms** 74:19
**first** 4:3 35:18,25
38:10 54:10 55:15
58:7 59:18 105:12
119:2
**firsthand** 61:21
**five** 9:16,18 15:17
18:10,20 65:3,11,16
66:25 82:15 115:18
**fix** 112:25
**flexible** 115:25
**florida** 1:1,13,23 2:5
2:14,21 79:17,19,19
79:22 80:5,9,23 81:7
102:18 109:14,18
118:20 123:9,12
126:10,19 127:21
128:3,9,10,19 129:5
129:23 130:2,7 131:2
131:8
**focused** 48:16
**follow** 124:11 125:9
**following** 59:2 82:21
110:7 115:14
**follows** 4:5
**forcefully** 116:3
**foregoing** 129:10
**forget** 19:19
**forgot** 19:13 72:1
119:3
**form** 18:5 26:9 29:5
42:1,11,14 44:3,22
50:17 53:24 56:25
57:9,19 63:2,20
64:10 65:9 66:1 67:8
68:11,18 69:4 70:10
72:15,20 73:6,21
74:21 75:6,14,23
76:6 77:17 78:1,9
79:4 82:5 86:4 87:5

87:13 88:17 89:5,15
90:5,13,21 91:1,8,14
92:6,18 93:20 95:4
96:8 97:10 98:5 99:9
99:18 100:19 101:24
104:12 112:10 114:9
115:5,10 116:9,10
117:6,14 118:5,7
119:20 120:25 121:6
122:3,23 123:25
127:23
**formalities** 125:19
**formed** 60:9 120:13
120:13
**former** 4:17
**forming** 65:23 80:6
112:5
**forms** 26:6
**forth** 37:1
**forum** 86:25
**forward** 23:12 29:22
30:4 131:18
**forwarded** 19:19
116:1
**found** 30:2 101:7,23
**foundation** 118:12
121:7 122:4
**founded** 119:21
**four** 37:22 71:12,14
81:4
**fourth** 103:2
**fpr** 1:22 128:18
131:24
**frame** 40:18 43:8
**framed** 119:3
**frankly** 110:8
**fraud** 26:6,9,15
66:14,23 70:24 101:7
101:23 102:21
112:18 113:13
122:20
**fraudulent** 15:22
16:6 17:21,25 18:3
18:15 19:5,10 23:22
25:5 26:1,5,5 27:6,22

29:21 32:20 33:23
46:12,22 47:13 49:7
49:16 50:6,7,14
54:23 62:18 64:14,19
64:23 65:8 67:20
76:10,21,23 80:16
101:11,19 102:6,12
102:16 112:2,4
113:19 116:22
**friday**   130:15
**front**   105:10
**full**   4:9 57:17 85:5
87:9 99:16
**fully**   36:11
**fund**   58:9 71:16,19
**funding**   24:21
**funds**   16:21 19:8,11
22:13,17,24 41:3
42:23 68:1 73:8
97:16 98:12,14 99:7
100:1 109:20 119:12
119:15,19 121:25
**furnish**   130:17
**furnished**   9:8,10
**further**   3:8 49:20
70:17 85:19 89:22
90:1 96:12 112:8
124:7,9 126:6 129:15
**furtherance**   29:24
96:6
**future**   40:12

**g**

**gained**   38:14
**gardens**   2:5 130:7
**general**   10:14 13:5
64:6,13 71:1 89:16
91:15 99:19
**generally**   56:13 75:3
104:16 117:9
**gentlemen**   53:15
**getting**   103:3
**gilbert**   1:21 2:4,6 3:7
7:4,13 8:5,7,12,15,20
18:5 28:19 29:5

39:11 42:1,11,14
44:3,22 50:17 53:24
56:25 57:9,19 58:24
63:2,20 64:10 65:9
66:1 67:8 68:11,18
70:10 72:3,15,20
73:6,21 74:21 75:6
75:14,23 76:6 77:17
78:1,9 79:4 82:5 86:4
87:5,13 88:17 89:5
89:15 90:5,13,21,24
91:14,21 92:6,18
93:20 95:4 96:8
97:10 98:5 99:9,18
100:19 101:24
104:12 108:25 109:2
109:8 111:5,8,10,14
111:22 112:11,16,23
113:3,5,9,10 114:11
115:6 116:13 117:7
117:15,19,21,25
118:3,6,15,18 119:4
119:9,22 120:1 121:4
121:11 122:10 123:7
124:3,6 125:8,11
128:7,18 129:3,22
130:6,7,23 131:24
**gilbertyarnell.com**
2:7
**give**   5:21,24 6:11,16
8:3 35:13 39:17
44:12 58:1 72:11
76:4,4 81:19 82:1,14
101:15 112:21
**given**   6:6,7 39:21
60:11 61:3 81:7,13
103:18 104:9,18
111:17
**gives**   33:14 55:20
113:17
**giving**   4:8 6:11,17
14:20 50:13,18 60:23
63:5 82:9
**go**   8:12 23:11 30:4
35:7 50:8 82:15,17

90:24 95:7 101:25
105:5 117:25
**goes**   32:18
**going**   8:11 10:13
29:22 30:3 35:21,22
37:14 55:5 75:18
82:25 83:12 105:5
110:21
**good**   52:10 83:4
**gospel**   78:7
**governed**   85:25
97:12
**great**   77:16,18
**grievance**   52:21
**group**   2:20 115:18,20
**guess**   8:3 25:1 59:7
61:13 110:14
**guessing**   105:13
**guidance**   35:13

**h**

**half**   5:12 15:9 16:5
21:22 58:16 68:3
**hall**   82:15
**hand**   74:6,20 75:4
99:13 128:14
**handful**   32:14
**handling**   122:22
**happened**   29:1 36:18
50:10 101:9
**happens**   28:25
**head**   12:3 50:8 54:11
74:11 97:3 103:14
125:4
**hear**   28:20 35:2
112:19
**heard**   54:15 84:8
120:3
**hearing**   109:23
**held**   97:1
**help**   34:8,20 35:4
38:21 50:5
**helpful**   35:12 39:18
85:4

**helps**   65:25
**hesitating**   43:19
**hired**   12:10 79:1,2
106:10 109:22
**hmm**   20:5 53:13
55:16 59:11
**hold**   13:9 97:7
117:15
**holding**   97:9
**holland**   105:21
**hour**   10:3 58:16
**hourly**   10:5
**hours**   6:18,20,20,22
7:22 130:14
**house**   75:9,18,21
76:11 79:2 115:16
**hurdle**   100:17
**hypothetical**   34:14
94:7,23 95:15
**hypotheticals**   35:8

**i**

**i.d.**   126:15
**idea**   45:16
**identification**   8:23
39:14
**identified**   105:6
**identify**   14:12 47:4
60:22 85:7
**ifs**   98:10
**igilbert**   2:7
**ignorant**   52:5
**ignore**   76:1,3
**iii**   1:16 3:4 4:2,10
126:1,7 127:2,25
128:11 129:7 130:5,9
130:10 131:10
**immediately**   19:12
**impact**   120:17
**implication**   5:23
**important**   73:11
**imposed**   88:5
**impossible**   88:13
**impression**   20:6,14
20:22 21:2 55:3,3

