UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CV-80416-RYSKAMP

CORDELL CONSULTANTS, INC.,
MONEY PURCHASE PLAN,
a Virginia corporation,
         Plaintiff,
v.

ELIOT C. ABBOTT, et al.,
         Defendants.
_____/

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [D.E. 592] AND DEFENDANTS' MOTION IN LIMINE TO EXCLUDE "SPECULATIVE" AND "CONJECTURAL" ARGUMENT [D.E. 598]**

Plaintiff, Cordell Consultant, Inc. Money Purchase Plan and Trust ("Plaintiff"), respectfully requests leave to supplement its opposition to D.E. 592 and D.E. 598, and states:

**BACKGROUND**

1. Defendants, Abbey Kaplan ("Kaplan") and Steve Silverman ("Silverman"), filed a Motion for Summary Judgment [D.E. 592] claiming that Ed Okun's ("Okun") personal financial statement ("PFS") was not fraudulent and that it would be improper to invite the jury to infer that they and Eliot Abbott ("Abbott") verbally shared knowledge of Okun's ongoing fraud prior to the April 20, 2007 loan. In further support of this claim, they filed a Motion in Limine [D.E. 598] which they referenced in the body of D.E. 592 at p. 4, fn. 9.

2. Defendants claimed that it would be improper and inadmissible to "speculate" about any of their verbal communications, including whether Kaplan and Abbott informed Silverman of a March 29, 2007 email from Janet Dashiell ("Dashiell"). [D.E. 635-1 at p. 91]. Dashiell's email warned that Okun was still stealing his Qualified Intermediary ("QI") customers' money, substantially increasing Okun's liabilities and risking criminal prosecution. [D.E. 635-1 at pp. 91-92]. Richard Simring ("Simring") then forwarded this email to Kaplan and Abbott, acknowledging the problem that Dashiell identified. [D.E. 635-1 at p. 91]. Silverman was not copied on this email thread.

3. Plaintiff responded by noting that on April 2-3, 2007—after the Dashiell/Simring emails—Silverman contacted Kaplan, Abbott, and Simring to discuss PENTA's findings regarding Okun's QI liability. [D.E. 673-2, Tab 4 at pp. 12-16]. Plaintiff also noted that Silverman thereafter sent Kaplan an invoice showing that PENTA had traced "1031 Advance transfers"—money that Okun withdrew from Dashiell's company, which he acquired *after* December 14, 2006, the date that Defendants claim they told Okun to cease his QI theft. [D.E. 673-2, Tab 5 at pp. 18-19].[1] Defendants also claimed that it would be impermissible to "speculate" about these discussions.

4. At this time, Plaintiff has identified other documents produced by the Defendants which further clarify their knowledge of Okun's increased liability as of April 2-3, 2007.

5. These exhibits are central to the question of whether Kaplan, Silverman, and Abbott knew that Okun's financial condition had substantially deteriorated since December 1, 2006. That was the date when all three Defendants reviewed Okun's personal financial statement ("PFS"), representing that "Investment Properties of America" owed $134 million in "notes and accounts payable" to "The 1031 Tax Group"—not to specific QIs or customer accounts[2] [D.E. 635-1 at pp. 99-110]. Plaintiff has argued that on April 20, 2007, it was presented with an identical financial statement during the loan closing [D.E. 635-1 at pp. 88-90] and informed that Okun's net worth had not materially changed. As explained in D.E. 767 at pp. 9-10, every new dollar raised from a segregated account increased Okun's liability far beyond the liability that would have attached to an authorized loan or investment. All three Defendants had been informed via the Perkins Memos that Okun's false PFS was being provided to lenders. [D.E. 635-1 at p. 122]. The respective Defendants knew that Okun's PFS was false.

## ARGUMENT

6. On April 3, 2007, Simring emailed the accounting firm, Kaufman, Rossin & Co. ("Kaufman Rossin"). Simring's email was copied to Silverman, Abbott, Dashiell, Okun, and David Field ("Field"), and stated:

---

[1] Defendants' replies in further support of both motions included "Appendices" [D.E. 670; D.E. 714] which improperly added dozens of pages of substantive argument, including topics and exhibits that were never mentioned in the body of their replies [D.E. 666; D.E. 669; D.E. 713]. Plaintiff moved to strike these appendices, or in the alternative, for leave to file "counters" to both appendices. [D.E. 712; D.E. 716]. These motions are currently unresolved.

[2] Some of Okun's contracts called for segregated escrow accounts while others did not.

