UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CV-80416-KLR

CORDELL CONSULTANT, INC. MONEY
PURCHASE PLAN AND TRUST, a
Virginia Corporation,

      Plaintiff,

v.

ELIOT C. ABBOTT, et al.

      Defendants.

_____/

**DEFENDANTS KAPLAN and SILVERMAN'S JOINT OPPOSITION TO PLAINTIFF'S
MOTION IN LIMINE RE USURIOUS AND ONEROUS LOAN TERMS [D.E. 747]**

At a time when the prime rate for short term business loans was 8.25 %,[1] Cordell made a $7 million loan to Ed Okun, requiring interest to be paid at 18% and requiring a guaranteed additional $1 million payment, which also bore interest at 18% if not paid within six weeks.[2] But, Cordell does not think anyone should mention usurious and onerous loan terms during trial to determine if the lawyers for Okun, the borrower, should be liable to Cordell, the lender for the unpaid loan. That is an absurd request to make of the Court in the circumstances.  Defendants Abbey Kaplan and Steve Silverman oppose Cordell's effort  at D.E. 747 to prohibit Defendants from referring to the loan terms as potentially usurious or onerous, from introducing testimony on the subject, and apparently to prevent Defendants from linking the promissory note to the other documents providing for the extra $1 million payment. These descriptions and arguments

---

[1] Statistical Supplement to the Federal Reserve Bulletin, July 2007.  Exhibit 1.

[2] The $1 million payment was structured as a 10% interest in another entity, that had no property or assets other than an option to purchase a warehouse. Exhibit 2 at 39.  That 10% membership interest was subject to a put (right of the owner to demand repurchase) or call (right of the other party to demand a sale) at $1 million.   Exhibit 2 at 56.  Okun personally and unconditionally guaranteed that payment.  *Id*. para 3. The obligation to make the payment accrued 18% interest from June 1, 2007 until paid. *Id*. para 2(c).  There was no other document providing for a loan fee.  *See* Exhibit 2 at 4 (Loan Agreement). The Loan Agreement does not refer to the interest in the warehouse entity or the put/call. *Id*.

are well-founded in fact, documents, and testimony, and highly relevant to the defenses in the case that Cordell may not recover because of its own unclean hands and its being at equal or greater fault than any of the Defendants.

## **Memorandum**

Ed Okun asked a financial advisor by the name of Randy Kominsky to approach Cordell for a loan to close by the end of the week.  When Kominsky first went to Robin Rodriguez's (Cordell's principal) home in Coconut Grove, Miami, Florida  to pitch Okun's request to make the loan and offered Okun's proposed $1 million fee, Kominsky asked how Cordell would avoid the [obvious] usury issues.  Exhibit 3, Excerpts of Deposition of Kominsky (Hunter)[3] at 88. ("Robin, How can you do this and get around usury?").  Robin Rodriguez told him "Not a problem, I've done it many times."  *Id.*

Cordell's lawyers were also concerned about usury.  Cordell's Fort Lauderdale lawyer, Glen Stankee reported to his colleagues:

> The loan will be for 3 years with interest only at **18% per annum** payable monthly with a balloon at the end. The Default rate will be 36 %. There will be a **$1 million funding fee** paid from the loan proceeds, which translates to **14.29 points. The points are to [be] regarded as interes**t, not as fees for services. The loan agreement and note are to be governed by Virginia law. Robin has a Virginia lawyer who will issue an opinion as to the validity and enforceability of the loan documents under Virginia law. **Virginia does not have a usury statute** for loans over $5,000. You should have an associate research the issue of whether a mortgage on Florida real property is enforceable where it secures a loan that is governed by the laws of another state but **which would be usurious under Florida law.**

Exhibit 4, Email, Glen Stankee to James Soble, Robin Rodriguez, April 18, 2007, Rodriguez depo Exhibit 40 (emphasis added).

Cordell's Virginia lawyers were concerned about increasing Virginia contacts.

> Jim:
>
> We want to increase the Virginia contacts. I think the documents, including the note, should reference acceptance at Cordell's office in Charlottesville. Do we need to recite Ft. Lauderdale in the note?
>
> John.

---

[3] Full transcript filed at D.E. 595-2.

Exhibit 5, Email from John Griffin to James Soble, April 19, 2007.

Mr. Soble responded from Tampa, Florida:

> well, barring Ed's hopping on plane to Virginia, FTL is where he is signing the note and we would have to foreclose on the mortgage and other security (don't know-where the Salina mall is) in Florida so I don't think that you can indicate another location. We are using Cordell's address in Virginia for the docs and can indicate payment there.

Exhibit 5, Email from James Soble to John Griffin, April 19, 2007.

