UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  11-CV-80416-RYSKAMP

CORDELL CONSULTANTS, INC.
MONEY PURCHASE PLAN AND
TRUST, a Virginia corporation,
        Plaintiff,
v.

ELIOT C. ABBOTT, et al.,
        Defendants.
_____/

**REPLY TO DEFENDANT KAPLAN AND SILVERMAN'S RESPONSE TO PLAINTIFF'S MOTION IN LIMINE RE USURIOUS AND ONEROUS LOAN TERMS**

Plaintiff replies to Kaplan and Silverman's response in opposition [D.E. 757] to its motion *in limine* to exclude references to onerous and usurious loan provisions [D.E. 747] and states:

1. In an effort to avoid exclusion, Kaplan and Silverman's continue to fixate on red herrings. As noted in D.E. 747, the terms of the April 20, 2007 loan were squarely within the bounds of Virginia law—the very law that governed the loan per the terms of the Promissory Note acquiesced to by Okun. The terms therefore are not usurious.

2. As stated by Kaplan and Silverman themselves, it was Okun himself through his intermediary Randy Kominsky[1]—a former client of defendants who was retained by Okun with the defendants' help—who proposed the $10% interest pledge in an LLC with no assets to

---

[1] Not only did defendants introduce Kominsky and his company, Alliance for Financial Growth, Inc., to Okun in January 2007, but they were in fact in communication with Kominsky as he attempted to solicit financing for Okun. A copy of Alliance for Financial Growth, Inc.'s, engagement letter, along with transmittal emails from January 2007, is attached hereto as Exhibit A; a copy of the February 12, 2007, KPKB waiver of conflict letter, along with a transmittal email from Abbott, is attached hereto as Exhibit B.

Cordell.[2]  See D.E. 757 at p. 2.  Notably, this 10% interest had little bearing on the April 20, 2007 loan transaction, as it was intended to induce Cordell to make a much larger $100 million loan to Okun.

3. Unlike defendants, Cordell had no way of ascertaining that Okun was outright stealing from his QI customers.  Cordell, for example, was not familiar with the QI exchange contracts and had no reason to suspect that monies were being taken by Okun in contravention of these agreements.  Since Cordell was making a loan with impaired collateral (the collateral was already leveraged), it charged higher interest rates. This cannot be evidence that Cordell had knowledge of Okun's crime or be evidence of *in pari delecto*.

4. As evidence of Cordell's alleged knowledge of Okun's fraud, Kaplan and Silverman point to the fact Cordell's attorney Glen Stankee wrote in an email that by making a $5 million deposit Okun "put himself in a bind" and that Okun "must pay someone $5 million on Friday or the damages he sustains could approach $30 million."  See D.E. at p. 4.  This does not relate in any fashion to improper or unlawful conduct by Okun.  This email in no way apprises Cordell of the fact that deposit monies were stolen QI funds and that Okun faced **criminal consequences** for failing to pay an exchanger.  As noted above, Cordell lacked the material facts necessary to arrive at these conclusions.

5. Kaplan and Silverman, however, were aware of these consequences because they reviewed the Perkins memoranda which warned that Okun's financial statement was materially

---

[2] This was actually a separate transaction, signed after the loan on April 23, 2007, and it involved the possible financing of a purchase of a warehouse.  A copy of the Option to Purchase and Option to Sell LLC Interest executed on April 23, 2007, is attached hereto as Exhibit C.  This was never pursued by either Okun or Cordell.

misleading and the memorandum prepared by KPKB associate Jeffrey Berman which cited to criminal cases in analyzing Okun's business practices.

6.      In their response to this Motion, Defendants continue to claim that Kaplan had no role in the April 20, 2007, loan. This is wholly untrue. On April 19, 2007, Kaplan wrote the following email to Simring and Abbott:

> Spoke to ECA about Columbus not being part of Cordell bridge loan[3] ... what about the mezz loan and the big whopper to follow ... my comments were based upon my understanding that Columbus would be part of some kind of financing. If not, no need to worry.

A copy of the April 19, 2007, email from Kaplan is attached hereto as Exhibit D. Moreover, on the very day of the April 20, 2007, loan, Kaplan was forwarded a string email containing receipts such as Plaintiff's lawyers James Soble and Joseph McNabb with the subject line "Okun/Cordell re: 394 S. Hibiscus Drive, Miami Beach, KPKB File No.6025.0001." A copy of this April 20, 2007, loan email string forwarded to Kaplan is attached hereto at Exhibit E.

