# TAB ONE

```
                                                              Page 1
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
 2   ----------------------------------x           VOL. I
     CORDELL CONSULTANT, INC.
 3   MONEY PURCHASE PLAN AND
     TRUST, A VIRGINIA CORPORATION,
 4
                  Plaintiffs,
 5
     vs.                        Case No. 11-CV-80416-RYSKAMP
 6                              Date:  February 16, 2015
     ELIOT C. ABBOTT, AN INDIVIDUAL;
 7   DALE S. BERGMAN, AN INDIVIDUAL;
     ABBEY L. KAPLAN, AN INDIVIDUAL;
 8   STEVEN I. SILVERMAN, an INDIVIDUAL;
     AND KLUGER, PERETZ, KAPLAN
 9   & BERLIN, P.L., A FLORIDA PROFESSIONAL
     LIMITED LIABILITY COMPANY,
10
                  DEFENDANTS.
11   ----------------------------------x
12
13             DEPOSITION OF TODD PAJONAS
14
         The deposition of Todd Pajonas was taken on
15
     February 16, 2015, beginning at 10:24 a.m., at 350
16
     Fairfield Avenue, Bridgeport, Connecticut, before
17
     Susan Wandzilak, Registered Professional Reporter and
18
     Notary Public in the State of Connecticut.
19
20
21
22            Susan Wandzilak  License No. 377
23
24
25
```

```
 1   A P P E A R A N C E S
 2   IRWIN R. GILBERT, ESQUIRE
         Gilbert Yarnell
 3       11000 Prosperity Farms Road
         Suite 33410
 4       Palm Beach Gardens, Florida 33410
         561-622-1252 Phone
 5       561-799-1904 Fax
         igilbert@gilbertyarnell.com
 6
                   Attorney for Plaintiffs
 7
     DEBORAH S. CORBISHLEY, ESQUIRE
 8       Kenny Nachwalter, P.A.
         201 South Biscayne Boulevard
 9       Suite 1100
         Miami, Florida 33131
10       305-373-1000 Phone
         305-372-1861 Fax
11       dcorbishley@kennynachwalter.com
12                 Attorney for Defendants
                       Abbey L. Kaplan and
13                     Steve I. Silverman
14   Also Present:  Abbey L. Kaplan
15
16
17
18
19
20
21
22
23
24
25
```

1    A.   Well, I called each of them.
2    Q.   So about this, about not having enough money
3  to cover withdrawals?
4    A.   That's correct.
5    Q.   What did they say?
6    A.   Ed Okun told me that based on advice of his
7  lawyer, that he couldn't speak to me any longer.
8    Q.   Was this because you were in the process of
9  separating from the company?
10   A.   That's correct.
11   Q.   All right.  And so did he say anything else
12 other than that to you?
13   A.   I don't recall specifically other than that I
14 shouted and cursed at him and told him that he needed
15 to put the money back and a few other things.
16   Q.   Okay.  And were you able to reach Mr. Field
17 on this subject?
18   A.   I did.
19   Q.   And what did Mr. Field say to you?
20   A.   He hung up on me.
21   Q.   Now, did you enter into a termination
22 agreement which required a payment of money to you?
23   A.   I did.
24   Q.   Okay.  And do you need to look at the
25 agreement to recall what the agreement provided you

1  would be paid?
2  A. I should look at it to refresh my
3  recollection. (After review.) It says that I'm to
4  receive $950,000.
5  Q. Was a portion of that to be paid immediately?
6  A. Yes.
7  Q. And a portion to be paid over time?
8  A. That's correct.
9  Q. Okay. Did this exceed the total of any
10 salary that was actually owed to you for the following
11 12 months?
12 A. Just basic salary? Yes.
13 Q. All right. And as part of paying you this
14 $950,000, were you asked to do anything in particular?
15     MS. CORBISHLEY: I object to the form.
16     THE WITNESS: Well, there were lots of
17  different conditions contained in this document.
18 BY MR. GILBERT:
19 Q. One of them involved confidentiality?
20 A. It did involve confidentiality.
21 Q. Did you understand that you were agreeing to
22 keep all of the information that you had obtained
23 while you were employed by 1031 Tax Group or
24 Mr. Okun's company confidential?
25 A. I did, but I never cared.

