**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 11-80416-CIV-RYSKAMP/HOPKINS

CORDELL CONSULTANTS, INC.
MONEY PURCHASE PLAN,
a Virginia corporation,

      Plaintiff,

v.

ELIOT C. ABBOTT, an individual;
DALE S. BERGMAN, an individual;
ABBEY L. KAPLAN, an individual;
STEVEN I. SILVERMAN, an individual;
and KLUGER, PERETZ, KAPLAN
& BERLIN, P.L., a Florida Professional
Limited Liability Company,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court pursuant to Defendants Abbey Kaplan ("Kaplan") and Steve Silverman's ("Silverman") motion for summary judgment, filed July 17, 2015 **[DE 592]**. Plaintiff Cordell Consultants, Inc. Money Purchase Plan ("Cordell") responded on August 4, 2015 **[DE 649]**. Silverman and Kaplan filed replies on August 13, 2015 **[DE 666, 669]**. Defendant Eliot Abbott filed an amended notice of joinder on November 4, 2015 **[DE 775]** wherein he joined Kaplan and Silverman's summary judgment motion to the extent the motion is applicable to him. Counsel for Kluger, Peretz, Kaplan & Berlin, P.L. ("KPKB") adopted at the November 3, 2015 summary judgment hearing the arguments of counsel for Abbott, Kaplan and Silverman. This motion is ripe for adjudication.

# I.    BACKGROUND

Edward Okun ("Okun") was a real estate businessman engaged in several lines of

business, including investment in commercial and retail property through Investment Properties

of America ("IPA").  He owned several qualified intermediaries that facilitated Section 1031

Exchanges.  *See* 26 U.S.C. § 1031.  1031 Exhanges involve selling property and replacing that

property with other property.  When a delay is present between the two transactions, the funds

from the first sale are held by a Qualified Intermediary ("QI") company, that is, out of control of

the taxpayer, for the gain to be deferred for tax purposes.  QIs receive funds, invest them, and

then repay the funds to the customer once the customer closes on the second transaction.  The

maximum amount of time allowed between transactions is 180 days.

Okun used Cordell as a lender prior to April 2007.  Either Cordell or a related entity made

four prior loans to Okun or to his related entities.  (Kaplan and Silverman's Statement of Facts,

53, n.1.)  The first loan was made before KPKB began representing Okun.  The second and third

loans were in progress before KPKB began representing Okun but closed while KPKB was

representing Okun.  The fourth loan involved property in Louisiana.  KPKB describes its role in

that loan as "minor" and notes that Okun also used  Louisiana counsel for that loan.  *Id.*  None of

these loans are at issue in this action.

In the fall of 2006, the president of Okun's QI businesses, Todd Pajonas ("Pajonas"), told

Okun's new CFO, David Field ("Field"), who then told IPA in house counsel, Eric Perkins

("Perkins"), that Okun had used QI money to pay for non-QI acquisitions and expenses.  *Id.* at

12.[1]  Perkins told Okun on November 7, 2006 that his financial statements did not reflect his liability to the QIs, that the financial statements were misleading and that they must be corrected. *Id.* at 14.  Newly consulted outside counsel McGuire Woods said the same and later declined to continue representing Okun.  *Id.* at 13.  Perkins advised that the correction needed to be shared with creditors who received prior financial statements.  *Id.* at 15.  Field revised the statements to show $134 million in debt to the QIs.  *Id.* at 16.

In November 2006, Okun terminated Pajonas.  Okun's employment relationship with his in house lawyers also ended.  *Id.* at 64.[2]  Okun contacted Richard Simring ("Simring"), then an attorney with Jordan Burt.  *Id.* at 65.  Simring recommended KPKB as outside counsel and called Kaplan on or around November 22, 2006.  *Id.* at 65.  Kaplan was about to start trial in another matter and requested that Silverman and Abbott meet with Simring to learn about Okun's legal representation needs.  Silverman and Abbott met with Simring and eventually Okun between November 27 and 29, 2006.  KPKB accepted representation of Okun.  *Id.* at 66.  Silverman, Kaplan and Abbott received copies of the in house counsel memos wherein Okun was advised of the improper use of QI funds and the need to rectify same.  *Id.* at 67.  On December 1, 2006, Silverman, Kaplan and Abbott received Okun's financial statement that disclosed $134 million in QI liability.  *Id.* at 68.  Cordell received the same statement the prior week, on November 27, 2006.  *Id.* at 5.

