UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CV-80416-KLR

CORDELL CONSULTANT, INC. MONEY
PURCHASE PLAN AND TRUST, a
Virginia Corporation,

      Plaintiff,

v.

ELIOT C. ABBOTT, et al.

      Defendants.

_____/

**DEFENDANT KAPLAN AND SILVERMAN'S RENEWAL AND
SUPPLEMENTATION OF MOTIONS AT D.E. 96, 161 FOR SANCTIONS
PURSUANT TO RULE 11, 28 U.S.C. § 1927, AND INHERENT AUTHORITY**

*Rule 11 Motion originally filed at D.E. 96, response at D.E. 136 and reply at D.E. 153.*

*See also D.E. 143, 145, 146, 152, 154, 155, 157, 158, 160, 169, 170.*

*§ 1927 Motion originally filed at D.E. 161, response at D.E. 171 and reply at D.E. 177.*

*The arguments in those pleadings are not repeated, but are incorporated herein.*

Richard H. Critchlow, Esq. (FL Bar #155227)
Deborah S. Corbishley, Esq. (FL Bar #588229)
KENNY NACHWALTER, P.A.
201 South Biscayne Blvd., Suite 1100
Miami, Florida 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
rcritchlow@knpa.com
dcorbishley@knpa.com

***C**ounsel for Defendant Abbey L. Kaplan*

Edward R. Shohat, Esq. (FL Bar #152634)
JONES WALKER
201 South Biscayne Blvd., Suite 2600
Miami, Florida 33131
Telephone 305.679.5700
Facsimile 305.679.5710
eshohat@joneswalker.com

***Counsel for Defendant Steve I. Silverman***

Dated:    November 23, 2015

In April 2011, Plaintiff Cordell and its counsel embarked on an expensive litigation campaign, claiming Cordell had been defrauded when it made a loan to Edward Okun in April 2007, and that Defendants Abbey Kaplan and Steve Silverman had conspired in or aided and abetted that fraud.  After extensive motion practice, endless contested discovery proceedings, more than thirty deposition sessions, and the production of expert reports, Cordell was unable to support any of the material allegations of its pleadings.  On November 9, 2015, the Court entered summary judgment against Plaintiff, finding that Plaintiff presented no admissible evidence that it was, in fact, defrauded or that these two individuals knew of, conspired to, aided, or furthered any alleged fraud.  D.E. 787.  In short, not one of the essential elements of Plaintiff's claims was supported by evidence.

Because there was no basis for the allegations at the time they were brought, and because Plaintiff's counsel -- and indeed Plaintiff -- engaged in bad faith conduct throughout the costly litigation of the issues, Defendants Abbey Kaplan and Steve Silverman are entitled to Rule 11 sanctions against counsel and client as well as 28 U.S.C. § 1927 sanctions against counsel.[1] Immediately after suit was filed in 2011, Defendants' counsel sent a detailed letter to Plaintiff's counsel, pointing out the problems with the claims and suggesting sources of investigation that would demonstrate that the claims were without basis.  D.E. 96-1.  On June 14, 2011, the undersigned wrote:

> You are invited to fulfill your obligations to the Court and your client by making a further investigation of the facts and law before our clients are required to incur much more expense to address the unfounded claims.

---

[1] The amount of the sanctions should be determined after entitlement is decided.  It is Defendants' position that they are entitled to attorneys' fees, ESI discovery and maintenance costs, expert witness fees, and all other costs and fees associated with the defense of this matter.  All conduct in the litigation flowed from Cordell and its counsel's willingness to pursue a baseless claim, without regard to the effect on Defendants.  In addition, Cordell insisted on additional depositions on side issues, scheduled depositions so that they could not be concluded in one sitting, refused to present the corporate representative for deposition without hearings, and delayed and then misrepresented in discovery responses.  Cordell repeatedly made false, fantastic or unfounded claims and arguments, which Defendants attempted to halt. Cordell relied on its own reckless "investigation" notes to withstand sanctions on individual issues, but the pattern of recklessness (at best) entitles Defendants to relief on a holistic basis.

All proceedings in the case were a result of the Rule 11 violation, as without that violation no proceedings would have occurred.  The refusal to back down from any position or to provide reasonable responses to discovery in a timely fashion, coupled with the moving to compel costly additional ESI searches and production (which was denied) was also vexatious.

D.E. 96-1 at 2.

[A] review of the pleadings in the California Class Action will alert you to the need to investigate your client's actual knowledge that Edward Okun and his 1031 entities were borrowing money from your client in order to fund 1031 exchanges because they had already used the funds from the 1031 clients for other purposes. With such knowledge or even notice that such facts existed, your clients could not reasonably rely on any failure to disclose by the law firm when it was not asked to opine on the issues.

*Id.* at 3.

On November 11, 2011, Defendants served, but did not file, their Rule 11 motion. At the time that the Court dismissed the Amended Complaint, Defendants filed their previously served Rule 11 motion, D.E. 96,[2] and after dismissal of the Second Amended Complaint, they filed a motion for sanctions pursuant to 28 U.S.C. § 1927. D.E. 161.[3] On Plaintiff's appeal from the dismissal, the Eleventh Circuit remanded the case on legal grounds and on the assumption that the allegations of the Second Amended Complaint were true.[4] Plaintiff and its counsel continued to advocate for the positions in the Amended Complaint, expanding them in the Second Amended Complaint, and causing Defendants to incur substantial costs for motion practice, discovery, depositions, investigation, travel, document production, and experts through summary judgment. Thus, the original motion for Rule 11 sanctions is still viable.

After remand and the conclusion of discovery, the Defendants were granted summary and final judgment. When it entered final judgment, the Court dismissed the earlier sanctions motions as moot, but noted that Defendants could refile them if warranted. D.E. 788 at 2. Defendants renew those motions as originally filed, rely on and incorporate the prior briefing,

---

[2] Plaintiff responded at D.E. 136 and Defendants replied at D.E. 153. In addition there was litigation over the failure to produce emails referenced in Mr. Rodriguez' declaration. D.E. 143, 145, 146. The Court struck Mr. Rodriguez' declaration at D.E. 147, and Plaintiff asked to file a new declaration, which was granted. D.E. 152, 154, 155, 157, 158. Defendants responded to the late filed declaration at D.E. 160. Plaintiff filed further support at D.E. 169 and 170. **No emails copying Kaplan or Silverman as well as Rodriguez were ever produced or located**.

[3] Plaintiff responded at D.E. 171, and Defendants replied at D.E. 177.

[4] Astonishingly, Cordell's counsel argued that law of the case precluded Defendants from contesting factual statements in the Eleventh Circuit's Opinion reversing a ruling on a motion to dismiss! Cordell specifically argued that law of the case established that the allegation that Okun did not own the assets on his financial statement and that Defendants could not contest this "fact." Most importantly, Cordell argued that it did not have to prove that Okun did not own those assets. *See* D.E. 676.

and supplement them with this filing.  Defendants will attempt to limit this supplement to events after the briefing closed.  The number of false statements, unfounded assertions, and vexatious proceedings in this case are so numerous, that it is hard to separate them into categories or even to address them in a memorandum.  Regrettably, Defendants have exhaustively and expensively briefed almost all of these issues in addressing summary judgment or discovery issues.  Therefore, Defendants will also rely on and incorporate by reference prior motion practice, as identified in this document.

In order to make clear what unsupported statements and inferences were made by Plaintiff, Defendants rely on the textual analysis in the appendices prepared in connection with summary judgment and the motion to limit speculation.  Defendants attach the following documents, highlighted and sparingly annotated, to indicate the statements that were not supported by evidence, the misstatements of documents and testimony, the unwarranted leaps of fantasy, and the wild goose chases that Defendants were sent on.  The details of why statements in items 1, 2, and 3 were baseless are addressed with support in item 4 and in analysis in item 5.