59:7 61:5,6,12 80:21
**improper**  19:10 43:1
68:1 94:9 121:22
**improperly**  68:10,14
**impropriety**  52:14
**imprudent**  98:14
**imprudently**  99:8
**impute**  52:24 53:1
**imputed**  49:13,22
**imputes**  49:15
**imputing**  49:25
**inaccurate**  24:2
28:24
**included**  102:20
114:4
**including**  44:23
101:10 114:19
**inclusive**  43:9 129:10
**incomplete**  90:20
**independent**  79:7
**index**  3:1
**indicate**  105:23
114:6 115:2 116:6,17
116:25
**indicated**  95:16
**indicating**  13:20
**indictment**  119:11
**individual**  47:5
49:21 52:20 54:23
60:16 63:9 71:24
85:19 123:12
**individual's**  87:11
**individually**  53:9
84:10
**individuals**  51:8,12
88:1
**inducement**  101:12
101:19
**inferences**  44:24
**inferred**  115:21
**information**  10:11
28:2,7 30:18 36:23
53:25 54:4 59:13
60:3,13,21 64:7 69:8
69:9 74:23,24 85:20

90:18,19 91:3,13
92:14,23 93:14 94:7
94:22,25 104:17
110:24 121:13
**informed**  24:5 28:11
28:13 94:18
**infringement**  107:11
**initial**  45:5 119:21
**inquiry**  25:23 48:11
52:22
**insofar**  67:12
**instance**  99:6 101:11
**insubstantial**  13:18
13:25 14:9,11
**intend**  81:25
**intended**  82:11
**intends**  100:14
**intent**  51:20
**intention**  30:10
**interest**  105:24 106:1
106:14 108:4,10
**intermediaries**  97:7
**intermediary**  96:24
97:23 114:23 119:13
119:16 120:11
**internally**  69:12
**interruption**  69:1
90:23
**invest**  97:8
**invested**  97:24
**investigation**  78:13
**investment**  19:9 98:4
98:14 99:2,16 100:1
100:21 115:17
121:19
**investments**  100:24
**investor**  97:20 98:13
99:14,25 100:3,22,25
**involved**  12:1 15:16
29:20 37:7 47:9,15
47:19 53:22 61:20
62:6 72:10 80:10
102:4 106:1,2 107:13
120:19 121:10
122:20

**involvement**  60:10
60:14 123:21 124:16
**irwin**  2:6 130:7
**issue**  5:19 17:5 42:6
57:5 69:11 71:25
84:11,17 97:15
110:12
**issues**  5:20 55:15
77:9
**item**  8:22 39:13 45:3

**j**

**jacksonville**  107:25
**janet**  115:16
**jeffrey**  3:23
**jet**  120:14
**johnson**  109:14,19
**joint**  107:21
**jointly**  9:22
**judge**  107:2
**judgment**  101:11,18
101:20
**jurisdictions**  81:5
**jury**  108:11,18,19

**k**

**kaplan**  1:21 2:11,18
3:22 4:14,17 19:20
19:24 20:3,23 21:5
21:10,15 23:2 29:8
37:25 44:18 46:8,25
48:3,21,21 49:4
51:15,20 52:14,25
53:6,11 55:1,4,21
60:4 62:7,16,19
63:13 70:2,8 72:24
83:6 116:2,18 122:14
**kaplan's**  1:24
**kenny**  2:13 131:6
**kept**  6:24
**kind**  62:3 74:8 123:1
**kinds**  114:24
**klr**  1:2
**kluger**  2:18 4:17 5:6
15:15 19:23 20:3,22
21:5,10,14 23:2,11

29:8 37:25 43:2,17
44:17 46:8 48:20
60:4 70:2,7 72:24
83:6,11 86:9 93:17
94:24 116:7 120:4
121:25
**knew**  15:19,24 35:12
44:18 46:9,19 47:6
47:10,19 49:5 50:14
52:1,2 54:20 58:22
59:14 65:5,6 66:20
66:21 67:18 68:6
69:7,10,11,13 70:5
76:9 86:10,21 116:18
**knight**  105:21
**know**  5:12,13 19:23
20:1 22:23 24:18
25:7,20 28:12,17,23
28:25 29:6 31:1 32:1
32:1,9,15,19 33:23
35:1,9,20 36:15,17
36:19 40:14 41:1
42:3,19,25 43:10
45:12,14,18,20,21,24
46:2 47:1,21 49:18
49:24 50:2 51:4,11
52:6,17 53:14 54:9
55:12 57:25 58:7,11
61:16,19 62:7,9,10
62:12 63:17 64:1,25
65:10 66:13 67:21,24
67:25 68:4,10 71:23
71:25 73:9,10 74:24
75:3,7 77:6 78:21,25
79:12,17 80:15 83:10
84:8 85:13,22 86:2
86:11,21,25 87:2,3,8
87:9 88:2,12,22,22
88:24 89:3,12 92:15
93:22 94:3,17 95:7
96:1,4 97:13,16
98:25 102:24 103:5
103:16 104:9 105:9
107:7,17 108:16
110:6,22,25 111:3,3

112:22 114:14
122:16,17,24 123:9
125:15
**knowing**   31:1 47:14
54:20 71:5 76:16
78:2 86:16
**knowledge**   31:22
32:3,8,11,17 38:14
42:5 45:19 46:14
49:11,12,15,15,21,25
50:23 51:22,22 53:14
61:9,21 62:17 63:24
66:13,22 68:16,24
69:6 84:6 96:2 116:7
118:13,14 121:10
122:19 123:1,18,19
123:23 124:2,14
125:2
**known**   15:20,24 46:9
46:19 47:11 49:5
54:21 65:6 67:19
68:7 70:6 80:12 86:6
93:15 108:23 109:5
126:15
**knows**   32:19 33:22
50:4 100:12
**knpa.com**   2:16
**kpkb**   64:13
**kutak**   18:21,22 45:19
92:4

**l**

**l**   1:21,24 2:11
**lack**   121:6
**lacking**   118:11,12
**laid**   62:12
**language**   48:18,24
52:14
**large**   1:23 74:18
120:14 126:19
128:10,19
**late**   18:22,24 19:2
44:19 60:6
**law**   2:4,20 4:17 5:17
10:14,16 11:4 13:5

29:14 32:7 37:7,8,13
37:15,19,22 38:11
40:14,21 41:1,9,21
41:24 49:22 51:9
58:12 63:6 74:2,12
79:18 93:1 97:23
105:19 109:15 116:7
120:4 122:1 124:2
130:6
**laws**   80:11
**lawsuit**   107:10
**lawyer**   10:17,17
11:18,22,24 12:6,10
25:21 29:19 30:1,4,7
30:11,13,16,18,19,20
31:23 32:9,18,20
33:5,17,19,21,22
34:5,9,12,16,19,24
35:19,23,25 36:3,6,6
43:2,20,24 44:17
49:21,25 50:1,4,7
62:8,11 64:2,22 68:6
75:9,13,18,20,21
79:2 80:25 82:1,3
99:20 100:7 101:1
102:20 103:20
107:21 109:19,22,25
117:2,11 118:19,24
119:1 120:22
**lawyer's**   30:22 36:21
79:24 80:10 103:20
**lawyering**   10:16
**lawyers**   12:15,19,22
12:23,25 15:16 23:17
30:9 31:18 42:24
46:8 47:1,5 50:14
59:14,19 60:4,10,14
60:17,22 61:19 62:5
63:9,14 64:4,13,18
64:20 65:1,6 66:12
67:18 68:10,15,22
70:22 72:24 73:4,20
77:15 107:13 111:24
114:19 116:7 119:17
120:4 121:12,25