> Need your forensic assistance cleaning up the accounting for our 1031 qualified intermediary business. A firm called PENTA started the project but Ed is dissatisfied with their work. The paperwork is apparently in Richmond.
>
> **Janet is the CEO.**
>
> **Need to have kluger hire u.**
>
> Would you please call me on my cell at your convenience?

*See* "New Assignment" email, attached as Exhibit 1 (emphasis supplied). One day before this email, Simring emailed Abbott and Dashiell to request a verbal discussion of Okun's QI contracts, noting that they "cannot have this discussion by email" and proposing April 3 as the date to discuss the situation. *See* "Attorney-Client Privileged" email, attached as Exhibit 2.

    7.    Several weeks later, on April 25, 2007, Kaufman Rossin sent an engagement letter to Kluger Peretz Kaplan & Berlin ("KPKB"), which stated the scope of their assignment:

> The Firm will, **at the direction of Counsel**, provide accounting and consulting services to assist Counsel and Counsel's Client in its investigation of **certain transactions recorded by the Company during 2007**.

*See* Kaufman Rossin engagement letter, attached as Exhibit 3 (emphasis supplied).

    8.    "The Firm" was Kaufman Rossin, the "Client" was the 1031 Tax Group, and Kaplan, Silverman, and Abbott would be the "Counsel" directing their work. The "transactions recorded by the Company in 2007" meant the same type of transactions PENTA had been tracing—Okun's theft of QI accounts.

    9.    On April 26, 2007, Okun and Kaplan gave their blessing to KPKB's hiring of Kaufman Rossin. *See* "ditto" email, attached as Exhibit 4. Abbott, Kaplan, and Silverman were the "originating" attorneys for this Okun matter. *See* "origination" email, attached as Exhibit 5.

    10.    Defendants did not produce any emails which reveal their discussions with Kaufman Rossin between the dates of April 3 and April 25, 2007. Nonetheless, Plaintiff proposes that Exhibits 1-5 would permit the jury to reasonably infer that Silverman, Abbott, and Simring contacted Kaufman Rossin on April 3, 2007, because they (and Kaplan) knew that Okun had stolen a large, undocumented sum of QI funds during 2007. All three Defendants have affirmatively represented that they did not know Okun was still removing QI money after December 14, 2006. This claim is substantially defeated by the fact that they hired accountants to document Okun's theft which occurred during their representation.

11. Plaintiff contends that this inference would be further supported by the fact that Janet Dashiell was copied to the April 3, 2007 email to Kaufman Rossin. (Exhibit 1). On April 4, 2007—the next day—Dashiell sent an email to Simring and Field, explaining that she had been concerned about improper documentation of Okun's 2007 QI transfers since February of 2007:

> The best thing that happened in February was when David Field took over as COO of Okun Holdings and lavish spending slowed from a gallop to a cantor. The worst thing was I finally noticed Lydia was blithely siphoning funds off of the 1031 Group at an unbelievable rate. Without telling me. **Not until I screamed about Lydia wiring out funds to Ed's accounts without my knowledge did some notes get slapped together to justify the "loans." I kept being promised that financials were being prepared and reports were to come from the mysterious PENTA to explain where the "missing money" went**.

*See* Dashiell email, attached as Exhibit 6, at p. 2, ¶ 5-6 (emphasis supplied). To a reasonable jury, Defendants' act of hiring Kaufman Rossin may appear to be a direct response to the concerns Dashiell had been raising since February of 2007, which PENTA was tasked to address.

12. This inference of verbally shared knowledge is enhanced by Simring's comment that he, Abbott, and Dashiell needed to avoid documenting their conversation in emails[3]. Because Defendants' knowledge of Okun's continuing QI theft manifested in their act of contacting a new accounting firm to document Okun's ongoing theft, this is another instance where multiple facts fit together, permitting the jury to make a reasonable inference. It is not "speculation."

13. For these reasons, the proposed exhibits are crucial to all three elements of Aiding and Abetting Fraud: (1) the underlying fraud of misrepresenting Okun's net worth to obtain credit, (2) Defendants' knowledge of the fraud, and (3) Defendants' substantial assistance to the fraud[4]. Similarly, these exhibits are relevant and material to the conspiracy count. As explained in D.E. 649 at pp. 18-19, Florida law does not require that conspiracy be directed at one specific victim.