The $1 million payment was structured through an Option Agreement, which provided an interesting put and call.  Exhibit 2 at 56.  Okun could pay the $1 million for the interest any time (the call) and if he did not pay it before June 1, 2007, Cordell could demand repayment, with 18% interest. Cordell received an agreement that it should own 10% of the warehouse entity for recited consideration of $10.  Exhibit 2 at 39. The certificate representing Cordell's ownership was issued and included in the closing binder.  Exhibit 2 at 54.  The documents relating to the put and call are signed by Cordell. Exhibit 2 at 56.  All of these documents were included in the closing binder for the April 20, 2007 loan. Exhibit 2 at 2 (index to closing binder); 39 (purchase agreement): 54 (certificate of ownership); 56 (put and call).

The Zobrist Law Group, the Virginia firm that represented Cordell, included the put/call option providing for the $1 million payment in its list of Loan Documents, together with the note and mortgage, and opined that the transaction contemplated by the Loan Documents did not violate Virginia usury laws.  Exhibit 6.  Okun's Virginia lawyers, the Gregory Kaplan firm, originally also included the put/call option in its opinion letter with the note and opined that the transaction did not violate the Virginia usury laws.  Exhibit 2 at 74. However, Cordell's lawyers asked that the opinion from Okun's Virginia counsel separate the promissory note and loan agreement from the promise to pay the $1 million.  Exhibit 7, Email from Joseph McNabb to Dale Bergman, April 20, 2007.  Two new opinion letters were issued, *both* with the caption:

**Re: $7 million loan (the "Loan") from Cordell Consultants, Inc. Money Purchase Plan and Trust ("Lender") to Edward H. Okun ("Borrower")**

They clearly refer to a single transaction on April 20, 2007, involving the $1 million promise of payment and the 18% note.  Compare Exhibit 2 at 74 (refers to all documents) to Exhibit 8 (refers to Loan Agreement and Note) to Exhibit 9 (refers to Option Agreement and Purchase Agreement).

The Promissory Note provides that Virginia law will govern.  Exhibit 2 at 16. The application of Virginia law was apparently a struggle for the Virginia lawyers.  The Florida contacts with the transaction were far more significant than the Virginia contacts.  The loan was negotiated in Miami-Dade County, Florida.  Exhibit 3, Kominsky at 77-78.  Ed Okun, the Borrower was a Florida resident. The collateral was his Florida home. Exhibit 2 at 4.  Okun signed the loan documents in Miami.  Exhibit 3 Kominsky at 135 (closing at KPKB office).  The Promissory Note was signed in Miami. *See* Exhibit 2 at 80 (doc stamps paid to Miami-Dade Clerk of Court).  Rodriguez attended the closing in Miami, Kominsky at 135, but did not sign the documents for Cordell.  Instead, Cordell's signature was affixed in Virginia, by Gardy Bloemers.  Surely, these contortions to bring the loan under Virginia law may be probative of an effort to obtain a return on the loan that might appear to many to be unfair and even unlawful in the place the loan was actually made and to try as hard as possible to make it look reasonable and legitimate under the law of another state.

Cordell not only negotiated for this excessive return, but it also knew that it was helping Okun pay a QI customer whose money Okun used, and that Okun had used QI money to pay the down payment on the warehouse Okun's newly formed company was buying.  Thus Cordell was going to benefit by an onerous return and be given an interest of 10% in the company that benefitted from Okun's misuse of QI funds! As Cordell's lawyer wrote in his first email after Rodriguez called him about the loan:

> [The loan] will both be secured by a second mortgage on the borrower, Edward Olcun's, residence at 394 S. Hibiscus Drive, Miami Beach, and by a collateral assignment of the interest that Ed Okun's company, IPofA Miami Logistics Center, LLC, a Delaware limited liability company, has in its ***agreement that to purchase a warehouse in Hialeah for $100 million***. A copy of the agreement was provided separately. ***Ed made the $5 million deposit required under the contract. In making that deposit, he put himself in a bind with respect to other obligations*** he has. ***He must pay someone $5 million on Friday or the damages he sustains could approach $30 million***.

Exhibit 4, Email, Glen Stankee to James Soble, Robin Rodriguez, April 18, 2007, Rodriguez depo Exhibit 40 (emphasis added).    According to Kominsky, Rodriguez knew that the loan was needed to pay a QI customer.  Exhibit 3, Kominsky at 78 l. 24-25 to 79 l. 6-8 and 23-24 ("Ed needs five, ten million dollars immediately . . . Because he tells me he needs the money to --- for the qualified intermediaries. . . . They need cash to complete an exchange by Friday.")  Even worse, Rodriguez was told by Kominsky that the loan would be paid with new QI money the

following week.  *Id.* at 82 ("Ed told me you're going to get paid next week because he has another exchange of property number one coming in").  When he explained the situation, Kominsky says Robin Rodriguez "kind of looked at me and said, I get it.  I understand." *Id*. at 83.