### NONE OF THE CASES CITED SUPPORT DEFENDANTS' PREJUDICIAL AND NON-PROBATIVE ATTACK ON PLAINTIFF'S BUSINESS MODEL

7.      Defendants' assertion that the April 20, 2007, loan was "out of the ordinary" is erroneous for a number of reasons. First, it is Cordell's business to provide loans of this nature—loans which larger commercial lenders will simply not make hence the large interest rates. Second, the loan was essentially unsecured as the collateral provided to Cordell was already heavily leveraged. Third, Kaplan and Silverman do not cite to authority that a hard money cannot charge premium interest rates for unsecured or poorly secured.

---

[3] The term "bridge loan" directly references the loan that is at issue in the instant case.

8. Defendants cite cases which allegedly stand for the proposition that a business that seeks "out of the ordinary" transactions may be imputed with knowledge of its business partner's wrongdoing. The cited cases do not support this proposition.

9. In *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543 (Fla. 4th DCA 2003), the receiver for a fraudulent corporation, North American, sued a banking firm, Dean Whitter, claiming that it knew or should have known of North American's fraud. The court found that Dean Whitter had no duty to scrutinize "normal, lawful" banking records for North American's suspicious activity, especially as there were no honest directors at North American to report a fraud to. *Id*. at 552. The court held that defrauded customers could bring actions against Dean Whitter if its agents "knew that the individual customer was being defrauded and actively participated in that fraud." *Id*. at 554. There was no discussion of "out of the ordinary" transactions being used to impute knowledge of a fraud.

10. More egregiously, Defendant conflates the rules of evidence with Florida's securities laws in its reliance on *Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A.*, 938 F. Supp. 825 (S.D. Fla. 1996). A block quote is necessary to illustrate this misrepresentation of the case:

> Counts IV and V of the Complaint allege violations of **Florida securities laws**. In order for liability to attach on **these Counts**, Defendant must be found to be either a seller of a security or a "director, officer, partner, or agent of or for" the seller of the securities. F.S.A. § 517.211(1), (2). Defendant argues, and the Court agrees that, based on the undisputed facts of this case, Defendant has no liability on Counts IV and V.
>
> \*\*\*
>
> This Court is convinced, as was Judge Hoeveler in *Sahlen*, that Defendant must be shown to have provided more than standard legal services to Freedom **in order to impose liability as an agent under § 517.211**.

4

*Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A.*, 938 F. Supp. 825, 828 (S.D. Fla. 1996).

11. Next, defendants cite a Second Circuit securities case , *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir. 2012). The need for "more than just routine business practices" regarded the elements of aiding and abetting a breach of fiduciary duty under New York law. *Id*. at 643. It was not part of the court's common law fraud analysis, which was disposed because the plaintiff failed to allege scienter. *Id*. at 641.

12. Defendants also rely on another securities case, *In re Cascade Int'l Sec. Litig.*, 840 F. Supp. 1558, (S.D. Fla. 1993). The *Cascade* court observed that "if the method or transaction is atypical or **lacks business justification**, it may be possible to infer the knowledge necessary for aiding and abetting" a violation of SEC § 10(b). *Id*. at 1566 (emphasis supplied). The court was defining suspicious securities activity that implies knowledge of an SEC violation.

13. *Cascade* and *Bailey* are irrelevant here because the elements of Florida's common law fraud differs from the elements of violating securities statutes. *See Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1568 (S.D. Fla.). The *Cascade* decision was also part of a trend where courts tightened the rules for "aiding and abetting" SEC violations, until the Supreme Court ruled that no cause of action exists for aiding and abetting SEC fraud. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, N.A., 128 L. Ed. 2d 119 (1994).

14. None of the case cited address Defendants' peculiar legal theory—that driving a hard bargain suggests knowledge of a fraud. If this theory were taken seriously, every businessperson charging high prices may be asked to explain why their prices are not evidence that they knew their customers were committing crimes. There is no probative value to

Defendants' attack on Plaintiff's basic business model. It is simply an attempt to prejudice or confuse the jury.