1     Q.    I understand, but you understood that's what
2  the agreement required?
3     A.    I understood what the agreement said, but I
4  never abided by it.
5     Q.    Do you have an understanding as to whether
6  they were trying to buy your silence with this money?
7           MS. CORBISHLEY: I object to form. Lack of
8     foundation.
9           THE WITNESS: That's what they may have
10    thought was happening, but it's not what
11    happened.
12 BY MR. GILBERT:
13    Q.    Did you meet with Abbey Kaplan in connection
14 with reaching this termination or severance agreement?
15    A.    Yes.
16    Q.    How many times did you meet with Mr. Kaplan?
17    A.    I believe just once.
18    Q.    Where was the meeting?
19    A.    It was a meeting at a law firm in New York
20 City.
21    Q.    Prior to that, did you speak with Mr. Kaplan
22 directly on the telephone?
23    A.    I don't believe I ever spoke with him. I'm
24 not certain, but I don't believe so.
25    Q.    Subsequent to this meeting in New York City,

1   of that meeting?
2       A.  You know, I don't recall.
3       Q.  Give me just a moment, please.  Would you go
4   to page 3555 of the deposition, please?
5       A.  I'm already there.
6       Q.  I would like you to take a moment and read
7   lines 6 through 11.  Let me know when you have done
8   that.
9       A.  I have read it.
10      Q.  Does this refresh your recollection, sir,
11  about whether you told Mr. Kaplan that Mr. Okun had
12  more to worry about than you do?
13      A.  Doesn't change my answer.
14      Q.  Well, sir, did you tell Mr. Kaplan that
15  Mr. Okun had more to worry about than you did?
16      A.  It was a general statement.  I can't recall
17  specifically what we were talking about at the moment
18  that it was said, but yes.
19      Q.  Okay.  And so again the question and answer
20  found on page 51 (it's also marked electronically file
21  3555) to the question, Did you tell Mr. Kaplan that
22  Mr. Okun had more to worry about than you did, your
23  answer at the criminal trial of Mr. Okun was a
24  truthful answer?
25          MS. CORBISHLEY:  I object to the form.

```
 1              THE WITNESS:  That's correct.
 2    BY MR. GILBERT:
 3       Q.   Okay.  Why would Mr. Okun have more to worry
 4    about than you did?
 5              MS. CORBISHLEY:  I object to the form.
 6              THE WITNESS:  Because that's the most
 7       understated question I think I have ever heard in
 8       my life.  Why?  Because he had stolen tens of --
 9       $100 million.
10    BY MR. GILBERT:
11       Q.   When you said in sum and substance generally
12    to Mr. Kaplan that Mr. Okun had more to worry about
13    than you did after Mr. Kaplan was threatening to sue
14    you, did you -- hold on -- did you or anyone else in
15    the room elaborate in any way on what it is Mr. Okun
16    had to worry about?
17       A.   No.
18       Q.   Did Mr. Kaplan in his reaction to those words
19    indicate to you any existing understanding familiarity
20    with what it is that Mr. Okun would have to worry
21    about?
22              MS. CORBISHLEY:  I object to the form.
23              THE WITNESS:  He made us sit back down at the
24       table, so that was an indication to me that he
25       didn't want us to leave the room.
```