In mid-December, research performed by KPKB associates confirmed that Okun could

---

[1] Pajonas testified at deposition that Okun had stolen from the QIs, but Pajonas did not testify that he told Field that the money was stolen.  (DE 382-1, 121.)

[2] Defendants claim that Okun terminated the in house lawyers.  Cordell claims that Perkins resigned on ethical grounds.  In any event, the material point is that Okun wanted new legal representation.

4

not use QI funds for non-QI purposes.  *Id.* at 69.  Silverman, Kaplan and Abbott met with Okun

and Simring and Silverman and Kaplan told Okun that Okun could not use QI money for non-

QI purposes and that Okun needed to repay the funds he had taken.  *Id.*  Abbott recommended a

criminal lawyer to advise Okun.  Michael Rosen ("Rosen"), a criminal lawyer, attended meetings

with Okun and in Abbott's presence told Okun not to take the funds while Rosen studied the

issues.  Okun indicated that he did not know how he would repay the QIs.  *Id.* at 70.  This

statement does not indicate that Okun did not intend to repay the QIs, only that he did not know

how he would go about doing so.  Okun disputed the amount he owed to the QIs and claimed that

Pajonas, the president of the QIs, had failed to keep the records up to date, had taken money

personally and had hidden bank accounts with QI money.  *Id.* at 71.  As a result, KPKB, through

Silverman, retained Penta Advisory Services ("Penta"), an accounting and financial company, to

review transactions and records, determine the precise Okun debt to the QIs, and to reconstruct,

as necessary, the financial records of the QI companies.  *Id.* at 72.  Kaplan and Silverman

understood that Okun intended to use Penta's results to ensure that QI customers were repaid in

full and that Okun intended to refinance his properties or obtain an equity infusion to make

complete payment.  *Id.*

In December 2006 and February 2007, the KPKB transactional dept closed loans between

Cordell or related entities and Okun and his companies.  *Id.* at 119.  The transactional department

also negotiated the documents to close Okun's acquisition of another QI company, 1031

Advance, Inc., which Okun bought in late December 2006 with funds borrowed from Cordell.

*Id.* at 122.

Penta had yet to finish its work as of late March 2007.  On March 30, 2007, Kaplan and

5

Abbott received from Simring a copy of a March 29, 2007 email from Janet Dashiell ("Dashiell"), the new QI president. *Id.* at 73. Dashiell was concerned that Okun had not completed repayment to the QIs and advised Okun and Simring that Okun had a total liability of 175 million but only 2.3 million in "flexible cash." *Id.* at 20. To the extent that Dashiell's email might have suggested to Kaplan that Okun was taking QI money, Kaplan was then advised that Okun had actually been paying the QIs' liabilities instead. *Id.* at 74. Abbott advised Kaplan on March 30 that Okun's staff located missing bank accounts and expected to find 60 million. *Id.* Silverman never received the Dashiell email. Penta finished its work in April of 2007 and tentatively concluded that the QIs needed to be repaid $114 million. *Id.* at 22.[3]

In mid-April 2007, Okun met with potential lenders, including Cordell, to refinance debt to the QIs as well as debt on his properties. Cordell knew that Okun sought a $200-250 million loan to, in part, refinance the QI debt. *Id.* at 45. Cordell was aware that Okun made a $5 million down payment on a $100 million warehouse and that he needed a loan to make the rest of the payments on the warehouse. *Id.* at 46-47. KPKB did not refer Okun to Cordell. *Id.* at 108-09. The documents Cordell cites for the proposition that KPKB recommended Cordell do not indicate that KPKB made such a recommendation. At that time, Cordell was aware that Okun was late in making a payment on a Cordell loan. *Id.* at 44. On April 17, 2007, Randy Kominsky ("Kominsky"), an Okun advisor, approached Robin Rodriguez ("Rodriguez"), Cordell's principal, and asked him to make an emergency loan to Okun because Okun had a problem with the QIs. *Id.* at 32. Specifically, Rodriguez testified that Kominsky told him that Okun

---

[3] Cordell claims that Penta concluded that Okun's debt to the QIs was $112.7 million in December 2005 but that Penta revised its estimate to $114 million for 2006. The financial statement shows $134 million in debt to the QIs, however, so whether Penta revised its figure from $112.7 to $114 million is immaterial.