1. Amended Complaint D.E. 27
2. Second Amended Complaint D.E. 97
3. Amended Responses to Interrogatories, D.E. 393-3
4. Compilation of Defendants' Statement of Material Facts, Plaintiff's Responses and Defendants' reply, D.E. 670[5]
5. Appendix to Reply in Support of Defendants' Motion to Limit Improper Speculation, D.E. 714.[6]

Defendant tried time and again to discover the bases of Plaintiff's claims, as their own knowledge and documents did not support the claims.  Each effort was met with stonewalling. At no point would Plaintiff agree to drop contentions and issues from the case.  The responses to interrogatories sought the basis for the essential allegations of Plaintiff's Second Amended Complaint.  They were apparently compiled by Plaintiff's counsel, but reviewed and endorsed by

---

[5] In ruling on the summary judgment motions, the Court indicated that it would not consider the analysis in the appendix.  At this point, Defendants ask that the analysis be considered as it identifies the inaccuracies and impropriety of the responses Plaintiff made to Defendants' Statement of Facts.  The documents cited by both Defendants and Plaintiff in connection with the disputed facts are filed as exhibits to D.E. 670.

[6] The Court struck as unnecessary and premature the motion that this appendix related to. Defendants ask that the appendix and its explanation of the impropriety of Plaintiff's asserted "events" and "inferences" be considered.

Plaintiff's representative.   D.E. 393-2 at 282, 302-04.   Plaintiff's Rule 30(b)(6) witness, as discussed below, presented obstructive responses and behaviors at deposition.   Plaintiff's responses to requests for production indicated an intransigent approach to issues.   *See* Exhibits 6 and 7.   The two compiled appendices and analysis attached as Exhibits 4 and 6 most clearly delineate the bad faith efforts Plaintiff's counsel engaged in to pretend that there was a basis for the case he brought on behalf of Cordell.   Defendants seek fees and costs associated with all discovery in this case, as well as motion practice.   Attached as Exhibit 8 is an excerpt of the docket which includes the filings that Defendants contend were vexatious or required because of vexatious conduct by Plaintiff's counsel.[7]   All flowed from the violation of Rule 11.

Because the problems in the case overlap and support both the Rule 11 and § 1927 motion, this memo will address the facts and law for both motions together. As noted above, however, this memorandum supplements and does not replace the original motions and briefing.

### Bases and Standards for Sanctions

Rule 11 sanctions are properly assessed when a party files a pleading that has no reasonable factual basis, that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law, or that stems from bad faith or an improper purpose.   *Massengale v. Ray,* 267 F.3d 1298, 1301 (11th Cir. 2001) (per curiam).   Bad faith is an objective standard that is met if the party's conduct was ***objectively reckless*** or **outside of the bounds of acceptable conduct**.   *Amlong & Amlong, P.A. v. Denny's, Inc.,* 500 F.3d 1230, 1241 (11th Cir.2007) (addressing § 1927) (emphasis added).

Under 28 U.S.C. §1927, "any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Counsel's conduct must be "tantamount to bad faith."   *Avigran v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991). To satisfy §1927, the movant must show the culpable attorney engaged in unreasonable and vexatious conduct that multiplied the proceedings, and the amount of the sanction must bear a financial nexus to the excess proceedings. *Peterson v. BMI Refractories,* 124 F.3d 1386, 1396

---

[7] The deposition sessions and hard costs are detailed in invoices filed as exhibits to the Bill of Costs and Memorandum in Support of Bill of Costs, being filed simultaneously.  Not all costs of the depositions may be recoverable as taxable costs, and Defendants ask that those not taxable be recovered as sanctions.

(11th Cir.1997). A lawyer who pursues a case after remand, knowing there is no basis for the factual allegations is subject to sanctions for vexatious litigation. *Young Apartments Inc. v. Town of Jupiter*, 503 Fed. Appx. 711, 725-26 (11th Cir. 2013). *See also Cook-Benjamin v. MHM Correctional Svcs.*, 571 Fed. Appx., 944 (11th Cir. 2014)(refusal to drop baseless claims warrants sanctions). A finding of bad faith turns on objective conduct, not the lawyer's belief and subjective intent. *Amlong*, 500 F.3d at 1239. The purpose of Sec. 1927 is to penalize lawyers whose conduct is egregious. *Peer v. Lewis*, 606 F.3d 1306, 1313 (11th Cir. 2010).

The Court's inherent authority also provides a basis for an award of fees. To assess fees under its inherent authority, the court must find a party has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal quotation marks and citations omitted). "The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998) (citation omitted). Bad faith is shown "where an attorney knowingly or recklessly raises a frivolous argument . . ." *Id.*

### Counsel Responsibility

Mr. Yarnell signed the Complaint and Amended Complaint. D.E. 1, 27. Mr. Gilbert signed the Second Amended Complaint. D.E. 97. However, the Second Amended Complaint is merely an expansion of the allegations and theories of the Amended Complaint, and thus Mr. Gilbert is liable, under the plain language of Rule 11, for sanctions for advocating the allegations of the Amended Complaint in the further amendment. Furthermore, Mr. Yarnell continued to advocate for the allegations in defending the motions to dismiss. D.E. 119. Sanctions may be awarded against an attorney who "did not file the original complaint ... [but] has repeatedly advocated [Appellants'] complaint, as originally filed. . . . and "had numerous opportunities to dismiss" . . . yet . . . refused to do so. The fact that another attorney originally filed the action, then, does not defeat the imposition of sanctions." *Duncan v. Citimortgage, Inc.,* No. 14-10625, 2015 WL 3718963, at *3 (11th Cir. June 16, 2015).

In connection with the original Rule 11 motion, Both Gilbert and Yarnell affirmed, subject to the penalties of perjury, that they made a reasonable investigation before filing suit. D.E. 136-2 (Declaration of Gilbert; Affirmed by Yarnell) *See also* D.E. 136, 169-71 (filings in opposition to Rule 11, signed by Yarnell). Both participated in discovery on the factual allegations, with Mr. Gilbert taking most of the depositions and Mr. Yarnell demanding most of

the written and document discovery and pursuing motion practice.  Mr. Gilbert advocated for the claims in discovery hearings.  Most of the Court filings until May 4, 2015 are signed by Mr. Yarnell.  It appears that Mr. Gilbert prepared Mr. Rodriguez to testify as Cordell's 30(b)(6) witness on May 31, 2015, but it is not clear who prepared him – if anyone did – for his February 2015 sessions. Defendants do not know who prepared the interrogatory answers.  The summary judgment filings were signed by a young lawyer under Mr. Gilbert's supervision and one assumes at his instruction.  Mr. Gilbert argued the summary judgment motions**.**

<u>**Court's Finding of No Basis For Allegations**</u>

In granting summary judgment, the Court found that there was no competent evidence to support ***even one*** of the essential and critical elements of Cordell's claims:

> Cordell has not offered any competent evidence that Okun owed more than $134 million on November 27, 2006 or on April 20, 2007, the dates when the financial statement was provided to it.

Summary Judgment Order, D.E. 787 at 10.

> Cordell has not adduced any competent proof that Kaplan or Silverman knew that Okun intended to obtain loans by use of false financial statements, however. Indeed, by the time Defendants were retained, Okun had prepared corrected financial statements as he had been advised to do by prior lawyers. Cordell has also failed to produce any evidence that Silverman or Kaplan knew that loans were being sought to prevent the scheme from collapsing. Kaplan and Silverman told Okun that Okun must cease using QI funds for non-QI purposes. Kaplan and Silverman were informed he would stop. They were entitled under the law to believe their client.

Summary Judgment Order, D.E. 787 at 14-15.

> Even if Cordell could prove that there was a fraud by Okun in connection with the loan or that Cordell was a victim of the QI fraud, Cordell's claims fail because Cordell cannot point to a single act by either Silverman or Kaplan that substantially assisted or was overtly in furtherance of Okun's fraud.

Summary Judgment Order, D.E. 787 at 15-16.