122:21 123:1,12,22
124:14,22
**leap**   67:2
**learn**   71:4,7
**learned**   34:7 59:19
**learns**   81:1
**leave**   67:14 80:20
**led**   13:19
**left**   56:13
**legal**   40:8 49:14 50:3
77:1 79:7,10 81:2
84:12 92:2,3 93:5,7
124:23 130:1 131:1
**legally**   100:23
**lend**   77:15
**lender**   23:24,25 24:5
24:8 26:13,19,23,25
27:4,7,10,17,19 28:3
28:8 29:2 60:11
81:20 82:2 104:22
**lending**   41:10
**letter**   3:12 25:13,14
43:20,25 44:10,12
63:19,25 64:5 84:1
104:2,10,17,24
130:11 131:15
**letters**   25:10
**level**   26:16 32:10
49:11
**liabilities**   98:6
115:24
**liability**   52:19,24,24
63:6 82:12 102:20
103:20 123:10,11
**liable**   98:15 99:3
101:7
**likes**   123:12
**limit**   26:4 65:11
**limitation**   31:15,16
**limitations**   30:7
33:16,18
**limited**   5:16 11:20
**line**   35:18 127:5
130:17

**lines**   37:22 101:12
**liquidity**   16:23 17:9
41:20 57:5 58:3
59:14 69:11 115:19
**list**   130:16
**listed**   9:19 15:18
103:6 130:12 131:14
**lists**   9:4 92:22
**litany**   35:7
**litigated**   102:7
**litigating**   11:16
**litigation**   11:5,11
52:17,18 75:2 99:1
100:8,10
**litigator**   28:17 101:5
**little**   16:3 52:22 59:6
123:13
**livenote**   129:25
**loan**   5:8,9,11,14 12:5
15:7,9,10 16:3,5,8
17:5,8,13 18:2,14
19:4 21:22 23:3,6
24:6,9,22 25:1,5,17
25:18,19 26:1,10,14
27:1,5,8,12,18,20,22
28:9 38:8,8,13 41:11
41:12 42:10,13,21
43:1,11 44:20 46:10
46:20 47:9,12,14,16
47:20,25 50:24,25
60:7 61:4,10,20
62:17 63:14,17,18
67:10,19 68:3,7 70:9
81:22 83:12,17,19,21
83:24 92:17 95:6,22
100:12 101:22
113:22,25 114:24
119:14 122:15
**loans**   23:13,14,15,19
23:21,25 41:18 42:24
65:7 67:10 69:15,15
84:3 115:1
**logical**   18:1
**long**   10:22 101:9
111:16

**longer**  11:1
**look**  13:13 31:4
   36:13 37:21 39:7
**looked**  79:16,21
   83:22
**looking**  50:21 88:8
**loss**  98:16
**lost**  98:4,14 99:8,17
   100:1,2
**lot**  76:4 93:11 102:3
**low**  115:19
**loyalty**  108:5,9
**lumped**  51:8

**m**

**madoff**  103:8,10,11
   103:17
**mail**  19:18 40:10
   53:10,11 55:5 57:6
   72:4,13 73:13 114:18
   114:21 115:15,23
   116:1,23
**mails**  19:18 59:7
   69:20
**maintain**  75:3
**maintained**  74:19
**maintaining**  16:23
**maintains**  74:12
**major**  116:18,20,20
**majority**  10:19,22,25
**making**  67:5,9
**man**  4:14
**manager**  115:17
**mandatory**  31:18
   81:13
**manual**  79:24
**march**  115:15 116:2
   116:23
**mark**  8:20
**marked**  8:8,23 9:3
   39:6,14
**material**  88:25 89:3,7
   89:11,12 90:2,3
**materially**  24:1

**matter**  45:25 47:6
   52:12 57:8 90:17
   130:20
**matters**  38:4
**mean**  14:9 22:21,21
   23:15 24:11 25:14
   26:6 28:4 30:16
   35:15 36:15 46:13
   48:16 52:16 56:18
   65:12 67:22 74:23
   75:25 77:19,19 81:9
   88:25 91:16 94:13
   98:6 99:23 107:2,24
   113:24 117:18
**meant**  20:12
**mechanics**  122:22
**meet**  7:1 74:6,13,20
   75:4 119:14
**member**  49:16,17
   77:6,6 111:17
**members**  49:13
   53:18
**memo**  23:10 29:9,12
   29:16,17,18 34:19
   38:2,11 39:18,22,25
   40:17,20,25 41:7
   45:2,3,9 47:8 50:22
   55:18,25 69:10,21
   72:19 114:15 121:14
   121:16
**memoranda**  16:11
   16:11,14 19:7,21
   34:23 38:15,16,18,19
   45:19 46:15 47:3,4
   55:13,14 69:10,22
   92:2 93:2 97:15
**memorandum**  3:22
   29:18 40:4 45:6 46:2
   116:11
**memos**  22:7 37:1
   69:19 78:7,22 92:4
   97:19
**mention**  110:21
**mentioned**  84:18
   92:10

**merit**  128:7 129:3,23
**methods**  82:4
**miami**  2:13,14
   108:23 130:2 131:2,7
   131:8
**middle**  48:20
**military**  2:21
**million**  5:12,14 15:9
   15:10 16:2,5,8 17:5,7
   17:13,21 18:2 21:22
   25:19 26:1,9 50:24
   50:25 55:22,23 56:17
   56:18,19,23 68:3
   83:24 113:21,25
   115:23,25
**mind**  69:23 80:9
   118:16
**minute**  38:18 56:1
**minutes**  82:15
   110:10
**misinformed**  23:24
   24:9 26:13,19,23,25
   27:17 28:3 29:2
**misrepresentation**
   102:21,22
**missed**  58:8
**misspoke**  106:21
**misstated**  117:17
**misstates**  44:10
**mistaken**  28:18
   33:14
**mistakes**  28:24
**misusing**  109:20
**mm**  20:5 53:13 55:16
   59:11
**moment**  25:15 50:3
   70:12 71:3 80:19
   96:16 122:9
**moments**  124:18
**monday**  1:13 130:15
**money**  1:5 17:1 37:4
   37:4,9 44:1 72:12
   73:3 96:23 97:1,7,9
   97:22 98:4 99:13,16
   100:14 101:2,20

   120:10,12,20
**moneys**  56:12 114:21
   115:4 121:22
**monitored**  109:25
**monitoring**  109:16
   110:12
**month**  57:17
**months**  44:2 57:15
   74:7,13,20 75:5
**motion**  110:3,4

**n**

**nachwalter**  2:13
   131:6
**name**  4:9 19:13 61:25
   72:2 103:23 120:13
   120:14
**named**  74:3
**nancy**  1:21 22:1
   128:7,18 129:3,22
   130:23 131:24
**narrow**  24:10 87:19
   104:18
**natural**  85:13
**nature**  16:17 34:25
   69:14,14 104:19
   105:25 108:2 112:12
   114:14 116:8,20
   117:16 118:2,3,7
**necessarily**  17:14
   27:13 78:17 85:9
**need**  8:15 19:11
   24:14,18 25:7,9 33:3
   37:4 42:3,18 43:10
   87:2 92:24 116:3
   118:9 125:14
**needed**  56:24 89:25
**needs**  22:18
**negligent**  102:21
**neither**  53:7
**never**  54:15 74:22
   83:15
**new**  29:15 30:5,8
   37:6,12 53:21 77:15
   79:1 111:2

**newer**  17:1
**nodding**  12:3 54:11
  97:3 103:14 125:4
**non**  44:21 53:20
**normal**  56:22
**normally**  16:15
**north**  2:21
**notarized**  130:17
**notary**  1:22 126:18
  128:9,19,21
**note**  84:1
**notes**  114:24 129:12
**notice**  1:24 3:19 6:1
**notified**  115:22
  119:15
**notifying**  131:15
**noting**  130:17
**notwithstanding**
  113:11
**november**  18:13,20
  20:2,4,14,24 21:16
  22:12,18 23:1,11
  40:15,24 43:18 44:19
  53:19 55:19 56:3
  57:6 58:2 59:12,15
  59:24 60:7 69:20
  70:1,21 130:10
  131:11
**number**  3:17 8:11
  32:4 130:13
**numbered**  9:6
  129:10
**numbers**  130:17