---

[3] This is similar to Simring's directive to Chris Hoctor to avoid sending more emails and call regarding "concerns" about Okun's purchase of 1031 Advance. As previously explained, Hoctor then called Simring, Silverman, and Abbott, expressing the concern that Okun would steal 1031 Advance funds to compensate for the absence of funds in other QIs. [D.E. 678 at p. 7].

[4] "Substantial assistance" refers to the attempt to legitimize the appearance of Okun's theft through documentation and the attempt to mollify the concerns of Dashiell, yet another Okun employee who spoke of Okun being federally prosecuted. This would be an example of assisting a fraud by working to "artificially prolong" its life. *See* D.E. 649 at p. 21.

If a Defendant knew that Okun was generally defrauding both lenders and QI customers, and acted in concert with another Defendant who furthered the fraud against Cordell, joint and several liability applies.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court admit these exhibits onto the record as it pertains to determination of Defendants' Motion for Summary Judgment [D.E. 592] and Motion in Limine to Exclude "Speculative" and "Conjectural" Argument [D.E. 598].

## CERTIFICATE OF GOOD FAITH CONFERENCE

I HEREBY CERTIFY that counsel for the movant has conferred with all parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues raised in the motion and states that the following issues have been resolved: Plaintiff's counsel communicated with the respective attorneys for the Defendants in an effort to resolve this Motion. The Defendants' attorneys reported their objection to this motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 27, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically transmitted notices of electronic filings.

                                  KELLY KRONENBERG, P.A.
                                  Counsel for Plaintiff
                                  1475 Centrepark Boulevard Suite 275
                                  West Palm Beach, Florida 33401
                                  (561) 684-5956 – Tel. (561) 684-5753 – Fax
                                  igilbert@kelleykronenberg.com

                                  By: */s/ Jimmy W. Mintz, Esq.*
                                       IRWIN R. GILBERT, ESQ.
                                       Florida Bar No.:  099473
                                       JIMMY W. MINTZ, ESQ.
                                       Florida Bar No.:  113363

**Service List**

| | |
|---|---|
| Steven C. Marks, Esq.<br>Fla. Bar No.: 516414<br>smarks@podhurst.com<br>Ramon Rasco, Esq.<br>Fla. Bar No.: 0617334<br>rrasco@podhurst.com<br>**Podhurst Orseck, PA.**<br>City National Bank Building, 8th Floor<br>25 West Flagler Street<br>Miami, FL  33130<br>Telephone:  (305) 358-2800<br>Facsimile:  (305) 358-2382<br>*Counsel for Defendant, Eliot C. Abbot*<br><br>Howard D. DuBosar, Esq.<br>Fla. Bar No.: 729108<br>dubosarh@dubolaw.com<br>**The DuBosar Law Group, P.A.**<br>Attorneys for Kluger Peretz Kaplan & Berlin, P.L.<br>1800 N. Military Trail, Suite 470<br>Boca Raton, FL  33431<br>Telephone:  (561) 544-8980<br>Facsimile:  (561) 544-8988<br>*Counsel for Defendant, Kluger, Peretz, Kaplan & Berlin, P.L.* | Deborah S. Corbishley, Esq.<br>Fla. Bar No.: 588229<br>dcorbishley@kennynachwalter.com<br>Richard H. Critchlow, Esq.<br>Fla. Bar No.: 155227<br>rcritchlow@kennynachwalter.com<br>**Kenny Nachwalter, P.A**.<br>201 South Biscayne Boulevard<br>Suite 1100<br>Miami, FL  33131<br>Telephone:  (305) 373-1000<br>Facsimile:  (305) 372-1861<br>*Counsel for Defendant, Abbey L. Kaplan*<br><br>Marilyn G. Kohn, Esq.<br>Fla. Bar No.: 168009<br>mkohn@klugerkaplan.com<br>**Kluger, Kaplan, Silverman, Katzen & Levine, P.L.**<br>201 S. Biscayne Blvd., 17th Floor<br>Miami, Florida 33131<br>Phone: (305) 379-9000<br>Facsimile: (305) 379-3428<br>*Counsel for Defendants, Abbey L. Kaplan and Steve I. Silverman*<br><br>Edward R. Shohat, Esq.<br>Fla. Bar No.: 152634<br>eshohat@joneswalker.com<br>**Jones Walker**<br>201 S. Biscayne Blvd<br>Twenty Sixth Floor<br>Miami, Florida 33131<br>Telephone: (305) 679-5700<br>Facsimile: (305) 679-5710<br>*Counsel for Defendant, Steve I. Silverman* |