Cordell now claims that the $1 million payment was not part of the loan.  That may be its current dubious position, as set forth in D.E. 747 ¶ 4.  But, as demonstrated above, that is not what it told its lawyers, not what the opinion letter from its Virginia lawyer includes, and it is inconsistent with the closing binder.  *See* Exhibit 2.  It is inconsistent with its own lawyer's opinion letter and with the first version of Okun's  Virginia lawyers' opinion letter. Exhibit 6 and Exhibit 2 at 74.  Cordell may choose to make this new exculpatory argument, but Defendants are entitled to prove the contrary and have a well-founded basis, as set forth above, for this factual statement.

Cordell has sued two lawyers, Steve Silverman and Abbey Kaplan, who had no role in the loan and never saw any of the loan documents.  Defendants have asserted that Cordell was *in pari delicto* with them and that it is barred by its own unclean hands  to sue them for their alleged role in Okun's alleged fraud.  Cordell expected to make an outrageous return 32% or more on this $7 million loan, which it was told would be repaid in a week and thought would be more like a three week period.  *See* Exhibit 3, Kominsky at 80-81.  Part of the defense in this case is that Cordell knew that Okun was taking money from the QIs and could not repay it, so Cordell helped him with a smaller loan until he could obtain larger permanent financing.  Cordell knew Okun was in serious financial trouble, that he was using QI money as a private bank, and that he faced significant legal problems if he did not get this money to pay back a QI customer.

Kominsky characterized the manner in which this loan occurred as "out of the ordinary." Exhibit 3 at 131. When a business provides assistance that is not run of the mill that may support a finding that the business is willingly engaged in assisting the misconduct of its client.[4]  Making

---

[4] *See generally Meridian Horizon Fund, LP v. KPMG,* 2012 WL 2754933 (2d Cir. 2012)(liability must be predicated on "more than just performing routine business services for the alleged fraudster);  *Freeman v. Dean Witter Reynolds,* 865 So.2d 543, 552 (Fla. 2d DCA 2011) ("Merely conducting **normal**, lawful banking operations is not enough")(emphasis added); *Bailey v Trenam Simmons,* 938 F. Supp. 825, 827 (no liability where legal services provided were typical of work normally provided by attorneys for clients in such transactions); *In re Cascade Int'l Secur. Lit.* , 840 F. Supp. 1558, 1566 (S.D. Fla. 1993)(no liability when law firm acted as scriveners for clients or conducted activities that made up the "daily grist of the mill").

a $7 million loan, without a new financial statement, on four business days' notice, when the borrower is already not current on loans from the same lender, and expecting a $1 million fee in addition to interest more than double prime rate is not an ordinary or run of the mill business transaction.  Structuring the transaction the way Cordell did is not "run of the mill."  The issue of usury concerns is relevant and admissible in support of Defendants' affirmative defenses of *in pari delicto*, bar by participation, and estoppel.

Under the doctrine of unclean hands, a plaintiff  "who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice[,] or unfairness will appeal in vain to a court of conscience, ***even though in his wrongdoing he may have kept himself strictly within the law.***"  *In re Garfinkle,* 672 F.2d 1340, 1347 n. 7 (11th Cir.1982) (citations omitted; emphasis added).  Defendants are entitled to tell the whole story of how Cordell was engaged with Okun, and what benefits Cordell bargained for in terms of interest rates, excess collateral, and an extra million dollars fee or interest to be paid to Cordell. Defendants are entitled to show the machinations that Cordell and its lawyer engaged in to fit the loan into Virginia law and to separate the loan fee from the loan.   Cordell's willingness to enter into this loan on these problematic terms demonstrates that its hands were unclean vis-a-vis both the QI customers and KPKB.[5]

The common law defense of *in pari delicto* refers to "[t]he principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Black's Law Dictionary* 806 (8th ed. 2004). This principle is based on the relative circumstances of the parties at the time of the events and generally may be raised in an action at law or in equity.  *See O'Halloran v. PricewaterhouseCoopers LLP,* 969 So.2d 1039, 1044 (Fla. 2d DCA 2007) ("The defense of *in pari delicto* 'is both an affirmative defense and an equitable defense'... [that] prohibits plaintiffs from recovering damages resulting from their own wrongdoing." (quoting *Nisselson v. Lernout,* 469 F.3d 143, 151 (1st Cir. 2006)). Equal fault does not mean identical fault, but that the Plaintiff bears at least substantially equal responsibility for his own injury.  *Earth Trades, Inc. v. T & G Corp.,* 108 So. 3d 580, 583 (Fla. 2013) (citations omitted). Surely a jury might find that Cordell was equally or more at fault than Kaplan or Silverman, who

---

[5] "Unclean hands may be asserted by a defendant who claims that the plaintiff acted toward a third party with unclean hands with respect to the matter in litigation*." Quality Roof Servs. v. Intervest Nat'l Bank,* 21 So.3d 883, 885 (Fla. 4th DCA 2009).  *See also Leila Corp. v. Ossi*, 138 So.3d 470 (Fla. 2d DCA 2014); *Yost v. Rieve Enter.*, 461 So.2d 178 (Fla. 1st DCA 1984).

did not know the loan terms,[6] such as that Cordell was getting an extra $1 million from the company that benefitted from Okun's misuse of QI funds, or that Okun was making this desperate loan because he could not meet his QI obligations – which Cordell knew and bargained to profit from.