15. Lastly, as to Kaplan and Silverman's argument that the interest provisions of the loan are pertinent to their affirmative defenses, Plaintiff again reiterates that the defense of unclean hands is unavailable in legal actions. *See Regions Bank v. Commonwealth Land Title Ins. Co.*, 977 F. Supp. 2d 1237 (S.D. Fla. 2013), appeal dismissed (Jan. 27, 2014); *Regions Bank v. Old Jupiter, LLC*, 10-80188-CIV, 2010 WL 5148467 (S.D. Fla. 2010) *aff'd*, 449 Fed. Appx. 818 (11th Cir. 2011); *Monks v. Smith*, 609 So. 2d 740, 743 (Fla. 1st DCA 1992); *Nature's Products, Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1317 (S.D. Fla. 2013), appeal dismissed (July 1, 2014). As to *in pari delicto*, Plaintiff had hardly the same quality or quantity of interactions with Okun as the defendants did. There is no evidence, for example, that Plaintiff knew that Okun was "borrowing" from his QI customers without their written consent. Indeed, Okun's financial statement fraudulently misrepresented Okun's theft from his customers as innocuous loans. Whereas Kaplan and Silverman were apprised of the fraudulent nature of Okun's financial statement by their review of his customers' contracts and the various legal memoranda reviewed by them, including the two Perkins and Berman memoranda and an email from Tim Heaphy, Plaintiff had no such luxury and was left in the dark as to the true extent of Okun's fraudulent scheme. Therefore, Plaintiff could hardly be said at equal fault relative to Kaplan or Silverman.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 4, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically transmitted notices of electronic filings.

/s/   Irwin R. Gilbert
Irwin R. Gilbert (Fla. Bar #099473)
Sayed M. Zonaid (Fla. Bar #113442)
Jimmy W. Mintz (Fla. Bar #113363)
Kelley Kronenberg
Attorneys for Plaintiff
1475 Centrepark Blvd. Ste. 275
West Palm Beach, FL 33401
Tel. 561.684.5956
Fax. 561.684.5753
igilbert@kelleykronenberg.com
jmintz@kelleykronenberg.com

**Service List**

| | |
|---|---|
| Steven C. Marks, Esq.<br>Fla. Bar No.: 516414<br>smarks@podhurst.com<br>Ramon Rasco, Esq.<br>Fla. Bar No.: 0617334<br>rrasco@podhurst.com<br>**Podhurst Orseck, PA.**<br>City National Bank Building, 8th Floor<br>25 West Flagler Street<br>Miami, FL 33130<br>Telephone: (305) 358-2800<br>Facsimile: (305) 358-2382<br>*Counsel for Defendant Eliott C. Abbot*<br><br>Howard D. DuBosar, Esq.<br>Fla. Bar No.: 729108<br>dubosarh@dubolaw.com<br>**The DuBosar Law Group, P.A.**<br>Attorneys for Kluger Peretz Kaplan & Berlin, P.L.<br>1800 N. Military Trail, Suite 470<br>Boca Raton, FL 33431<br>Telephone: (561) 544-8980<br>Facsimile: (561) 544-8988<br>*Counsel for Defendant, Kluger, Peretz,*<br>*Kaplan & Berlin, P.L.* | Deborah S. Corbishley, Esq.<br>Fla. Bar No.: 588229<br>dcorbishley@kennynachwalter.com<br>Richard H. Critchlow, Esq.<br>Fla. Bar No.: 155227<br>rcritchlow@kennynachwalter.com<br>**Kenny Nachwalter, P.A**.<br>201 South Biscayne Boulevard<br>Suite 1100<br>Miami, FL 33131<br>Telephone: (305) 373-1000<br>Facsimile: (305) 372-1861<br>*Counsel for Defendants Abbey L. Kaplan and*<br>*Steve I. Silverman*<br><br>Marilyn G. Kohn, Esq.<br>Fla. Bar No.: 168009<br>mkohn@klugerkaplan.com<br>**Kluger, Kaplan, Silverman,**<br>**Katzen & Levine, P.L.**<br>201 S. Biscayne Blvd., 17th Floor<br>Miami, Florida 33131<br>Phone: (305) 379-9000<br>Facsimile: (305) 379-3428<br>*Counsel for Defendants, Abbey L. Kaplan and*<br>*Steve I. Silverman*<br><br>Edward R. Shohat, Esq.<br>Fla. Bar No.: 152634<br>eshohat@joneswalker.com<br>**Jones Walker**<br>201 S. Biscayne Blvd<br>Twenty Sixth Floor<br>Miami, Florida 33131<br>Telephone: (305) 679-5700<br>Facsimile: (305) 679-5710<br>*Co-counsel for Defendant Steve I. Silverman* |

8