# TAB TWO

```
 1               IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3                        RICHMOND DIVISION

 4

 5    ---------------------------------------
                                             :
 6    UNITED STATES OF AMERICA               :   Criminal No.
                                             :   3:08CR00132-01
 7    vs.                                    :
                                             :
 8    EDWARD HUGH OKUN                       :   March 6, 2009
                                             :
 9    ---------------------------------------

10

11    COMPLETE TRANSCRIPT OF THE TESTIMONY OF TODD R. PAJONAS

12             BEFORE THE HONORABLE ROBERT E. PAYNE

13           UNITED STATES DISTRICT JUDGE, AND A JURY

14

15    APPEARANCES:

16    Michael S. Dry, Esquire
      Jessica A. Brumberg, Esquire
17    U.S. Attorney's Office
      600 East Main Street
18    Suite 1800
      Richmond, Virginia  23219
19    and
      Brigham Cannon, Esquire
20    United States Department of Justice
      1400 New York Avenue, NW
21    3rd Floor
      Washington, DC  20530
22    Counsel for the United States

23

24                     Peppy Strahan, RPR
                     Official Court Reporter
25                 United States District Court
```

```
 1   APPEARANCES:  (cont'g)

 2   Carolyn V. Grady, Esquire
     Robert J. Wagner, Esquire
 3   Office of the Federal Public Defender
     701 East Broad Street
 4   Suite 3600
     Richmond, Virginia  23219
 5   and
     Barry J. Pollack, Esquire
 6   Miller & Chevalier
     655 Fifteenth Street, NW
 7   Suite 900
     Washington, D.C.  20005-5701
 8   Counsel for the defendant.

 9

10

11

12

13

14

15

16

17                    I N D E X

18

19                   DIRECT   CROSS   REDIRECT   RECROSS

20   Todd R. Pajonas     4      57       98        --

21

22

23

24

25
```

Case 1:08-cr-00132-LREP Document 788 Filed 07/16/19 Page 50 of 163 PageID# 3554
Case 1:08-cr-00132-REP Document 788 Filed 07/16/19 Page 50 of 163 PageID# 3554
Pajones - Direct

50

```
 1   Q    Kluger, Peretz, Kaplan, and Berlin?
 2   A    Right.  I'm sorry.  I don't recall all the names, but it
 3   was Kluger Peretz.
 4   Q    Did you participate in a meeting with Abbey Kaplan from
 5   that law firm?
 6   A    I did.
 7   Q    And did Mr. Kaplan represent to you that he was
 8   negotiating on behalf of Edward Okun?
 9   A    Absolutely.
10   Q    During your negotiations with Mr. Kaplan, describe -- was
11   there any discussion regarding the potential for litigation?
12   A    Absolutely.  Both sides were both threatening litigation
13   and at the same time pointing to the other side saying, you
14   don't want litigation.
15   Q    Why did neither side want litigation?
16   A    Because it's an ugly mess, and nobody wanted it to see the
17   light of day.
18   Q    What do you mean, see the light of day?
19   A    The allegations of how the money was being used was not
20   something --
21            MS. GRADY:  Judge, I'm going to object to his
22   conclusions that both sides wanted to avoid litigation.  I
23   think that's an assumption he can't make.  He can only testify
24   about his own knowledge.
25            THE COURT:  I think what he said is the lawyers from
```

```
 1   both sides were saying that, but I'm not sure.  I think it
 2   would be a good idea if you asked specific -- get in there and
 3   deal with it.  She's got a legitimate objection to the way it's
 4   coming in, and if it doesn't belong in, it doesn't belong in,
 5   so do it right or do it not at all.
 6   Q    Did Mr. Kaplan threaten you with litigation and tell you
 7   that you did not want litigation because things would come out
 8   about what had happened?
 9   A    Many, many times during that meeting.
10   Q    Did you tell Mr. Kaplan that Mr. Okun had more to worry
11   about than you did?
12   A    I did.
13   Q    Ultimately, you received $900,000; correct?  You
14   negotiated for $900,000 in severance; correct?
15   A    $950,000 in settlement.
16   Q    As part of that settlement, were you required to sign an
17   agreement that included a confidentiality provision?
18   A    I did.
19   Q    Did you perceive at the time that you were being given
20   extra money in order to keep you quiet?
21   A    Yes.  I would say that that's a fair statement.
22   Q    Sir, you've been granted immunity in this case; correct?
23   A    I have.
24   Q    And that means you can't be prosecuted for your actions
25   during all this; correct?
```