> said he had a cash flow problem.  And until -- He had planned on
> this exchange being done closer to the six-month mark, and the
> investor came in much earlier on the other side of the transaction.
> And so he was going to cover the problem personally, and then get
> the money when the assets were sold, and repay the loan.

*Id.* at 32.  Cordell lent Okun $7 million, and the loan closed in four days later on April 20, 2007.

Kaplan and Silverman's respective roles in the loan were minimal, to the extent any such role existed at all.  KPKB issued an opinion letter regarding the loan.  *Id.* at 57.  Cordell claims that at closing it received only the first two pages of the financial statement and that these pages did not include schedule H, which provided for the $134 million debt to the QIs.  The first two pages of the financial statement reference Schedule H and included the same total liability as did the November 27, 2006 statement.  *Id.* at 6.  KPKB transactional and corporate lawyers negotiated the loan documents.  Silverman was unaware that KPKB was representing Okun in connection with a loan.  *Id.* at 112.  Kaplan received a conflict check on the loan.  *Id.* at 114.  Neither Kaplan nor Silverman spoke with Okun, his staff or Rodriguez re the loan, and neither attended the closing.  *Id.* at 115-16.

Okun defaulted on the loan in May of 2007.  *Id.* at 2.  The QIs filed for bankruptcy protection, and Okun ended his active engagement with them.  Okun was convicted of fraud against the QI customers and was found to have used QI money that was not repaid in the amount of $128,892,575.97.  *See United States v. Okun*, Cr. No. 3:08CR132 (E.D. Va.) (July 26, 2009). *Id.* at 23.

Cordell claims that the KPKB, Abbott, Kaplan and Silverman aided and abetted Okun's fraudulent scheme to induce it to make a $7 million loan based on misrepresentations.  The

7

elements of this claim under Florida law are: 1) the existence of an underlying fraud; 2) the defendants' knowledge of the fraud; and 3) the defendants' provision of substantial assistance to advance the commission of the fraud. *ZP No. 54 Ltd. P'ship v. Fid. & Dep. Co. of Md.*, 917 So.2d 368, 372 (Fla. 5th DCA 2005).  Cordell also claims that Defendants conspired to help Okun defraud it in connection with the loan.  The elements of a claim for civil conspiracy under Florida law are as follows: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong,* 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).  The Court on December 5, 2012 granted Defendants' Rule 12(b)(6) motion and dismissed the second amended complaint with prejudice. The Eleventh Circuit reversed and remanded.  Defendants now move for summary judgment on each of Cordell's claims.

## II.      LEGAL STANDARD

Summary judgment is warranted where the party bearing the burden of proof fails to prove an essential element of its case or fails to identify specific facts showing that there is a genuine issue for trial.  *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Merget v. Moss*, 246 Fed.Appx. 664, 666 (11th Cir. 2007).  The movant bears "the initial responsibility of informing [the court] of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has done so, "a plaintiff

cannot rely on its allegations; it must provide evidence to support those allegations." *Inlet Condo. Ass'n, Inc. v. Childress Duffy, Ltd., Inc.*, No. 13-14064, 2015 WL 3798474, at \*10 (11th Cir. June 19, 2015) (citing *Doe v. Drummond Co.*, 782 F.3d 576, 604 (11th Cir.2015) ("Plaintiffs could not rely upon mere allegations to survive summary judgment, but were required to either point out evidence in the record or provide additional evidence in support of their claims sufficient to withstand a directed verdict motion."). "[T]o survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (citing *Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006)). "Summary judgment must be granted if the nonmoving party has failed to make a sufficient showing on 'an essential element of her case with respect to which she has the burden of proof.'" *Annunziata v. School Board*, No. 04-12560, 2005 WL 591205, at \*4 (11th Cir. Mar. 4, 2005) (quoting *Celotex*, 477 U.S. at 323).