<u>**Argument**</u>

Cordell was required to have a basis for these assertions at the time it filed the Complaint, Amended Complaint and Second Amended Complaint.  Fed.R. Civ. P 11.  Because they failed to undertake an adequate pre-filing  investigation and refused to accept what they learned in discovery and drop the claims, Cordell and its counsel are liable to Abbey Kaplan and Steve

6

Silverman pursuant to Rule 11 and § 1927. Cordell has vigorously pursued this litigation, with excessive depositions and proceedings demanding that it be permitted to take double the presumed limit under Rule 26 and demanding that the proceedings take place in Palm Beach even though Plaintiff's counsel had falsely claimed that the causes of action accrued in Palm Beach. Routinely, Plaintiff's deposition representative and counsel have either intentionally or recklessly misrepresented the contents of documents and obscured dates in an effort to keep the case alive to get to a jury.

These uninsured Defendants have incurred more than $1.8 million in fees and costs in defense of the baseless claims. Cordell and its counsel are liable to repay most, if not all, of that, because there was no reasonable basis for the factual claims them and the litigation was conducted with a reckless disregard for the truth or the cost.

***Lack of Reasonable Investigation***

Cordell filed a Complaint [D.E. 1], an Amended Complaint [D.E. 27] and Second Amended Complaint [D.E. 97] which proved to have no factual basis in support of any of the material allegations. When they first presented the Rule 11 motion, Defendants did not have copies of Cordell's documents or the information Cordell received in discovery in *Hunter v. Citibank*, to which Cordell was a party. Therefore, the original argument on the failure of Plaintiff's investigation is supplemented by this section.

In response to the Rule 11 motion filed in 2012, Cordell detailed what it reviewed and relied on to support its suit in D.E. 136-2. Now that Defendants have had access to what Cordell should have reviewed, the failure of the pre-suit investigation is glaringly apparent.

Cordell and its counsel failed to review

1) Cordell's own files, as produced in prior litigation,[8]

2) Robin Rodriguez' computer,[9]

3) Prior statements given by Cordell's agents Rodriguez and Bloemers,[10] or

---

[8] Defendants had to move to compel production of these records. D.E. 218. When produced in November 2014, they contained the Okun financial statements, the April 20, 2007 loan documents, April 2006 material written by Robin Rodriguez about the QI contracts, the November 2006 correspondence regarding the QI debt, and the May 2006 pledge of QI interests.

[9] Which produced the February 2007 email by which Cordell's agent recirculated the November 27, 2006 email and financial statement. That financial statement showed $134 million in QI obligations in the name of IPofA, guaranteed by Okun.

4) Cordell's transactional counsel's files for the loan at issue or any other loan.[11]

Had they done so, it would have been clear that Cordell actually knew the essential facts which it complained were not disclosed.  Pre-filing, it would have been obvious that Cordell was not defrauded as a matter of fact and law. It would also have been clear that Messrs. Kaplan and Silverman were not copied on any emails or communications relating to the loan.

From Mr. Gilbert's declaration at D.E. 136-2, it is clear that none of these sources were investigated, as they were not listed when he detailed the materials he and Mr. Yarnell reviewed. Indeed, these materials were also not listed in the Initial Disclosures required by Rule 26.  D.E. 29.[12]  Had Cordell's counsel also investigated the law after investigating the facts, it would have been clear that Cordell could not claim the financial statement and loan documents were false, when it knew the facts but failed to draw the legal conclusions from those facts.

In the loan transaction at issue, Plaintiff retained two law firms and three active lawyers. Plaintiff's counsel spoke to none of the lawyers who actually worked on the deal.  Instead, he spoke to only Glen Stankee, who was not the lead lawyer on the transaction.  Plaintiff did not interview Jim Soble, Joseph McNabb,[13] or John Griffin[14], the lawyers who actually worked on the loan for Plaintiff.  None of these lawyers interacted with Kaplan or Silverman on any Cordell transaction, although Plaintiff claimed otherwise. Exhibit 3 at 3; *see also* D.E. 376.

---

[10] In which Rodriguez admitted (among other things) to drafting a statement about QIs holding customer money in segregated escrow accounts and  to knowing that Okun could not pay to close a QI transaction and that was why he needed the April loan.  And in which Bloemers, Cordell's agent, admitted to investigating the QIs.

[11] In which was clear Cordell told its lawyers that Okun used QI money to buy property and that he could face liability for multiples of the money he owed if he could not close the QI transaction on schedule.

[12] Defendant Silverman served a Request for Production in June 2014.  Plaintiff did not produce its own files until November 2014, after motions to compel.  D.E. 218.  At that time, Defendants renewed the complaint that there was no basis for the allegations made by Cordell, because it had not produced any supporting records.

[13] As late as May 15, 2015, Cordell's counsel could not identify the correct Joe McNabb on its witness list.  D.E. 443 at 8.  The man who is listed had died some time earlier and the correct McNabb was in California.

[14] Indeed, Plaintiff never added Mr. Griffin to its disclosures or witness list until after the deadline for the list. The Court refused to allow the addition.  D.E. 565.

At some unknown point, Plaintiff asked for but did not follow up to review the files at the Zobrist firm, where Griffin worked.[15]  When those outside counsel files were finally produced late in May 2015 (in response to Defendants' subpoena), it was clear that Kaplan and Silverman were never copied on any loan documents, negotiations or drafts, although Plaintiff claimed otherwise.[16]  Plaintiff apparently never asked for the files at Ruden McCloskey prior to filing, and those files were destroyed during the pendency of this case during Ruden's bankruptcy.[17]

While Mr. Gilbert has sworn that Mr. Stankee told him that Abbey Kaplan called about the loan, Mr. Stankee unequivocally denies that he told Mr. Gilbert that. 4/23/15 Hearing at 28, D.E. 434.  Indeed, when the Zobrist files were finally produced, the only communication from Mr. Stankee shows that he was expecting to hear from Eliot Abbott. D.E. 670-19 at 3-5.  There was another Kaplan working on the loan, a Robert Kaplan from the Virginia firm Gregory Kaplan. Although that was communicated to Plaintiff's counsel, he refused to withdraw the claim that the communications were with Mr. Abbey Kaplan.   Mr. Gilbert recklessly accused Abbey Kaplan of intentional misconduct.[18]

Plaintiff's counsel also misrepresented – subject to the penalties of perjury in this instance -- what documents showed in the early investigation:

> We also relied upon copies of billing invoices which showed a consistent pattern of Kaplan and Silverman billing Okun for time expended in connection with various Cordell transactions.

Declaration of Gilbert, affirmed by Yarnell, D.E. 136-2 at 15-16.  The billing invoices do not show *ANY*, much less consistent, time entries by Kaplan or Silverman in connection with

---

[15] Rodriguez did testify that he had a copy of the files in February 2015. D.E. 393-1 at 182-83. It was never produced. Later, counsel denied that the words meant what they objectively conveyed.

[16] Defendants represented that they were not so copied, and Plaintiff's counsel asserted that this representation could not be trusted.  D.E. 145 at 2.

[17] Which failure is sanctionable *Pesaplastic, C.A. v. Cinn. Milacron Co*., 799 F.2d 1510 (11th Cir. 1986).

[18] Mr. Gilbert also asserted that Debra Sturmer, who represented the Silicon Valley Law Group, told him that Kaplan and Silverman were involved in the negotiations for the 1031 Advance purchase.  Ms. Sturmer denies that, as she had no documents from which she could have drawn the conclusion.  She did find documents from the Kluger Peretz Kaplan & Berlin law firm in the files of SVLG, but none copied to Kaplan or Silverman. There is no reference to Silverman or Kaplan in any SVLG materials nor did the two SVLG lawyers interact with them.