**o**

**o**  130:6
**oath**  3:11 128:1
**object**  66:1 112:10
  115:5 116:9,10 117:6
  117:14 120:25
  122:23 123:25
**objection**  18:5
  112:12 114:9 117:16
  118:4,7 119:20 121:6
  122:3

**objective**  87:22,25
  88:4,6,7
**objectively**  33:5
  34:15 35:2 88:2,8,14
  94:14
**obligated**  17:3 80:25
  82:2
**obligation**  5:6,16
  25:3 29:11 48:17,19
  49:12 51:10,21 64:4
  68:16,23 76:11,15,24
  77:2,3 80:1 86:1,1
  90:18 94:18 95:3,11
  96:7,11 97:13 100:16
  101:2,21,22 124:23
  125:1
**obligations**  17:10
  24:22 55:23 56:17
  57:14,17 59:9 74:6
  74:13 92:16 115:21
  118:20 119:14
**obliged**  48:14 77:11
**obtained**  17:8 74:23
  90:2
**occasion**  12:25
**occasionally**  28:18
  28:23,25
**occur**  21:9 98:4
**occurred**  20:2 21:4
  26:2 119:11
**october**  1:14 5:2 6:3
  6:14,15 7:4 18:23
  19:2 126:2 127:3
  128:12,15 129:8,20
  130:4,9 131:5,10
**offered**  9:25
**office**  130:14,14
  131:17
**offices**  2:4 130:6
**official**  128:14
**oh**  43:25 45:11 66:18
  82:19 105:8 107:22
  108:23 109:3 116:16
  117:21,25

**okay**  4:18 8:2,6 9:16
  10:11 11:14 12:14
  14:4,8,11,16,19 15:1
  19:16 21:19,24 23:8
  25:7 27:17 29:1,8
  31:4,6,10 32:2,13
  34:5 36:12,25 37:12
  38:17 39:6,9,12
  43:13 44:11,14 49:24
  51:17 52:4,10,10
  54:9,17 56:3,16
  59:23 61:2,7 63:16
  64:3 68:22 69:25
  70:20 71:6,11 74:10
  74:12,15 79:10,15
  80:13,18,22 81:7
  82:9,19,23 83:4,19
  84:7,15,23 86:8 87:8
  87:17 88:8,12,21
  89:10,24 90:9 91:5,9
  91:20 92:1 93:1,11
  93:24 94:5,6,10
  95:21 96:14,17 97:4
  98:1,17,23 99:12
  102:3,7,11,15 103:22
  104:9 105:4,8,12,17
  106:6,12,25 107:19
  108:6,11,15,19 109:4
  110:6,14,19 111:9,12
  111:18 112:23 113:3
  113:4,9,18,24 114:12
  114:18 115:9 117:1
  117:11,23,25 118:15
  118:24 119:10,12
  120:2,10 122:11,14
  123:22 124:3,6 125:2
  125:5,7
**okun**  5:7,18 15:6,20
  15:24 16:7,21 19:8
  19:18,24 21:6,11,15
  22:16,24 24:7 25:1
  29:15,20 37:2,6,8,12
  37:13,15,20 41:3,10
  41:21,25 42:17,21,22
  43:15 44:1,20 45:17

  46:11,21 47:12 49:1
  49:6 50:23,24 51:2
  52:3 53:19,23 54:22
  60:24 64:14 68:9,14
  69:25 71:15,19 72:11
  72:11 73:1 76:9,24
  79:1 83:11 84:10
  93:18 94:19,25 95:11
  102:4 112:7 113:12
  114:3,8,22 115:3,18
  116:3 119:14,18
  120:5,10,20,23
  122:17,18,19
**okun's**  20:1 22:11
  45:22 59:25 60:5
  76:11 113:18 115:22
  116:8 119:11 121:19
**ongoing**  27:23 38:20
  39:25 40:16,19 41:19
  45:10,22 65:8 66:13
  66:23 67:3,20 68:8
  76:20 114:7,14 116:8
  116:22 122:20
**open**  35:6
**operations**  115:17
**opine**  5:5 23:21 28:2
  28:7 37:10 42:6
  48:19,25 57:4 77:10
  82:6 106:15 109:22
**opined**  80:24
**opining**  15:8 90:16
**opinion**  3:20 5:21 6:3
  6:6,14 8:4 9:12 13:22
  17:11,17,20,23 18:21
  18:22 23:1,19 24:12
  25:4,10,14,25 26:8
  26:11,18,21,22 27:4
  27:12 29:4,11 35:14
  41:9,14 42:15,25
  43:9,20,25 44:10,12
  44:12 46:8,18 47:10
  47:18,21 48:8,13,16
  50:10,12,13,19 51:1
  51:8,14 52:6 53:6,8
  53:16,21 54:1 57:1

[opinion - practitioner]                                    Page 145

57:10,25 58:1 60:9
62:15 63:5,12,19,24
63:25 64:5,17 65:5
69:5 70:12,19,22
77:1 78:6,18 80:23
81:7,13,24 82:1,9
83:25 85:5,17 90:3,4
90:10 91:1,8,20 92:4
93:4,9 94:17 95:9
96:15 98:3,11,18,20
98:21,23 102:3 104:2
104:9,10,11,17,18,24
104:25 105:2 106:17
107:3,4 108:17 110:8
111:1 112:5,9 115:10
120:18 122:8 123:23
**opinions** 5:16,24 6:5
6:7,10,17 7:13,16
14:19 15:3,14 21:14
22:16 32:14 37:21
47:24 48:2 64:3
65:24 71:9,13 79:8
79:19,22 80:6 81:5
81:19 102:12
**opportunity** 36:13
**opposed** 25:2 95:8
**option** 78:11
**order** 68:22 92:15
119:14 125:15
**ordinary** 10:5 52:24
57:15
**original** 131:14,19,20
**outside** 22:25 82:18
**overall** 47:23
**overriding** 122:25
**owes** 100:15
**ownership** 84:12
**owns** 97:16

**p**

**p.a.** 2:20
**p.l.** 2:18
**p.m.** 1:13 82:20,21
125:18 130:15

**page** 3:2,9,17 9:2,4
14:20,23 71:12,14
101:16 115:13 127:5
130:17,24 131:19
**pages** 129:10
**paid** 10:2 56:19
**pajonas** 19:15,16,17
59:9 72:3,6,7,8,9,10
72:17,25 73:4,12,17
**palm** 1:13 2:5 109:5
109:9 127:21 128:4
130:7
**paragraph** 9:4,6
14:20,24 15:2,2,4,18
48:20 115:13 116:15
**paragraphs** 15:3
**paraphrased** 117:8
**pardon** 103:9 109:1
**parkervision** 105:22
106:4,24 107:10,23
**part** 17:24 18:3,15
19:4 23:16,20 26:16
26:24 27:16,23 40:9
41:19 50:6 52:4
62:17 67:19 68:8
69:15,17 73:3 86:5
95:23 116:14 119:3
**participating** 64:21
**particular** 13:6 16:2
17:18 55:8 80:5
90:16 91:12 92:23
105:15 116:19
120:16 121:12
**parties** 129:16,18
**partner** 50:9,9 74:3
**partners** 52:5 123:4
**party** 107:12,15,16
**party's** 7:25
**patent** 106:3,5
107:11
**pay** 16:23 17:2 56:4
57:16 101:2,20
**penalties** 127:22
**people** 4:14 58:13