## <u>Conclusion</u>

Cordell's motion to forbid testimony and argument calling its conduct what it was – onerous and possibly usurious – should be denied.  The term usury was used when the loan was negotiated and Cordell's lawyers worked hard to make it look less so.  The terms of the loan as understood at the time the loan was negotiated and closed, and the $1 million payment Cordell now wants to deny, tend to prove that Cordell was knowingly engaged in helping Okun with his unlawful conduct – or at least knowingly trying to benefit from it.  The motion in limine at D.E. 747 should be denied.

Respectfully submitted

Dated: October 28, 2015

s/ Deborah S. Corbishley
Richard H. Critchlow, Esq. (FL Bar #155227)
Deborah S. Corbishley, Esq. (FL Bar #588229)
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
rcritchlow@knpa.com
dcorbishley@knpa.com

***Counsel for Defendant Abbey L. Kaplan***

- and -

---

[6] Silverman did not even receive a conflict check for the loan or any indication that there was a loan. D.E. 594-1 at 594-1 at 44-50.  Kaplan received the conflict check but did not receive documents, know the terms, or supervise the work.  D.E. 594-1 at 33 to 36.

s/ Edward R. Shohat
Edward R. Shohat, Esq.
JONES WALKER
201 South Biscayne Blvd., Suite 2600
Miami, Florida 33131
Telephone 305.679.5700
Facsimile 305.679.5710
eshohat@joneswalker.com
***Counsel for Defendant Steven I. Silverman***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 28, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s Deborah S. Corbishley
Deborah S. Corbishley

8

*Cordell Consultant, Inc. Money Purchase Plan and Trust, v. Eliot C. Abbott, et al*

## SERVICE LIST

Irwin R. Gilbert, Esq. (FL Bar #099473)
Sayed M. Zonaid, Esq. (FL Bar #113442)
KELLEY KRONENBERG
1475 Centrepark Blvd., Suite 275
West Palm Beach, Florida 33401
Telephone: 561-684-5956
IGilbert@kelleykronenberg.com
Irgeservice@kelleykronenberg.com

Bryan J. Yarnell, Esq. (FL Bar #088900)
YARNELL LAW OFFICES
11000 Prosperity Farms Road,
Suite 205
Palm Beach Gardens, FL 33410
Telephone: (561) 622-1252
Facsimile: (561) 799-1904
bryanyarnell@gmail.com
**Counsel for Plaintiff**

Ramon Rasco, Esq. (FL Bar #0617334)
PODHURST ORSECK, P.A.
City National Bank Building – 8th Floor
25 West Flagler Street
Miami, Florida 33130
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
rrasco@podhurst.com
**Counsel for Defendant, Eliot C. Abbott**

Howard D. DuBosar, Esq. (FL Bar #729108)
THE DUBOSAR LAW GROUP, P.A.
1800 N. Military Trail, Suite 470
Boca Raton, Florida 33436
Telephone: (561) 544-8980
Facsimile: (561) 544-8988
hdubosar@dubosarnavon.com
**Counsel for Defendant, Kluger, Peretz,
Kaplan & Berlin, P.L.**

Richard H. Critchlow, Esq. (FL Bar #155227)
Deborah S. Corbishley, Esq. (FL Bar #588229)
KENNY NACHWALTER, P.A.
201 South Biscayne Blvd., Suite 1100
Miami, Florida 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
rcritchlow@knpa.com
dcorbishley@knpa.com
**Counsel for Defendant Abbey L. Kaplan**

Edward R. Shohat, Esq.
JONES WALKER
201 South Biscayne Blvd., Suite 2600
Miami, Florida 33131
Telephone 305.679.5700
Facsimile 305.679.5710
eshohat@joneswalker.com
**Counsel for Defendant Steven I. Silverman**

Marilyn G. Kohn, Esq.
KLUGER, KAPLAN, ABBEY KAPLAN,
KATZEN & LEVINE, P.L.
201 S. Biscayne Blvd., 17th Floor
Miami, Florida 33131
Phone: (305) 379-9000
Facsimile: (305) 379-3428
mkohn@klugerkaplan.com
**Counsel for Defendants Abbey L. Kaplan
and Steve I. Abbey Kaplan**