Prior to commencing its analysis of Cordell's claims, the Court also deems it necessary to set forth the legal standards as to what evidentiary inferences are sufficient to create triable issues of fact. To create an issue for trial, an inference must rest on actual evidence and be a reasonable conclusion from that actual evidence. An inference cannot be build upon another inference, nor can it be built upon speculation. If positive testimony to the contrary exists, an inference cannot be a basis for argument or for fact finding. *See Clover v. Total System Servs.*, 176 F.3d 1346, 1354-55 (11th Cir. 1999)( "could have told" is not the same as "did tell;" that two people "talk regularly...is not enough to support a reasonable inference that they discussed a specific topic, much less an inference concerning what they said about it."); *Burrell v. Board of Trustees of GA*

*Military College*, 970 F.2d 785, 791 n.15 (11th Cir. 1992) ("Any conclusion about the content of

their discussion in contradiction to their testimony would qualify as speculation..., not inference.

In sum, the naked fact of...meeting, considered independently or in conjunction with all other

inferable facts in the record, does not permit the inference that [they] conspired...."); *Lee v.*

*Celotex Corp.*, 764 F.2d 1489, 1490-91 (11th Cir. 1985) ("speculation and conjecture that

renders them mere guesses or possibilities" does not defeat summary judgment); *Gadsby v. Am.*

*Golf Corp. of California*, 557 Fed.Appx. 837, 839-40 (11th Cir. 2014) ("We have said repeatedly

that speculation about a fact or result is insufficient to survive summary judgment.  An inference

based on speculation and conjecture is not reasonable.") (quotation omitted); *Carlson v. United*

*States*, 754 F.3d 1223, 1230 (11th Cir. 2014) ("The problem is [not the use of circumstantial

evidence but] that this circumstantial evidence says nothing about what Carlson actually knew.

Any conclusion that Carlson actually knew the return understated tax is not made based on this

evidence, but rather is made from pure speculation.").

### III.    DISCUSSION

**A.    Cordell was not defrauded.**

**1.    Financial Statement not Fraudulent**

Cordell must demonstrate that it was the victim of fraud in connection with the making of

the April 2007 loan to prevail on either of its claims.  "In order to recover for fraud in the

inducement, the plaintiff must prove by the greater weight of the evidence that: 1) a false

statement was made regarding a material fact; 2) the individual who made the statement knew or

should have known that it was false; 3) the maker intended that the other party rely on the

statement; and 4) the other party relied on the false statement to its detriment." *Taylor Woodrow Homes Florida, Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003) (citations omitted).

The financial statement indicates that Okun owed $134 million to the QIs. Cordell received the full statement on November 27, 2006 and received the first two pages of the statement at the April 20, 2007 closing.[4] Defendants did not generate the statement; the $134 million number came from Fields, Okun's CFO. Okun, Defendants and Cordell all relied on this number. While Dashiell's March 30, 2007 email refers to $175 million in liability against $2.3 million in flexible cash, there is no proof of what funds were held in segregated accounts and no proof that such was an accurate representation of the amounts due as of March 30. Although Penta arrived at an obligation of $160 million, Penta also concluded that the hole - or gap in assets available to meet it - was $114 million. Indeed, the amount due from Okun to the QIs as of mid-2007 is the schedule to the United States' filings in the Okun criminal case. That amount totaled roughly $128 million. Cordell has not offered any competent evidence that Okun owed more than $134 million on November 27, 2006 or on April 20, 2007, the dates when the financial statement was provided to it.

### 2.    Failure to Disclose Legal Consequences of Known Facts is not Fraudulent

Cordell also claims that it was defrauded because no one disclosed 1) that Okun's transfers from the 1031 Tax Group constituted a crime or fraud; and 2) that Okun did not own the

---

[4] The document Cordell received at closing consisted of the first two pages of the financial statement. The first two pages of the statement reference Schedule H and include the same total liability as did not November 27, 2006 statement. (Response, p. 7.)

property listed on his financial statement because he had stolen the funds to purchase the

properties.  Each of these claims is fundamentally an allegation that Cordell was defrauded

because it did not know the legal consequences of certain facts.