Cordell transactions. Indeed, in response to the statement of undisputed facts, ***Cordell admitted that Kaplan and Silverman did not bill any time on the loan.***  D.E. 670, ¶ 116.[19]

Furthermore, Cordell failed to investigate the claim that Okun's financial statement understated his liability to the QI companies.  Cordell repeatedly argued that the amount the QI companies owed customers was the amount Okun owed the QIs, although that was clearly wrong. Cordell never considered or investigated how much cash the QIs had in segregated accounts to meet the QI liabilities.  *See generally* D.E. 670 at Para.¶¶ 5-20. Cordell and its counsel were clearly aware before filing that segregated accounts existed, because Cordell alleged the role of Dale Bergman in efforts to release those accounts. D.E. 97 ¶90-92. Cordell had access to the Okun criminal trial docket, where details of the losses are contained as of late 2009.   D.E. 276 - 328, *U.S. v. Okun*, Docket No. 3:13-cv-00230-REP (E.D. Va.). Cordell repeatedly and incorrectly claimed that Okun took over $150 million, not the $134 million that was disclosed on the financial statement.  Cordell never obtained an accounting report, an expert opinion, or a statement of the actual amount Okun owed to the QIs as of November 27, 2006 or April 20, 2007.  Thus, it never developed admissible evidence that Okun owed more than was actually disclosed to Cordell on the financial statement. Clearly, it had no basis for the allegation that it was defrauded because the financial statement vastly understated Okun's liabilities or the assertion that Okun borrowed more than $150,000,000.

Finally, Cordell had no basis whatsoever to allege that Kaplan and Silverman advised Okun to borrow from Cordell, supervised and reviewed the loan documents, assisted Okun to prepare and disseminate a false financial statement, participated in loan negotiations, or otherwise conspired to or aided and abetted Okun to defraud Cordell in obtaining the April 20, 2007 loan, although it repeatedly alleged, testified, and signed interrogatory answers asserting or arguing that these were factual. Had Cordell obtained its own counsel's files, it would have been clear that Kaplan and Silverman were not, despite Cordell's allegations and testimony, copied on the loan negotiations or drafts.  Had Cordell and its counsel spoken to the lawyers who actually handled the loan for Cordell, it would have been clear they never spoke to, emailed to, or negotiated with Kaplan or Silverman, all contrary to Cordell's allegations and testimony.

---

[19] Cordell never cited any time billed by Kaplan or Silverman for work connected to a Cordell transaction.

Cordell alleged and argued that Kaplan and Silverman specifically advised Okun to take this loan from Cordell.  This was a central theory of the case in Cordell's pleadings and argued to and specifically relied on by the Eleventh Circuit.  This was a patently false allegation, and in its summary judgment papers in **AUGUST 2015** *Cordell finally admitted that Silverman and Kaplan never even spoke to Okun or his staff about the loan.*  D.E. 670¶ 114. Obviously, they did not advise him to borrow from Cordell, if they never spoke to him about the loan.

While Cordell claimed that it obtained information about Kaplan and Silverman's role from Okun, Cordell never produced Mr. Okun's statement or testimony.  On June 12, 2014, without opposition from Defendants' counsel, Plaintiff was granted leave to depose Okun in prison. D.E. 192.  Again, on April 7, 2015, Plaintiff was advised that the Okun deposition would still be permitted despite the fact that Plaintiff had already taken 10 depositions.  4/7/15 transcript at 124, D.E. 405.   Discovery closed on June 19, 2015, and Plaintiff never scheduled that deposition.   Indeed, Plaintiff never even obtained a declaration from Okun. Thus, the assertion that Okun was the basis for any unproven allegation of the Second Amended Complaint (or Amended Complaint) is unsupportable.  Had Plaintiff truly had that evidence, it would have memorialized and produced it in opposition to the motion for summary judgment.

Defendants had to move to compel to obtain answers to interrogatories about the basis for the allegations in the Second Amended Complaint, which took five and a half months from service.  *See* D.E. 217. The interrogatory answers were finally completed in January 2015.  D.E. 393-3.  These were replete with misstatements and ultimately did not provide support for the allegations.  An appropriate, professional  investigation by Plaintiff and its counsel of materials readily available to them would have resulted in Kaplan and Silverman not being named as parties to or being dropped from this suit.

Cordell was a party to *Hunter v. Citibank*, in the Northern District of California.  It took depositions in that action and had access to discovery.  The Ed Okun trial transcripts were of record on line in the Eastern District of Virginia by late of 2009, including Steve Silverman's testimony on behalf of the government.  The SVLG trial transcripts were available on line as well.  Cordell did not avail itself of any of this material to check its facts as to the amount Okun owed the QIs, the lack of any role of Silverman and Kaplan in the loan at issue, the lies Okun told to one lawyer after another, and the advice Okun was given and agreed he would comply with.

Attached hereto are the Amended Complaint (Ex. 1) and  Second Amended Complaint (Ex. 2), highlighted to indicate the multiple assertions that are material and were not supported by documents or witnesses with knowledge. Plaintiff's Amended Complaint lacked a reasonable basis when made, and its allegations were expanded and advocated in the Second Amended Complaint, which also lacked a reasonable basis.  Plaintiff's investigation was wholly inadequate and evidenced a reckless disregard for their obligations.   As a result, Defendants, who were uninsured, were forced to defend themselves at great personal expense.  Now that it is clear there was no basis for the claims, they are entitled to sanctions pursuant to Rule 11 and § 1927, as well as the Court's inherent authority.

### *Multiplicity of Proceedings in Bad Faith*

From the start of the case, Defendants attempted to eliminate issues and discover the basis for the claims against them.  Shortly after the remand, in June 2014, Defendant Silverman sent interrogatories to Plaintiff asking for the basis of the allegations in the Second Amended Complaint.[20]   Plaintiff claimed that a number of witnesses would testify in support of the allegations.[21]   Plaintiff also claimed that certain documents supported the claims.  At the end of the day, the overwhelming majority of the material and relevant assertions were not supported by the witnesses cited or the documents identified.   32 deposition sessions occurred with fact witnesses.  They did not support Cordell's allegations that that Kaplan or Silverman knew that Okun was using a false financial statement, that they advised him to borrow any amount from Cordell, that they knew he did not own the assets on his financial statement, or that they knew customers were threatening claims before the loan was closed.  The witnesses did not support the claims that the financial statements misstated Okun's liabilities or ownership.  They did not support the claim that Cordell was defrauded.

---

[20] Defendant Silverman had to move to compel responses, D.E. 217. Responses to the June 2014 interrogatories were finally received in January 2015. They were non-responsive and repetitive, but at that point Defendants moved on to the deposition of Cordell, which also required much motion practice and was unsatisfactory.  It should be noted that the amount of time required to prepare for deposition was substantial given the interrogatory answers, the length of the Second Amended Complaint, and the amount of material Defendants' files contained.

[21] Of course misrepresentations in discovery are sanctionable.  *Steed v. Everhome Mortgage Co*, 308 Fed.Appx. 364 (11th Cir. 2009).

Cordell listed or produced several thousand pages of documents as those that supported the allegations. The thousands of pages of documents were printed for review, and they ***did not*** support the claims. The Interrogatory Answers are attached hereto as Exhibit 3, with the material statements that were false or unsupported by evidence highlighted. As the Court will note, there are too many such assertions to address each one. Most of the issues are addressed in D.E. 670, the compilation of Defendants' Statement of Material Facts, Plaintiff's responses, and the analysis of whether the response was supported by the cited materials.

The next effort to learn the basis for the claims and bring to Cordell and its counsel's attention that there was not an adequate basis was by Rule 30(b)(6) deposition. Robin Rodriguez, Cordell's representative, was set for deposition. He was utterly unprepared and was required to return. *See* D.E. 392, Order at 455. When he did return, he fantasized answers to support Cordell's assertions. When asked when a meeting he claimed occurred took place in Miami,[22] at Mr. Gilbert's instruction, he dwelt on a " .1" time entry on a date that the time records showed Abbott and Kaplan were in New York for meetings. *See* 549-1 at Deposition page 565-70. He fabricated a theory that Silverman arranged for a "secure wipe" of data that Penta had obtained from Okun. *See* D.E. 598 at 1-3. He also fantasized that Silverman had ongoing daily access to Okun's financial records and transactions. *Id.* at 3-5. These were a desperate attempt to keep the claims against Silverman alive. Rodriguez also insisted, falsely, that either he or his counsel was present for loan closings in December 2006. D.E. 393-1 at 146-53 (insisting that financial statement was physically delivered at that closing). He later admitted that this was not so.[23] D.E. 549-1 at 376. This, among many other claims, demonstrated a cavalier disregard of the requirement for truth when making statements under oath.