**percent** 115:20
**peretz** 2:18 4:17 5:6
15:15 19:23 20:3,22
21:5,10,14 23:2,11
29:8 37:25 43:2,17
44:18 46:8 48:21
60:4 70:2,7 72:24
83:6,11 86:9 93:17
94:24 116:7 120:4
122:1
**period** 41:5 56:13
57:18 84:25 97:9
113:20 114:5,7
121:20
**perjury** 127:22
**perkins** 16:11,14
19:6,11,22 21:4,8
22:7 23:10 29:9,12
29:16,17 34:19,23
37:1 38:2,11,15
40:10,17,20 41:7
45:19 46:15 47:3
55:12,13 69:9 76:9
77:11 78:22 92:3
114:15
**permissible** 50:7
**permission** 31:16
33:14
**permit** 28:2 36:5
**permitted** 29:15 30:4
30:11,13,18,20 32:21
34:6 37:3,8,15,19
93:18 119:17,24
**perpetrate** 70:23
**personal** 22:18 41:4
42:23 45:16 73:18
74:8
**personally** 25:2
42:21 62:19 73:18
120:13 126:15
128:12
**pertain** 52:19
**pertinent** 79:20
**phone** 90:23

**phrase** 95:5 112:17
**phrased** 96:10
**picked** 66:3
**place** 55:15 114:25
**plaintiff** 1:6 2:2
**plaintiff's** 3:19,20
6:2,8
**plaintiffs** 108:14
**plan** 1:5 81:19 89:19
90:9
**planes** 120:21
**play** 26:7 85:16
**pleading** 28:15
**pleadings** 28:23
**please** 4:9 18:17 43:4
94:1 119:5 125:12
130:13,16
**plus** 103:23
**point** 6:4 85:16
106:13 124:12
**pointed** 71:22
**ponzi** 16:16,17 23:17
23:18,20 26:2,5,17
27:23 41:19 102:5
103:23,25 112:1,14
112:17
**poor** 55:7
**portion** 22:3 43:5
119:6
**position** 57:4
**positive** 6:21 20:7
49:19
**possession** 131:20
**possibility** 36:10
**possible** 36:10
**possibly** 122:13
**potential** 123:15
**practice** 10:14,20,23
10:25 11:4 92:11
109:15,24,25
**practiced** 11:22,23
86:25 98:25
**practices** 12:24
**practitioner** 74:16

| | | q | r |
|---|---|---|---|
| **pre** 103:8,10,11,13 | **progress** 59:24 60:5 | **qi** 16:21,24 17:1,3,4 | **r** 2:6 130:7 |
| **preceding** 21:25 | **projones** 72:1 | 17:10 19:8 22:13,17 | **ramifications** 40:8 |
| **precision** 6:18 | **prompt** 130:20 | 22:24,25 24:22 25:2 | 40:12 |
| **prefacing** 98:11 | **prong** 66:12,19 67:18 | 37:16 41:3 44:21 | **rare** 13:1 |
| **prefer** 95:5 | 68:6 69:6 70:6 | 53:20 56:13,13 98:15 | **rate** 10:5,7 |
| **prejudicial** 118:11 | **proper** 37:18 | 98:24 99:6,13,15 | **raton** 2:21 |
| **prepared** 36:11 | **properties** 19:9 | 100:7,23 101:1 | **rdr** 1:22 128:18 |
| 37:10 77:9 81:18 | 121:19 | 115:18 120:19 | 130:23 131:24 |
| 82:6 96:10 101:25 | **property** 120:12,21 | 121:23 | **reach** 23:1,5 |
| 102:24 129:13 | 121:3,5 122:16 | **qis** 22:17 26:3 37:14 | **reached** 26:8,18 |
| **preparing** 6:16 10:8 | **proposition** 89:17 | 41:11,12,23 42:23 | 46:18,24 80:6 |
| 90:9 | 91:16 | 43:16,16 44:1,21 | **reaching** 21:14 22:15 |
| **present** 2:25 | **prosperity** 2:5 130:6 | 53:20 70:3 115:4 | 48:13 |
| **pretty** 12:4 19:7 | **provide** 31:18,21 | **qualcomm** 105:23 | **read** 7:18,23 9:5,25 |
| 74:16 87:14 110:19 | 65:24 85:5 118:22 | 106:3,3,10,18 107:11 | 18:8,18,20 19:1 |
| **prevail** 110:4 | **provided** 22:10 23:25 | 107:12 | 21:25 22:4 23:15,23 |
| **prevailed** 110:2 | 27:5,7,10,19 28:8 | **qualcomm's** 106:10 | 28:15 31:17 42:16 |
| **previously** 87:22 | 29:3 36:22 38:1 | **qualified** 96:24 97:6 | 43:6 47:2,8 50:22 |
| **primarily** 87:1 | 43:14 44:15 60:25 | 97:23 114:22 119:13 | 54:6 55:12,13 58:6 |
| **principle** 99:19 | 61:14 84:21 85:20 | 119:16 120:11 | 61:9 79:11 84:16 |
| **principles** 52:18,23 | 90:19 91:2 95:10 | **question** 18:17 20:17 | 110:11 119:7 125:11 |
| **prior** 20:2,4,23 21:16 | 102:11 131:17 | 21:18,25 24:17,20 | 127:23 130:10,14 |
| 23:3 33:7 37:7 46:14 | **provides** 34:4 | 33:15 34:11 35:6,16 | 131:11,15 |
| 46:17 47:15 53:22 | **providing** 65:7 66:22 | 37:11 38:4,5,9 39:24 | **reading** 3:12 97:14 |
| 69:14 95:24 113:25 | **provision** 60:14 | 40:9 41:19 43:4,8 | 130:12,18,19 131:15 |
| 117:4 124:4 130:18 | **prudent** 97:20 98:12 | 44:9 51:3 57:20 | 131:17 |
| **privy** 74:22 77:5 | 99:25 100:2,21,24 | 62:22,25 66:6 67:10 | **real** 120:12,21 |
| **probably** 28:4 42:2,8 | **public** 1:22 126:18 | 68:20 69:3 73:10,11 | **really** 24:16 32:8 |
| 43:22,25 46:1 78:12 | 128:10,19 | 81:17 86:17 87:15 | 77:9 87:10,18 101:5 |
| 85:6 87:6 99:1 103:3 | **purchase** 1:5 | 88:18 91:16 92:20 | 105:5 |
| **problem** 55:10 58:3 | **purchased** 16:21 | 95:15 101:13 108:8 | **realtime** 128:8 129:4 |
| 75:10 116:18,20,21 | **purpose** 17:8 23:24 | 112:20 117:22 118:9 | 129:24 |
| 122:12 | 24:5,9,21 26:14 27:1 | 118:16 120:2 124:14 | **reason** 26:1 40:14 |
| **proceeding** 109:19 | 27:18 36:2 47:19 | **questioning** 35:18 | 41:2,6 42:25 55:20 |
| **proceedings** 59:2 | 97:24 112:5 119:19 | 71:22 82:25 111:1 | 73:16 96:1,5 107:18 |
| 81:3 82:21 | **purposes** 19:10 22:25 | **questions** 83:7 85:3 | 127:5 130:17 |
| **proceeds** 83:12,17 | 43:16 44:21 47:24 | 85:21 111:15,16 | **reasonable** 30:24 |
| 101:22 | 53:20 104:20 | 117:9 | 32:23 33:5 73:3 |
| **process** 11:2 56:8 | **pursuant** 1:23 | **quickly** 105:5 | 77:25 78:3 87:12,21 |
| 69:18 114:25 | 100:24 | **quite** 11:19 53:7 | 88:2,14 105:13,15 |
| **product** 14:6 | **put** 30:3 33:16,18 | **quote** 62:5,5 117:2 | 110:16 113:15 |
| **professional** 10:17 | 34:8,21 37:3,4,9 50:8 | | **reasonably** 30:19 |
| 32:7 81:8 124:24 | 87:2 | | 31:1 32:1,19 33:19 |
| 128:9 129:5,23 | | | |