Cordell was not defrauded by Okun or KPKB's failure to tell it that Okun's conduct in

borrowing from the QIs was illegal and fraudulent.  Neither Okun nor anyone else told Cordell

anything about the legal consequences of these transfers because 1) Cordell never asked; and 2)

Cordell had its own highly competent lawyers in connection with the loans and apparently never

asked them for advice on the subject.  It is axiomatic that "every person is presumed to know

what the law forbids."  *United States v. Paradies*, 98 F.3d 1266, 1285 (11th Cir. 1996) (quotation

omitted).  Cordell's claim that it was defrauded because it was not told that Okun's conduct was

illegal is similar to *L & L Doc's, L.L.C. v. Florida Div. of Alcoholic Beverages & Tobacco*, 882

So. 2d 512, 515-16 (Fla. 4th DCA 2004), in which the court affirmed summary judgment against

a buyer of a slot machine business who alleged that he believed the slot machine business was

legal because it was open and discussed and because no one told him it was illegal:

> [D]uring the negotiations for the sale of the business. . . [Buyer]
> asserted that . . . he was unaware that gambling is illegal in the
> state of Florida .... [Seller] signed a Business Owner's No Lien
> Affidavit . . . in which he affirmatively represented to the buyers
> that he knew 'of no violations of municipal, county or state laws
> and ordinances pertaining to the above-described property, or in
> the use and occupancy thereof, or in the leased premises' and had
> 'complied with all laws, rules and regulations imposed by
> government or otherwise relating to the assets transferred to
> Buyer....'
> * * * *
>
> Without admitting that there was a misrepresentation, seller argues
> that, in any event, the buyers were not justified in relying upon a

12

> misrepresentation which they knew or should have known, with the
> exercise of some diligence, was false.  We agree.  Buyers'
> ignorance of the law is not excused simply because they are not
> from this country.  *See generally State v. Beasley,* 580 So.2d 139,
> 142 (Fla.1991) ("As to notice, publication in the Laws of Florida or
> the Florida Statutes gives all citizens constructive notice of the
> consequences of their actions"); *see also Davis v. Strople*, 158 Fla.
> 614, 29 So.2d 364 (1947) (ignorance of the law is no excuse).

*L & L Doc's, L.L.C. v. Florida Div. of Alcoholic Beverages & Tobacco*, 882 So.2d 512, 515-16

(Fla. 4th DCA 2004).  Cordell has not asserted that anyone told it that Okun's use of QI funds for

his own purposes was legal.

Cordell also claims that the fact that the obligation was listed under notes and accounts

payable and not described as stolen money was a misrepresentation.  The question of the

characterization of the debt is a legal argument and is not the basis for a fraud claim.

Furthermore, the financial form, which Defendants did not prepare, does not provide for

characterization of the amounts as "stolen."  Okun retained a CPA to prepare the statement, and

all persons involved in this action relied on it.

As to potential claims against the assets listed in the statement, no one had made such

claims at the time of closing.  The potential for future claims against the assets was not raised

until May 20, 2007, one month after closing.  Cordell asserts that QI liability could be trebled

under civil theft statutes, but no one on Okun's staff or at KPKB had recognized the potential for

trebling, and no QI customer had been harmed at that point.  Non-disclosure of the legal

consequences of known facts is not fraud.

### 3.    No False Statements in Opinion Letter or Borrower's Affidavit

Cordell has also asserted that the KPKB opinion letter and the borrower's affidavit signed

by Okun were false.  Cordell has failed to identify a single false statement in those documents, however.  What it seems to rely on is an omission -- the failure to make any statements about Okun's QI businesses.  The opinion letter and borrower's affidavit only make representations about Okun's ability to sign the documents and the lack of pending or threatened claims against him or the collateral for the loan.  Neither the opinion letter nor the borrower's affidavit can form the basis for a fraud claim.