---

[22] Which, according to interrogatory answers covered (i) the general structure of Edward Okun's businesses; (ii) a description of the assets held by Okun and the businesses he owned; (iii) Okun's desire to borrow funds from Cordell Consultant, Inc.. Ex. 3 at 2. All in ".1" or six minutes, when two of the lawyers were not in town.

[23] During this third session of deposition, Mr. Gilbert interrupted, coached, took his client out of the room while questions were pending, read into the record, prompted additional remarks, and generally interfered with the questioning. *See* D.E. 548 and 549-1 (marked transcript of third session). Mr. Gilbert's interruptions, coaching and testimony are marked in yellow in 549-1. His behavior was objectively unreasonable for a lawyer during a deposition. The Magistrate Judge denied discovery sanctions in connection with this conduct, but did not look at it as a pattern of vexatious litigation practices. *See* D.E. 618.

In the Second Amended Complaint and in a declaration filed in October 2014, Rodriguez insisted that he was given a financial statement by Defendants at a February closing. *See* D.E. 263-1 at 2-3 and D.E. 97 ¶ 126. In his deposition, he testified that he was not sure if he went to a closing for that loan. D.E. 393-1 at 102-03. He later had to testify that he did not meet with Okun and counsel for a closing then. D.E. 594-1 Deposition page 584. He also learned that his own staff sent him the February financial statement, by forwarding the November 27, 2006 email and financial statement again. *See* D.E. 263-2, 3.

In responding to interrogatories, Plaintiff insisted that lawyers at the former Ruden McCloskey firm would testify about communications with Silverman and Kaplan. Ex. 3 at 3. That was false. *See* D.E. 376. Plaintiff claimed that Abbot and Okun would testify that Kaplan was involved in the discussions of whether to provide financial statements to Dashiell. Ex. 3 at 6.[24] That was false. Plaintiff claimed that Kaplan and Silverman were involved in the negotiations to acquire Ms. Dashiell's company. That was false.

There were two particularly unreasonable issues Cordell created with respect to Steve Silverman – besides the fabricated secure wipe and access to daily transactions. Cordell insisted that although Silverman did not receive a copy of the Dashiell email and no one testified that they spoke to him about it, he still either received it or was told of it. *See* Ex. 4 and 5. Second, Cordell insisted that Silverman received the conflict check on the April 20, 2007 loan, even though the metadata and the distribution list does not include him. *Id*. Even on demonstrable falsity, Cordell would not cede these points, and they had to be addressed time and again. This stubborn intransigence is not acceptable behavior for experienced lawyers (or anyone).

As a result of the false statements in the interrogatory answers, Defendants scheduled and took or prepared thoroughly to defend depositions in the belief that witnesses had relevant information to offer. Soble, Stankee, Dashiell, Schacter, and Chapman did not support the assertions relating to Silverman or Kaplan. Pajonas, Perkins, Hoctor, and Polishen also did not support claims about the false financial statement and other communications attributed to them.

---

[24] Plaintiff's interrogatory answers stated that the following persons have knowledge pertaining to Kaplan and Silverman's knowledge of financial statements: (i) Edward Okun; (iv) Bergman; (viii) Janet Dashiell; (ix) James Chapman, Esq., Silicon Valley Law Group; (x) closing attorneys and paralegals employed by Rude McCloskey; (xiii) other former employees of Kluger Peretz Kaplan and Berlin; (ix) Todd Pajonas.all had knowledge of Kaplan and Silverman's knowledge of the financial statements. Ex. 3 at 8. This was false.

In responding to the Motion for Summary Judgment, Plaintiff made many statements about the contents of documents and witness testimony that were untrue.  In addition, Plaintiff filed a response to the Motion to Limit Unfounded Speculation which contained further unfounded statements.    In response to each, Defendants' counsel compiled the misstatements, relevant documents,  and analysis  of the discrepancies at D.E. 670 and at D.E. 714.   The text of D.E. 670, with the misstatements highlighted, is attached hereto as Exhibit 4, and the text of D.E. 714 with the misstatements highlighted is attached as Exhibit 5.   There are far too many misstatements of documents and testimony for this to be anything but bad faith.

### *Initial Vexatious Proceedings*

 This case began with a misrepresentation in the civil cover sheet, which resulted in venue in West Palm Beach and increased the costs of defense. First Plaintiff asserted that its county of residence was  Palm Beach, D.E. 1, although it had never had an office there.  Plaintiff also claimed that the claimed cause of action arose in Palm Beach. When it dropped the residency assertion, because that would have defeated diversity jurisdiction, Cordell's counsel still maintained that the cause of action arose in Palm Beach County.  D.E 4.  Cordell knew that every negotiation over the loan took place in Miami-Dade.   The loan closing took place in Miami-Dade.  No meeting, call, collateral, signature, or anything took place in or related to Palm Beach County. Cordell finally admitted in deposition in February 2015 that Palm Beach County had no connection whatsoever to the causes of action. D.E. 393-1 at deposition pages 29-30. It can only be assumed that the docketing in Palm Beach was for the convenience of Plaintiff's counsel and made without any concern for the effect on Defendants or accuracy.[25]

As a result of the misrepresentation, all hearings, the depositions of Messrs. Kaplan and Abbott, and Plaintiff's expert depositions took place in Palm Beach, increasing costs for Defendants, by adding more than three hours of counsel travel time to each appearance.  When the misrepresentation was called to Mr. Gilbert's attention, he refused to hold Defendants' depositions in Miami. He described the twice filed civil cover sheet as a minor error on which defendants sought to capitalize.  He also made it clear that he was requiring Abbey Kaplan to

---

[25] By the time Rodriguez; deposition was taken and it was confirmed that nothing having to do with the loan took place in Palm Beach and that Cordell did not have an office there, the case had been pending in Palm Beach for several years.

travel to Palm Beach in retaliation for Robin Rodriguez having to be deposed in Miami on a weekend, although he could offer no weekdays. Mr. Rodriguez lives in Mexico.

### *Obfuscation of Dates*

In order to keep its claims alive and keep Kaplan and Silverman in the case, Cordell repeatedly obscured the dates on which events occurred and the order in which they occurred.

The Complaint, Amended Complaint and Second Amended Complaint all refer to the loan as an **April 27, 2007** loan.  Complaint ¶ 25, 30.  D.E. 1;  Amended Complaint  Ft. 5, ¶ 19, 35, 50. [D.E. 27]; Second Amended Complaint  Ft. 12; ¶ 96, 106, 127 [D.E. 97].  In fact the loan was **signed, closed, and disbursed on April 20, 2007**, and Rodriguez was in attendance. This one week date difference mattered, because Plaintiff also alleged that Defendants knew that there was a threat of litigation if QI closings did not occur.  D.E. 27 at ¶ 47 (April 25, 2007 threat). The Second Amended Complaint refers to a number of activities on April 26, 2007 that would indicate that there were exchanger issues and that Okun was under investigation. Second Amended Complaint ¶ 90-92; *See also id*. ¶ 52-54 (events after April 20 attributed to before April 20). Plaintiff never came forward with a threat from an exchanger that preceded the April 20, 2007 loan closing.

Plaintiff's date problems persisted in other ways that would not have occurred with an actual pre-filing investigation.  Plaintiff claimed to have received a February financial statement *from Defendants at a closing*.  D.E. 27, ¶ 34.  D.E. 97 ¶ 126.  In October 2014, Plaintiff was finally able to produce the original email in native format from its own computer, which showed that *its own staff* recirculated the November 27, 2006 financial statement in February 2007. Plaintiff claimed to have attended a closing in person in February.  There was no in person closing in February.  Documents were signed in advance and Rodriguez went to KPKB to pick them up from someone other than Defendants.  There is no evidence or indication that any financial statement was provided.