**[reasonably - reviewed]** Page 147

33:22 86:3,6,14 88:9
88:23 89:4,14 94:13
94:14,24 95:17
100:11
**recall** 12:13 25:13,15
38:24 39:2 43:19
45:2 61:5,17,17
62:14 80:8,14,19
81:11 84:2,3,7,13,18
97:19,21 101:8,14
102:9,14 104:1,3,6
105:19 106:7,20
107:1,7 108:12 110:2
110:12 113:22,23
114:2,16,17 117:4
120:8 121:16 124:18
**received** 6:1 10:11
**receiving** 29:12
**recess** 59:1 82:20
**recollection** 61:24
**recommendation**
110:7
**recommended** 110:5
**reconsidered** 80:24
**record** 82:24 125:13
129:11
**records** 6:24 73:2
**rectify** 59:25 60:5
**reestablish** 17:9
**refer** 15:3
**referee** 110:5
**referee's** 110:11
**referenced** 130:19
**referencing** 16:1
**referred** 8:22 16:15
22:3 39:13 43:5 57:5
119:6
**referring** 40:18
55:25 59:8 116:21
**refinancing** 116:4
**reflected** 48:1
**refused** 49:1
**regard** 12:16 15:21
15:25 16:8 22:13
23:6 25:19 26:3,9

28:7 29:2 37:15
41:25 42:9 51:12
52:14 54:25 62:22,25
63:14 66:11 79:25
82:1,10 118:1,13
**regarding** 16:4 80:1
82:3 83:12 86:10
103:16 116:6,8
**regardless** 95:2 96:1
**registered** 128:7,8
129:3,4,23,24
**regulating** 118:20
**relate** 12:20 79:22
**related** 5:18 67:11,13
67:13,23 96:5 106:5
**relation** 47:14 95:23
**relationship** 45:12
46:16
**relative** 129:15,17
**relatively** 86:18,22
**relevant** 24:12 25:23
81:6
**relied** 9:5,20 65:4,23
115:9
**relief** 109:21
**rely** 22:11 30:13
35:24 45:3 81:20
104:22
**relying** 66:17 67:17
**remember** 7:6 21:21
28:14 63:11 96:17
97:14 117:9 120:16
**remove** 109:23
**removed** 119:16
120:20
**removing** 110:5
119:12
**repaid** 19:12
**repay** 99:7,13,16
100:14 101:22
**repeat** 18:17 43:3
118:16 119:2,4
**repetitious** 83:8
**rephrase** 9:17 113:24

**report** 31:12 75:19
76:24 77:12 90:10
110:11 111:2 129:7
**reported** 58:13
**reporter** 4:9 22:4
43:6 119:7 128:7,8,9
128:9 129:3,4,5,5,23
129:23,24,24,25
**reporter's** 129:1
**reporting** 73:17
**represent** 4:13 29:15
30:4 41:10,25 51:15
52:3,6 53:3,23 83:5
94:19 95:11 99:15
100:7,17 106:4 117:3
120:5,23 121:23
**representation** 5:7
5:17 15:16 20:9,16
29:22 30:21 32:6
36:1 46:9,20 47:11
48:15 49:6 54:21
68:2 81:1 106:19,24
118:25
**representations**
58:11
**representatives**
63:18
**represented** 21:11
42:22 106:2,3,8
107:24
**representing** 12:6
21:5 42:17 49:1 51:2
51:6 60:24 86:19
95:6 100:13 101:1
114:8 121:18 122:17
122:18
**represents** 4:16
**reprinted** 46:3
**request** 90:18 110:23
121:13
**requested** 91:10
129:9
**require** 34:24 36:6
70:7 88:1

**required** 23:2 31:23
37:24 38:12 69:5
78:15,16 94:12 97:7
99:7 118:24
**requirement** 69:6
**research** 55:14 79:8
79:10 80:3
**reserve** 111:3
**respect** 38:12 46:10
46:25 48:7 51:14
63:8 115:3 116:19
**respective** 114:22
119:13
**respondent's** 109:15
**responding** 4:4 21:17
**response** 24:17
124:13
**responsibility** 10:18
13:5,6
**responsible** 98:24
**result** 15:19 29:24
32:6 90:1 99:3
101:23 106:20 107:1
**resulting** 49:12
**results** 100:8
**retained** 4:23 5:1
6:13 19:24 20:23
29:9 38:1,11 41:22
43:17 44:11 54:10
60:6 70:2 85:1
105:19 107:24
108:22
**retention** 7:2 20:3
40:21 44:19
**reveals** 115:23
**revelations** 103:15
**reversing** 9:13
**review** 64:5 83:19
91:23 93:1 129:9
131:18
**reviewed** 13:14,17
14:6 63:25 75:12
79:18 83:15 84:21
94:22

**reviewing** 66:7
**revise** 71:9
**richard** 115:16
**right** 7:12 8:5 13:13
  13:21 14:25 15:4
  16:25 30:3 31:14
  32:5,12 34:8,8,21
  35:4,21,22 36:2 38:9
  39:20,21 40:23 44:2
  44:7 46:7 59:5,17
  69:3 76:14 78:12
  81:20 87:3,19 88:6
  89:2,19 94:21 95:14
  101:10,13 104:4,5
  105:8 106:25 111:4
  111:14,23,23 112:16
  114:3 115:12 118:6
  121:12 125:5
**rises** 26:16
**rmr** 1:22 128:18
  130:23 131:24
**road** 2:5 130:6
**rob** 4:16
**robert** 2:22 83:5
**rock** 92:4
**role** 60:23 85:18
  110:1
**rothstein** 103:13,17
**rsheres** 2:23
**rule** 30:22 31:2,3,7
  31:25 33:13,24 34:4
  49:14,18 80:15,17
  81:8 98:13 99:25
  100:3,22,25 111:19
  117:17 118:17
  119:17,18 120:23
  122:1,5,12,21
**rules** 31:11,15,17
  32:7 33:16,17 70:6
  77:8 79:11,14,16
  118:13,20 123:9,10
  123:15 124:23,24
  125:1
**running** 59:10

**s**

**s** 2:15 3:22 131:8
**sand** 50:8
**satisfaction** 66:12
**satisfy** 66:19 67:16
  67:18 68:6 70:5
**sayeth** 126:6
**saying** 14:5,17 19:11
  34:22 53:16 59:10
  94:4 123:16 124:18
**says** 30:1,22 32:5
  33:13 34:6,20 35:3
  52:12 75:9,18 105:12
  106:8 108:11
**scenario** 95:1 122:25
**scenarios** 93:11
**scheduled** 59:19
**scheme** 16:16,18
  23:17,18,20 26:2,17
  27:24 41:19 50:6
  69:16 102:5 112:1,2
  112:4,8,14,17 113:7
  113:12,13,16,19
  114:4,6,14 116:22
**schemes** 26:6 102:12
  102:16 103:16,23
**scholarly** 102:15
**scope** 5:3 104:18
**seal** 128:14
**second** 5:13 7:18
  9:11,13,18 25:11
  43:21 44:16 57:7
  62:13 65:19 66:3
  83:23 90:22 109:11
  115:12 116:14
**secured** 11:9,11 84:3
**see** 10:24 23:14,15
  25:10,16 35:1 39:10
  59:5 71:11 101:8
  109:11 111:23
  116:12
**seeking** 117:3
**seen** 35:20 61:9