### 4.    Cordell was aware of the material facts.

To the extent that Cordell claims that there were misrepresentations or, more correctly, omissions about legal matters such as ownership of or claims with regard to the assets in the loan documents, these theories, even if true, cannot support a fraud claim.  Cordell knew that Okun owned several QI companies and owed them $134 million.  At the time it made the loan, Cordell knew that Okun could not pay one or more of the QI customers and that Okun was overdue on a separate $192,000 loan payment due to Cordell.  Cordell was fully aware that Okun was looking for a $200-250 million loan.  Cordell never sought a cash flow projection for Okun's needs, either short or long term.  Cordell knew that the financial statement it relied on was originally sent in November 2006.  Cordell knew via Kominsky that Okun had a cash flow problem.  Cordell loaned Okun $7 million dollars not knowing if he would need another $7 million dollars or $15 million dollars the next day, the next week or whenever or if or how he would pay Cordell, the QI customers, or other creditors.  The loan carried an 18% interest rate, the highest interest rate a loan may carry without being usurious under Florida law.  Fl. Stat. § 687.03 (setting 18% as Florida's usury rate).

Neither Okun nor KPKB were obligated to inform Cordell that Okun had engaged in illegal or unlawful activity because "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose." *See TransPetrol, Ltd. v. Redulovic*, 764 So.2d 878, 879 (Fla. 4th DCA 2000) (citing *Don Slack Ins., Inc. v. Fidelity & Cas. Co. of N.Y.*, 385 So.2d 1061 (Fla. 5th DCA 1980)). "[S]uch duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." *Id.* (quoting *State v. Mark Marks, P.A.*, 654 So.2d 1184, 1189 (Fla. 4th DCA 1995), *approved by,* 698 So.2d 533 (Fla.1997)). There is no confidential, contractual, or fiduciary relationship between Cordell and the Defendants.

Each of Cordell's legal theories require proof that Cordell was defrauded into making the loan. Cordell has failed to present any evidence indicating that it was defrauded with regard to the April 2007 loan, however. Therefore, both the aiding and abetting claim and the conspiracy claim fail as a matter of law. On this basis alone, even without addressing the remaining elements of the claims or the claims as to any individual Defendant, summary judgment for each Defendant is appropriate.

**2. Silverman and Kaplan did not know of any intent to obtain loans by fraud.**

It is undisputed that both Silverman and Kaplan knew that Okun had taken money from the QIs prior to November 2006 and that such was likely a civil wrong. Cordell has not adduced any competent proof that Kaplan or Silverman knew that Okun intended to obtain loans by use of false financial statements, however. Indeed, by the time Defendants were retained, Okun had prepared corrected financial statements as he had been advised to do by prior lawyers. Cordell has also failed to produce any evidence that Silverman or Kaplan knew that loans were being

15

sought to prevent the scheme from collapsing.  Kaplan and Silverman told Okun that Okun must

cease using QI funds for non-QI purposes.  Kaplan and Silverman  were informed he would stop.

They were entitled under the law to believe their client.  *In re Cascade Intn'l Secs.*, 840 F.Supp.

1558, 1564-65 (S.D. Fla. 1993) ("The Court will not go so far as to require law firms to fully

investigate their clients at any hint that they may be conducting fraudulent activities, and then to

punish the law firms if they do not do so.  Otherwise, the law firms would be charged with a duty

to the public at large to 'tattle' on their clients.").

To the extent that there was any awareness of fraud against QI customers, knowledge of

the fraud against the QI customers is not enough to establish liability to Cordell.  *Kirschner v.*

*Bennett*, 648 F.Supp.2d 525, 544 (S.D.N.Y. 2009) (holding that facts must demonstrate that the

defendants had actual knowledge of wrongful conduct that harmed the specific customers, not

actual knowledge of different wrongful conduct that might have harmed others.  Arguments of "a

strong inference that [the defendants were] aware of the magnitude of the RGHI [r]eceivable[s]"

or that "Refco lacked the financial health it presented to the outside world," are insufficient to

support aiding and abetting claims against *these* defendants in *this* action.").  Cordell's claims

fail because there is no basis in this record for a finding that Kaplan or Silverman knew that

Okun intended to obtain a loan through fraud or that they agreed with him that he should do so.