In responses to interrogatories, Plaintiff falsely claimed that Steve Silverman communicated with Cordell about collateral for the loan on **"Mach 23, 2007**." (sic) Amended Interrogatory Response at 2.  Although this was (much) later explained as a typo, in the interrogatory responses, Plaintiff twice asserted that Silverman provided or agreed to provide information for the April 20th loan: "Plaintiff did not discuss the $7,000,000.00 loan directly with Kaplan and Silverman, except for Silverman sending Plaintiff documents related to loan collateral."

*Id.* at 10.  "Both an opinion letter signed by borrower's counsel and a financial statement of the borrower were documents required by the lender. In addition, other loan documents were required. Silverman agreed to Okun's request for Silverman to provide one such document, regarding Columbus Works, directly to Plaintiff."  *Id.* at 19.  The email was actually dated **May 20, 2007 – a month after the loan** -- and related to property that was not collateral for the April 20, 2007 loan.  In fact, Silverman never communicated with Cordell as Cordell claims – he advised Okun that he could not locate the information, and Okun forwarded his email to Cordell.   Plaintiff's and its counsel's reckless or intentional inability to keep dates straight concerning its claimed pre-transaction communications demonstrated unacceptable conduct in litigation.[26]

The most egregious date obfuscation engaged in by Plaintiff was the persistent claim that because Defendants had in house counsel Eric Perkins' November 7, 2006 memo, they knew the financial statement relied on by Cordell was false.  Cordell refuses to acknowledge that the financial statement it received and relied on was created after the Perkins memo and contains the exact information the Perkins memo advised should be included.   On November 7, 2006, Perkins wrote:

> . . .the current outstanding amount could be as low as $80 million and as high as $135 million.

Perkins, Nov. 7 at 1.  The financial statement received by Cordell on November 27, 2006 and by Defendants on December 1, 2006, discloses $134 million outstanding. ¶ 31 of the Second Amended Complaint alleges that the Perkins memo reveals the true extent of the borrowing, and Defendants agree that it does.

Perkins also stated:

> Based upon information made available to date--the prior conduct surrounding the Loans: . . .(iv) could potentially violate the terms of one or more existing loans to which IPofA, Ed Okun, and/or affiliates are parties; and (v) these Loans could render outstanding financial statements provided to lenders of IPofA or Ed Okun materially inaccurate.

Nov. 7, 2006 memo at 3.

---

[26] Silverman was present at a meeting with Rodriguez on May 19 or 20th, a month after the loan closed.  At that meeting Howard Berlin, the bankruptcy lawyer advising Okun, spoke with Cordell's Rodriguez about the need for significant loan to refinance Okun's debts and repay all the QI obligations.

> All financial information regarding IPofA, its affiliates, and Ed Okun that is provided (or already has been) to third parties regarding proposed debt or equity financing transactions to which iPofA (or its subsidiaries) is or will be a party should be reviewed and approved by the Chief Financial Officer prior to distribution. Financial disclosures previously provided to third party lenders should be reviewed for accuracy by the Chief Financial Officer and, if deemed necessary by in-house counsel, updated financial disclosures should be delivered to such third party lenders as soon as possible.

*Id* at 4.

On November 27, 2006, Cordell received a new financial statement, which included the QI liability. Defendants received it on December 1.   Thus, every time Cordell alleged or argued that the November 7th memo put Defendants on notice that a false financial statement was used in connection with Cordell loans, Cordell and its counsel were dishonest.   D.E. 97 ¶ 30. Furthermore, the Perkins memo clearly and unequivocally supported the dollar amount in the financial statement shown to Defendants and the financial statement was prepared and sent after the Perkins memo and appears to comply with it.   An examination of the Perkins memo, the financial statement Cordell eventually conceded that it had and relied on, and the dates would have eliminated this allegation.   That however, would have required Plaintiff to abandon its claims, so it simply ignored the obvious disingenuousness of its argument.

### *Obfuscation of Dollars*

Plaintiff's case depended on the financial statement it was given being false.   Plaintiff alleged that it "vastly" understated Okun's liabilities and that he had taken more than $150,000,000 from the QIs.   Cordell based its claims that Okun took and owed more than $134 million on a recklessly indifferent reading of documents.   Cordell insisted that the total due from the QIs to the customers was the same as the total due from Okun to the QIs.   Every memo from Pajonas, Polishen and Perkins notes the total due to QIs and total cash on hand, leaving a lesser amount due from Okun.   Penta performed the same analysis.   Kaplan reviewed notes and reached a total of more than $150 million, but specifically stated that he did not know if any had been repaid or replaced.   Not one person said that the total Okun owed was more than $134 million in November or April; except Cordell, and it had no basis to do so.   Cordell   and   its   counsel refused to accept that their argument was logically flawed and not supported by any objective or admissible evidence.   As noted above, Cordell's investigation on this issue was inadequate and based on an unwillingness to review the issues properly.

In addition to failing to recognize the baselessness of the argument on numbers, Plaintiff's counsel also refused to conduct appropriate legal research into whether a failure to advise of legal consequences was actionable.  As demonstrated in the motion for summary judgment and applied in the order on summary judgment, Cordell's claims that the financial statement should have characterized the transfers from the 1031 Tax Group differently, that it should have revealed potential trebling, and that it should have noted potential claims by the QI and the Government for constructive trust or forfeiture all fail as a matter of law.  Not one of those issues was recognized until after bankruptcy was filed and there is no fraud in failing to disclose legal consequences of disclosed facts.  Cordell knew Okun used money that his companies received subject to contracts for segregated escrow accounts and bought property. Cordell knew he could not pay the QI money back at the time of the April 2007 loan.  Cordell knew Okun was concerned about liability of five to six times the amount he could not pay. Cordell never asked if what Okun was doing was acceptable, much less legal.  And Cordell's counsel would have known all of these facts had it read the Zobrist files, the marketing material Cordell prepared in connection with the May 2006 loan, and Rodriguez and Bloemers' prior depositions before filing suit.

Plaintiff also glossed over the difference between historic wrongdoing and future wrongdoing.  There was unrebutted testimony that Okun was told and agreed that he would stop taking QI money on December 14, 2006.  *See* D.E. 714 at I.  Plaintiff had access to Silverman's 2009 testimony at Okun's criminal trial and the Okun trial court findings which established this. **Indeed, Plaintiff did not dispute that the advice was given on December 14.  Ex. 4 ¶ 69.** Nonetheless, Plaintiff consistently argued that the receipt of the Perkins memos, the McGuire Wood email and Pajonas communications in November 2006 required KPKB to withdraw because their services were being used in ongoing fraud or put them on notice that he was engaged in fraud in April 2007.  This also was dishonest.

### *False Representations of Document Contents*

Cordell repeatedly misrepresented the contents of documents. Among the more egregious was the statement that

the "inaccuracies" of the PFS Perkins  referred to included Okun's "prior conduct surrounding the (QI) Loans," such as the fact that the  PFS failed to reveal Okun's assets were compromised by his unlawful acts.

Plaintiff's Response to Defendants' Statement of Material Facts.   ¶ 14.   A review of that document shows that there is no reference whatsoever to a compromise of the assets.   According to Plaintiff:

> Okun's CPA, Field, explained to Cordell that Okun was the sole owner of the companies that held title to the assets so that Okun could list those assets on his Personal Financial Statement. (Ex. 21). The PFS failed to disclose that title to those assets was impaired because they were acquired with stolen QI funds.  Defendants already knew this. (Ex. 4; 9; 19).

*Id*. ¶ 27 (the document cited to as 9 is the Perkins memo) (Ex. 19 post-dates the loan). Perkins never mentions any compromise of Okun's assets.  Plaintiff attempted to mislead the Court by indicating that this statement was made in Perkins' memo. And Plaintiff again obfuscated dates by treating a document generated after the loan as proof that Defendants knew of an issue before the loan.

### *Experts without a Basis*[27]

Plaintiff submitted an expert report for Mr. Smith in October 2014, before obtaining any discovery from Defendants and before taking their depositions.  Plaintiff submitted an expert report from Ms. Lord in April 2015 without her having done the review of materials and without depositions from Defendants.  Then Plaintiff tried to postpone Ms. Lord's deposition to give her time to form a basis for her opinion, which is backwards to the usual way of doing it.  It appears that Plaintiff did not think the experts needed a basis for the opinions they were to give before it provided them.  Defendants were put to the expense of taking their depositions to learn that they did not have admissible opinions or had not complied with the Rules of Civil Procedure.  *See* D.E. 597, 674, 709 (Smith); 521, 569, 572, 585 (order); 657, 699, 717 (Lord). Plaintiff's complete inability to recognize the requirements for expert reports and comply with the deadlines caused significant wasted cost, especially as Ms. Lord's testimony was stricken after

---

[27] Presentation of expert reports when the experts had not yet reviewed materials demonstrates that Plaintiff's counsel was either utterly unfamiliar with Rule 26 or utterly indifferent to it.  Similarly, counsel's repeated complaints that he could not respond to discovery about the bases of his client's claims until he obtained Defendants' files or third party discovery demonstrates a failure to comply with Rule 11, which requires a basis for claims at the time they are pleaded.  The failure to prepare Mr. Rodriguez to testify as a Rule 30(b)(6) deponent also demonstrates a lack of competence or concern for compliance with federal court requirements.

deposition.[28]   Plaintiff then tried to return Ms. Lord as a rebuttal witness, requiring further briefing on the impropriety of its behavior and its failure to recognize deadlines.

### Repeated Unfounded Claims of Kaplan and Silverman Involvement

In response to Defendants' Rule 11 motion, Cordell's Robin Rodriguez signed a declaration insisting that he had telephone and email communications on which Abbey Kaplan and Steve Silverman were included and that related to the loans Cordell made to Okun.  136-1 at 2, ¶ 4-5.  Cordell could not produce such emails and motion practice was required to obtain that admission.  D.E. 143, 145, 146.    Nonetheless, Cordell continued to insist that there had been emails.  *See* Responses to Interrogatories D.E. 393-3, response 1-2.  In November 2014, Cordell finally made its production available – the same production it had made in *Hunter v. Citibank* and *In re 1031 Tax Group* many years earlier.    There were no such emails and no emails relating to calls involving these two defendants. As late as June 2015, n response to requests for admission, Plaintiff refused to concede that there were no such communications.  *See* Ex. 6, 7.

Cordell failed to review and produce records from the Zobrist firm, its Virginia counsel that represented it in connection with the April 2007 loan.  Defense counsel was required to subpoena them, and Mr. Gilbert complained bitterly about the process.  When finally produced in May 2015, the emails from that firm revealed that neither Abbey Kaplan nor Steve Silverman was copied on a single one of the emails.  Counsel for Kaplan had advised counsel for Cordell that it was likely that Mr. Rodriguez was recalling a Rob Kaplan, who represented Okun in Virginia, and who worked on the loan transaction.  Cordell would still not back off the claim that there were email communications with Abbey Kaplan.

As of the time of the Summary Judgment Motion, no emails that included both Mr. Rodriguez and Abbey Kaplan had ever been found.  No emails sharing drafts of the loan documents with Messrs. Kaplan and Silverman existed.  However, by that time, Defendants had had to engage in extra searches of their 2006-2007 emails, then review the results and make additional productions, which should not have been necessary, as that work had already been done in connection with KPKB's 2008-09 productions to the trustee in *In re 1031 Tax Group.*

---

[28]   The day before Ms. Lord's deposition, Plaintiff provided more than 3000 pages of documents, almost all of which were not identified in her report.  Defendants had to have them printed and delivered on an emergency basis and have a paralegal attend the deposition to assist in working with them.

The ESI retrieval and production costs, as well as counsel's time to review the documents, should be reimbursed.

### *Basis of Claims Proceeding After Remand*

When it remanded this case for further proceedings, the Eleventh Circuit found persuasive that

> More significantly, **it is alleged** that these **defendants knew that the financial statement** used to obtain the April 2007 loan –upon which they all intended plaintiff to rely in making the loan – **was false**. *Cordell v. Abbott* at 3 (emphasis added).
>
> **It is also alleged** that **all four individual defendants knew** that the financial statement used to obtain the April 2007 loan **falsely listed such properties as the client's own** and *vastly* **understated his liabilities**. *Cordell v. Abbott* at 4 (emphasis added) .
>
> **[I]t is alleged** that **the two litigation lawyers specifically advised the client to borrow the $7 million at issue from plaintiff.** This advice was given notwithstanding that the two litigation lawyers allegedly had full knowledge of the client's Ponzi scheme and his intent to use the proceeds to continue and conceal the scheme. **More significantly, this advice was given notwithstanding** the allegations that **the two litigation lawyers knew** that the client would obtain the loan based upon a **false financial statement**. *Cordell v. Abbott,* at 5-6 (emphasis added).

**Not one** of these three statements on which the Eleventh Circuit relied in remanding the case for further proceedings had a basis when it was pleaded.  These allegations were made in the Amended Complaint, signed by Mr. Yarnell, and were expanded upon and advocated in the Second Amended Complaint, signed by Mr. Gilbert.  Mr. Gilbert advocated for these claims until the entry of summary judgment.  Mr. Yarnell defended them against a motion to dismiss.   The Rule 11 motion addressed the Amended Complaint, but it covers the Second Amended Complaint, because of the continued advocacy of the unfounded facts.  To the extent that anything is not covered by Rule 11, it is covered by 28 U.S.C § 1927 as vexatious.

The amended complaint [D.E. 27] also included false allegations that Silverman and Kaplan directed and supervised the loan transaction and reviewed and commented on the loan documents.  Amended Complaint D.E. 27 at ¶ ¶ 13, 32, 63.   It included the false allegation that Defendants advised Okun to borrow from Cordell.   ¶ 28. It falsely claimed that Defendants delivered a financial statement in connection with a February loan.  ¶ 34, 35.  (D.E. 263-3, and - 4 demonstrates that Cordell internally circulated the November financial statement in connection with the February loan.)   In general, Cordell asserted that the defendants knew of the fraud

against Cordell, knew that Okun owed at least $150 million, that his assets were subject to third party claims, and that they assisted in making false misrepresentations in connection with the April 2007 loan.  D.E. 27 ¶ ¶ 14, 16, 17, 20, 22, 28, 34, 35, 53, 63, 69.  As the Court has found, Cordell did not present any admissible evidence to sustain these claims against Kaplan and Silverman.  Nonetheless, Cordell, through Mr. Gilbert and others under his supervision made those allegations,  and continued to advocate for them from the filing of the Complaint through the hearing on the motion for summary judgment and in negotiation of the pretrial stipulation.

Near the close of discovery, in response to requests for admission, Cordell again made bad faith responses which had no basis in testimony, documents, or reality.

Defendant asked Cordell to admit:

> 55.  Abbey Kaplan did not participate in the preparation of the Opinion Letter attached hereto as Exhibit D.

Cordell responded:

> 55.   Denied. The opinion letter in question was the joint responsibility of defendants Kaplan, Silverman and Abbott.

There was never any basis for the assertion of participation or responsibility by Silverman or Kaplan.  However, Plaintiff would not admit simple facts that it had no evidence to contest.  It simply wanted to stick to its theories in the face of every request to discard issues.  A compilation of the requests for admission and responses, highlighting of the bad faith responses is attached hereto as Exhibit 6 (Kaplan) and 7 (Silverman).[29]

In the amended Complaint and again in the Second Amended Complaint, Plaintiff asserted:

> 28. The defendants actually advised Okun to borrow funds from Cordell so that Okun could continue his Ponzi scheme and avoid detection of his activities by police agencies. [D.E. 27]
> 125. The defendants Silverman and Kaplan actually advised Okun to borrow funds from Cordell so that Okun could continue his Ponzi scheme and avoid detection of his activities by police agencies. [D.E. 97]

---

[29] Cordell's responses to the requests for admission also failed to comply with the Rules of Civil Procedure.  The refusal to admit or deny because the party lacks personal knowledge are forbidden.  The party must state what efforts he has made. Refusing to admit Ms. Bloemer's receipt of documents, when the documents were sent with emails and Ms. Bloemers was available for consultation was unacceptable.

In responding to the summary judgment motion, Plaintiff admitted the falsity of these allegations by admitting that neither Silverman nor Kaplan spoke to Okun or his staff about the Cordell loan. D.E. 670 at 56, Statement of Undisputed Fact ¶ 114. Therefore, it is obvious that they did not advise Okun to borrow from Cordell. Nonetheless, after the Rule 11 motion was filed, Cordell and its counsel advocated for this position.

## Conclusion

> If warranted for effective deterrence, an appropriate sanction may include "an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses" incurred as a result of the Rule 11 violation. Fed.R.Civ.P. 11(c)(2). The goal of Rule 11 sanctions is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers."

*Massengale v. Ray*, 267 F.3d 1298, 1301-02 (11th Cir. 2001)(citations omitted). This case was replete with costly, meritless maneuvers. The claims were frivolous, in light of the information Cordell had before it made the loan and in light of the lack of investigation about Cordell's knowledge and Defendants' relationship to the loan. The proceedings following the Amended Complaint were based on the same claims and theories and Plaintiff and its counsel advocated for them, even as a review of the documents and testimony should have caused them to withdraw the allegations. Plaintiff's counsel vexatiously multiplied the proceedings through allowing documents to be misrepresented, absurd positions to be taken, and inaccurate statements of fact to be made. Counsel's utter unwillingness to comply with the Rules of Civil Procedure increased costs and delay.

Three versions of Plaintiff's complaint and all discovery responses were founded on a claim that Cordell was defrauded by Okun when it made the loan. Cordell consistently claimed that the liability to the QIs was vastly understated. Cordell consistently claimed that Defendants knew Okun did not own the assets that were listed on his financial statement. At the end of the day, Cordell did not present admissible competent evidence to support these claims.

Three versions of Plaintiff's complaint, all discovery, expert reports, and motion practice insisted that Kaplan and Silverman knew of, participated in, directed, or supervised the presentation of a false financial statement, false borrower's affidavit and false opinion letter, violating ethics rules and constituting tortious behavior. At the end of the day, Cordell did not present admissible competent evidence to support these claims.

Cordell claimed Silverman and Kaplan received drafts of loan documents and participated in calls relating to the negotiation of the loan.   Again, Cordell could not present evidence to support these claims.

Cordell claimed that Silverman and Kaplan conspired with and aided and abetted Okun to defraud Cordell.  Cordell could not establish that it was defrauded or that Kaplan or Silverman had anything to do with the alleged fraud.

In defending themselves from allegations of intentional wrongdoing, which threatened their Bar licenses and livelihood, to say nothing of a demand for repayment of a $7 million loan with 8 years of interest, Defendants were forced to spend **more than $1.8 million**.  Defendants took a limited number of depositions, did not travel to most of the out of town depositions, and tried from the first day the complaint was served to educate Plaintiff's counsel about the incorrect allegations.  Defendants are entitled to have Cordell and its counsel repay most, if not all, of their costs and fees.  There is no better deterrence to the frivolous claims and bad faith practices in this case than requiring counsel and his client to pay for the harm they caused.   As a hard money lender (i.e. a lender of last resort), Cordell is a repeat litigant.  Cordell's counsel are significantly experienced lawyers.  They need to be deterred from litigating this way in the future.

## Certificate of Good Faith Efforts to Resolve Issues

The undersigned certifies that she made a good faith effort to resolve or narrow the issues presented in this motion by agreement, beginning on May 20, 2011, with her first call to Plaintiff's counsel, continuing with the efforts recited in the original Rule 11 motion, and with every motion thereafter.  The final effort to resolve the issues presented by this motion was made on November 10, 2015, by letter asking if Plaintiff's counsel would discuss resolution.  No response was received.  As several years' efforts were unsuccessful, the undersigned did not continue to make futile efforts.

Respectfully submitted on November 23, 2015,

s/ Deborah S. Corbishley                          s/ Edward R. Shohat
Richard H. Critchlow, Esq. (FL Bar #155227)       Edward R. Shohat, Esq. (FL Bar #152634)
Deborah S. Corbishley, Esq. (FL Bar #588229)      JONES WALKER
KENNY NACHWALTER, P.A.                             201 South Biscayne Blvd., Suite 2600
201 South Biscayne Blvd., Suite 1100              Miami, Florida 33131
Miami, Florida 33131                              Telephone 305.679.5700
Telephone: (305) 373-1000                         Facsimile 305.679.5710
Facsimile: (305) 372-1861                         eshohat@joneswalker.com
rcritchlow@knpa.com
dcorbishley@knpa.com                              ***Counsel for Defendant Steve I. Silverman***
***Counsel for Defendant Abbey L. Kaplan***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on that the original Rule 11 motion at D.E. 96 was served on Messrs. Gilbert and Yarnell at their prior address and was then served via CM/ECF on August 2, 2012. The original §1927 motion was served on Messrs. Gilbert and Yarnell on June 14, 2013. I also certify that on November 23, 2015, I electronically filed the foregoing and its exhibits with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants. Because Mr. Yarnell is no longer counsel of record, a paper copy of the motion and attachments is being served on him by United States mail.

/s Deborah S. Corbishley
Deborah S. Corbishley

*Cordell Consultant, Inc. Money Purchase Plan and Trust, v. Eliot C. Abbott, et al*

**SERVICE LIST**

Irwin R. Gilbert, Esq. (FL Bar #099473)
Sayed M. Zonaid, Esq. (FL Bar #113442)
KELLEY KRONENBERG
1475 Centrepark Blvd., Suite 275
West Palm Beach, Florida 33401
Telephone: 561-684-5956
IGilbert@kelleykronenberg.com
Irgeservice@kelleykronenberg.com

Bryan J. Yarnell, Esq. (FL Bar #088900)
YARNELL LAW OFFICES
11000 Prosperity Farms Road,
Suite 205
Palm Beach Gardens, FL 33410
Telephone: (561) 622-1252
Facsimile: (561) 799-1904
bryanyarnell@gmail.com
***Counsel for Plaintiff***

Ramon Rasco, Esq. (FL Bar #0617334)
PODHURST ORSECK, P.A.
City National Bank Building – 8th Floor
25 West Flagler Street
Miami, Florida 33130
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
rrasco@podhurst.com
***Counsel for Defendant, Eliot C. Abbott***

Howard D. DuBosar, Esq. (FL Bar #729108)
THE DUBOSAR LAW GROUP, P.A.
1800 N. Military Trail, Suite 470
Boca Raton, Florida 33436
Telephone: (561) 544-8980
Facsimile: (561) 544-8988
hdubosar@dubosarnavon.com
***Counsel for Defendant, Kluger, Peretz,
Kaplan & Berlin, P.L.***

Richard H. Critchlow, Esq. (FL Bar #155227)
Deborah S. Corbishley, Esq. (FL Bar #588229)
KENNY NACHWALTER, P.A.
201 South Biscayne Blvd., Suite 1100
Miami, Florida 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
rcritchlow@knpa.com
dcorbishley@knpa.com
***Counsel for Defendant Abbey L. Kaplan***

Marilyn G. Kohn, Esq.
KLUGER, KAPLAN, ABBEY KAPLAN,
KATZEN & LEVINE, P.L.
201 S. Biscayne Blvd., 17th Floor
Miami, Florida 33131
Phone: (305) 379-9000
Facsimile: (305) 379-3428
mkohn@klugerkaplan.com
***Counsel for Defendants, Abbey L.
Kaplan and Steve I. Abbey Kaplan***

Edward R. Shohat, Esq.
JONES WALKER
201 South Biscayne Blvd., Suite 2600
Miami, Florida 33131
Telephone 305.679.5700
Facsimile 305.679.5710
eshohat@joneswalker.com
***Counsel for Defendant Steve I. SILVERMAN***