**selected** 9:16
**selection** 9:20,21
**self** 68:20
**send** 7:12,15 130:16
**sense** 13:7 33:18 51:3
  55:4 62:2,4 64:13
  78:8,10 88:16
**sent** 114:18 131:15
**separate** 123:11
**sequence** 16:4
**series** 88:3
**serious** 77:20
**services** 23:18 70:23
  76:22
**set** 36:25
**shaking** 74:11
**shareholders** 123:4
**sheet** 3:10 126:4
  127:1
**sheres** 2:22 3:6,8
  4:16 8:21 83:1,3,5
  86:7 87:7,16 88:20
  89:8,18 90:8,15 91:4
  91:19,22 92:9,21
  93:23 95:13 96:13
  97:18 98:8 99:11
  100:4 101:3 102:2
  104:15 109:7,10
  110:19 111:6,9,12
  116:10 124:10 125:5
  125:14
**shortage** 19:18
**showed** 83:16
**shown** 55:19
**sic** 14:2,7 20:15
  117:12
**side** 102:8
**sign** 13:21 130:10,14
  131:11,16
**signature** 3:9 125:18
  131:19
**signed** 130:16
**signing** 130:12,18,19
  131:15

**silverman** 1:21 2:11
  2:25 3:23 4:13 46:19
  47:8,10,19,24 48:4
  48:22 49:5 50:22
  51:15,20,25 52:1,2
  52:15,25 53:7,15
  54:20,23 62:10,23
  63:13 114:13,18
  115:2 122:14
**silverman's** 1:24
**similar** 38:25 40:12
  102:8
**simple** 12:4 65:16
**simply** 32:4,5 92:2,2
  100:11
**simring** 115:16 116:1
**sincerely** 130:21
  131:22
**single** 51:20
**singled** 51:19
**sit** 56:23 70:11 85:2
  97:25
**sitting** 4:13 58:15
**situation** 53:12 73:19
  77:25 86:10 94:23
**six** 44:2 57:15,17
  74:7,13,20 75:5
**slipped** 69:23
**smith** 1:16 3:4 4:2,10
  4:12,22 9:2 39:21
  110:15 126:1,7 127:2
  127:25 128:11 129:7
  130:5,9,10 131:10
**sole** 74:16
**solutions** 130:1 131:1
**somebody** 64:2
**somewhat** 56:9 91:16
  96:18
**sorry** 9:17 14:23
  18:21 20:11 21:21
  28:21 33:1 53:1
  66:18 67:7 90:22
  106:22 108:24
  117:21 119:2 120:15

sort  102:22
sorts  25:17
sought  119:14
sounding  19:17
sounds  12:18 95:8
source  33:2,4 61:6,16
  61:18
sources  45:18 66:15
south  2:14 130:2
  131:2,7
southern  1:1
speaking  93:12
  104:16
specific  12:16,20
  27:8,12 34:14 50:3
  64:7 124:23
specifically  46:10
  47:4 48:25 70:25
  71:21
specifics  102:10
specified  5:9
spectrum  36:10
spend  10:12
spending  116:4
spent  6:16
spoke  7:10 63:18
spread  123:13
ss  126:10 128:3
standalone  102:23
standard  31:22,25
  32:8,17,18,24 33:4
  33:21 80:12 85:24
  87:21,22,25 88:4,5
  92:22 97:20
standards  82:10
standpoint  88:7
start  16:13 20:18
  116:4
state  1:23 32:8 60:2
  126:10,19 127:21
  128:3,10,19
stated  30:9 51:18
statement  24:10
  27:11,15,20 34:25
  61:3,8,14 67:3 71:11

89:9 104:19 124:13
  124:21
statements  24:1 28:8
  30:14,23 32:21 33:6
  34:10,13,16 60:11,15
  60:23 75:10,11 77:24
  83:15
states  1:1 15:4
stating  116:3
statute  97:23 112:14
statutes  79:17
stealth  109:8
stenographic  129:11
stenographically
  129:6
step  82:18
steps  18:1
steve  1:20,24 2:11,25
  46:18 48:22 50:22
sticks  80:8
stipulate  111:5,11
stop  37:14 116:4
stopped  30:3 93:19
  95:18
stopping  34:20 35:4
strictly  50:21
strike  40:2
strikes  25:21
strong  52:13
struggle  72:11 73:3
study  84:2
subject  90:17 91:10
  98:11,12 105:23
  107:20 127:23
subjective  32:24 33:3
subparts  32:5
subscribe  79:24
subscribed  126:13
subsequent  34:25
  119:12
substance  106:12
  108:6 114:20 127:24
substantial  11:4 14:2
  14:7 72:12

substantive  13:25
successful  76:14
sufficient  75:4
suggest  82:11
suing  107:11
suitability  109:15
suite  1:12 2:4,13,20
  130:1 131:1,7
sums  72:12
supervise  13:4 63:13
  64:5
supervised  12:14,19
  12:23,25
supervising  12:22
  13:10
supervision  13:3
  129:14
support  16:10 44:17
  70:22
supporting  23:18
supports  23:16
suppose  25:9 31:18
  35:7 73:22 124:1
  125:11
sure  14:18 25:6,8
  39:2 73:8 77:7 78:18
  78:19 85:7,12 87:18
  90:14 101:16 103:25
  104:4 112:23 121:1
  122:5 123:2
surprised  98:21
surrounding  43:11
suspect  62:12
suspension  109:23
  110:5
sworn  4:4 126:13
  128:13

**t**

take  13:13,16 78:7
  94:1 121:22
taken  1:20 7:21 25:1
  27:1,18 47:25 59:1
  82:20 126:2 127:3
  130:9 131:10

talk  11:15
talked  54:3 55:9 65:4
  93:11 103:20
talking  13:4 33:10,25
  38:3,7 52:16,20
  53:12 59:6 60:16
  70:7 77:19 96:2
  100:9,20 110:17
  124:25
targets  16:19
tax  115:20
technical  123:14
telephone  7:3,4
teleservices  110:15
tell  6:15,19 10:14
  13:14 15:13 19:1
  21:20 40:21 50:2,9
  65:22 82:2 118:9
telling  51:10
tells  75:11
temporary  109:23
ten  6:20,20,22 7:21
  103:3
tenor  36:19
term  11:12 26:4 68:2
terminated  76:17
terms  33:15 64:6,16
  95:6
testified  4:5 92:1
  96:20 105:14
testify  89:21 107:5
testifying  10:8 91:12
  102:13 105:7
testimony  85:23
  105:24 106:13
  107:20 108:7 110:9
thank  4:11 8:9,17
  13:8 21:1 72:9 124:8
  125:10
thing  68:4,9 77:20
  78:12 102:22
things  19:11 25:17
  47:17 51:10 65:13
  85:9,22 115:9,23

[think - version]                                                                                    Page 150

**think**  20:20 22:2,22
  24:14 25:12 29:10
  35:5 37:10 38:9 42:2
  43:10 44:6 45:9 52:8
  57:20 59:6,17 71:21
  77:15,20 78:24,24
  83:23,25 89:16 91:17
  96:9,11 98:15 99:21
  100:6 103:2,12,15
  105:12 110:19
  111:12,24 112:24
  113:1,5 118:23 120:3
  121:8 122:6,12
**thinking**  45:5
**third**  107:12,15,16
**thought**  79:19 81:6
  109:8
**thread**  53:10 55:6
**three**  9:2 14:21 48:13
  50:14 51:8 52:21
  81:4 123:17
**thursday**  7:8
**time**  6:13,14,16
  11:25 12:1 21:4,10
  40:18,20 41:5 43:17
  44:18 56:14 58:7,21
  59:10,18 60:6 63:17
  72:12,18 82:16 84:25
  86:15 97:2 101:9
  111:7 113:20 114:5,7
  121:20 125:15
  131:19
**title**  84:12
**today**  14:12 25:24
  28:1,6 35:11,13
  36:11,23 37:11 42:5
  51:11 54:20 56:16
  63:6 67:25 70:19
  74:5 82:7 85:2 124:7
**told**  5:11 23:15,23
  24:21 28:16 29:10
  35:19 37:13 41:21
  42:16 45:14 53:18
  54:7 58:19 59:17
  65:12 70:3,15 78:25

**tomorrow**  56:19,24
**top**  71:13
**topic**  81:24
**tort**  52:18 123:10
**total**  115:24
**totally**  75:25
**tower**  130:1 131:1
**trail**  2:21
**transaction**  5:8,9,14
  12:2,24 13:1,6 15:7,9
  15:10 16:3,5 17:18
  17:19,21,22,24 21:22
  24:16,19 27:16 38:13
  41:24 42:3,18 46:17
  47:16 50:5,15 51:5,6
  58:9 60:25 61:15,20
  71:24 83:24 86:20
  87:3,10 92:20 100:12
  104:20,20
**transactional**  11:12
  11:18,22,24 12:15,19
  12:22 13:10 25:21
  62:5,8,11 63:14
  86:24,25 87:2 92:11
  92:15,23
**transactions**  5:11
  11:10,11,16 12:17
  13:3 15:21,25 16:1
  37:16,18,20 38:8
  41:11 61:10 64:21
  67:10,19 68:7 83:21
  94:20 95:7,12,22
  120:5,6,19,24 121:1
  122:19 123:6,21
  124:17
**transcript**  91:24
  126:5 127:4,23 129:9
  129:13 130:11,14,20
  131:14,16,17,18,20
**transfer**  19:8
**transferring**  16:20
  41:3 68:1

79:2 83:11 84:5,14
  118:8

**traveling**  10:9
**treatise**  102:19
  103:19
**trial**  89:21 108:11
**trick**  81:16
**trouble**  51:7,13
**true**  24:3 42:8 44:25
  63:8 65:19,21,23
  66:5 77:14 99:12
  116:24 126:5 127:23
  129:11
**trust**  1:5 109:20
**truth**  32:25 78:7
**try**  18:25 20:19,20
  24:3 33:1 47:7 69:16
  76:13 87:19
**trying**  7:6 20:12
  41:20 51:13 67:12
**turn**  9:2 38:17 116:1
**tweaks**  13:18,25 14:3
  14:7,9
**twelve**  10:25
**twenty**  11:21
**two**  5:11 14:23 16:10
  16:11 19:6 33:17
  41:18 47:16 53:15
  59:7 64:21 67:10
  80:7 83:20 110:14
  130:2 131:2
**type**  10:6 40:5,6,7,8,9
  40:17 104:16
**types**  93:13 103:16

**u**

**ultimately**  89:21
  107:3
**unable**  90:25
**unaware**  47:24
**unclear**  16:3 21:12
**underlying**  15:7 38:8
  102:19 113:16
  120:18
**understand**  4:22
  16:13 17:5,7 24:15
  37:2,3 41:13,18 53:4

53:5 56:7,11,15
  57:14 87:8 88:18
  107:16 121:21
**understanding**  5:23
  21:9 61:23 87:9 97:5
  98:2,3
**understood**  5:4 45:8
  56:21 85:23
**undertake**  30:21
  36:1
**undertaken**  106:18
  106:23
**undertaking**  106:4
**undocumented**  69:14
**unethical**  99:14
**united**  1:1
**unknown**  93:24
**unlawful**  121:22
**unquote**  117:2
**unreasonable**  34:15
  35:2 52:11
**unrelated**  37:20
  43:16
**unusual**  75:15
  109:17
**ups**  125:9
**use**  6:5 8:15,18 16:22
  22:13,17 32:15,16
  39:11 42:23 100:14
  112:16
**uses**  31:25 33:15 41:4
**usual**  73:24
**usually**  10:16 11:12
  85:8

**v**

**various**  25:16 110:17
  114:19
**venture**  107:21
**verdict**  108:12,14
**verifying**  85:9
**veritext**  130:1,14
  131:1
**version**  7:15

**versus**  4:20 80:9 97:8
    105:22 107:19
    109:14 110:15
**vicarious**  52:19,24
    123:10
**view**  21:9 27:21,23
    38:19 52:23
**violation**  32:6 80:10
    82:10 99:24 100:2,21
**virginia**  1:5 77:7,7
**vs**  1:7 126:1 127:2
    130:8 131:9

**w**

**waive**  131:15
**waived**  125:19
    130:19
**want**  8:7 10:12 26:4
    58:21 82:14 101:15
    101:15,16 111:3
    112:19,20
**water**  82:18
**way**  6:23 11:14 13:2
    28:11 42:6 43:25
    45:9 48:10 51:18
    71:5 78:2 88:9,15
    92:5
**ways**  35:20
**we've**  10:2,11 65:4
**week**  7:6,9
**weigh**  36:20
**weight**  77:16,18
**west**  1:13
**white**  11:6
**wholly**  26:15
**wide**  36:10
**withdraw**  5:17 15:5
    22:17 23:3 29:11
    31:24 32:10 37:23,25
    38:3,12 48:14,22
    51:1,6 53:22 68:16
    68:23 69:5 70:8 80:1
    80:25 86:1 94:12
    95:3,8 96:7 101:21

**withdrawal**  31:18
    80:17 81:14
**withdrawn**  76:17
    106:16
**withholding**  72:18
    73:2,7
**witness**  3:2,9,11,12
    3:20 4:3,23 6:2 8:18
    21:24 22:5 29:6
    39:12 42:2,15 43:3,7
    44:4,23 50:18 53:25
    57:1,10,20 58:18,22
    63:3,21 65:10 66:2
    67:9 68:12,19 70:11
    72:4,21 73:7,22
    74:22 75:7,15,24
    76:7 77:18 78:2,10
    79:5 82:6,17 86:5
    87:6,14 88:18 89:6
    89:16 90:6,14,25
    91:15 92:7,19 93:21
    95:5 96:9 97:11 98:6
    99:10,19 100:20
    101:25 104:13
    111:16 114:10
    116:11 117:20,23
    119:8,23 121:2,8
    122:5,24 124:1,4
    125:7,12 128:1,11,14
    129:8,12 131:14,17
    131:19
**wonder**  24:25
**word**  16:25
**words**  51:24 118:8
    118:10
**work**  11:7,12 12:20
    13:10
**worked**  63:17,19
**working**  73:8
**works**  56:8
**worth**  56:23
**write**  127:4
**writing**  6:8 7:16
**written**  7:13 55:18
    102:15,18 107:5

**wrong**  30:2 98:22
    118:9
**wrongdoing**  22:12
    30:9 67:3 70:17
    81:21
**wrongful**  23:9 33:8
    67:4 68:8 70:1 76:20
**wrote**  72:13,19

**y**

**yarnell**  2:4 7:5,10,12
    52:12 108:25 109:2
    130:6
**yeah**  44:4 109:17
**year**  5:2
**years**  10:25 11:21
    103:3