### 3.    Silverman and Kaplan provided no assistance in the alleged fraud.

Even if Cordell could prove that there was a fraud by Okun in connection with the loan or

that Cordell was a victim of the QI fraud, Cordell's claims fail because Cordell cannot point to a

single act by either Silverman or Kaplan that substantially assisted or was overtly in furtherance

16

of Okun's fraud.

Cordell alleges that Silverman and Kaplan were told by Okun that he intended to obtain loans by use of false financial statements or to obtain another QI and strip it of cash. Okun's CFO revised the financial statement to meet the concerns raised and Okun told Silverman in Kaplan's presence that he understood and would comply with the advice not to use any QI funds for non-QI purposes. Again, the lawyers were legally entitled to believe their client. Neither Kaplan nor Silverman attended the closing. No Defendant prepared the financial statement; indeed, all individuals involved in this action relied on the statement prepared by Okun's accountant.

Cordell repeatedly argues that KPKB was required to withdraw if Okun did not disclose his wrongdoing to QI customers. Rules 4-1.16(a)(4) and (5) of the Florida Rules of Professional Conduct only require withdrawal under these circumstances if the lawyer's services were used to commit the crime or fraud, however. Because KPKB was newly retained, it could go forward without requiring Okun to make disclosure of misconduct that occurred earlier and without KPKB's involvement.

Even if, as Cordell maintains, Kaplan advised Okun to obtain the loan from Cordell, Kaplan believed Okun when Okun said that Okun would not take any more QI money and would repay same. Kaplan was entitled under the law to do so. As Kaplan was unaware of fraud in connection with the loan, he had no reason to intervene. Even if there were fraud, mere knowledge absent cooperation "is not enough to constitute one a party to a conspiracy." *United*

*States v. Mendez*, 496 F.2d 128, 130 (5th Cir. 1974).[5]  "In order to fasten guilt on one accused of

being a co-conspirator it is necessary to prove that he actively participated in the conspiracy

charged."  *Id.*

      Cordell argues that the lawyers had a duty to disclose Okun's wrongdoing if they had a

"high conscious intent" to commit fraud.  "When no duty of disclosure is alleged, an alleged

aider-abettor may be found liable only if scienter of the high 'conscious intent' variety can be

shown."  *Lancer Offshore, Inc. v. Citco Grp.*, No. 05-60080-Civ, 2008 WL 926513, at *6 (S.D.

Fla. Mar. 31, 2008).  Kaplan had no duty to Cordell because Kaplan made no statements

whatsoever to Cordell and did not know what statements were made.

      Cordell's reliance on Dale Bergman's ("Bergman") belief that Bergman was kept in the

dark is a red herring.  Bergman's belief that he was kept in the dark neither makes it true nor

supports a claim that Kaplan assisted in or conspired to defraud Cordell.  Cordell's claim that

Howard Berlin's ("Berlin") request for information in May 2007 demonstrates that he was kept

in the dark as well is also a red herring.  Berlin made his inquiry after the loan closed.

      Silverman's links to the April 2007 loan are even more tenuous.  Cordell alleges that it

was Kaplan, not Silverman, who advised Okun to obtain the loan from Cordell.  Cordell does not

point to any record evidence that indicates that Silverman worked on the loan in question.  Any

work that Silverman performed on a previous Cordell loan is not at issue here.  Merely meeting

with Abbott or Kaplan to discuss Okun matters does not lead to an inference that Silverman

---

[5] Decisions of the United States Court of Appeals for the Fifth Circuit issued prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981)

18

defrauded Cordell with respect to the April 2007 loan.  A jury may not reasonably infer that

Abbott or Kaplan discussed the Dashiell email with Silverman, nor does Silverman's meeting

with Pajonas mean that Silverman defrauded Cordell with regard to the April 2007 loan.

### IV.    CONCLUSION

THE COURT, being fully advised and having considered the pertinent portions of the

record, hereby

ORDERS AND ADJUDGES that Kaplan, Silverman and Abbott's motion for summary

judgment, which arguments KPKB has adopted, filed July 17, 2015 **[DE 592]**, is GRANTED.

Final judgment shall be entered by separate order.

DONE AND ORDERED at Chambers in West Palm Beach, Florida, this 9th day of

November, 2015.


S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE